1 Kevin M. Flowers (admitted *pro hac vice*)
John R. Labbé (admitted *pro hac vice*)
2 MARSHALL, GERSTEIN & BORUN LLP
233 South Wacker Drive
3 6300 Willis Tower
Chicago, Illinois 60606-6357
4 (312) 474-6300 (telephone)
(312) 474-0448 (facsimile)
5 E-Mail: kflowers@marshallip.com
E-Mail: jlabbe@marshallip.com
6
Gina A. Bibby
7 FOLEY & LARDNER LLP
975 Page Mill Road
8 Palo Alto, CA 94304
(650) 856-3700
9 (650) 856-3710 (facsimile)
E-Mail: gbibby@foley.com
10
Attorneys for Plaintiffs
11 ILLUMINA, INC. and SOLEXA, INC.

12

13 **UNITED STATES DISTRICT COURT**

14 **NORTHERN DISTRICT OF CALIFORNIA**

15 **SAN FRANCISCO DIVISION**

16

17 ILLUMINA, INC. and SOLEXA, INC.,        ) Case No. 3:10-cv-05542 EDL
                                          )
18             Plaintiffs,                 )
                                          ) **PLAINTIFFS' OPENING CLAIM**
19     v.                                  ) **CONSTRUCTION BRIEF**
                                          )
20                                         ) Date:    December 9, 2011
   COMPLETE GENOMICS, INC.               ) Time:    2:30 P.M.
21                                         ) Judge:   Honorable Elizabeth D. Laporte
             Defendant-Counterclaimant.    ) Place:   Courtroom E, 15th Floor
22                                         )
                                          )
23                                         )

24

25

26

27

28

1

**TABLE OF CONTENTS**

2  TABLE OF AUTHORITIES ..................................................................................................... iii

3  LEGEND .................................................................................................................................... v

4  I.    INTRODUCTION ........................................................................................................... 1

5  II.   BACKGROUND FACTS ............................................................................................... 3

6        A.    Dr. Macevicz's invention ..................................................................................... 3

7        B.    Claim 1 of the '597 patent ................................................................................... 6

8        C.    The AB litigation and Judge Alsup's construction
               of the '597 claim terms ........................................................................................ 6

9
         D.    The reexamination initiated by AB ...................................................................... 7
10
         E.    The current dispute .............................................................................................. 8
11
   III.  ARGUMENT .................................................................................................................. 8
12
         A.    "initializing oligonucleotide" ('597 claims 1, 9, 10, 14-19) ............................... 8
13
               1.    Judge Alsup's construction, as proposed by Illumina, is consistent
14                   with the plain meaning of "initializing" and the context of claim l ........ 9

15             2.    CGI imports limitations from the specification into "initializing
                     oligonucleotide" to create a non-infringement argument ..................... 10
16
               3.    CGI's proposal also runs afoul of the doctrine of claim differentiation ........... 11
17
         B.    "extending an initializing oligonucleotide along the polynucleotide by
18             ligating an oligonucleotide probe thereto to form an extended duplex"
               ('597 claims 1, 9, 10, 14-19) ............................................................................ 11
19
               1.    Illumina's construction of the "extending" step is consistent with
20                   Judge Alsup's construction .................................................................... 12

21             2.    Illumina expressly disavowed claim scope regarding "extending..."
                     and "repeating…" in the reexamination of the '597 patent ................... 13
22
               3.    CGI's construction is inconsistent with its construction of step (c) ................. 15
23
               4.    CGI would construe step (a) to give back what Illumina was
24                   required to surrender in the reexamination ........................................... 16

25             5.    Illumina is not barred by collateral estoppel from relitigating the
                     construction of step (a), "extending…" ................................................. 17
26
         C.    "repeating steps (a) and (b) until the sequence of nucleotides is
27             determined" ('597 claims 1, 9, 10, 14-19)......................................................... 18

28             1.    Judge Alsup's construction of "repeating" as "conditional" was
                     narrowed during the reexamination .................................................... 19

2.  The specification supports Illumina's construction ............................. 20

3.  CGI's construction is inconsistent with its construction of step (a) ................. 22

D.  "oligonucleotide probe" ('597 claims 1, 9, 10, 14-19) ............................. 22

1.  CGI's proposed construction would exclude a preferred embodiment in the '597 patent that uses a probe that does *not* contain a label, which "is rarely, if ever, correct ............................. 22

2.  Illumina's unequivocal statement is at odds with CGI's construction ............. 23

E.  "binding region" ('597 claims 9 and 10) ............................. 24

1.  The specification does not restrict the binding region to be "known" ............. 24

2.  Claim differentiation creates a presumption that the binding region is not required to be a "known sequence" ............................. 25

F.  "target polynucleotide" ('597 claims 9 and 10) ............................. 25

1.  The claims do not require conjugation to a binding region ............................. 26

2.  The specification describes "a target polynucleotide" that is independent of "the binding region" ............................. 26

G.  "spectrally resolvable fluorescent signal" ('597 claims 14 and 15) ............................. 27

H.  "set" and "probe set" ('597 claims 2, 4, and 5) ............................. 27

I.  "annealing temperatures" ('597 claims 2, 4, and 5) ............................. 29

IV.  CONCLUSION ............................. 30

1

**TABLE OF AUTHORITIES**

2
*Cases:*                                                                       ***Page(s):***

3   *ACCO Brands, Inc. v. Micro Sec. Devices, Inc.,*
       346 F.3d 1075 (Fed. Cir. 2003) ................................................................2

4   *Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.,*
5      475 F.3d 1080 (9th Cir. 2007) ................................................................17

6   *Altiris v. Symantec Corp.,*
       318 F.3d 1363 (Fed. Cir. 2003) ....................................................25, 27

7   *Bicon, Inc. v. Straumann Co.,*
8      441 F.3d 945 (Fed. Cir. 2006) ................................................................27

9   *C.R. Bard, Inc. v. U.S. Surgical Corp.,*
       388 F.3d 858 (Fed. Cir. 2004) ................................................................17

10  *Chimie v. PPG Indus., Inc.,*
11     402 F.3d 1371 (Fed. Cir. 2005) ................................................................18

12  *Comark Communications, Inc. v. Harris Corp.,*
       156 F.3d 1182 (Fed. Cir.1998) ................................................................25

13  *Cordis Corp. v. Medtronic AVE, Inc.,*
14     339 F.3d 1352 (Fed. Cir. 2003) ................................................................26

15  *Decisioning.com, Inc. v. Federated Dept. Stores, Inc.,*
       527 F.3d 1300 (Fed. Cir. 2008) ................................................................18

16  *In re Trans Tex. Holdings Corp.,*
17     498 F.3d 1290 (Fed. Cir. 2007) ................................................................17

18  *Liebel-Flarsheim Co. v. Medrad, Inc.,*
       358 F.3d 898 (Fed. Cir. 2004) ................................................................11

19  *Moore U.S.A., Inc. v. Standard Register Co.,*
20     229 F.3d 1091 (Fed. Cir. 2000) ................................................................21

21  *MySpace, Inc. v. Graphon Corp.,*
       756 F.Supp.2d 1218 (N.D. Cal. 2010) ....................................................25, 27

22  *Nazomi Communications, Inc. v. ARM Holdings, PLC,*
23     403 F.3d 1364 (Fed. Cir. 2005) ................................................................20

24  *On Demand Mach. Corp. v. Ingram Indus., Inc.,*
       442 F.3d 1331 (Fed. Cir. 2006) ................................................................17

25  *Phillips v. AWH,*
26     415 F.3d 1303 (Fed. Cir. 2005) ........................................2, 11, 20, 30

27  *Power Integrations, Inc. v. Fairchild Semiconductor Int'l,*
       2009 WL 4928029 (D. Del. Dec. 18, 2009) ................................................18

28

*Retractable Techs., Inc. v. Becton, Dickinson and Co.*,
    653 F.3d 1296 (Fed. Cir. 2011) ..................................................................21

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
    775 F.2d 1107 (Fed. Cir. 1985) .......................................................... 10, 25

*Teleflex, Inc. v. Ficosa North Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002) ........................................................... 3, 18

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ............................................................ 17, 23

*z4 Techs., Inc. v. Microsoft Corp.*,
    507 F.3d 1340 (Fed. Cir. 2007) ...................................................................9

*ZMI Corp. v. Cardiac Resuscitator Corp.*,
    844 F.2d 1576 (Fed. Cir. 1988) .................................................................18

*Statutes:*

35 U.S.C. § 307 ...........................................................................................2

*Other Authorities:*

Dictionary of Bioscience (McGraw-Hill 1997)...................................................29

Dictionary of Genetics (5th Ed. Oxford Univ. Press, 1997) ...................................29

Merriam-Webster's Collegiate Dictionary (10th Ed. 1996) ...................................10

Oxford Dictionary of Current English
    (Rev. 2nd Ed. Oxford Univ. Press 1992, 1996)................................................28

1

**LEGEND**

2    The following citation conventions are used in this brief:

3    • D.I. # = Docket Item number

4    • '597 patent = U.S. Patent No. 6,306,597

5    • Reexamination certificate = U.S. Patent No. 6,306,597 Ex Parte Reexamination Certificate
6      Issued Under 35 U.S.C. § 307 on March 2, 2010

7    • '341 patent = U.S. Patent No. 5,750,341

8    • '119 patent = U.S. Patent No. 5,969,119

9    • The Macevicz patents = the '341 patent, the '597 patent, and the '119 patent

10   • XX:YY = column number:line number(s) of referenced patent

11
12   • All emphases in quoted material in this brief have been added, except where indicated
     otherwise.

13   • Labbé Decl. = The declaration of John Labbé filed concurrently herewith, attaching
14     Exhibits 1-20.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    I.      INTRODUCTION

2            This case involves DNA sequencing. All living things contain DNA, in the form of very

3    long strands, made up four building blocks called "nucleotides." We refer to the four nucleotides

4    as A, C, G, and T. An organism's DNA sequence – that is, the order of its A's, C's, G's, and T's –

5    determines what proteins are made in its cells and tissues. In this way, an organism's DNA

6    sequence determines its identity, and in some cases its destiny. DNA sequencing allows us to

7    "read" that DNA sequence.

8            DNA sequencing has improved our lives in many ways. Sequencing farm animals' DNA

9    can improve breeding. Sequencing DNA samples from a crime scene can exonerate a wrongfully

10   accused suspect. And sequencing a patient's DNA can allow a physician to select medicines or

11   tailor treatments for that patient, to improve efficacy or avoid an adverse reaction.

12           Plaintiffs Illumina and Solexa (collectively "Illumina") manufacture and sell DNA

13   sequencing technologies that allow customers to sequence an individual's complete DNA (their

14   "genome") in one week for less than $10,000. To put that in perspective, the Human Genome

15   Project took thirteen years and spent almost $3 billion to sequence the first human genome.[1]

16           The '597 patent-in-suit covers some of Illumina's pioneering DNA sequencing technology.

17   The '597 patent teaches a sequencing method that builds on the principle that a single strand of

18   DNA – with its A's, C's, G's, and T's – is attracted to and will bind with another single strand of

19   DNA to form a "double helix." Such binding is "complementary": only A's in one strand will bind

20   with T's in the other strand, and only C's will bind with G's, as illustrated below:

21
22
23                              
24
25
26
27

28   _____
     [1] See http://www.genome.gov/11006929.

1       The sequencing method described and claimed in the '597 patent begins by bringing a

2   short single strand of DNA having a known sequence (an "initializing oligonucleotide") into

3   contact with a very long single strand of DNA having an unknown sequence (a "polynucleotide").

4   The initializing "oligo"[2] will bind to the polynucleotide to form a double-stranded "duplex."

5   Another very short single strand of DNA having a known sequence (a "probe") is then added. If

6   the probe binds to the polynucleotide immediately adjacent to the bound initializing oligo, the

7   probe can be chemically linked ("ligated") to the initializing oligo to form an "extended duplex."

8       If one determines which probe has been bound and ligated, one can determine the sequence

9   of the polynucleotide. For example, the probe may have a label (such as a fluorescent dye

10   molecule) that can indicate whether there is an A, C, G, or T at a certain position in the probe. If a

11   probe containing a T at that position it also contains a "blue" label. Then, if "blue" is detected, the

12   fact that a T in the probe can only bind to an A in the polynucleotide means that one can "identify"

13   the nucleotide at that position in the polynucleotide as being an A.

14       Some of the '597 claim terms in dispute here were construed by Judge Alsup, and later

15   affirmed by the Federal Circuit, in *Applera Corporation - Applied Biosystems Group v. Illumina,*

16   *Inc. and Solexa, Inc.*, Case Number 07-02845 WHA (N.D. Cal.) ("the AB litigation"). The

17   accused infringer here, Complete Genomics, Inc. ("CGI"), seeks to change Judge Alsup's

18   constructions. For the reasons discussed below, these constructions should not be disturbed.

19       This Court should instead adopt Illumina's constructions, which are supported both by the

20   claim language and by the current intrinsic evidence, as required by the Federal Circuit's *en banc*

21   decision in *Phillips v. AWH*, 415 F.3d 1303 (Fed. Cir. 2005). For example, following the AB

22   litigation and Judge Alsup's constructions, the '597 patent was reexamined by the Patent Office

23   ("the PTO"). The PTO examiner required that Illumina make an "unequivocal statement"

24   narrowing elements in claim 1 of the '597 patent to secure the patentability of the claim. Based on

25   this unequivocal statement, the PTO issued a reexamination certificate under 35 U.S.C. § 307.[3]

26   _____

[2] "Oligo" is an abbreviated form of "oligonucleotide."

27   [3] *See ACCO Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1078 (Fed. Cir. 2003)
   ("Statements made during prosecution which clearly disclaim a particular claim interpretation will

28   limit the scope of the claims.").

1      Incredibly, CGI proposes constructions here that would restore the very scope of claim 1

2   that the PTO required Illumina to surrender. CGI's proposed constructions are wrong and should

3   be rejected. Instead, the Court should adopt Illumina's constructions, which directly reflect the

4   language of the claims and their use in the specification, Judge Alsup's prior constructions, and

5   Illumina's unequivocal disclaimer of claim scope (and the PTO's decision to issue the claims

6   based on that disclaimer).

7      For these and other terms, CGI also commits the "'cardinal sin' of claim construction" by

8   seeking to import limitations from preferred embodiments described in the '597 specification the

9   '597 patent claims – limitations that not coincidently allow CGI to make non-infringement

10   arguments.[4] This Court should reject CGI's attempt to limit the claims to such embodiments.

11   ## II.    BACKGROUND FACTS[5]

12      ### A.    Dr. Macevicz's invention

13      The invention claimed in the '597 patent, a new method for sequencing nucleic acids

14   ("polynucleotides," such as deoxyribonucleic acid ("DNA")), was conceived and developed by Dr.

15   Stephen Macevicz, a Ph.D. biophysicist and patent attorney, in 1995.

16      Prior to Dr. Macevicz's invention, scientists sequenced DNA using "Sanger" sequencing

17   (named for its Nobel Prize-winning inventor). The Sanger method allowed one to sequence only

18   up to about a thousand DNA nucleotides at a time. A complete human genome, however, includes

19   more than three billion nucleotide pairs. The Sanger method was also a laborious manual process.

20   Consequently, there was a great need for a sequencing method that was simpler, faster, and less

21   expensive than the Sanger method.

22      Working alone, and utilizing his years of training and experience in biophysics and

23   molecular biology, Dr. Macevicz realized that one could sequence a polynucleotide by exposing it

24   to a much shorter DNA fragment (an "initializing oligonucleotide") whose sequence is known to

25   be complementary to a portion (called a "binding region") of the polynucleotide, and allowing that

26   ─────────────

[4] *Teleflex, Inc. v. Ficosa North Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002).

27   [5] For the Court's convenience, Exhibit 1 to the Labbé Decl. (submitted herewith) contains
    background information on molecular biology and sequencing (*Sequence for Yourself*,
28   http://www.pbs.org/wgbh/nova/body/sequence-DNA-for-yourself.html (October 21, 2011)).

1    initializing "oligo" to bind to the polynucleotide to create a double-stranded structure called a

2    "duplex."[6] Dr. Macevicz realized that if one then brings additional short oligos having known

3    sequences (called "probes") into contact with the polynucleotide containing the duplex, only a

4    probe whose sequence is perfectly complementary along its entire length to the sequence of the

5    polynucleotide immediately adjacent to the duplex will stably bind ("hybridize") to the

6    polynucleotide at that spot.[7]

7         Once a probe is bound to that spot, it can be chemically linked to the initializing oligo

8    (through a process called "ligation") to create an even-longer "extended duplex."[8] Dr. Macevicz

9    realized that each probe could be used to detect the identity of one or more nucleotides in the

10   polynucleotide that were complementary to the nucleotides in the probes.[9] For example (as

11   illustrated below), if probes containing a "T" (thymidine) nucleotide at position 5 also contain a

12   "blue" label, and shining a laser on the polynucleotide with a bound probe complex results in a

13   blue "flash," the nucleotide present in the polynucleotide at position 5 must be an "A" (adenine)

14   (because a "T" nucleotide in the probe can only bind to an "A" nucleotide in the

15   polynucleotide).This hybridization/ligation/identification process can reveal the identity of the

16   nucleotide located five positions away from the end of the extended duplex, as illustrated below:



23        The nucleotides at other positions can be identified by using different initializing oligos to

24   shift (or "re-register") the whole process by one nucleotide position to the left or right (as

---

26   [6] *See, e.g.*, Exh. 2 to Labbé Decl. ('597 patent) at 2:66-3:3.

27   [7] *See, e.g.*, *id.* at 3:3-11.

     [8] *See, e.g.*, *id.* at 11:49-12:20.

28   [9] *See, e.g.*, *id.* at 3:7-9; 5:10-12; 6:34-46.

illustrated above), so that the same process that identified the fifth position is re-positioned to identify the fourth position, then the third position, and so on, until all of the nucleotides at the various positions within the polynucleotide may be identified, as illustrated below:



Alternatively, one can use the same initializing oligo, but use probe sets where the interrogating nucleotide is at position 3, or 4, or 6, etc., respectively. After the first probe (where the interrogating nucleotide is at, for example, position 4) has bound, been ligated to the initializing oligo, and had its label detected, the initializing oligo/ligated probe complex can be stripped away, a new initializing oligo allowed to hybridize, and the next probe (where the interrogating nucleotide is at, for example, position 4) ligated and detected, as illustrated below:



Repeating this process can identify all of the nucleotides in the previously "unknown" polynucleotide, and if practiced on many individual polynucleotides, can identify millions of nucleotides in each round of the method.[10]

Compared to the Sanger method, which was time-intensive, cumbersome, and only capable of sequencing up to about one thousand bases at a time, Dr. Macevicz's invention paved the way

_____

[10] *See, e.g., id.* at Figs. 1-3, and 4: 58-5:9.

for sequencing an entire 3-billion-base-pair human genome in a very short time.

**B.     Claim 1 of the '597 patent**

Claim 1 of the '597 patent is directed to a method "for identifying the sequence of nucleotides in a polynucleotide" (such as DNA). The claim recites three steps of "extending" an initializing oligo, "identifying" a nucleotide in the polynucleotide, and then "repeating" steps (a) and (b) to determine a sequence in the polynucleotide:

> 1. A method for identifying a sequence of nucleotides in a polynucleotide, the method comprising the steps of:
>
> (a) extending an initializing oligonucleotide along the polynucleotide by ligating an oligonucleotide probe thereto to form an extended duplex;
>
> (b) identifying one or more nucleotides of the polynucleotide; and
>
> (c) repeating steps (a) and (b) until the sequence of nucleotides is determined.

To satisfy the claim, one must ligate a probe to an initializing oligo to form an extended duplex on the polynucleotide, identify a nucleotide, and then repeat those same steps. The claim requires no more and no less.

**C.     The AB litigation and Judge Alsup's construction of the '597 claim terms**

In 2007, another competitor in DNA sequencing, Applied Biosystems ("AB"), filed suit against Illumina and Dr. Macevicz, alleging that AB, not Illumina, was the true owner of three related Macevicz patents, including the '597 patent. Illumina counterclaimed for infringement of those patents.[11] During the AB litigation, Judge Alsup construed some of the terms in the Macevicz patents. Below are Judge Alsup's constructions and where each construction can be found[12]:

---

[11] The AB litigation was tried in two phases: the first to resolve the issue of ownership, and the second to resolve Illumina's infringement counterclaims. On January 14, 2009, the jury found that Illumina owns the patents. *See* D.I. 426 in Case No. 07-02845 WHA (N.D. Cal.). On January 27, 2009, the jury found that AB did not infringe claim 1 of the '119 patent, and that the claim was not invalid for obviousness. *See* D.I. 427 in Case No. 07-02845 WHA (N.D. Cal.). The parties withdrew the other two Macevicz patents, the '341 and '597 patents, prior to the jury verdict. *See* D.I. 386, at p. 5, line 14, and D.I. 402 in Case No. 07-02845 WHA (N.D. Cal.).

[12] For the Court's convenience, the relevant orders in which Judge Alsup construed the terms in the Macevicz patents are provided as Exhibits 4 and 5 to the Labbé Decl.

| Claim term (patent claim) | Construction (source for the construction)[13] |
|---|---|
| "initializing oligonucleotide probe" ('597 claim 1) | The oligonucleotide to which the first extension oligonucleotide probe is first ligated (D.I. 133 at p 10, lines 3-4) |
| "identifying" ('597 claim 1) | Within each cycle determining the identity of a base in the target polynucleotide (D.I. 133 at p 16, lines 3-4) |
| "extending an initializing oligonucleotide" ('597 claim 1) | In the first pass of the method, an initializing oligonucleotide be attached to the polynucleotide to be sequenced, and is extended with an oligonucleotide probe. When repeated, either (1) a new initializing oligonucleotide is laid down along the polynucleotide with each repetition; or (2) where the initializing oligonucleotide is originally attached to the polynucleotide and thereafter an ever extending chain of probes is ligated thereto to form an ever-extending duplex, all beginning with the same initializing oligonucleotide (D.I. 384-1 at p. 2, lines 11-25) |
| "repeating steps (a) and (b) until the sequence of nucleotides is determined." | Step © is conditional, meaning that there is no need for repetition if the sequence of the polynucleotide has been fully determined in the first cycle (D.I. 384-1 at p. 3, lines 1-3) |

On March 25, 2010, the Federal Circuit affirmed the constructions of these last three terms (the first was not appealed by either AB or Illumina).[14]

**D.     The reexamination initiated by AB**

On June 30, 2008, long before trial in the AB litigation, AB filed a request for reexamination of the '597 patent in the PTO.[15] On May 28, 2009, three months after the AB trial, the PTO issued an office action rejecting claim 1 of the '597 patent as anticipated by a number of references.[16] After an interview with the examiner, Illumina responded to the office action by adding new claims and responding to the examiner's rejections.[17]

At the interview, Illumina's counsel and the examiner discussed whether a prior-art reference, the Martinelli patent,[18] disclosed "'repeating' steps a and b within the meaning of claim

---

[13] All sources are docket items in Case No. 07-02845 WHA (N.D. Cal.).

[14] Exh. 6 to Labbé Decl. (Fed. Cir. Opinion) at p. 14-16.

[15] Exh. 7 to Labbé Decl. (Reexam Request).

[16] Exh. 8 to Labbé Decl. (5/28/09 Office Action) at p. 4-9.

[17] Exh. 9 to Labbé Decl. (8/6/09 Amendment).

[18] Exh. 11 to Labbé Decl. (Martinelli, U.S. Patent No. 5,800,994).

1."[19] The Martinelli patent is directed to a method called "HLA," which involves binding two probes to a DNA sample to detect whether a mutation is present. If the two probes can be ligated, the identity of the nucleotide at the site in the sample where the two probes attach to each other can be determined, because ligation could only occur if the mutation is present.

At the interview, Illumina's counsel and the examiner agreed that an unequivocal statement by Illumina narrowing claim 1 would overcome the rejection premised on Martinelli.[20] In its subsequent amendment, Illumina made that unequivocal narrowing statement:

> As discussed at the interview, the "repeating" step in the claimed method, *step ©, requires the repetition of steps (a) and (b) on the same polynucleotide sequence that was acted upon in the first cycle* of the recited method. Step (a) of claim 1 recites "extending an initializing oligonucleotide along the polynucleotide." *When step (a) is repeated* as required by step (c), *a (new) initializing oligonucleotide is extended along the same polynucleotide as was acted upon in the first cycle of the recited method ("the polynucleotide").*[21]

On the basis of this unequivocal narrowing statement, the examiner withdrew his rejection based on Martinelli (and two other references, Landegren and Whiteley, that disclose a similar method),[22] and the PTO then confirmed that this narrower claim 1 is patentable.[23]

**E.      The current dispute**

Illumina filed this lawsuit on August 3, 2010, alleging that CGI's DNA sequencing technology, called "Combinatorial Probe-Anchor Ligation," infringes three Illumina patents. Because two of those three patents are involved in ongoing reexaminations in the PTO, the parties agreed to proceed with Illumina's infringement case on the '597 patent, and to temporarily dismiss the infringement claims on the other two patents.[24]

## III.    ARGUMENT

**A.      "initializing oligonucleotide" ('597 claims 1, 9, 10, 14-19)**

---

[19] Exh. 10 to Labbé Decl. (7/24/09 Examiner Interview Summary) at p. 3.

[20] Exh. 9 to Labbé Decl. (8/6/09 Amendment) at p. 11.

[21] *Id.* at p. 15 (emphasis added).

[22] Exh. 12 to Labbé Decl. (9/30/09 Office Action) at p. 5 (emphasis in original).

[23] Exh. 13 to Labbé Decl. (12/22/09 Office Action) at p. 3.

[24] D.I. 75.

| Term | Illumina's Construction | CGI's Construction |
|------|------------------------|--------------------|
| "initializing oligonucleotide" | The oligonucleotide to which the oligonucleotide probe is first ligated | An oligonucleotide that forms a highly stable duplex with the binding region of the polynucleotide that remains intact during any washing steps |

In his February 21, 2008 Claim Construction Order, Judge Alsup construed the term "initializing oligonucleotide probe," which appears in the claims of a related Macevicz patent, the '341 patent.[25] Judge Alsup recognized that (in both the '341 and '597 patents)[26] the term's meaning should "take into account that the initializing oligonucleotide probe is the starting point for subsequent ligations."[27] Consequently, he construed the term to mean "the oligonucleotide to which the first extension oligonucleotide probe is first ligated," which is the construction Illumina proposes here.[28] CGI's proposed construction should be rejected because it fails to include this express purpose of the initializing oligonucleotide, and instead improperly imports limitations from preferred embodiments described in the '597 specification.

> **1.    Judge Alsup's construction, as proposed by Illumina, is consistent with the plain meaning of "initializing" and the context of claim 1**

As Judge Alsup recognized, the '597 patent repeatedly refers to the initializing oligo as the starting point for the ligation process.[29] For example, in describing an embodiment in Figure 1, it states: "Preferably, the binding region should be long enough to accommodate a set of different initializing oligonucleotides, <u>each hybridizing to the template to produce a different starting point for subsequent ligations</u>."[30] Likewise, the patent describes the probes used in the invention as

---

[25] Exh. 4 to Labbé Decl. (2/21/2008 Claim Construction Order) at p. 8-10.

[26] *See z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1348 (Fed. Cir. 2007) ("We presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning.") (internal quotation marks omitted).

[27] Exh. 4 to Labbé Decl. (2/21/2008 Claim Construction Order) at p. 10.

[28] *Id.* at p. 10.

[29] *Id.* ("The meaning for the term should thus take into account that the initializing oligonucleotide probe is the starting point for subsequent ligations.").

[30] Exh. 2 to Labbé Decl. ('597 patent) at 5:24-27 (emphasis added). The specification contains numerous other references to the initializing oligo's role as the oligo to which the first extension probe is ligated to. *See id.* at 4:61-64 (probe is ligated to "$i_1$," the first initializing oligonucleotide); 4:64-67 (probe is ligated to "$i_2$," the second initializing oligonucleotide); 5:8-11 ("Likewise, terminal nucleotides of probes ligated to duplexes starting with initializing oligonucleotides $i_2$, $i_3$, $i_4$, and so on…"); 5:67-6:1 ("Generally, the oligonucleotide probes should be capable of being ligated to an initializing oligonucleotide…"); 14:54-55 ("After annealing, probes are enzymatically ligated to the initialing oligonucleotide…").

1   having one critical feature: "the oligonucleotide probes should be capable of being ligated to an

2   initializing oligonucleotide."[31] Nothing in the '597 patent requires that the initializing oligo must

3   form stable duplexes that remain intact during any subsequent washing steps.

4        Judge Alsup's construction reflects the plain language of the claim (reiterated in the

5   specification) that an *initializing* oligonucleotide is an oligonucleotide that "*initializes*" something

6   (here, probe ligation). CGI's proposal must fail because it does *not* incorporate this key aspect of

7   the initializing oligo.[32] Judge Alsup correctly discerned the essential function of an "initializing

8   oligonucleotide" in the claimed method, and this Court should adopt Judge Alsup's construction.

9                    **2.    CGI imports limitations from the specification into "initializing**
                         **oligonucleotide" to create a non-infringement argument**

10       CGI's proposal creates more questions than it answers: What is a washing step? Why

11   would the claimed method require an unrecited washing step? And if the duplex doesn't remain

12   intact during "any" (*i.e.*, every) washing step, why would that matter? The answer to each of these

13   questions is the same: in its accused sequencing method, CGI uses a caustic "washing step" to

14   remove the initializing oligo (and the probe ligated to it).[33] Consequently, in an attempt to create a

15   non-infringement argument, CGI seeks to define an initializing oligo by its ability to "form a

16   highly stable duplex with the binding region" that "remains intact during any washing steps."

17       While the '597 specification states that an initializing oligo should, among other things, be

18   able to form an extended duplex that can survive washing during the extension process,[34] that

19   merely states an advantageous property of an initializing oligo: that it bind well enough so that it

20   doesn't easily wash away with the un-bound and un–ligated probes. However, claim elements are

21   not to be limited to their advantageous properties.[35] Otherwise, all of the other advantageous

22

23   ────────────────

     [31] *Id.* at 5:66-6:1.

24   [32] Exh. 14 to Labbé Decl. (Merriam-Webster's Collegiate Dictionary) at p. 601 (defining
     "initialize" as "to set to a starting position, value, or configuration").

25   [33] Exh. 15 to Labbé Decl. (CGI Technology White Paper) at p. 9 ("After each base is read, the
     entire anchor-probe complex is washed away.").

26   [34] Exh. 2 to Labbé Decl. ('597 patent) at 5:30-32.

27   [35] *See SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) ("If
     everything in the specification were required to be read into the claims, or if structural claims were
     to be limited to devices operated precisely as a specification-described embodiment is operated,
28   there would be no need for claims.").

1    properties of an initializing oligo described in the patent would also have to be included.[36] That

2    cannot be correct.

3         CGI imports its washing-step limitations from a sentence in the '597 specification

4    describing the properties an initializing oligo might have.[37] CGI's construction requires that the

5    duplex containing the initializing oligo must remain intact during *all* subsequent washing steps.

6    But the sentence CGI relies on only states that the duplex remains intact "during any washing

7    steps *of the extension cycles*," not *all* washing steps.[38] In seeking to twist the construction to its

8    own advantage, CGI omits the last four words of that sentence, "of the extension cycles," from its

9    construction. CGI's cherry-picking from the specification should be rejected.[39]

10              **3.    CGI's proposal also runs afoul of the doctrine of claim differentiation**

11        The claims themselves contradict CGI's proposal that the polynucleotide must include a

12   known binding region. Under the doctrine of claim differentiation, "the presence of a dependent

13   claim that adds a particular limitation gives rise to a presumption that the limitation in question is

14   not present in the independent claim."[40] Here, claims 9 and 10, which depend from claim 1,

15   require that the polynucleotide include a "binding region." If these dependent claims are to have

16   any meaning, as they must, claim 1 cannot require a "binding region" as CGI proposes (otherwise

17   claims 9 and 10 would not narrow claim 1).[41]

18        **B.    "extending an initializing oligonucleotide along the polynucleotide by ligating
              an oligonucleotide probe thereto to form an extended duplex" ('597 claims 1,**

19            **9, 10, 14-19)**

20   [36] The specification describes that the initializing oligonucleotide should: (1) be longer than the
     probes being used (5:32-36); (2) have a higher than typical content of G and C bases (5:32-36); (3)

21   be cross-linked or strongly bound to the template DNA (5:36-39); (4) have a length of 20-30
     nucleotides (5:45-49); and (5) have a high melting temperature (5:45-49). The one constant

22   throughout the specification is the initializing oligonucleotide's function and purpose: to act as the
     starting point for ligation.

23   [37] *See* Exh. 2 to Labbé Decl. ('597 patent) at 5:30-32.

24   [38] *Id.* at 5:30-32 (emphasis added).

25   [39] Even if this Court were to find some basis to reject Judge Alsup's prior, well-reasoned
     construction and instead adopt CGI's proposed construction, it should include those four key

26   words "of the extension cycles" in that construction.

27   [40] *Phillips*, 415 F.3d at 1315.

     [41] *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) ("[W]here the

28   limitation that is sought to be 'read into' an independent claim already appears in a dependent
     claim, the doctrine of claim differentiation is at its strongest.").

| Term | Illumina's Construction | CGI's Construction |
|---|---|---|
| "extending an initializing oligonucleotide along the polynucleotide by ligating an oligonucleotide probe thereto to form an extended duplex" | Extending an initializing oligonucleotide along the polynucleotide by ligating an oligonucleotide probe thereto to form an extended duplex, and when step (a) is repeated a new initializing oligonucleotide is extended along the same polynucleotide sequence as was acted upon in the first cycle of the recited method | ligating an oligonucleotide probe to an initializing oligonucleotide to form an extended duplex and further extending the duplex by ligating a new oligonucleotide probe to the extended duplex in any subsequent cycles |

The parties agree that the first time it is practiced, step (a) requires that an initializing oligo is extended by ligating a probe to it. The parties' dispute concerns what step (a) requires when repeated.

Illumina contends that when one repeats step (a) (in a second "cycle"), it can be repeated just as it is written in the claim: by ligating a probe to a previously un-extended initializing oligo, just as everyone agrees occurs in the first cycle. In contrast, CGI contends that when one repeats step (a), one has to "further extend" the duplex created during the first cycle of the method, by ligating another probe to the probe that was ligated to the initializing oligo in the first cycle. Remarkably, CGI's proposed construction *excludes* repeating step (a) as it is written in the claim, even though CGI agrees that step (a) is practiced as it is written in the first cycle. CGI's construction is also inconsistent with the intrinsic evidence, specifically the narrowing amendments made during the reexamination of the '597 patent, with Judge Alsup's prior construction of this term, and with its own proposal for step (c). It must be rejected.

### 1. Illumina's construction of the "extending" step is consistent with Judge Alsup's construction

Judge Alsup construed the phrase "extending an initializing oligonucleotide along the polynucleotide" in '597 claim 1 to mean that in the first cycle of the method, a probe is ligated to an initializing oligonucleotide, and that the "extending" step (a) is repeated either by **(i)** ligating a new probe to a new initializing oligonucleotide (*i.e.*, "a brand new initializing oligonucleotide must be laid down along the polynucleotide with each repetition"); or **(ii)** by "further extending," *i.e.*, ligating a second probe to the duplex that was created by ligating a first probe to the initializing oligo in the first cycle (such that "an ever-extending chain of probes is ligated thereto

to form an ever-extending duplex").[42] Judge Alsup construed step (a) to include both of these forms of repeating, yet CGI proposes construing the term to only permit the latter.

However, Judge Alsup construed this term to be satisfied by either of two alternatives *before* Illumina made its unequivocal statement narrowing the scope of step (a) in the reexamination of the '597 patent. As explained below, in the reexamination, Illumina unequivocally narrowed the scope of "repeating" step (a) to require that "a new initializing oligonucleotide is extended along the same polynucleotide sequence as was acted upon in the first cycle of the recited method." CGI ignores this amendment, and instead changes Judge Alsup's construction to eliminate the form of repeating that the reexamination examiner required for patentability. This cannot be correct.

**2.      Illumina expressly disavowed claim scope regarding "extending..." and "repeating…" in the reexamination of the '597 patent**

In the reexamination of the '597 patent that followed the AB litigation, the examiner rejected claim 1 as anticipated by the Martinelli patent. The examiner argued that Martinelli disclosed a method whereby two different probes are designed so that, when allowed to bind to a target DNA, the ends of the probes meet at the site of a mutation.[43] If the probes can be ligated, the presence (or absence) of the mutation can thereby be detected.[44] The examiner argued that Martinelli thus disclosed steps (a) and (b) in '597 claim 1. With regard to whether Martinelli disclosed "repeating" step (a) of '597 claim 1, the examiner cited the following in Martinelli:

> By moving to the next portion of the target, a similar experiment can be run. Thus, **by moving sequentially along the target**, one can determine the site or sites on the target where mutations are found and then proceed to design experiments to identify the exact mutation which occurs at each of the mutation sites.[45]

The examiner argued that this passage in Martinelli disclosed that "the process can be repeated with probes complementary to different portions of the target nucleic acid, which meets the limitations of step 1 of the claim."[46]

---

[42] Exh. 5 to Labbé Decl. (D.I. 384-1 in AB litigation) at p. 3 (emphasis added).

[43] Exh. 8 to Labbé Decl. (5/28/09 Office Action) at p. 5-6.

[44] *Id.* at p. 5.

[45] Exh. 11 to Labbé Decl. (Martinelli, U.S. Patent No. 5,800,994) at 4:56-61 (emphasis added).

[46] Exh. 8 to Labbé Decl. (5/28/09 Office Action) at p. 6 (citation omitted).

At a subsequent interview, Illumina's counsel and the examiner "[d]iscussed whether [the] Martinelli patent is 'repeating' steps a and b within the meaning of claim 1."[47] The examiner agreed that an unequivocal statement by Illumina narrowing the scope of "repeating" to exclude Martinelli's form of repeating would overcome the rejection.[48]

In its formal response to the examiner's rejection, after the interview, Illumina provided that unequivocal statement narrowing the way step (a) must be repeated to require that a "new" initializing oligonucleotide be used when step (a) is repeated (*i.e.*, Judge Alsup's option (i)):

> As discussed at the interview, the "repeating" step in the claimed method, step I, requires the ***repetition of steps (a) and (b) on the same polynucleotide sequence that was acted upon in the first cycle of the recited method***. Step (a) of claim 1 recites "extending an initializing oligonucleotide along the polynucleotide." *When step (a) is repeated as required by step (c),* ***a (new) initializing oligonucleotide*** *is extended along the same polynucleotide as was acted upon in the first cycle of the recited method ("the polynucleotide").*[49]

The examiner acknowledged his understanding of this unequivocal narrowing statement in the subsequent Office Action:

> Patent Owner's response (response of August 3 [*sic*: August 6], 2009, p. 15) has clarified that "repeating" requires ***repetition of steps (a) and (b) on the same polynucleotide sequence that was acted upon in the first cycle of the method***.[50]

Despite the fact that Illumina's unequivocal statement required by the examiner explicitly states that a "(new)" initializing oligo must be used when repeating step (a), CGI's proposed construction requires that a "new initializing oligonucleotide" *cannot* be used when repeating step (a) in subsequent cycles. Instead, CGI contends that repeating step (a) requires repeated, further extensions of the same (old) initializing oligo (essentially Judge Alsup's option (ii)). This contradicts the prosecution history and defies common sense.

That new initializing oligos can be extended along the same polynucleotide ("the polynucleotide") is shown by the fact that Illumina's statement during reexamination closely parallels Judge Alsup's option (i) – both requiring a "new initializing oligonucleotide" laid down

---

[47] Exh. 10 to Labbé Decl. (7/24/09 Examiner Interview Summary) at p. 3.

[48] Exh. 9 to Labbé Decl. (8/6/09 Amendment, Interview Summary) at p. 10-11.

[49] *Id.* at p. 15 (emphasis added).

[50] Exh. 12 to Labbé Decl. (9/30/09 Office Action) at p. 3.

along "the polynucleotide" with each repetition. Compare:

| Judge Alsup's Option (i) | Reexamination Statement |
| --- | --- |
| a brand **new initializing oligonucleotide** must be laid down along **the polynucleotide** with each repetition.[51] | A **(new) initializing oligonucleotide** is extended along **the same polynucleotide** as was acted upon in the first cycle of the recited method ("**the polynucleotide**").[52] |

Illumina's unequivocal reexamination statement cannot be confused with Judge Alsup's option (ii), which requires "an ever-extending chain of probes" ligated to form an "ever-extending duplex" – but which makes no mention of using a "new initializing oligonucleotide" on "the same polynucleotide sequence." Contrast:

| Judge Alsup's Option (ii) | Reexamination Statement |
| --- | --- |
| the initializing oligonucleotide is originally attached to the polynucleotide and thereafter an ever-extending chain of probes is ligated thereto to form an ever-extending duplex[53] | a **(new) initializing oligonucleotide** is extended along **the same polynucleotide** as was acted upon in the first cycle of the recited method ("**the polynucleotide**")[54] |

Given Illumina's clear, unequivocal statement that a "new" initializing oligonucleotide must be used when step (a) is repeated, Illumina's proposed construction, which parallels this statement, should be adopted. CGI's counterintuitive reading of this same statement to reach the opposite conclusion must be rejected.

### 3.  CGI's construction is inconsistent with its construction of step (c)

The impropriety of CGI's construction, and its rationale for that construction, is evidenced by the incompatibility of its constructions for step (a) and step (c). CGI's proposed construction for "extending…" in step (a) requires that when step (a) is repeated, it requires further extending the already-extended duplex (*i.e.*, the initializing oligo/probe complex that was created in the first

---

[51] Exh. 5 to Labbé Decl. (D.I. 384-1 in AB litigation) at p. 3, lines 18-19 (emphasis added).

[52] Exh. 9 to Labbé Decl. (8/6/09 Amendment) at p. 15 (emphasis added).

[53] Exh. 5 to Labbé Decl. (D.I. 384-1 in AB litigation) at p. 3, lines 23-24.

[54] Exh. 9 to Labbé Decl. (8/6/09 Amendment) at p. 15 (emphasis added).

cycle). CGI's proposal for step (c) – "repeating steps (a) and (b) . . ." – requires an incompatible form of repeating: the use of parallel reactions with different initializing oligonucleotides "out of register by one or more nucleotides." CGI's proposed constructions for step (a) and step (c) cannot be reconciled, because its construction of step (a) does not allow for the "parallel reactions" required by its construction of step (c) (where nucleotides are identified in separate reactions). It should be rejected at least on that basis**.**

### 4.  CGI construes step (a) to recapture what Illumina was required to surrender in the reexamination

Martinelli's disclosure of "moving sequentially along the target" is the same form of "repeating" that CGI proposes the Court adopt ("further extending the duplex by ligating a new oligonucleotide probe to the extended duplex in any subsequent cycles"). To overcome Martinelli, the examiner required Illumina to narrowed claim 1 to require that when step (a) is repeated, rather than "further extending…" or "moving sequentially along the target" (as in the Martinelli reference), one must hybridize a "new" initializing oligonucleotide to "the same polynucleotide as was acted upon in the first cycle."[55] In other words, Illumina disclaimed part of Judge Alsup's construction in order to get the claims allowed in the reexamination. CGI now seeks a construction that expressly recaptures what Illumina was required to surrender during prosecution.

Following Illumina's unequivocal statement, the examiner acknowledged that Illumina's statement "raised the question of the meaning of 'repeating' (remarks of August 3 [*sic*: August 6], 2009, p. 15)."[56] The examiner then stated:

> "Repeating" has several meanings in the context of claim 1. First, "repeating" refers to "repeated cycles of duplex extension along a single stranded template" as set forth in the specification (e.g. col. 3, lines 2-19). This is viewed as an essential characteristic of the claimed invention, because no embodiment of the invention is disclosed which lacks repeated cycles of extension.[57]

This "essential" characteristic *includes* extensions where step (a) is repeated by extending (ligating a probe to) a new initializing oligo to create a new duplex. As the examiner noted later in that paragraph, his view on what repeating meant for purposes of the '597 patent paralleled the

---

[55] *Id.*

[56] Exh. 12 to Labbé Decl. (9/30/09 Office Action) at p. 3.

[57] *Id.*

1    unequivocal statement made by Illumina quoted above – that "a (new) initializing oligonucleotide

2    is extended along the same polynucleotide."[58] On the basis of Illumina's "unequivocal statement"

3    narrowing claim 1, the examiner withdrew his rejection premised on Martinelli.[59]

4              Despite the fact that Illumina made an unequivocal statement limiting the repetition of step

5    (a) to distinguish the type of "repeating" disclosed in Martinelli, and that the examiner found that

6    this unequivocal statement did distinguish Martinelli, CGI now proposes that this Court construe

7    step (a) to encompass the "repeating" aspect of Martinelli that was distinguished. Compare

8    Martinelli's "repeating" – characterized by the examiner as "moving sequentially along the target"

9    – to CGI's proposed construction for repeating step (a) – requiring moving sequentially down the

10   target by ligating a new probe to further extend the already-extended initializing oligo.

11             The type of "repeating" that CGI seeks to require is exactly the type of repeating that

12   Illumina expressly distinguished during reexamination. CGI's proposal cannot be correct.

### 5.    Illumina is not barred by collateral estoppel from relitigating the construction of step (a), "extending…"

14             CGI will argue that Illumina is barred by collateral estoppel from modifying Judge Alsup's

15   construction of step (a). CGI is wrong. Collateral estoppel (or "issue preclusion") applies to

16   prevent re-litigation only of those issues actually litigated and necessarily decided, after a full and

17   fair opportunity for litigation, in a prior proceeding.[60] This case presents a unique collateral

18   estoppel issue where the prosecution history, which "is often of critical significance in determining

19   the meaning of the claims,"[61] was modified after the claim construction. Here, Illumina's

20   unequivocal statements during the reexamination, which are no less binding on claim scope than

---

[58] *Compare Id.* at p. 3 *with* Exh. 9 to Labbé Decl. (8/6/09 Amendment) at p. 15.

[59] Exh. 12 to Labbé Decl. (9/30/09 Office Action) at p. 4-5 ("Patent Owner has provided an unequivocal statement that "repeating" steps (a) and (b) of the claimed method means that the steps are performed on the same nucleic acid sequence in each cycle (response of August 3, 2009, p. 15). In Martinelli, repetition is performed on different portions of the target nucleic acid (col. 4, lines 56-61). Therefore Martinelli does not anticipate the claim and the rejection is **withdrawn**.").

[60] *Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1086 (9th Cir. 2007); *In re Trans Tex. Holdings Corp.*, 498 F.3d 1290, 1297 (Fed. Cir. 2007).

[61] *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996).

1    statements made during the original prosecution,[62] narrowed the scope of step (a). Neither the

2    parties to the AB litigation, nor Judge Alsup, had an opportunity to litigate or consider those

3    narrowing statements.

4         This Court's gate-keeping function on claim construction requires that claim 1 be

5    construed to "exclude any interpretation that was disclaimed during prosecution."[63] Collateral

6    estoppel does not require this Court to ignore or exclude this intrinsic evidence that did not exist

7    during the AB litigation.[64]

8         **C.    "repeating steps (a) and (b) until the sequence of nucleotides is determined"
          ('597 claims 1, 9, 10, 14-19)**

| Term | Illumina's Construction | CGI's Construction |
|---|---|---|
| "repeating steps (a) and (b) until the sequence of nucleotides is determined" | Determining a nucleotide sequence by repeating steps (a) and (b) | Either (1) repeatedly extending the extended duplex by subsequent cycles of ligation and identifying a label on or associated with a successfully ligated oligonucleotide probe until the sequence of nucleotides is determined or (2) using parallel reactions employing different initializing oligonucleotides, each out of register by one or more nucleotides, and identifying a label on or associated with a successfully ligated oligonucleotide probe until the sequence of nucleotides is determined. There is no need for repetition if the sequence of the polynucleotide has been fully determined in the first cycle |

16        Here, CGI takes a term that couldn't be simpler, and imports the limitations of two

17   exemplary embodiments in the specification into the claim. That is improper: "Limitations  from

18   the  specification,  however,  such as from the preferred embodiment, cannot be read into the

19   claims absent a clear intention by the patentee to do [so]."[65] This Court should reject CGI's

[62] *See On Demand Mach. Corp. v. Ingram Indus., Inc.,* 442 F.3d 1331, 1338-39 (Fed. Cir. 2006) (patentee's and examiner's statements in reexamination were considered in construing claim); *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 867-68 (Fed. Cir. 2004) (communication with the PTO during reexamination is intrinsic evidence and should be considered for claim construction purposes).

[63] *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to 'exclude any interpretation that was disclaimed during prosecution.'") (quoting *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1580 (Fed. Cir. 1988)).

[64] *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l*, 2009 WL 4928029, at *16-17, n. 9 (D. Del. Dec. 18, 2009) (declining to apply collateral estoppel because a reexamination resulted in "significant subsequent developments" in the patent's prosecution history that should be considered when construing the claims).

[65] *MySpace, Inc. v. Graphon Corp.*, 756 F.Supp.2d 1218, 1226 (N.D. Cal. 2010) (quoting *Teleflex*, 299 F.3d at 1326 ("The claims must be read in view of the specification, but limitations from the
(Footnote continues on next page.)

proposed construction.

### 1.   Judge Alsup's construction of "repeating" as "conditional" was narrowed during the reexamination

Judge Alsup construed step I as "conditional, meaning that there is no need for repetition <u>if the sequence of the polynucleotide has been fully determined in the first cycle</u>."[66] Judge Alsup considered this a "clear-cut" term when he analyzed a nearly identical term in the '341 patent ("repeating steps (b), (c) and (d) until a sequence of nucleotides in the target polynucleotide is determined"), and concluded that the term "requires no construction and may be sufficiently understood by a layperson without any guidance from this Court."[67] This Court should adopt Judge Alsup's non-construction of step (c), albeit as narrowed by Illumina's unequivocal statements during the reexamination that step (c) is not "conditional" but rather required.

This is clear from the reexamination record: Illumina narrowed its claims to require repeating. As mentioned above in the discussion of step (a), the examiner rejected the claims over Martinelli. In response, Illumina unequivocally stated that "the 'repeating' step in the claimed method, **step (c), requires the repetition of steps (a) and (b)**"[68] and that "claim 1 recites a method that is **limited to repeating steps (a) and (b)**…"[69]

This requirement for repetition was important to Illumina's arguments against the rejection over Martinelli. Illumina distinguished Martinelli by stating: "Martinelli, however, did not disclose repeating the steps of its 'HLM' method. In fact, Martinelli expressly taught that the HLM reaction was intended to be performed for only one cycle."[70]

Illumina having clearly stated that repeating steps (a) and (b) is required, and then having relied on this clear statement that repetition is a requirement (rather than being conditional) to

---

(Footnote continued from previous page.)

specification are not to be read into the claims.") (citations omitted) and *Decisioning.com, Inc. v. Federated Dept. Stores, Inc.*, 527 F.3d 1300, 1307-08 (Fed. Cir. 2008)).

[66] Exh. 5 to Labbé Decl. (D.I. 384-1 in AB litigation) at p. 3 (emphasis added).

[67] Exh. 4 to Labbé Decl. (D.I. 133 in AB litigation) at p. 17, lines 4-11.

[68] Exh. 9 to Labbé Decl. (8/6/09 Amendment) at p. 15 (emphasis added).

[69] *Id.* at p. 11 (emphasis added).

[70] Exh. 9 to Labbé Decl. (8/6/09 Amendment) at p. 15.

1   overcome the prior art during reexamination, it would be improper to now hold that repetition is

2   not required, but is instead conditional.

3                        **2.      The specification supports Illumina's construction**

4          CGI also seeks to limit the form of "repeating" that can occur in the claimed method to the

5   specific exemplary embodiments disclosed in the patent (as CGI interprets them). Figure 1 of the

6   '597 patent, and the text describing it (at col. 4, line 46 – col. 5 line 11), address a scenario where

7   different initializing oligos are used in the invention in different "aliquots," *i.e.*, "for each aliquot a

8   different initializing oligonucleotide" is used.[71] Each initializing oligo used in this embodiment

9   binds to the polynucleotide to be sequenced at a position that is at least one nucleotide upstream or

10  downstream from where any other initializing oligo binds, so as to allow for identification of

11  nucleotides at different positions in the polynucleotide.[72] CGI asks this Court to import the

12  limitations of this "aliquots" embodiment into its construction of the "repeating" step (c), in the

13  form of CGI's proposed "parallel reactions [*i.e.*, separate "aliquots"] employing different

14  initializing oligonucleotides, each out of register by one or more nucleotides." This is improper

15  and should be rejected.

16         CGI's proposal overstates the import of Figure 1 and its accompanying description. The

17  '597 patent describes Figure 1 as showing only "[t]he general scheme of one aspect of the

18  invention," and states that "the invention is ***not*** meant to be limited by the particular features of

19  this embodiment."[73] CGI's proposed construction improperly ignores this express caveat, and

20  instead improperly asks this Court to import the limitations of this embodiment into the claim. As

21  the Federal Circuit stated in its *en banc* decision on claim construction in *Phillips*, "although the

22  specification often describes very specific embodiments of the invention, we have repeatedly

23  warned against confining the claims to those embodiments."[74] Indeed, a claim is not limited to a

---

24  [71] Exh. 2 to Labbé Decl. ('597 patent) at 4:46 – 5:12.

25  [72] *Id.*

26  [73] *Id.* at 4:47-49 (emphasis added).

27  [74] *Phillips*, 415 F.3d at 1323 ("However, the line between construing terms and importing
    limitations can be discerned with reasonable certainty and predictability if the court's focus
    remains on understanding how a person of ordinary skill in the art would understand the claim
28  terms. For instance, although the specification often describes very specific embodiments of the
    invention, we have repeatedly warned against confining the claims to those embodiments."); *see*

(Footnote continues on next page.)

1  patent's described embodiments even when the "patent describes only a single embodiment."[75]

2      The touchstone to discern whether an invention is so limited is "whether a person of skill

3  in the art would understand the embodiments to define the outer limits of the claim term or merely

4  to be exemplary in nature."[76] The statement in the '597 patent's description of Figure 1 warning

5  those of skill in the art that the "invention is not meant to be limited by the particular features of

6  this embodiment" speaks volumes here.

7      One of ordinary skill in the art would understand that even though the specification refers

8  to conducting these reactions in "aliquots," the invention is not limited to using such "aliquots" (in

9  separate, parallel, reaction chambers). The '597 specification's warning against limiting the

10  invention "by the particular features of" the Figure 1 embodiment, as well as simple logic,

11  counsels against importing CGI's "parallel reactions" limitation into claim 1. This is especially

12  true here, where the specification refers to the "aliquots" embodiment as ***one aspect*** of the

13  present invention,"[77] *not* "the" invention.[78] This Court should reject CGI's invitation to limit step

14  (c) to an embodiment that was obviously *not* intended to limit the scope of the invention.

15      Elsewhere, in a section concerned with automating the process, the specification lists "the

16  degree of parallel operation desired" as a "design constraint."[79] One of ordinary skill in the art

17  reading this section would understand that the invention is not limited to "parallel reactions," but

18  includes a range of parallel reactions, from a fully parallel ("aliquots") process, to one that is not

19  parallel at all. CGI's construction turns the "aliquots" embodiment into "the" invention, when it is

20  in fact only one of a number of means to an end.

21      CGI's construction appears to assume that the scope of a claim is strictly limited by the

22  ────────────────────────

(Footnote continued from previous page.)

23  *also Nazomi Communications, Inc. v. ARM Holdings, PLC,* 403 F.3d 1364, 1369 (Fed. Cir. 2005)
    (claims may embrace "different subject matter than is illustrated in the specific embodiments in
24  the specification").

25  [75] *Phillips*, 415 F.3d at 1323.

    [76] *Id.*

26  [77] Exh. 2 to Labbé Decl. ('597 patent) at 4:46-47.

27  [78] *See Moore U.S.A., Inc. v. Standard Register Co.,* 229 F.3d 1091, 1111 (Fed. Cir. 2000) (treating
    a reference in the patent to "one aspect of the present invention" as a preferred embodiment).

28  [79] Exh. 2 to Labbé Decl. ('597 patent) at 13:55-62.

1  disclosed embodiments – that a claim cannot exceed the scope of the disclosed embodiments. CGI

2  is simply wrong.[80] The Court should reject CGI's attempt to read *one* of the ways Dr. Macevicz

3  described practicing his invention as his *only* invention.

### 3.   CGI's construction is inconsistent with its construction of step (a)

4

5  As discussed above in regard to step (a), the impropriety of CGI's constructions, and its

6  rationale for those constructions, is reflected in the fact it has proposed incompatible constructions

7  for step (a) and step (c). CGI's proposed construction of step (c) should be rejected at least on that

8  basis.

### D.   "oligonucleotide probe" ('597 claims 1, 9, 10, 14-19)

9

| Term | Illumina's Construction | CGI's Construction |
|------|------------------------|--------------------|
| "oligonucleotide probe" | A nucleic acid that can bind to the polynucleotide and, when bound to the polynucleotide, can be ligated to the initializing oligonucleotide | An oligonucleotide that contains or is associated with a label and that is ligated to the initializing oligonucleotide or, in subsequent cycles, to the extended duplex |

13  The parties appear to agree that an "oligonucleotide probe" is a nucleic acid (or

14  oligonucleotide) that can be (or is) "ligated to the initializing oligonucleotide." The parties

15  disagree, however, regarding: (1) whether a probe has to contain a "label"; and (2) whether the

16  probe can only be ligated to an "extended duplex" in "subsequent cycles." Neither of CGI's

17  proposed additional limitations is correct.

18  With respect to the first disagreement, the '597 patent discloses an embodiment of the

19  invention in which the oligonucleotide probe does *not* contain (nor is it associated with) a label.

20  Adopting an interpretation that excludes this preferred embodiment would be improper. With

21  respect to the second disagreement, CGI's position appears to be a re-hash of its position

22  regarding the "extending …" element, and should be rejected for the same reasons.

### 1.   CGI's proposed construction would exclude a preferred embodiment in the '597 patent that uses a probe that does *not* contain a label, which "is rarely, if ever, correct"[81]

23

24

25

---

26  [80] *See Retractable Techs., Inc. v. Becton, Dickinson and Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) ("In reviewing the intrinsic record to construe the claims, we strive to capture the scope of the

27  actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention.").

28  [81] *Vitronics*, 90 F.3d at 1583.

1       There is no doubt that the '597 specification describes probes in certain embodiments as

2  containing labels used to identify a nucleotide.[82] However, the patent also describes embodiments

3  that use oligonucleotide probes that do *not* contain labels. In Figure 4, the "probe **(402)**" does *not*

4  contain, nor is it associated with, a label. That probe is nevertheless described as a "probe," and

5  serves the claimed role of the probe, being ligated to the "initializing oligonucleotide **(400)**."[83]

6  Once probe (402) is ligated to the initializing oligonucleotide (400), a free nucleotide (a

7  "dideoxynucleotide (412)") containing a "label" is added onto the probe (402), and is subsequently

8  removed from the probe after identification:

9
> Extended duplex **(406)** is further extended by a nucleic acid polymerase in the
10
> presence of **labeled dideoxynucleoside triphosphates (412)**, thereby permitting
> the identification of a nucleotide of template (20) by the **label of the incorporated
> dideoxynucleotide**. The **labeled dideoxynucleotide and a portion of probe
11
> (402)** are then cleaved **(414)**, for example, by RNase H treatment, to regenerate an
> extendable end on extended duplex **(406)**.[84]

12       It is apparent from Figure 4, and its accompanying description, that one of ordinary skill in

13  the art reading the specification would *not* understand that "oligonucleotide probes" in the '597

14  patent *must* "contain[] or [be] associated with a label," as CGI's proposed construction would

15  require. Instead, a label may be contained on a nucleotide that is later added to the duplex.

16       CGI's attempt to import this limitation into the construction of the term would exclude a

17  preferred embodiment, "an interpretation [that] is rarely, if ever, correct and would require highly

18  persuasive evidentiary support…"[85] CGI cannot point to any "highly persuasive" evidence that

19  would lead one of ordinary skill in the art to conclude that a probe *must* contain a label.

20         **2.    Illumina's unequivocal statement contradicts CGI's construction**

21       CGI seeks to limit the ligation of probes in "subsequent cycles" (*i.e.*, in subsequent

22  "repeating" steps) to sequential ligations to the previously-extended initializing oligo (*i.e.*, to the

23  "extended duplex"). As explained above, step (a) of claim 1 does not encompass a form of

24

25   ––––––––––––––––––––
[82] *See, e.g.,* Exh. 2 to Labbé Decl. ('597 patent) at 5:12-15.

26  [83] *Id.* at 11:15-38. The specification also states: "Oligonucleotide probes (402) of the form: OP(=O)(O⁻)O(5`)BBB…BBBRRRRB…B(3`)OP(=O)(O⁻)O are annealed to template (20) and ligated (404) to form extended duplex (406)." *Id.* at 11:20-25.

27  [84] *Id.* at 11:30-37 (emphasis added).

28  [85] *Vitronics*, 90 F.3d at 1583.

1   repeating in which probes are ligated to an ever-extending duplex, because Illumina's unequivocal

2   statements during the reexamination disclaimed that form of repeating. CGI cannot use the

3   construction of "oligonucleotide probe" to re-broaden the scope of step (a) to include that which

4   Illumina disclaimed during prosecution.

5         **E.**     **"binding region" ('597 claims 9 and 10)**

| Term | Illumina's Construction | CGI's Construction |
|------|------------------------|---------------------|
| "binding region" | A region of the polynucleotide to which the initializing oligonucleotide binds | A known sequence of the polynucleotide to which the initializing oligonucleotide binds |

8         The parties agree that the "binding region" is a region of the polynucleotide to which the

9   initializing oligo binds. The parties only disagree as to whether the binding region must be a

10  known sequence. The specification reveals that the "binding region" has one purpose: to bind the

11  initializing oligo. CGI's proposal to import "known sequence" into the construction of "binding

12  region" should be rejected because: (1) nothing in the intrinsic evidence requires such a narrow

13  construction; and (2) such a construction violates the doctrine of claim differentiation.

14            **1.**      **The specification does not require the binding region to be "known"**

15        The specification repeatedly refers to the singular role of the binding region in the

16  invention: to bind ("hybridize") to the initializing oligo. For example:

17        [The binding region] must be sufficiently long *to accommodate the hybridization*
    *of an initializing oligonucleotide*. Different binding regions can be *employed with*

18  *either identical or different initializing oligonucleotides*, but for convenience of
    preparation, it is preferable to provide identical binding regions and different

19  initializing oligonucleotides. Thus, all the templates are prepared identically and
    then separated into aliquots *for use with different initializing oligonucleotides*.

20  Preferably, the binding region should be long enough *to accommodate a set of*
    *different initializing oligonucleotides*, each hybridizing to the template to produce

21  a different starting point for subsequent ligations.[86]

22        In regard to one embodiment (shown in Figure 1), the specification states "[b]inding region

23  (40) has a known sequence, but can vary greatly in length and composition."[87] Obviously, a

24

25  [86] Exh. 2 to Labbé Decl. ('597 patent) at 5:16-28 (emphasis added); *see also id.* at 4:52-5:2 ("...a
    different initializing oligonucleotide $i_k$, is provided that forms a perfectly matched duplex at a

26  location in binding region (40)... the initializing oligonucleotides $i_1$-$i_N$ form a set of duplexes with
    the template in the binding region (40)..."; *id.* at 5:30-32 ("Initializing oligonucleotides are

27  selected to form highly stable duplexes with the binding region that remain intact during any
    washing steps of the extension cycles.").

28  [87] *Id.* at 5:15-16.

1   binding region with a "known" sequence makes it easier to design an initializing oligo which will

2   bind to it, but that does not require limiting the binding region to a known sequence. Claims are

3   not typically limited to a particular embodiment described in the patent (even if it were the only

4   embodiment expressly described).[88] In the '597 patent, the term "binding region" is limited only

5   by its purpose in the invention: to bind the initializing oligo. CGI's attempt to further limit the

6   term should be rejected.

          **2.    Claim differentiation creates a presumption that the binding region is
7              not required to be a "known sequence"**

8         Claim differentiation assists in determining whether a limitation in a dependent claim

9   should be read into a claim from which it depends.[89] Claim 10, which depends from claim 9 (and

10  thus from claim 1), requires that the binding region contains "a known sequence."[90] If the binding

11  region of claims 1 and 9 were to be interpreted, as CGI proposes, to be "a known sequence," it

12  would render the limitation in claim 10 superfluous, thus violating the doctrine of claim

13  differentiation.[91] This is an additional reason to reject CGI's proposed construction.

14        **F.    "target polynucleotide" ('597 claims 9 and 10)**

| Term | Illumina's Construction | CGI's Construction |
|---|---|---|
| "target polynucleotide" | A polynucleotide having a portion to be sequenced | The region of the polynucleotide to be identified that is conjugated to the binding region |

17        The parties appear to agree that the "target polynucleotide" referred to in claims 9 and 10 is

18  a polynucleotide (which can be a region of "the polynucleotide" recited earlier in claims 1 and 9)

19  that contains some portion to be sequenced (or, as CGI puts it, "identified"). The parties only

20  disagree as to whether the target polynucleotide has to be "conjugated to the binding region."

21

22  ───────────────────

23  [88] *See MySpace*, 756 F.Supp.2d at 1226 ("Limitations from the specification, however, such as from the preferred embodiment, cannot be read into the claims absent a clear intention by the patentee to do.") (citing *Altiris v. Symantec Corp.*, 318 F.3d 1363, 1372 (Fed. Cir. 2003).

24  [89] *See SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985) ("It is settled law that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement.").

26  [90] Exh. 3 to Labbé Decl. ('597 patent reexamination certificate) at 1:25-28.

27  [91] *See Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1187 (Fed. Cir.1998) (finding a violation of the doctrine of claim differentiation when a proposed construction would render another claim superfluous).

28

1

    **1.     The claims do not require conjugation to a binding region**

2

       Claim 9 recites "wherein the polynucleotide [of claim 1] comprises a binding region and a

3

target polynucleotide," and claim 10 recites "wherein…the target polynucleotide [of claim 9]

4

comprises an unknown sequence."[92] The claims do not say the target polynucleotide must be

5

conjugated to the binding region.

6

             **2.     The specification describes "a target polynucleotide" that is**
                         **independent of "the binding region"**

7

       One of ordinary skill in the art would have understood the specification to describe a

8

"target polynucleotide" as a polynucleotide having a portion to be sequenced. For example, in the

9

Background of the Invention, the patent describes the limitations of conventional sequencing

10

techniques in terms of their ability to sequence "long target polynucleotides."[93] The patent

11

describes a "target polynucleotide" as having one purpose and function: it is simply a

12

polynucleotide that is subjected to the claimed sequencing method. For example, the two examples

13

are each titled "Sequencing a Target Polynucleotide."[94]

14

       Even the portion of the specification that CGI cites to support its proposed construction

15

supports Illumina's construction, not CGI's. That portion says only that the target polynucleotide

16

is "preferably" conjugated to a binding region ("Preferably, a target polynucleotide is conjugated

17

to a binding region to form a template . . . .").[95] The Federal Circuit has explained that "the use of

18

the term 'preferably' makes clear that the language describes a preferred embodiment, not the

19

invention as a whole."[96] Here, the use of the word "preferably" implies that a target polynucleotide

20

need not be conjugated to a binding region.

21

       This description of a "target polynucleotide" does *not* define a target polynucleotide as

22

23

[92] Exh. 3 to Labbé Decl. ('597 patent reexamination certificate) at 1:23-29.

24

[93] Exh. 2 to Labbé Decl. ('597 patent) at 2:13-17 ("Several significant technical problems have
seriously impeded the application of such techniques to the sequencing of long target

25

polynucleotides, e.g. in excess of 500-600 nucleotides . . . .").

26

[94] *Id.* at 14:40-43 ("EXAMPLE 1: Sequencing a Target Polynucleotide Amplified from pUC19
with Four Initializing Oligonucleotides") and 16:30-33 ("EXAMPLE 2: Sequencing a Target

27

Polynucleotide Amplified from pUC 19 with One Initializing Oligonucleotide").

[95] *Id.* at 8:9-10.

28

[96] *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1357 (Fed. Cir. 2003).

1  being "conjugated to the binding region." It merely states a "preference" to combine a binding

2  region and a target polynucleotide to form "a template." This preferred embodiment should not be

3  used to limit the scope of the term "target polynucleotide."[97]

4      **G.      "spectrally resolvable fluorescent signal" ('597 claims 14 and 15)**

| Term | Illumina's Construction | CGI's Construction |
|---|---|---|
| "spectrally resolvable fluorescent signal" | A light signal generated by fluorescence which can be distinguished based on its spectral characteristics (e.g., its color) | A signal that may be distinguished on the basis of its spectral characteristics |

7          The parties agree that a "spectrally resolvable fluorescent signal" is a "signal" that can be

8  distinguished based on its "spectral characteristics." The parties only disagree as to whether the

9  signal must be a "fluorescent" light signal. CGI's proposal writes the term "fluorescent" out of the

10  term, instead broadening the term to any "signal." CGI's proposal is inconsistent with both the

11  claim term itself, and the specification's description of the term.

12          Obviously, a "fluorescent signal" is a particular type of signal, one involving the emission

13  (giving off) of fluorescent light.[98] CGI's proposed construction should be rejected because it does

14  not require fluorescence. Referring to "spectral characteristics" does not capture fluorescence. The

15  specification defines "spectrally resolvable" as relating to dyes that "may be distinguished on basis

16  of their spectral characteristics," but describes "fluorescence emission wavelength" as only one

17  possible type of spectral characteristic.[99] Because it writes "fluorescent" out of the claim term,

18  CGI's proposed construction must be rejected.[100]

19      **H.      "set" and "probe set" ('597 claims 2, 4, and 5)**

| Term | Illumina's Construction | CGI's Construction |
|---|---|---|
| "set" & "probe set" | Plaintiffs contend that no construction is necessary for the terms "set" and "probe set." Should the Court determine that construction is required, Plaintiffs propose: "a number of probes grouped together" | A subset of a mixture of all oligonucleotides of a selected length that are grouped according to their free energy of duplex formation with their perfectly complementary sequences |

---

[97] *See MySpace*, 756 F.Supp.2d at 1226 ("Limitations from the specification, however, such as from the preferred embodiment, cannot be read into the claims absent a clear intention by the patentee to do.") (citing *Altiris*, 318 F.3d at 1372).

[98] *See* http://en.wikipedia.org/wiki/Fluorescence (last visited October 21, 2011).

[99] Exh. 2 to Labbé Decl. ('597 patent) at 14:25-29.

[100] *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 951 (Fed. Cir. 2006) ("In sum, the effect of adopting Diro's proposed claim construction would be to read limitations . . . out of the claim. Not only would that be contrary to the principle that claim language should not [be] treated as meaningless, but it would be contrary to the specification . . .").

1    The Court does not need to construe these terms, as they are not defined in the intrinsic

2    record to have anything other than their ordinary meaning.[101]

3    CGI's proposed construction inappropriately uses "sets" to add additional limitations to the

4    "sets" recited in claim 2 (where these terms appear). Claim 2 already contains limitations that

5    delineate the size of the set, and the probe sets relative ability to bind to DNA at a certain

6    temperature (the annealing temperature). CGI's proposals unnecessarily further narrow those

7    express limitations. First, CGI proposes that a "set" must be "a subset of a mixture of all

8    oligonucleotides of a selected length." But, as shown below, the size of the "set" is already

9    determined by the first clause of claim 2:

10    2. A kit for DNA sequence analysis, the kit comprising one or more **sets** of
      oligonucleotide probes, wherein

11

12    (i) **each probe set contains at least 50 different-sequence, single-
      stranded oligonucleotide probes**…[102]

13    Claim 2 already defines the required attributes of the "set." There is no need to import further

14    limitations beyond those expressly set out in the claim. The intrinsic record simply does not

15    require that a "probe set" be derived from a pool of all possible probes of a given length.

16    CGI's proposal also requires that the "sets" are "grouped according to their free energy of

17    duplex formation with their perfectly complementary sequences." This very complex phrase

18    means that probes in a given set are grouped according to their relative ability to bind to their

19    complementary sequence at or near the same temperature. CGI ignores that claim 2 already

20    requires that the probes have a certain similarity to each other, based on the temperature at which

21    they can hybridize (anneal) to form a stable duplex ("…  (iii) for at least one said probe set, **the**

22    **different-sequence, single stranded oligonucleotide probes in that set have annealing**

23    **temperatures whose maximum and minimum values differ from each other by no more than**

24    **1° C.**")[103]

25    Given that the claim itself already sets forth the temperature-based similarity required by

─────────────────────────────

26    [101] Exh. 16 to Labbé Decl. (Oxford Dictionary of Current English) at p. 833 (defining the noun
      form of "set" as "a group of linked or similar things or persons."

27    [102] Exh. 2 to Labbé Decl. ('597 patent, claim 2) at 21:35-39 (emphasis added).

28    [103] *Id*. at 21:41-44 (emphasis added).

the claim, it is inappropriate to imbue the term "set" with that characteristic (much less the characteristic CGI seeks to add, which is not the same as that actually recited in the claim).

### I. "annealing temperatures" ('597 claims 2, 4, and 5)

| Term | Illumina's Construction | CGI's Construction |
|---|---|---|
| "annealing temperatures" | The temperatures at which the annealing step can be carried out | The temperatures at which particular probes have about fifty percent maximum annealing in a standard PCR buffer solution |

The parties disagree about the scientific meaning of this term. Illumina proposes that the term be construed consistently with its use in the '597 specification and in the art. CGI proposes to construe "annealing temperature" to mean the same as "melting temperature," despite the fact that these are entirely different processes, as is made clear in the '597 specification.

"Annealing" is when two DNA strands are combined to form a "duplex" of double-stranded DNA.[104] The opposite process, "melting," is the separation of two strands of DNA.[105] These two temperatures very different. The melting temperature is that at which half of a mixture of double-stranded DNAs will separate into single strands.[106] The annealing temperature is the temperatures at which the annealing step of a process can be carried out.

CGI assumes the two are synonymous, but they are not. The annealing temperature for an oligonucleotide is *not* the same as its melting temperature. In a leading molecular biology treatise, the authors noted that the annealing step could be done within a range of temperatures: "Annealing is *usually* carried out *3-5°C lower* than the calculated *melting temperature* at which the oligonucleotide primers dissociate [*i.e.*, melt] from their templates."[107] This is reflected in other scientific literature[108] and in the '597 patent specification.[109]

---

[104] Exh. 17 to Labbé Decl. (Dictionary of Bioscience) at p. 28 (defining "anneal" as "to recombine strands of denatured bacterial deoxyribonucleic acid that were separated").

[105] Exh. 18 to Labbé Decl. (Dictionary of Genetics) at p. 208 (defining "melting" as "the denaturation [separation] of double-stranded DNA to single strands").

[106] *See id.* (defining "melting" as "the denaturation [separation] of double-stranded DNA to single strands").

[107] Exh. 19 to Labbé Decl. (Sambrook et al., *Molecular Cloning*) at p. 8.8-8.9 (emphasis added).

[108] Exh. 20 to Labbé Decl. (Rychlik et al.) at p. 6412 ("For the first cycle, the $T_a$ [annealing temperature] was determined by subtracting 8° from the $T_m$ [melting temperature] of the less stable oligonucleotide as calculated from the actual starting template concentration. The $T_a$ was then increased by 1° every other cycle (Fig. 4).").

[109] Exh. 2 to Labbé Decl. ('597 patent) at 16:4-9.

1    The '597 specification itself refers to a range, and reveals CGI's mistake:

2         The range of annealing temperatures (22-70° C) is roughly bounded
         by the temperatures **5-10 degrees below** the temperatures at which
3         the least stable and most stable 8-mers [probes], respectively, are
         expected to **have about fifty percent maximum annealing in a**
4         **standard PCR buffer solution**.[110]

5    Thus, the specification indicates that to calculate the highest end of the range of annealing

6    temperatures for a set of "8-mers" (probes eight nucleotides long), one subtracts 5-10 degrees

7    from the melting temperature (*i.e.*, from what CGI proposes as the annealing temperature).

8         In addition to being scientifically inaccurate and inconsistent with the specification, CGI's

9    proposal overcomplicates a simple concept: the annealing temperature is simply the temperature at

10   which the annealing reaction (step) takes place. The Court should adopt Illumina's construction.

11   **IV.    CONCLUSION**

12        In the AB litigation, Judge Alsup was not aware of Illumina's express disavowal of claim

13   scope; that disavowal only occurred *after* the close of the AB litigation. Had Judge Alsup known

14   that the PTO required Illumina to narrow the scope of step (a) in claim 1 to encompass only one

15   form of "repeating" (Judge Alsup's option (i)), he undoubtedly would have limited the scope of

16   step (a) in that manner. CGI asks this Court to improperly re-broaden step (a) to include the scope

17   that the examiner required Illumina to surrender during the reexamination. As for the other

18   disputed terms, CGI seeks overly narrow constructions by: (i) improperly reading limitations from

19   preferred embodiments into the claim (for "repeating...," "binding region," "target

20   polynucleotide," and "[probe] set"); (ii) construing the term so as to exclude a preferred

21   embodiment (for "oligonucleotide probe"); and (iii) ignoring a term specifically recited in the

22   claim ("fluorescent" in "spectrally resolvable fluorescent signal"). CGI's constructions violate the

23   guiding principles set forth by the Federal Circuit in *Phillips*, and should be rejected.

24

25

26

27

28   ---
     [110] *Id.* at 16:4-9 (emphasis added).

1    Dated: October 20, 2011                    Respectfully submitted,

2

3                                                /s/ John R. Labbé
                                              Kevin M. Flowers (admitted *pro hac vice*)
4                                              Email:  kflowers@marshallip.com
                                              John R. Labbé (admitted *pro hac vice*)
5                                              Email:  jlabbe@marshallip.com
                                              MARSHALL, GERSTEIN & BORUN LLP
6                                              233 South Wacker Drive
                                              6300 Willis Tower
7                                              Chicago, Illinois 60606-6357
                                              Telephone: (312) 474-6300
8                                              Facsimile: (312) 474-0448

9                                              Gina A. Bibby
                                              Email:  gbibby@foley.com
10                                             FOLEY & LARDNER LLP
                                              975 Page Mill Road
11                                             Palo Alto, CA 94304
                                              Telephone: (650) 856-3700
12                                             Facsimile: (650) 856-3710

13                                             Attorneys for Plaintiffs
                                              ILLUMINA, INC. and SOLEXA, INC.
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28