UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ILLUMINA, INC and SOLEXA INC.,

                    Plaintiffs,                           No. C 10-5542 EDL

        v.                                                CLAIM CONSTRUCTION ORDER

COMPLETE GENOMICS, INC.,

                    Defendant.
_____/

On December 9, 2011 and January 11, 2012, the Court held hearings on the parties' proposed construction of the disputed terms of United States Patent Number 6,306,597, pursuant to Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996), preceded by a technology tutorial presented by the parties on November 30, 2011. Having carefully reviewed the papers and considered the arguments of counsel and the relevant legal authority, the Court hereby construes the claim terms as follows.

I.      BACKGROUND

        A.      The Instant Action

Plaintiffs Illumina, Inc. and Solexa, Inc. (collectively, "Illumina") filed this patent infringement action against Defendant-Counterclaimant Complete Genomics, Inc. ("CGI") in the District Court for the District of Delaware on August 3, 2010. The parties are competitors in the field of DNA sequencing. Illumina designs, manufactures, and sells several platforms for high-throughput DNA sequencing, including its Genome Analyzer and HiSeq sequencing instruments. CGI offers DNA sequencing services to its customers through its Complete Genomics

**United States District Court**
For the Northern District of California

1  Analysis Service ("CGA™ Service").  In performing its CGA™ Service, CGI employs its Complete

2  Genomics Analysis Platform ("CGA™ Platform"), which includes its Combinatorial Probe-Anchor

3  Ligation (or "cPAL™") read technology.  Illumina contends that through CGI's use of its CGA™

4  Platform to perform DNA sequencing services, CGI infringes Illumina U.S. Patent No. 6,306,597

5  ("the '597 patent").  Illumina also previously asserted U.S. Patent No. 7,232,656 ("the '656 patent"),

6  and U.S. Patent No. 7,598,035 ("the '035 patent"), but the parties stipulated to dismissal without

7  prejudice of all claims and counterclaims related to the '656 and '035 patents.  Doc. no. 75.

8  CGI denies that it infringes any of the Illumina Patents. CGI further alleges that all of the

9  Illumina Patents are invalid, and it alleges that the '597 patent is unenforceable due to inequitable

10 conduct. CGI also claims that by filing its claim for infringement of the '597 patent against CGI,

11 Illumina has violated Section 2 of the Sherman Act under the doctrine of <u>Walker Process</u>

12 <u>Equipment, Inc. v. Food Machine & Chemical Corp.</u>, 382 U.S. 172 (1965).  Illumina denies that any

13 of the Illumina patents are invalid and denies that it has violated the Sherman Act.

14 By order dated November 9, 2010, the court granted CGI's motion to transfer venue to the

15 Northern District of California.  Judge Alsup denied CGI's motion to consider whether this action is

16 related to an earlier filed action, <u>Applera-AB v. Illumina</u>, No. C 07-02845 WHA.  Doc. no. 42.

17 Upon consent of the parties, this action was reassigned to this Court.

18 **B.     Prior Litigation of the '597 Patent**

19 In <u>Applera Corp. - Applied Biosystems Group v. Illumina, et al.</u>, No. C 07-02845 WHA,

20 Applied Biosystems ("AB") filed suit against Illumina for ownership of the '597 patent and two

21 related patents (U.S. Patent Nos. 5,750,341 and 5,969,119), alleging that the inventor, Dr. Macevicz,

22 invented the subject matter of the patents while he was in-house patent counsel for AB and breached

23 the terms of an Invention Agreement by, among other things, failing to disclose inventions to AB,

24 applying for patents on the inventions in his own name, and purporting to assign the inventions and

25 patents to Lynx, a spinoff corporation of AB, which subsequently merged with Solexa.  AB alleged

26 that Macevicz's conduct, as well as Illumina and Solexa's conduct, gave rise to claims for

27 interference with contract, breach of fiduciary duty, constructive fraud, conversion, imposition of

28 constructive trust, and unfair competition.  Illumina countersued AB for infringement.

**United States District Court**

For the Northern District of California

1    Judge Alsup issued a claim construction order on February 21, 2008, which construed terms

2  from one of the '597 patent's sibling patents, some of which also appear in the '597 patent.  See

3  Applera-AB, Case No. 07-2845 WHA, doc. no. 133.  See Labbe Decl., Ex. 5.  Judge Alsup issued a

4  supplemental claim construction on terms from Claim 1 of the '597 patent and the parties stipulated

5  that AB infringed Claim 1 and that the Southern prior art reference rendered Claim 1 invalid.

6  Applera-AB, doc. nos. 383-1, 384-1, 402 (order on stipulation re infringement and invalidity).  See

7  Labbe Decl., Ex. 5.  The parties agree that Judge Alsup's construction of the terms also applies to

8  the '597 patent.  Opening Br. at 6-7; Resp. at 9.  Following jury trial, on February 3, 2009, Judge

9  Alsup entered judgment for Illumina on AB's claim of ownership of the Macevicz patents and

10  entered judgment for AB on Illumina's claim that AB infringed the '119 patent.

11    On March 25, 2010, the Federal Circuit issued its decision affirming Judge Alsup's claim

12  construction of the terms that were appealed and affirming "the court's judgment of noninfringement

13  with respect to Applera's accused products, and the court's order, entered pursuant to stipulation,

14  concerning invalidity."  See Labbe Decl., Ex. 6 at 14-16.  Mandate was issued on May 3, 2010.

15    **C.    Reexamination**

16    While the litigation before Judge Alsup was pending, on June 30, 2008, AB filed a request

17  for reexamination of the '597 patent.  See Labbe Decl., Ex. 7.  Three months after the jury trial

18  before Judge Alsup, on May 28, 2009, the PTO issued a non-final Office Action rejecting claim 1 of

19  the '597 patent as being anticipated by several prior art references, including Martinelli (U.S. Patent

20  No. 5,800,994) and either Landegren (U.S. Patent No. 4,988,617) or Whitely (U.S. Patent No.

21  4,883,750) taken in view of Martinelli.  Labbe Decl., Ex. 8.  Illumina/Solexa held an interview with

22  the Examiner on July 13, 2009, and filed a response to the office action on August 6, 2009, which

23  included amendments to the claims.  Labbe Decl., Exs. 9, 10.

24    The Examiner's interview summary indicates that he and Illumina/Solexa discussed whether

25  the "Martinelli patent is 'repeating' steps a and b within the meaning of claim 1."  Labbe Decl., Ex.

26  10.  In its response to the PTO's Office Action, Illumina/Solexa summarized the interview as

27  follows:

28    It was discussed that Martinelli did not disclose repeating steps (a) and
      (b) on the same polynucleotide that was operated on in the first cycle

1  |  of the claimed method.  It was discussed that claim 1 recites a method
2  |  that is limited to repeating steps (a) and (b) on the same
   |  polynucleotide that was operated on in the first cycle of the method.  It
3  |  was agreed that an unequivocal statement by the Applicant that step
   |  (c) of claim 1 of the ' 597 patent requires repeating steps (a) and (b) on
   |  the same polynucleotide acted upon in the first cycle of the recited
4  |  method would overcome the rejections based on Martinelli.

5  Labbe Decl., Ex. 9 at 11 (8/6/2009 Suppl. Amendment).  According to Illumina, "Martinelli

6  described its version of [oligonucleotide ligation assay] as a 'hybridization-ligation methodology

7  (HLM),'" which involves binding two probes to a DNA sample to detect whether a mutation is

8  present.  Id. at 15; Opening Br. at 8.  Under the Martinelli patent, according to Illumina, "[i]f the two

9  probes can be ligated, the identity of the nucleotide at the site in the sample where the two probes

10  attach to each other can be determined, because ligation could only occur if the mutation is present."

11  Opening Br. at 8.  In response to the rejection of claim 1 as anticipated by Martinelli and obvious

12  over Landegren and Whiteley in view of Martinelli, Illumina/Solexa distinguished Martinelli on the

13  ground that Martinelli "did not disclose repeating the steps of its 'HLM' method . . . [and] expressly

14  taught that the HLM reaction was intended to be performed for only one cycle."  Labbe Decl., Ex. 9

15  at 15.  In its amendment to Claim 1, Illumina made the following narrowing statement:

16  |  As discussed at the interview, the "repeating" step in the claimed
17  |  method, step (c), requires the repetition of (a) and (b) on the
   |  same polynucleotide sequence that was acted upon in the first cycle of
18  |  the recited method.  Step (a) of claim 1 recites "extending an
   |  initializing oligonucleotide along the polynucleotide."  When step (a)
19  |  is repeated as required by step (c), a (new) initializing oligonucleotide
   |  is extended along the same polynucleotide as was acted upon in the
20  |  first cycle of the recited method ("the polynucleotide").

21  Labbe Decl., Ex. 9 at 15.  By Office Action dated September 30, 2009, the examiner withdrew the

22  claim rejections based on Martinelli (and based on Landegren or Whitely in view of Martinelli):

23  |  Patent Owner has provided an unequivocal statement that "repeating"
24  |  steps (a) and (b) of the claimed method means that the steps are
   |  performed on the same nucleic acid sequence in each cycle (response
   |  of August 3, 2009, p. 15).  In Martinelli, repetition is performed on
25  |  different portions of the target nucleic acid (col. 4, lines 56-61).
   |  Therefore Martinelli does not anticipate the claim and the rejection is
26  |  **withdrawn**.

27  Labbe Decl., Ex. 12 at 5.  The PTO confirmed that for the reasons detailed in that Office Action,

28  claim 1 is patentable.  Labbe Decl., Ex. 13 at 3 (12/22/09 Office Action).  An Ex Parte

**United States District Court**

For the Northern District of California

1   Reexamination Certificate with regard to the '597 patent was issued on March 2, 2010.  Labbe

2   Decl., Ex. 3.  On March 25, 2010, the Federal Circuit issued its opinion affirming the judgment

3   entered by Judge Alsup in the <u>Applera-AB</u> litigation, as noted above.

4   **II.      LEGAL STANDARD**

5          In construing claims, the court must begin with an examination of the claim language itself.

6   The terms used in the claims are generally given their "ordinary and customary meaning."  <u>See</u>

7   <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005); <u>see also</u> <u>Renishaw PLC v.</u>

8   <u>Marposs Societa' per Azioni</u>, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("The claims define the scope of

9   the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the

10  actual words of the claim.").  This ordinary and customary meaning "is the meaning that the terms

11  would have to a person of ordinary skill in the art in question at the time of the invention. . . ."

12  <u>Phillips</u>, 415 F.3d at 131.  A patentee is presumed to have intended the ordinary meaning of a claim

13  term in the absence of an express intent to the contrary.  <u>York Products, Inc. v. Central Tractor Farm</u>

14  <u>& Family Ctr.</u>, 99 F.3d 1568, 1572 (Fed. Cir. 1996).

15         Generally speaking, the words in a claim are to be interpreted "in light of the intrinsic

16  evidence of record, including the written description, the drawings, and the prosecution history, if in

17  evidence."  <u>Teleflex, Inc. v. Ficosa North Am. Corp.</u>, 299 F.3d 1313, 1324-25 (Fed. Cir. 2002)

18  (citations omitted); <u>see also</u> <u>Medrad, Inc. v. MRI Devices Corp.</u>, 401 F.3d 1313, 1319 (Fed. Cir.

19  2005) (court looks at "the ordinary meaning in the context of the written description and the

20  prosecution history").  "Such intrinsic evidence is the most significant source of the legally

21  operative meaning of disputed claim language."  <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d

22  1576, 1582 (Fed. Cir. 1996).

23         With regard to the intrinsic evidence, the court's examination begins, first, with the claim

24  language.  <u>See id</u>.  Specifically, "the context in which a term is used in the asserted claim can be

25  highly instructive."  <u>Phillips</u>, 415 F.3d at 1314.  As part of that context, the court may also consider

26  the other patent claims, both asserted and unasserted.  <u>Id</u>.  For example, as claim terms are normally

27  used consistently throughout a patent, the usage of a term in one claim may illuminate the meaning

28

1   of the same term in other claims.  Id.  The court may also consider differences between claims as a

2   guide in understanding the meaning of particular claim terms.  Id.

3       Second, the claims "must [also] be read in view of the specification, of which they are a

4   part."  Id. at 1315.  When the specification reveals a special definition given to a claim term by the

5   patentee that differs from the meaning it would otherwise possess, the inventor's lexicography

6   governs.  Id. at 1316.  Indeed, the specification is to be viewed as the "best source" for

7   understanding a technical term, informed as needed by the prosecution history.  Id. at 1315.  As the

8   Federal Circuit stated in Phillips, the specification is "the single best guide to the meaning of a

9   disputed term," and "acts as a dictionary when it expressly defines terms used in the claims or when

10  it defines terms by implication."  415 F. 3d at 1321.

11      Limitations from the specification, however, such as from the preferred embodiment, cannot

12  be read into the claims absent a clear intention by the patentee to do.  Teleflex, 299 F.3d at 1326

13  ("The claims must be read in view of the specification, but limitations from the specification are not

14  to be read into the claims.") (citations omitted); CCS Fitness, 288 F.3d at 1366 ("a patentee need not

15  describe in the specification every conceivable and possible future embodiment of his invention.");

16  Altiris v. Symantec Corp., 318 F.3d 1363, 1372 (Fed. Cir. 2003) ("resort to the rest of the

17  specification to define a claim term is only appropriate in limited circumstances").

18      "[T]here is sometimes a fine line between reading a claim in light of the specification,  and

19  reading a limitation into the claim from the specification. . . . [A]ttempting to resolve that problem in

20  the context of the particular patent is likely to capture the scope of the actual invention more

21  accurately than either strictly limiting the scope of the claims to the embodiments disclosed in the

22  specification or divorcing the claim language from the specification."  Decisioning.com, Inc. v.

23  Federated Dept. Stores, Inc., 527 F.3d 1300, 1308 (Fed. Cir. 2008) (citations omitted).   There is

24  therefore "no magic formula or catechism for conducting claim construction," and the court must

25  "read the specification in light of its purposes in order to determine whether the patentee is setting

26  out specific examples of the invention to accomplish those goals, or whether the patentee instead

27  intends for the claims and the embodiments in the specification to be strictly coextensive."  Id.

28  (internal citations omitted).

**United States District Court**
For the Northern District of California

1    Finally, as part of the intrinsic evidence analysis, the court "should also consider the patent's

2    prosecution history, if it is in evidence." Phillips, 415 F.3d at 1317.  The court should take into

3    account, however, that the prosecution history "often lacks the clarity of the specification" and thus

4    is of limited use for claim construction purposes. Id.

5    In most cases, claims can be resolved based on intrinsic evidence. See Vitronics, 90 F.3d at

6    1583.  Only if an analysis of the intrinsic evidence fails to resolve any ambiguity in the claim

7    language may the court then rely on extrinsic evidence, such as expert and inventor testimony,

8    dictionaries, and learned treatises. See Vitronics, 90 F.3d at 1583 ("In those cases where the public

9    record unambiguously describes the scope of the patented invention, reliance on any extrinsic

10   evidence is improper").  "Within the class of extrinsic evidence, the court has observed that

11   dictionaries and treatises can be useful in claim construction." Phillips, 415 F.3d at 1318.   While

12   expert testimony can be useful to a court for a variety of purposes, conclusory assertions by experts

13   are not. Id.  The court generally views extrinsic evidence as less reliable than the patent and its

14   prosecution history in determining how to read claim terms, although its consideration is within the

15   court's sound discretion. See id. at 1318-19.

16   **III.    DISCUSSION**

17   The parties dispute the construction of nine terms in the '597 patent.  The '597 patent

18   contains two independent claims, Claims 1 and 2.  Illumina asserts Claim 2 and dependent Claims 4,

19   5, 9, 10, 14, 15, 16, 17, 18 and 19 in this action.  Illumina has previously stipulated that Claim 1 is

20   invalid and does not assert that claim here.  However, because dependent claims 9, 10, 14, 15, 16,

21   17, 18 and 19 are dependent from Claim 1, its construction is necessary.

22   CGI points out that the most significant terms to be construed are the repeating step of Claim

23   1 (i.e., step (c)) and "annealing temperatures" and "set"/ "probe set" of Claim 2.  CGI contends that

24   it does not infringe because it neither (1) repeats ligation reactions in the manner that the patent

25   teaches nor (2) groups probes into subsets by annealing temperature.

26   **A.    Background of the '597 Patent**

27   Judge Alsup articulated a basic overview of DNA and the Sanger method of sequencing

28   DNA in the Applera-AB v. Illumina litigation:

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DNA consists of a long polymer of simple units called nucleotides. Each nucleotide in human DNA consists of a deoxyribose sugar linked to both a phosphate group and one of four characteristic nitrogen "bases": adenine (A), cystosine (C), guanine (G), or thymine (T). The deoxyribose sugar has five carbons, numbered 1' to 5', respectively. It is the sequence of these bases that encodes information about the functioning of living organisms. The bases bond with one another, or "hybridize," to create a structure known as a double helix consisting of two intertwined strands of DNA. These two strands are perfectly complementary to one another, such that A bonds with its complement T and C bonds with its complement G. When a single strand of DNA exists in isolation, its sequence is unknown, i.e., the exact lineup of the A, C, G, and T's is unknown. . . .

A method used in the prior art for DNA sequencing was known as "Sanger sequencing." In a single DNA strand, adjacent nucleotides are chemically bonded. A dideoxynucleotide, or a ddNTP, is a type of nucleotide that lacks the hydroxyl group of a standard deoxynucleotide, or a dNTP. Hydroxyl is a molecule consisting of an oxygen atom and a hydrogen atom. The lack of this hydroxyl group means that when a ddNTP is added to a sequence of DNA on a strand no further nucleotides, a ddNTP or a dNTP, may be added. The Sanger sequencing method made use of this chemical property. In Sanger sequencing, each base (e.g., A, C, G, and T) was assigned a fluorescent color and the target DNA to be sequenced was bonded with a known DNA sequence. The known DNA sequence was then hybridized by an initializing primer, which added stability to the entire structure. Several strands of the target DNA were then brought into contact with single probe ddNTPs and dNTPs. The result was that several strands of the target DNA would hybridize to the different probes at various points on the DNA strand. Because ddNTPs halt further hybridization on any given single strand of the target DNA, many strands would have varying lengths depending on where the ddNTP hybridized. Some strands that hybridized with the target would be longer (i.e., a ddNTP hybridized at a much later point in the sequence) and some would be shorter (i.e., a ddNTP hybridized at a much earlier point in the sequence). These several strands that hybridized to the target DNA were then collected and placed in a capillary tube to form a group of strands of varying lengths. A magnetic field was then placed on the capillary tube causing the various strands to line up in order of length (e.g., shortest to longest). Each individual strand would then be taken out of the tube and put through a light source which allowed the user to identify the fluorescent light associated with the ddNTP of that sequence. Because the varying strands were lined up according to their length, the user would go through strand by strand to decode each color, and hence base, associated with each nucleotide of the sequence in the correct order, thereby allowing the perfect complement to the target DNA sequence to be determined. In sum, the Sanger sequencing method allowed a target DNA strand to be sequenced by associating fluorescent labels with specific nucleotides that had hybridized with the target DNA sequence. Once the identities of the nucleotides that hybridized were determined, it was simply a matter of taking their complements to determine the sequence of the target DNA strand.

United States District Court

For the Northern District of California

1 | Applera-AB, No. C 07-02845 WHA, doc. no. 232 at 1-3.  See '597 patent, 1:18 - 2:64

2 | (Background).

3 |      The '597 patent teaches a method of DNA sequencing.  As used in the patent, "'ligation'

4 | means to form a covalent bond or linkage between the termini of two or more nucleic acids, e.g.

5 | oligonucleotides and/or polynucleotides, in a template-driven reaction.  The nature of the bond or

6 | linkage may vary widely and the ligation may be carried out enzymatically or chemically."

7 | '597 patent, 4:28-33 (Definitions).  Generally, in ligation reactions, an enzyme can link together two

8 | separate strands of DNA that are hybridized adjacent to each other but are not connected in their

9 | sugar phosphate backbone.  Once the enzyme repairs this break in the DNA ladder, the two pieces

10 | are linked together as one strand.  Resp. at 3.

11 |      As described in the patent, "[t]he invention relates generally to methods for determining the

12 | nucleotide sequence of a polynucleotide, and more particularly, to a method of identifying

13 | nucleotides in a template by stepwise extension of one or more primers by successive ligations of

14 | oligonucleotide blocks."  '597 patent, 1:10-14 [Field of the Invention].  The patent states that an

15 | objective of the invention is to provide "an alternative approach to presently available DNA

16 | sequencing technologies."  '597 patent, 2:65-67.  The invention provides a method of DNA analysis

17 | based on repeated cycles of duplex extension along a single stranded template.  '597 patent, 3:3-5.

18 |    **B.**    **Claim 1**

19 | Claim 1 teaches the following method:

20 |        1. A method for identifying a sequence of nucleotides in a
       polynucleotide, the method comprising the steps of:

21 |

22 |        (a) extending an initializing oligonucleotide along the
       polynucleotide by ligating an oligonucleotide probe thereto to
       form an extended duplex;

23 |

24 |        (b) identifying one or more nucleotides of the
       polynucleotide; and

25 |        (c) repeating steps (a) and (b) until the sequence of
       nucleotides is determined.

26 |

27 | '597 patent, 21:25-24.  The parties ask the Court to construe the following terms: "extending an

28 | initializing oligonucleotide along the polynucleotide by ligating an oligonucleotide probe thereto to

United States District Court

For the Northern District of California

1  form an extended duplex" (i.e., step (a)); "repeating steps (a) and (b) until the sequence of

2  nucleotides is determined" (i.e., step (c)); "initializing oligonucleotide;" and "oligonucleotide

3  probe."

4       As an initial matter, CGI contends that Illumina is barred by collateral estoppel from

5  relitigating the construction of the terms referring to extending step (a) and repeating step (c).  Resp.

6  at 12.  Illumina responds that it is not barred from re-arguing claim construction because it relies on

7  statements made during the reexamination which occurred after the Applera-AB litigation.  Reply at

8  2.  The law of the regional circuit applies to the doctrine of collateral estoppel, Transocean Offshore

9  Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc., 617 F.3d 1296 (Fed. Cir. 2010).  Because

10  the effect of the reexamination history was not presented in the earlier proceeding to Judge Alsup or

11  the Federal Circuit, the issues are not identical, strictly speaking, and Illumina would not appear to

12  be barred by the traditional doctrine of collateral estoppel from doing so now.  See Enovsys LLC v.

13  Nextel Communications, Inc., 614 F.3d 1333 (Fed. Cir. 2010) (applying the doctrine of collateral

14  estoppel, or issue preclusion, under California law: (1) the issue sought to be precluded from

15  relitigation is identical to the issue decided in the earlier proceeding; (2) the issue was actually

16  litigated in the former proceeding; (3) the issue was necessarily decided in the former proceeding;

17  and (4) the person against whom collateral estoppel is asserted was a party, or in privity with a party,

18  to the earlier proceeding).

19

20       **(1)      "extending an initializing oligonucleotide along the polynucleotide by**
          **ligating an oligonucleotide probe thereto to form an extended duplex"**

21

| Illumina's proposed construction | CGI's proposed construction |
|---|---|
| **"extending an initializing oligonucleotide along the polynucleotide by ligating an oligonucleotide probe thereto to form an extended duplex"** means  "Extending an initializing oligonucleotide along the polynucleotide by ligating an oligonucleotide probe thereto to form an extended duplex, and when step (a) is repeated a new initializing oligonucleotide is extended along the same polynucleotide sequence as was acted upon in the first cycle of the recited method" | **"extending an initializing oligonucleotide along the polynucleotide by ligating an oligonucleotide probe thereto to form an extended duplex"** means "ligating an oligonucleotide probe to an initializing oligonucleotide to form an extended duplex and further extending the duplex by ligating a new oligonucleotide probe to the extended duplex in any subsequent cycles" |

1

2
      **(2)**    **"repeating steps (a) and (b) until the sequence of nucleotides is determined"**

3

4

| Illumina's proposed construction | CGI's proposed construction |
|---|---|
| **"repeating steps (a) and (b) until the sequence of nucleotides is determined"** means "determining a nucleotide sequence by repeating steps (a) and (b)" | **"repeating steps (a) and (b) until the sequence of nucleotides is determined"** means "either (1) repeatedly extending the extended duplex by subsequent cycles of ligation and identifying a label on or associated with a successfully ligated oligonucleotide probe until the sequence of nucleotides is determined or (2) using parallel reactions employing different initializing oligonucleotides, each out of register by one or more nucleotides, and identifying a label on or associated with a successfully ligated oligonucleotide probe until the sequence of nucleotides is determined. There is no need for repetition if the sequence of the polynucleotide has been fully determined in the first cycle" |

The parties agree that the first time "extending" step (a) is practiced, this extending step requires that an initializing oligonucleotide be extended by ligating a probe to it. Resp. at 22-23. The parties dispute what this step requires when it is repeated, referring to "repeating" step (c) of claim 1, which is the central dispute in this litigation. Illumina contends that when step (a) is repeated in a subsequent cycle, it can be repeated by ligating a probe to a "new" initializing oligonucleotide that has either the same sequence as, or a different sequence than, the initializing oligonucleotide that was used in the first cycle. CGI, on the other hand, contends that when step (a) is repeated in a subsequent cycle, the probe has to be ligated either to the previously extended probe that was ligated to the initializing oligonucleotide in the first cycle, or to a "new" initializing oligonucleotide that has a different sequence than the initializing oligonucleotide that was used in the first cycle. CGI points out that Illumina's proposed construction of the "extending" step includes construction of the "repeating" step. The Court considers construction of the "extending" and "repeating" terms simultaneously, as the parties did in presenting oral argument on claim construction.

**United States District Court**
For the Northern District of California

**Illumina's proposed construction**

Starting with the construction of the extending term in the <u>Applera-AB</u> litigation, Judge Alsup construed the term **"extending an initializing oligonucleotide along the polynucleotide"** in claim 1 of the '597 patent to mean that in the first cycle of the method, a probe is ligated to an initializing oligonucleotide, and that the "extending" step (a) is repeated either by (i) ligating a new probe to a new initializing oligonucleotide (i.e., "a brand new initializing oligonucleotide must be laid down along the polynucleotide with each repetition"); or (ii) by further extending by successive ligation, i.e., ligating a second probe to the duplex that was created by ligating a first probe to the initializing oligo in the first cycle (such that "an ever-extending chain of probes is ligated thereto to form an ever-extending duplex").  <u>See</u> Labbe Decl., Ex. 5.  Illumina contends that Judge Alsup's repeating option (i) of laying down a "brand new initializing oligonucleotide" includes both (a) repeated use of new copies of the same sequence initializing oligonucleotide that was used in the first cycle and (b) use of new initializing oligonucleotides with different sequences on the same general region of the polynucleotide but staggered to start at a slightly different point, e.g., one nucleotide off from the first initializing oligonucleotide, an embodiment known as re-registration.

With respect to Judge Alsup's repeating option (ii) of successive ligation, or adding an additional probe to the extended duplex, Illumina contends that during reexamination, it narrowed the scope of step (a) to disavow successive ligation in favor of using a new initializing oligonucleotide extended along the same polynucleotide sequence.  CGI, however, contends that Illumina's purported disavowal of successive ligation (or Judge Alsup's option (ii)) is not consistent with the Reexamination history or with the entire claim scope of the patent.  CGI also points out that at the same time that Illumina made its narrowing statements during reexamination in its August 6, 2009 Supplemental Amendment in response to the Office Action, the cross-appeals from Judge Alsup's judgment were pending before the Federal Circuit, Illumina having filed its original notice of appeal on March 2, 2009, and its amended notice of appeal on April 6, 2009.

With respect to the "repeating" step (c), Judge Alsup determined that the repeating step "is conditional, meaning that there is no need for repetition *if* the sequence of the polynucleotide has been fully determined in the first cycle."  Labbe Decl., Ex. 5 at 2.  The Federal Circuit affirmed this

United States District Court

For the Northern District of California

1    construction on appeal.  Labbe Decl., Ex. 6.  Based on its argument that it disavowed successive

2    ligation during reexamination, Illumina contends that Judge Alsup's construction of the repeating

3    step should be narrowed so that step (c) is not conditional but a required step.  Illumina argues that it

4    would be improper to construe the repeating step as conditional after Illumina relied on an

5    unequivocal statement that repetition is a requirement to overcome the prior art.

6    **CGI's proposed construction**

7            Rather than including the repeating step in the extending term, CGI proposes that

8    "extending" be construed without reference to Judge Alsup's repeating option (i) ("possibility [] that

9    a brand new initializing oligonucleotide must be laid down along the polynucleotide with each

10   repetition").  Instead, CGI argues that the extending step should be construed to include successive

11   ligation, as set forth in Judge Alsup's option (ii), to form an extended duplex and further extend the

12   duplex whereby "an ever-extending chain of probes is ligated thereto to form an ever-extending

13   duplex, all beginning with the same initializing oligonucleotide" until the sequence is determined.

14   See Labbe Decl., Ex. 5.

15           CGI's proposed construction of "repeating" purports to encompass both forms of repeating

16   disclosed by the specification: (1) successive ligation, based on the Examiner's finding that this was

17   an "essential characteristic of the claimed invention, because no embodiment of the invention is

18   disclosed which lacks repeated cycles of extension;" and (2) an optional form of repeating in which

19   parallel reaction mixtures separated into different pots use a new initializing oligonucleotide shifted

20   over by one or more positions on the polynucleotide to allow for the interrogation of other additional

21   locations on the same template, known as re-registration.  Resp. at 14 (citing Figure 1 of '597

22   patent).  CGI disputes Illumina's contention that "repeating" should also be construed as using a

23   same sequence new initializing oligonucleotide that is not shifted or re-registered.

24           With respect to construction of the "extending" and "repeating" steps, the parties dispute

25   whether Illumina disavowed successive ligation during reexamination, whether repeating includes

26   new initializing oligonucleotides with the same sequence as the initializing oligonucleotide used in

27   the first cycle, whether repeating is conditional, and whether repeating uses parallel reactions.

28

United States District Court

For the Northern District of California

1

**a.      Scope of Disavowal During Reexamination**

2      Illumina takes the position that during reexamination of the '597 patent, it provided an

3  unequivocal statement to exclude the form of repeating taught by the Martinelli patent in order to

4  overcome the Examiner's rejection of claim 1.  Illumina characterizes the Examiner's rejection of

5  claim 1 by describing the Martinelli patent as disclosing that "the process can be repeated with

6  probes complementary to different portions of the target nucleic acid, which meets the limitations of

7  step 1 of the claim."

8            By moving to the next portion of the target, a similar experiment can be run.
           Thus, by moving sequentially along the target, one can determine the site or
9            sites on the target where mutations are found and then proceed to design
           experiments to identify the exact mutation which occurs at each of the
10           mutation sites.

11  Opening Br. at 13 (quoting Labbe Decl., Ex. 8 (5/28/2009 Office Action)).  Illumina now contends

12  that Martinelli's use of the phrase "moving sequentially along the target" discloses successive

13  ligation or the "repeating" step as proposed by CGI.  Opening Br. at 16.  Illumina argues that to

14  overcome Martinelli, the Examiner required Illumina to narrow claim 1 to require that when step (a)

15  is repeated, rather than "further extending" or "moving sequentially along the target," step (a) was

16  limited to hybridizing a "new" initializing oligonucleotide **to the same polynucleotide** as was acted

17  upon in the first cycle.  Id. (emphasis added).  In other words, Illumina argues that it clearly

18  disclaimed a central aspect of the invention called out prominently in the specification.  For

19  example, the specification's own description of the field of the invention is "more particularly, to a

20  method of identifying nucleotides in a template by stepwise extension of one or more primers by

21  successive ligations of oligonucleotide blocks," '597 patent, 1:11-14, and its Summary of the

22  Invention states "[t]he invention provides a method of nucleic acid sequence analysis based on

23  repeated cycles of duplex extension along a single stranded template. . . . The extended duplex is

24  then repeatedly extended by subsequent cycles of ligation."  Id. at 3:1-11.

25      During re-examination of the '597 patent, Illumina did narrow "repeating" to extending a

26  "(new) initializing oligonucleotide" along the "same" polynucleotide as was acted upon in the first

27  cycle, distinguishing the claimed invention from the repetition in Martinelli's method, which "does

28  not refer to repeating steps (a) and (b) on the same template sequence."  Labbe Decl., Ex. 12 at 5

1    (9/30/09 Office Action); see Illumina claim construction Slide 23.  CGI does not dispute that the

2    '597 patent teaches "repeating" on the same polynucleotide, but disagrees whether Illumina thereby

3    narrowed the scope of "repeating" to exclude successive ligation.  CGI has the better argument that

4    Illumina did not make such a broad disavowal.

5            As CGI points out, Illumina disavowed hybridization on a **different** target polynucleotide,

6    limiting step (a) to the **same** polynucleotide to overcome Martinelli, but the reexamination history

7    does not support Illumina's contention that it disavowed extending by successive ligation.  Illumina

8    unduly stretches the meaning of its narrowing statement in contending that it disavowed successive

9    ligation and required that a "new" initializing oligonucleotide be used when step (a) is repeated:

10            As discussed at the interview, the "repeating" step in the claimed method,
        step (c), requires the repetition of steps (a) and (b) on the same
11            polynucleotide sequence that was acted upon in the first cycle of the recited
        method. Step (a) of claim 1 recites "extending an initializing
12            oligonucleotide along the polynucleotide." When step (a) is repeated as
        required by step (c), a (new) initializing oligonucleotide is extended along
13            the same polynucleotide as was acted upon in the first cycle of the recited
        method ("the polynucleotide").

14

15    Opening Br. at 14 (quoting Labbe Decl., Ex. 9 (8/6/2009 Amendment)).

16            The reexamination officer correctly interpreted Illumina's disclaimer as distinguishing

17    Martinelli because the Martinelli method does not repeat the hybridization-ligation methods on the

18    **same** polynucleotide sequence in each cycle, but rather the "repetition is performed on **different**

19    **portions** of the target nucleic acid."  Labbe Decl. Ex. 12 at 5 (9/30/09 Office Action) (emphasis

20    added).  The reexamination officer acknowledged that Martinelli teaches that "repetition is

21    performed on different portions of the target nucleic acid," which was disclaimed by Illumina by

22    limiting the repeating step to being performed on the "same nucleic acid sequence in each cycle."

23    Labbe Decl. Ex. 12 at 5.  As clarified at the further Markman hearing, the parties do not dispute that

24    repeating on the "same" polynucleotide sequence includes anywhere on the polynucleotide that

25    overlaps on the same sequence.

26            The Martinelli patent informs the construction of the repeating and extending terms because

27    the parties dispute the scope of Illumina's disavowal of the Martinelli patent during reexamination of

28    the '597 patent.  Illumina contends that it narrowed "repeating" to be performed on the same

United States District Court

For the Northern District of California

sequence of the polynucleotide used in the first cycle, so that it could not repeat the steps on other sequences of the target polynucleotide during subsequent cycles of ligation. Illumina concludes that by disavowing the method of moving along the target polynucleotide to different sequences, it disavowed successive ligation altogether. CGI points out correctly that the reexamination history shows that Illumina only disclaimed "repetition performed on **different** portions of the target nucleic acid" (9/30/09 Office Action at 5) (emphasis added), which does not amount to disclaiming successive ligation by repeatedly extending the extended duplex by subsequent cycles of ligation.

The reexamination history indicates that Illumina disclaimed extending a new initializing oligonucleotide along different sequences of the target polynucleotide (to overcome the Martinelli prior art), but not successive ligation by further extending the extended duplex. Both Judge Alsup and the reexamination officer found that the successive ligation was a characteristic of the claimed method, and the Federal Circuit affirmed Judge Alsup's construction:

       i. Judge Alsup's claim construction

> The better interpretation of this language is that step (a) includes an extension process, whereby, with each repetition, an additional probe is added to what is already there, so that the chain gets longer and longer. Put differently, step (a) includes a scenario where the initializing oligonucleotide is originally attached to the polynucleotide and thereafter an ever-extending chain of probes is ligated thereto to form an ever-extending duplex, all beginning with the same initializing oligonucleotide.

Labbe Decl., Ex. 5.

       ii. Federal Circuit

> Thus, once an extended duplex is formed, it 'is further extended in subsequent cycles.'" ['597 patent], col. 3 ll. 15-16. This description of the invention is echoed throughout the specification, which repeatedly describes regenerating an extendable end on the extended duplex to allow for successive cycles of ligation. [Citations omitted.]

LaBarre Decl., Ex. O (3/25/10 slip op.) at 14.

       iii. Reexamination

> First, 'repeating' refers to 'repeated cycles of duplex extension along a single stranded template' as set forth in the specification (e.g. col. 3, lines 2-19). This is viewed as an **essential characteristic of the claimed invention**, because no embodiment of the invention is disclosed which lacks repeated cycles of extension.

1   LaBarre Decl., Ex. X (9/30/09 Office Action) at 3 (emphasis added).  As CGI points out, the

2   Examiner recognized two possible ways of repeating disclosed by claim 1:

> 'Repeating' has several meanings in the context of claim 1.  First,
> "repeating" refers to "repeated cycles of duplex extension along a single
> stranded template" as set forth in the specification (e.g. col. 3, lines 2-19).
> This is viewed as an essential characteristic of the claimed invention,
> because no embodiment of the invention is disclosed which lacks repeated
> cycles of extension.  "Repeating" can also refer to processes wherein the
> cycling process is performed in multiple "pots" with different initializing
> oligonucleotides in each pot (Fig. 1).  This is an optional feature of the
> invention, since the method can be performed in a single pot with a single
> initializing oligonucleotide (col. 5, lines 52-57).  Patent Owner's [8/3/2009
> response] has **clarified that "repeating" requires the repetition of steps
> (a) and (b) on the same polynucleotide sequence** that was acted upon in
> the first cycle of the method.

10  Id. at 3 (emphasis added).  Thus, the Examiner stated that to distinguish Martinelli, the repetition

11  must occur on the same sequence.  There was no mention of disavowing successive ligation, and as

12  CGI points out, the Examiner correctly recognized "repeated cycles of duplex extension" to be "an

13  essential characteristic of the claimed invention."  Indeed, successive ligation is emphasized

14  throughout the specification, as noted above.  Disavowal of successive ligation is further

15  contradicted by the Examiner's statement that Dr. Macevicz' notebook disclosed a method

16  describing successive ligation: "After detection and identification of the label, a new 3' or 5' end is

17  regenerated on the nascent nucleic acid to allow ligation of another labeled oligonucleotide, and the

18  process is repeated until the entire complement of the template nucleic acid has been synthesized."

19  Id. at 4.  The reexamination history does not support Illumina's contention that it disclaimed

20  successive ligation.

21          CGI also points out that Illumina did not discuss with, or attempt to clarify to, the Examiner

22  during Reexamination its argument now that the repeating step uses the same sequence initializing

23  oligonucleotide, in addition to the use of  "different initializing oligonucleotides" expressly

24  recognized by the Examiner.  LaBarre Decl., Ex. X (9/30/09 Office Action) at 3.  Illumina stated in

25  its Amendment that the repeating step uses "a (new) initializing oligonucleotide."  Labbe Decl., Ex.

26  9 at 15.  The more common sense meaning of "new" (especially "brand new" as construed by Judge

27  Alsup) suggests different rather than same sequence initializing oligonucleotides, although both

28  meanings are literally correct as a matter of English language.  It does not appear from the

1   reexamination history that it occurred to the Examiner that Illumina intended the claim scope of the

2   repeating step to include the use of a same sequence (though physically different copy) initializing

3   oligonucleotide.  That interpretation of the "repeating" term is further discussed below.

4         In addition to citing the reexamination history for disclaimer of claim scope, CGI raised a

5   new theory during the further <u>Markman</u> hearing that Illumina did not disclaim successive ligation

6   during reexamination because Illumina's statements in the reexamination history are not sufficient to

7   give public notice of its disclaimer.  Illumina points out that CGI's new theory is inconsistent with

8   its prior argument that "In this Amendment, Illumina disclaimed repetition of the hybridization-

9   ligation-and identification on a different portion of the genome. . . . The Examiner was very clear

10  that Illumina's disclaimer did not disclaim successive ligation."  Illumina Resp. at 6 (citing CGI's

11  responsive claim construction brief).  Illumina complains that CGI cannot have it both ways by

12  arguing for an ambiguous disclaimer and an express disclaimer.  However, parties are entitled to

13  make reasonable arguments in the alternative.

14        Although the Court accepts CGI's argument that Illumina's clarification of claim scope on

15  reexamination was limited to requiring repetition on the same (or overlapping) sequence, and did not

16  disavow successive ligation, the Court also considers CGI's fallback theory that there is no "clear

17  and unmistakable" disclaimer if a prosecution argument is subject to more than one reasonable

18  interpretation.  <u>See</u> <u>SanDisk Corp. v. Memorex Products, Inc.</u>, 415 F.3d 1278, 1287 (Fed. Cir. 2005)

19  (finding no disclaimer due to multiple reasonable interpretations of SanDisk's prosecution

20  arguments) and <u>Schwing GmbH v. Putzmeister Aktiengesellschaft</u>, 305 F.3d 1318, 1324 (Fed. Cir.

21  2002) ("Although prosecution history can be a useful tool for interpreting claim terms, it cannot be

22  used to limit the scope of a claim unless the applicant took a position before the PTO that would lead

23  a competitor to believe that the applicant had disavowed coverage of the relevant subject matter.").

24  In <u>SanDisk</u>, the Federal Circuit noted:

25             As a basic principle of claim interpretation, prosecution disclaimer promotes
           the public notice function of the intrinsic evidence and protects the public's

26             reliance on definitive statements made during prosecution. . . . An
           ambiguous disclaimer, however, does not advance the patent's notice

27             function or justify public reliance, and the court will not use it to limit a
           claim term's ordinary meaning.  There is no "clear and unmistakable"

28             disclaimer if a prosecution argument is subject to more than one reasonable

**United States District Court**
For the Northern District of California

> interpretation, one of which is consistent with a proffered meaning of the
> disputed term.

415 F.3d at 1287 (citations and internal quotation marks omitted).  Illumina does not dispute that these cases hold that in order for statements to constitute a disavowal, "someone would have to 'believe that the applicant had disavowed coverage,'" that is, the public must have clear, reliable notice of the scope of disclaimer.  Illumina Resp. at 7 (quoting Schwing, 305 F.3d at 1324).

Even assuming in the alternative that Illumina intended to disclaim successive ligation, its purported disclaimer was not "clear and unmistakable."   The reexamination history demonstrates that even the Examiner did not understand the disavowal as encompassing successive ligation as Illumina now contends, and neither does the Court.  Nor did Illumina make any such argument or otherwise alert the Federal Circuit which was in the process of construing the same term.  In particular, the Examiner cited the Summary of the Invention describing the practice of successive ligation where "[t]he extended duplex is then repeatedly extended by subsequent cycles of ligation," and viewed this form of repeating as an essential characteristic of the invention.  LaBarre Decl., Ex. X (9/30/09 Office Action) at 3 (citing '597 patent, 3:2-19).  The Court finds CGI's argument based on ambiguous disclaimer persuasive and determines, on this alternative ground, that Illumina did not disavow successive ligation during reexamination.

CGI also argued during the Markman hearing that if Illumina had believed that it had changed the claim scope to disavow successive ligation while the appeal in the AB litigation was pending, it should have notified the Federal Circuit of the reexamination decision, which was issued by the PTO only three weeks before the Federal Circuit issued the panel decision.  Although there is authority that the Federal Circuit can take judicial notice of the PTO's reexamination proceedings, Old Reliable Wholesale, Inc. v. Cornell Corp., 635 F.3d 539, 548-49 (Fed. Cir. 2011), CGI acknowledges that the Federal Circuit has not adopted a judicial estoppel or similar doctrine to address the situation presented in this case where reexamination proceedings and federal court actions are simultaneously pending and the PTO issues a reexamination certificate before the Federal Circuit issues a decision that the patentee then contends reached different interpretations of the same claim.  CGI revised Markman slides 161-63.  CGI contends that, for the purposes of this

1  ligitation, Illumina has manufactured a post hoc argument that it disclaimed successive ligation

2  during reexamination.  CGI makes a strong argument that if Illumina had actually believed that it

3  had so changed the claim's meaning during reexamination, at the very least it should have notified

4  the Federal Circuit of the reexamination decision, so Illumina should not be permitted now to assert

5  that it made inconsistent arguments to the Federal Circuit and the PTO.  The inefficiency, potential

6  waste of judicial resources and unfairness of such a process would seem to go against the basic goal

7  of making litigation just, speedy and inexpensive insofar as practical.  Cf. Fed. R. Civ. Proc. 1.

8  Judicial estoppel is invoked "not only to prevent a party from gaining an advantage by taking

9  inconsistent positions, but also because of 'general consideration[s] of the orderly administration of

10  justice and regard for the dignity of judicial proceedings,' and to 'protect against a litigant playing

11  fast and loose with the courts.'"  Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 783 (9th

12  Cir. 2001) (quoting Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir. 1990)).  The Court need not

13  reach the issue of judicial estoppel, however, because it concludes that Illumina did not disavow

14  successive ligation, much less do so clearly.

15              **b.       Brand New Initializing Oligonucleotide**

16              In the Applera-AB litigation, Judge Alsup construed the repeating step to include two

17  possibilities: successive ligation (which he found to be the "better" construction) and ligating a

18  "brand new" initializing oligo.  Illumina argues that during reexamination, it disavowed successive

19  ligation and narrowed the "repeating" step to using a "new initializing oligonucleotide," which

20  Judge Alsup construed as an alternative to the "better interpretation" of successive ligation: "One

21  possibility is that a brand new initializing oligonucleotide must be laid down along the

22  polynucleotide with each repetition."  Labbe Decl., Ex. 5 at 3.  Illumina also contends that

23  "repeating" with a "new initializing oligonucleotide" in fact actually encompasses two meanings: (1)

24  new initializing oligonucleotides with different sequences, or re-registration and (2) new initializing

25  oligonucleotides with the same sequence as the initializing oligonucleotide used in the first cycle.

26  Illumina Tutorial Slide 24.

27              The parties do not dispute that the repeating step can be done by hybridizing new initializing

28  oligonucleotides with different sequences and shifting positions (re-registering) along the

1   polynucleotide relative to the position of the initializing oligonucleotide utilized in the first cycle,

2   which Illumina referred to at the tutorial as re-registration.  Illumina Tutorial Slide 35-37.  CGI

3   refers to this form of "repeating" in its proposed construction as "(2) using parallel reactions

4   employing different initializing oligonucleotides, each out of register by one or more nucleotides,

5   and identifying a label on or associated with a successfully ligated oligonucleotide probe until the

6   sequence of nucleotides is determined."

7       The parties dispute, however, whether the "repeating" step allows use of a new initializing

8   oligonucleotide with the same sequence as the initializing oligonucleotide used in the first cycle.

9   Illumina contends that the repeating step also allows repeated use of new copies of the

10  same-sequence initializing oligo, whereas CGI contends that an initializing oligo with the same

11  sequence cannot be repeated unless repeatedly forming an extended duplex through successive

12  ligation.

13      CGI argues that Illumina is trying to expand claim scope to an undisclosed embodiment of

14  the invention by defining "new initializing oligonucleotide" to include a same-sequence copy of the

15  initializing oligonucleotide.  CGI does not point to any part of the specification that requires the

16  "new initializing oligonucleotide" in the repeating step to have a different sequence from the

17  initializing oligonucleotide used in the first cycle.  CGI is correct that the specification primarily

18  addresses different initializing oligonucleotides.  However, Illumina points out that the specification

19  discloses "repeating" by using an identical copy of the same initializing oligonucleotide, as well as

20  different initializing oligonucleotides: "Different binding regions can be employed with **either**

21  **identical or different initializing oligonucleotides**, but for convenience of preparation, it is

22  preferable to provide identical binding regions and different initializing oligonucleotides."  '597

23  patent 5:18-22 (emphasis added).  Illumina Markman Slide 38.

24      CGI argues that in the AB v. Illumina litigation before Judge Alsup and in the briefs filed on

25  appeal in the Federal Circuit, Illumina sought a construction of the repeating step to require "re-

26  registration," i.e., using a different sequence new initializing oligonucleotide, as opposed to a same

27  sequence copy of the initializing oligonucleotide.  CGI slides 139-150; LaBarre 2d Decl. Exs. A-H.

28  Illumina responds, however, that it never proposed a construction that would limit "repeating step

(a)" to using a different sequence or shifted initializing oligonucleotide.  Illumina quotes the

following argument from its claim construction brief in the AB litigation:

> It cannot be legitimately disputed, however, that step (a) in claim 1 requires exactly what it recites: extending an initializing oligonucleotide by ligating a probe to the end of that initializing oligonucleotide to form an extended duplex. Solexa's [i.e., Illumina's] proposed construction requires that the initializing oligonucleotide utilized when step (a) is repeated (as required by step (c)) be **a physically different molecule** than the initializing oligonucleotide utilized in the first cycle. **But there is no requirement that the initializing oligonucleotide utilized in the second cycle (or those used in subsequent cycles) has to be shifted, or "re-registered," along the polynucleotide relative to the position of the initializing oligonucleotide utilized in the first cycle.**

Labbe Decl., Ex. A at 9-10 (Solexa's Responsive Trial Brief Regarding Disputed Claim

Constructions) (doc. no. 116-1).

    Although CGI has consistently taken the position that "repeating" with a new initializing

oligonucleotide (as distinguished from repeating by successive ligation) is limited to "re-

registration," that is, shifting or staggering, Illumina correctly points out that CGI raised for the first

time at the January 13, 2012 hearing its argument that Illumina proposed this limitation in the earlier

AB litigation.  Illumina has submitted its trial brief on claim construction from the AB litigation

which demonstrates that Illumina did not take such an inconsistent position before Judge Alsup that

a "brand new" initializing oligo must be limited to "re-registration" using a different sequence

initializing oligo.  Rather, Illumina argued in the AB litigation that the new initializing oligo must be

a "physically different" molecule than the initializing oligo used in the first cycle (by removing the

first initializing oligo and replacing it with the second, or new, initializing oligo).  Illumina Resp. at

1, 3 (citing Solexa trial brief from AB case).  Illumina also stated in its trial brief to Judge Alsup that

the new initializing oligo could have the same sequence as the first:

> Repeating step (a) exactly as described would of course require the use of a physically different (**even if having the same sequence**) initializing oligonucleotide.
> . . .
> **But there is no requirement that the initializing oligonucleotide utilized in the second cycle (or those used in subsequent cycles) has to be shifted, or "re-registered," along the polynucleotide relative to the position of the initializing oligonucleotide utilized in the first cycle.**

United States District Court

For the Northern District of California

1    Illumina Resp. at 3 (quoting Solexa trial brief from AB case).  These statements by Solexa/Illumina

2    in the AB litigation demonstrate that Illumina did not take the position there that the repeating step

3    could only be performed by re-registration with a different sequence initializing oligo.

4         Judge Alsup was not presented with the issue that Illumina raises now, whether a "new"

5    initializing oligonucleotide can copy the same sequence or must have a different sequence.

6    Illumina's trial brief  in the AB litigation indicates that there was no apparent dispute between AB

7    and Solexa that claim 1 was not limited to re-registering and that Judge Alsup was not asked to

8    distinguish between same sequence and different sequence initializing oligonucleotides when he

9    construe the repeating step to include a "brand new" initializing oligo:

10              Although it never actually proposes a construction of any term in claim 1 of
                the '597 patent in its Trial Brief **AB asks this Court to adopt a**
11              **construction of the claim that does not limit the scope of the claim to**
                **require "resetting" or "re-registering" the initializing oligonucleotide.**
12              **Solexa agrees, as the terms "resetting" and "reregistering" are not**
                **found in claim 1.**
13

14   Labbe Decl., Ex. A at 9.

15        In further support of its argument that Illumina proposed a construction of repeating that was

16   limited to re-registering, CGI quoted Illumina's experts from the AB litigation.  CGI Slides 139-145

17   (excerpts from Backman and Quackenbush reports and deposition and trial testimony).  In its

18   response, Illumina has sufficiently demonstrated that the extrinsic evidence on which CGI relies

19   does not purport to limit use of a "different" initializing oligo to using a different sequence, re-

20   registered initializing oligonucleotide.

21                        i.       Backman expert report and testimony

22        Illumina's expert Backman stated in his rebuttal report that "claim 1 of the '597 patent

23   encompasses the concept of 'reregistering' the initializing oligonucleotide to allow for a shifting (or

24   reregistering) of the interrogation position by one or more nucleotides along the polynucleotide.

25   The repeating of the cycles, as recited in step (c) of claim 1, requires the use of a different

26   initializing oligonucleotide."  CGI Markman slide139; LaBarre 2d Decl., Ex. A.  To say that a claim

27   "encompasses" a concept does not mean, however, that the claim is limited to it.  Backman also

28   testified that "it means that when you go back and repeats steps A and B, you do so using a different

United States District Court

For the Northern District of California

1  initializing oligo." CGI slide 140; LaBarre 2d Decl., Ex. B.  Illumina clarifies that Backman made

2  these statements in the response to questions about whether AB's accused SOLiD system would

3  infringe claim 1 if the system didn't use a second, physically different initializing oligo: "if SOLiD

4  only used one [primer, or initializing oligo, cycle], then it would not be doing re-registering and it

5  wouldn't be addressed by this claim."   This statement does not amount to an admission that

6  "repeating" is limited to re-registration.  Illumina Resp. at 5.

7                    ii.      Quackenbush expert report

8       CGI also cites Illumina's second expert, Quackenbush, who stated, "The repeating of the

9  cycle, as contained in step c of claim 1, requires the use of a different initializing oligonucleotide."

10  CGI slide141; LaBarre 2d Decl., Ex. C.  Quackenbush also testified that "step c requires the use of a

11  different initializing oligonucleotide."  CGI slide143; LaBarre 2d Decl., Ex. D.  Quackenbush's

12  opinion that "repeating" requires use of a "different initializing oligo" does not limit that term to re-

13  registration, as CGI contends.

14                    iii.      Backman direct exam

15       CGI further relies on Backman's testimony at trial, where he testified that Figure 1 of the

16  '597 patent "involves the different initializing oligonucleotide primers [initializing oligos], the ones

17  which bind slightly different positions in each instance."  CGI slide 144; LaBarre 2d Decl., Ex. E.

18  He further testified "the next time we go through this elongation process, we're not going to be

19  asking questions about the exactly same positions that we did the first time we went through the

20  process."  CGI slide 145; LaBarre 2d Decl., Ex. F.  Although Illumina does not directly address

21  these specific excerpts of Backman's trial testimony, Illumina has shown that at other points in the

22  trial and in its briefs it specified that "different" does not require a different sequence, but instead

23  includes repeating step (a) by removing the first initializing oligonucleotide and using a "physically

24  different" initializing oligonucleotide, whether it has the same or different sequence.  Illumina Resp.

25  at 5-6.  These isolated expert statements from the AB litigation, addressing a specific embodiment of

26  the '597 patent, do not lead to imposing the limitation that CGI advocates.

27

28

**United States District Court**
For the Northern District of California

#### c.      Conditional Repeating Step

Although Judge Alsup determined that the "repeating" step "is conditional, meaning that there is no need for repetition *if* the sequence of the polynucleotide has been fully determined in the first cycle," Labbe Decl., Ex. 5 at 2, Illumina argues that it would be improper to construe the repeating step as conditional after Illumina relied on an unequivocal statement that repetition is a requirement to overcome the prior art.  At reexamination, Illumina stated:

> It was discussed that Martinelli did not disclose repeating steps (a) and (b) on the same polynucleotide that was operated on in the first cycle of the claimed method.  It was discussed that claim 1 recites a method that is limited to repeating steps (a) and (b) on the same polynucleotide that was operated on in the first cycle of the method.  It was agreed that an unequivocal statement by the Applicant that **step (c) of claim 1 of the ' 597 patent requires repeating steps (a) and (b) on the same polynucleotide acted upon in the first cycle of the recited method** would overcome the rejections based on Martinelli.

Labbe Decl., Ex. 9 at 11 (8/6/2009 Suppl. Amendment) (emphasis added).

As CGI points out, Illumina's disclaimer was not related to the conditional aspect of step (c), and does not unconditionally "require" repetition of steps (a) and (b) even if the sequence of the polynucleotide has been fully determined in the first cycle.  Rather, as discussed above, its disclaimer distinguished Martinelli as carrying out its method on different, i.e., non-overlapping and noncontiguous, portions of the polynucleotide.  Furthermore, the Federal Circuit affirmed Judge Alsup's construction of step (c) as conditional:

> The district court construed step (c) as "conditional, meaning that there is no need for repetition <u>if</u> the sequence of the polynucleotide has been fully determined in the first cycle."  Solexa argues that this construction is inconsistent with arguments made during the prosecution history.  During prosecution, the applicant distinguished the invention from a prior art reference by noting that "the reference does not teach 'repeating steps (a) and (b) until the sequence of nucleotides is determined, as recited in the present claim.  Because the prior art method identifies only a single nucleotide, not a sequence of nucleotides, there would be no need for such repetition."  Contrary to Solexa's argument, this statement does not require one to repeat steps (a) and (b) even when the polynucleotide has been determined in the first cycle (indeed, it states that the cycle is repeated "until the sequence of nucleotides is determined").  The distinguishing feature of the invention is that it taught a method for identifying a sequence of nucleotides, rather than a method for identifying a single nucleotide. . . .  We construe step (c), as the district court did, to have its plain and ordinary meaning.  To meet the limitations of claim 1, one must repeat steps (a) and (b) <u>until</u> the sequence of nucleotides is determined.  There is no need for repetition once the sequence of the polynucleotide has been fully determined.

United States District Court

For the Northern District of California

1   Labbe Decl., Ex. 6 at 16.  Illumina gives no persuasive reason to revisit Judge Alsup's and the

2   Federal Circuit's construction of that term as conditional, "meaning that there is no need for

3   repetition *if* the sequence of the polynucleotide has been fully determined in the first cycle."  Labbe

4   Decl., Ex. 5 at 2.

5         **d.**    **Parallel Reactions**

6         CGI also proposes that "repeating" be construed as "using parallel reactions," but as Illumina

7   persuasively argues, this proposed construction improperly imports limitations from the preferred

8   embodiment disclosed in the patent.  Opening Br. at 20-21.  See <u>Teleflex, Inc. v. Ficosa North</u>

9   <u>America Corp.</u>, 299 F.3d 1313, 1326-27 (Fed. Cir. 2002).  During reexamination, the Examiner

10  correctly recognized that the use of parallel reaction mixtures in multiple pots was an optional

11  feature of the invention: "'Repeating' can also refer to processes wherein the cycling process is

12  performed in multiple "pots" with different initializing oligonucleotides in each pot (Fig. 1).  This is

13  an optional feature of the invention, since the method can be performed in a single pot with a single

14  initializing oligonucleotide."  LaBarre Decl., Ex. X (9/30/09 Office Action) at 3 (citing '597 patent,

15  5:52-57).  The Court therefore declines to adopt this limitation in the construction of the "repeating"

16  term.

17  **Court's Construction**

18        The Court construes the claim term **"extending an initializing oligonucleotide along the**

19  **polynucleotide by ligating an oligonucleotide probe thereto to form an extended duplex"** to

20  mean **"ligating an oligonucleotide probe to an initializing oligonucleotide to form an extended**

21  **duplex."**

22        The Court construes the claim term **"repeating steps (a) and (b) until the sequence of**

23  **nucleotides is determined"** to mean **"either (1) ligating an additional probe to the extended**

24  **duplex by subsequent cycles of ligation until the sequence of nucleotides is determined or (2)**

25  **ligating a new probe to a new initializing oligonucleotide, either by extending different**

26  **sequence initializing oligonucleotides, each out of register by one or more nucleotides, or by**

27  **extending new initializing oligonucleotides with the same sequence as the initializing**

28  **oligonucleotide used in the first cycle along the identical polynucleotide sequence as was acted**

1    upon in the first cycle of the recited method, until the sequence of nucleotides is determined.

2    There is no need for repetition if the sequence of the polynucleotide has been fully determined

3    in the first cycle."

4

5                    (3)        "initializing oligonucleotide"

6

| Illumina's proposed construction | CGI's proposed construction |
|---|---|
| **"initializing oligonucleotide"** means "the oligonucleotide to which the oligonucleotide probe is first ligated" | **"initializing oligonucleotide"** means "an oligonucleotide that forms a highly stable duplex with the binding region of the polynucleotide that remains intact during any washing steps" |

10

11          The parties dispute whether the initializing oligonucleotide must remain intact during all

12   washing steps and must form a highly stable duplex with the binding region.

13   **Illumina's proposed construction**

14          Illumina proposes that in construing the term "initializing oligonucleotide," the Court adopt

15   Judge Alsup's construction of the term "initializing oligonucleotide probe" which appears in the

16   claims of a related Macevicz patent.  Judge Alsup held that construction of that term should "take

17   into account that the initializing oligonucleotide probe is the starting point for subsequent ligations,"

18   and construed that term to mean "the oligonucleotide to which the first extension oligonucleotide

19   probe is first ligated."  <u>Applera</u>, doc. no. 133 at 10.

20          As CGI points out, Illumina's proposed construction deletes Judge Alsup's construction of

21   the term to mean the oligonucleotide to which **the first extension** oligonucleotide probe is first

22   ligated.  CGI argues that "first extension" implies that there is at least a "second extension"

23   oligonucleotide probe.  Although Illumina initially distinguishes Judge Alsup's construction based

24   on the difference between the inventions claimed in the '341 patent and the '597 patent, Illumina

25   waived any objection to including "first extension" in the construction.  Reply at 9 n. 31.

26   **CGI's proposed construction**

27          CGI contends that surviving washing steps is a critical feature of the initializing

28   oligonucleotide: "After a set of probes is applied, mismatched probes must be washed away before

detection (otherwise the mismatched probes would still give off a signal from the label)."  Resp. at

United States District Court
For the Northern District of California

26. CGI reasons that if the initializing oligonucleotide does not remain strongly bound to the polynucleotide during the washing steps, the signal would be lost and the method would not work. Id.

As Illumina points out, the specification contains no language that limits "initializing oligonucleotide" to only those oligos that remain bound through any and all washing steps. CGI relies on the following statements in the specification to support its proposed construction which would require the initializing oligonucleotide to survive any washing steps:

> Initializing oligonucleotides are selected to **form highly stable duplexes with the binding region that remain intact during any washing steps** of the extension cycles. This is conveniently achieved by selecting the length(s) of the initializing oligonucleotides to be considerably longer than that, or those, of the oligonucleotide probes and/or by selecting them to be GC-rich. Initializing oligonucleotides may also be cross-linked to the template strand by a variety of techniques, e.g. Summerton et al, U.S. Pat. No. 4,123,610; or they may be comprised of nucleotide analogs that form duplexes of greater stability than their natural counterparts, e.g. peptide nucleic acids, Science, 254:1497-1500 (1991); Hanvey et al, Science, 258: 1481-1485 (1992); and PCT applications PCT/EP92/01219 and PCT/EP92/01220.
>
> Preferably, the length of the initializing oligonucleotide is from about 20 to 30 nucleotides and its composition comprises a sufficient percentage of G's and C's to provide a duplex melting temperature that exceeds those of the oligonucleotide probes being employed by about 10-50° C.

'597 patent, 5:30-49 (emphasis added).  As Illumina points out, CGI's proposed construction omits the part of the specification that describes the initializing oligonucleotides as remaining intact during "any washing steps **of the extension cycles**."  Opening Br. at 11.  Illumina proposes that if the Court were to adopt CGI's construction, rather than Judge Alsup's prior construction, that "of the extension cycles" be added.

CGI acknowledges that Judge Alsup's construction did not address this "critical feature" of the initializing oligonucleotide to survive the washing steps.  Resp. at 27.  CGI argues that Judge Alsup's prior construction of the similar "initializing oligonucleotide probe" claim term from the '341 patent does not determine this claim term from the '597 patent, which does not refer to a "probe."  To support its proposed construction requiring that the duplex formed with the initializing oligonucleotide "remains intact during any washing steps," CGI also cites Dr. Macevicz's deposition testimony indicating that the washing step would remove the reaction compounds in order to start

1    the next cycle and that "the initializing oligonucleotide would need to remain on the target."  Resp.

2    at 26 and LaBarre Decl., Ex. I at 44-45.  At oral argument, Illumina conceded that the method

3    includes washing steps, but argued that the highly stable duplex needs to be stable enough only to

4    detect a signal during detection, but not after that point.  Even without relying on the extrinsic

5    evidence offered by CGI, the Court determines that the specification language supports CGI's

6    proposed construction, with the additional language that the "highly stable duplexes with the binding

7    region" must remain intact "during any washing steps of the extension cycles."

8          Illumina also argues that the doctrine of claim differentiation bars CGI's proposed

9    construction requiring that the initializing oligonucleotide form "a highly stable duplex with the

10   binding region."  Under the doctrine of claim differentiation, "the presence of a dependent claim that

11   adds a particular limitation raises a presumption that the limitation in question is not found in the

12   independent claim."  Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 910 (Fed. Cir. 2004)

13   (citing Wenger Mfg., Inc. v. Coating Mach. Sys., Inc., 239 F.3d 1225, 1233 (Fed.Cir. 2001)).  In

14   Liebel-Flarsheim, the Federal Circuit held that the presumption under the doctrine of claim

15   differentiation undermined the alleged infringer's proposed construction where the infringer offered

16   no explanation for why the limitation was found in the dependent claims but not in the

17   corresponding independent claims.  "In such a setting, where the limitation that is sought to be "read

18   into" an independent claim already appears in a dependent claim, the doctrine of claim

19   differentiation is at its strongest."  Liebel-Flarsheim, 358 F.3d at 910.

20         Illumina argues that dependent claims 9 and 10 require the polynucleotide to include a

21   binding region, a separate term submitted for claim construction, and that these dependent claims

22   would not have meaning if independent claim 1 were to require a binding region.  CGI, however,

23   argues that a binding region is used in every embodiment of the invention, so that any presumption

24   against a limitation is rebutted by the specification.  Resp. at 29 (citing Edwards Lifesciences LLC v.

25   Cook Inc., 582 F.3d 1322, 1332 (Fed. Cir. 2009) ("claim differentiation is a rule of thumb that does

26   not trump the clear import of the specification")).  CGI cites the embodiment shown in Figure 1 of

27   the '597 patent and an excerpt from the Detailed Description describing that embodiment, 5:16-19,

28   but does not show that the specification describes the preferred embodiment as the invention itself.

1   Cf. Edwards Lifesciences, 582 F.3d at 1330 (finding that "the specification frequently describes an

2   'intraluminal graft' as 'the present invention' or 'this invention,' indicating an intent to limit the

3   invention to intraluminal devices," and that "the claim language itself" supports the limitation that

4   all of the claimed "graft" devices must be intraluminal).

5       Edwards Lifesciences held that the claim differentiation doctrine does not trump the

6   language of the specification.

> "When different words or phrases are used in separate claims, a difference
> in meaning is presumed." Nystrom v. TREX Co., 424 F.3d 1136, 1143
> (Fed.Cir.2005). "However, simply noting the difference in the use of claim
> language does not end the matter. Different terms or phrases in separate
> claims may be construed to cover the same subject matter where the written
> description and prosecution history indicate that such a reading of the terms
> or phrases is proper." Id. Although, as Edwards points out, claim 10 of the
> '458 patent recites a "second graft ... adapted to be intravascularly inserted
> into a lumen of [a] first graft," the intravascular insertion and the
> "intraluminal grafts" are not redundant. Instead, an "intraluminal graft"
> describes the ultimate location of the graft, whereas the intravascular
> insertion describes the process of moving the graft to that location. In other
> words, a device could theoretically be "intravascularly inserted" but
> ultimately reside outside of the vessel, such as inside the heart. Even if the
> claim construction had rendered the dependent claim redundant, the doctrine
> of claim differentiation does not require us to give the "graft" devices their
> broadest possible meaning. We may instead limit "grafts" to "intraluminal"
> devices, as demanded by the specification. See id.

17   Edwards Lifesciences, 582 F.3d at 1330.  CGI does not make as strong a showing that the

18   specification language includes the binding region limitation or describes that embodiment as the

19   invention itself, as was shown in Edwards, and would not overcome the presumption under the claim

20   differentiation doctrine if it applied.  Cf. Edwards Lifesciences, 582 F.3d at 1330 ("when the

21   preferred embodiment is described in the specification as the invention itself, the claims are not

22   necessarily entitled to a scope broader than that embodiment").  CGI has a stronger argument that

23   claim differentiation is not applicable because claims 9 and 10 include other limitations in addition

24   to binding region, so that those dependent claims would not be rendered completely redundant if the

25   Claim 1 term were to be construed as including a binding region.

26       CGI contends that claim differentiation only applies where the claims at issue are rendered

27   entirely redundant.  Resp. at 29 (citing Enzo Biochem v. Applera Corp., 599 F.3d 1325, 1342 (Fed.

28   Cir. 2010), cert. denied, 131 S. Ct. 3020 (2011)).  CGI argues that the presumption under the

United States District Court
For the Northern District of California

1   doctrine of claim differentiation does not apply here because dependent claims 9 and 10 include

2   limitations other than the binding region, such that the binding region is not the only "meaningful

3   difference" between the dependent and independent claims.  Id.  Dependent claim 9 adds the

4   limitation to claim 1 that "the polynucleotide comprises a binding region **and a target**

5   **polynucleotide**" and claim 10 adds not only the binding region limitation but also requires that "the

6   target polynucleotide comprises and unknown sequence" and "in step (a) the initializing

7   oligonucleotide is hybridized to the binding region on the polynucleotide."  Labbe Decl., Ex. 3

8   (3/2/2010 Reexamination Certificate) (emphasis added).  The Court agrees with CGI that dependent

9   claim 10 is not rendered superfluous by construing "initializing oligonucleotide" to include a

10  binding region.  See Tandon Corp. v. U.S. Intern. Trade Comm'n, 831 F.2d 1017, 1023-24 (Fed. Cir.

11  1987) (rejecting argument that claim differentiation prevents reading "non-gimballed" limitation

12  from a claim where the limitation related to only one element of that claim which, when viewed as a

13  whole, could still differ in scope from other claims).

14        The Court agrees with CGI that the doctrine of claim differentiation does not bar

15  construction of the "initializing oligonucleotide" term to include a binding region, and determines

16  that the specification language "remain intact during any washing steps of the extension cycles"

17  must be included in the construction.  '597 patent, 5:30-35.

18  **Court's Construction**

19        The Court construes **"initializing oligonucleotide"** to mean "an oligonucleotide that forms a

20  highly stable duplex with the binding region of the polynucleotide that remains intact during any

21  washing steps of the extension cycles."

22

23        **(4)    "oligonucleotide probe"**

24

| Illumina's proposed construction | CGI's proposed construction |
| --- | --- |
| **"oligonucleotide probe"** means "a nucleic acid that can bind to the polynucleotide and, when bound to the polynucleotide, can be ligated to the initializing oligonucleotide" | **"oligonucleotide probe"** means "an oligonucleotide that contains or is associated with a label and that is ligated to the initializing oligonucleotide or, in subsequent cycles, to the extended duplex" |

25

26

27

28

1    The parties dispute (1) whether the oligonucleotide contains or is associated with a label and

2    (2) whether the oligonucleotide probe can only be ligated to the extended duplex in subsequent

3    cycles.

4    **Illumina's proposed construction**

5    The parties do not dispute that an "oligonucleotide probe" is a nucleic acid that can be

6    ligated to the initializing oligonucleotide, as Illumina proposes.  CGI concedes that "not all

7    embodiments in the patent use a label <u>on</u> the oligonucleotide probe."  Resp. at 30.  CGI contends,

8    however, that Illumina's proposed construction ignores the way the term is used in the patent,

9    because without a label on, or associated with, the probe, it is unclear how the nucleotides would be

10   identified in each cycle.  <u>Id.</u>

11   Illumina does not propose a construction of "oligonucleotide probe" that refers to ligation to

12   the extended duplex in subsequent cycles, or successive ligation, because it contends that it

13   disavowed successive ligation during reexamination.  As discussed above, the Court concludes that

14   Illumina did not make such a broad disclaimer of claim scope.  Because Illumina's proposed

15   construction construes the term "oligonucleotide probe" as "**can be** ligated to the initializing

16   oligonucleotide," it does not necessarily limit the term to being ligated only to the initializing

17   oligonucleotide.  However, Illumina's proposed construction "oligonucleotide probe" is silent with

18   respect to whether the probe "can be ligated" to an extended duplex when practicing successive

19   ligation.

20   **CGI's proposed construction**

21          **a.      Label**

22   In support of its proposed construction, CGI contends that the specification emphasizes the

23   need for a label, citing the Summary of the Invention:

24          The initializing oligonucleotide is extended in an initial extension cycle by
             ligating an oligonucleotide probe to its end to form an extended duplex. The
25          extended duplex is then <u>repeatedly extended by subsequent cycles of
             ligation</u>. During each cycle, the identity of one or more nucleotides in the
26          template is determined <u>by a label on, or associated with, a successfully
             ligated oligonucleotide probe</u>.

27

28   Resp. at 30 (quoting '597 patent, 3:7-13).

32

United States District Court

For the Northern District of California

1    Although Illumina concedes that the specification describes probes in certain embodiments

2   as containing labels used to identify a nucleotide, Illumina contends that the limitations proposed by

3   CGI are contradicted by the specification which describes other embodiments of the invention that

4   use oligonucleotide probes that do not contain labels, in particular, probe (402) which is depicted in

5   Figure 4 exemplifying polymerase extension following ligation:

6           Identification of nucleotides can be accomplished by polymerase extension
           following ligation. As exemplified in FIG. 4, for this embodiment, template
7           (20) is attached to solid phase support (10) as described above and
           initializing oligonucleotide (400) having a 3' hydroxyl is annealed to the
8           template prior to the initial cycle. **Oligonucleotide probes (402) ["probe
           (402)"] are annealed to template (20) and ligated (404) to form extended
9           duplex (406).** The 3' monophosphate, which prevents successive ligations
           of probes in the same cycle, is removed with phosphatase (408) to expose a
10          free 3' hydroxyl (410). Clearly, alternative blocking approaches may also be
           used. Extended duplex (406) is further extended by a nucleic acid
11          polymerase in the presence of **labeled dideoxynucleoside triphosphates
           (412)**, thereby permitting the identification of a nucleotide of template (20)
12          by the **label of the incorporated dideoxynucleotide**. **The labeled
           dideoxynucleotide and a portion of probe (402)** are then cleaved (414),
13          for example, by RNase H treatment, to regenerate an extendable end on
           extended duplex (406). The cycle is then repeated (416).

14

15   '597 patent, 11:15-38 (emphasis added).  Illumina explains that in this embodiment, once probe

16   (402) is ligated to the initializing oligonucleotide (400), a free nucleotide which contains a label

17   ("labeled dideoxynucleoside triphosphates (412)") is added onto the probe (402), and is

18   subsequently removed from the probe after identification.  Opening Br. at 23.  This embodiment of

19   probe (402) would not require that oligonucleotide probes contain or be associated with a label at all

20   times, but would so require at some point after ligation.  See Illumina Markman slides 64-65.  CGI

21   responds that in Figure 4, the labeled free nucleotide added onto the probe "associates the label"

22   with the previously added probe.  Resp. at 30.  In this embodiment, the oligonucleotide probe is

23   "cleaved" to the labeled dideoxynucleotide, i.e., associated with a label, after ligation.  '597 patent,

24   11:35.  In this embodiment, however, the label is not added to the oligonucleotide probe until it has

25   been ligated to the initializing oligonucleotide, so that not all probes will be associated with a label,

26   only the successfully ligated ones.

27           Illumina also points out that the specification discloses "spacer" probes which do not contain

28   a label.  '597 patent, 6:30-34 ("in embodiments that rely on polymerase extension for base

33

1   identification, **the probe primarily serves as a spacer**, so specific hybridization to the template is

2   not critical, although it is desirable.") (emphasis added).  CGI responded at oral argument, however,

3   that when the probe is acting as a spacer, it is added to the labeled base, so that the probe is not

4   floating on its own.  As exemplified in Figure 4, the polymerase extension embodiment uses labeled

5   dideoxynucleoside triphosphates (ddntp), "thereby permitting the identification of a nucleotide of

6   template (20) by the label of the incorporated dideoxynucleoside."  '597 patent, 11:30-34.  CGI

7   argues that while all the embodiments do not use a label on the oligonucleotide probe, all

8   embodiments use either a labeled probe or a probe associated with a label.  Resp. at 30.  CGI

9   contends that without a label, the probe would serve no function because no nucleotides could be

10  identified.  Id.  As Illumina conceded during oral argument, if a spacer probe that does not initially

11  have a label is later associated with a probe that has a label, then it would be true in that sense that

12  the first probe is "associated with a label."

13          CGI has demonstrated that every embodiment described in the specification requires that a

14  successfully ligated oligonucleotide probe either have a label on it or be associated with a label at

15  some point after ligation.  The specification thus supports CGI's proposed construction.  Edwards

16  Lifesciences, 582 F.3d at 1329-30 ("the only devices described in the specification are intraluminal,

17  supporting an interpretation that is consistent with that description").  CGI also offered Illumina's

18  statement from the Applera-AB litigation that in the claimed invention, an oligonucleotide probe is

19  attached to a "labeled non-extendable chain terminating moiety."  CGI Markman revised slide 219.

20  Illumina did not address this argument in its supplemental response, and it lends further support to

21  CGI's proposed construction.  However, the Court need not rely on this prior statement to adopt the

22  language proposed by CGI, because the specification adequately supports it: "During each cycle, the

23  identity of one or more nucleotides in the template is determined **by a label on, or associated with,**

24  **a successfully ligated oligonucleotide probe**."  '597 patent, 3:10-13 (emphasis added).

25                     **b.       Subsequent Cycles**

26          CGI also contends that an oligonucleotide probe can be ligated not only to the initializing

27  oligonucleotide, but also to the extended duplex formed in the first round of ligation.  CGI argues

28  that the specification makes clear that oligonucleotide probes can be added to extend the extended

1    duplex further: "The extended duplex is then <u>repeatedly extended by subsequent cycles of ligation</u>."

2    '597 patent, 3:9-11.  CGI argues that the feature of being added to the extended duplex is consistent

3    with Judge Alsup's prior claim construction which recognized that "'step (a) includes an **extension**

4    process whereby, with each repetition, an additional probe is added to what is already there, so that

5    the chain gets longer and longer.'" Resp. at 31 (quoting LaBarre Decl., Ex. M).  In the <u>Applera</u>

6    action, however, Judge Alsup did not construe the term "oligonucleotide probe."  Illumina argues

7    that CGI's proposed construction of **"oligonucleotide probes"** would improperly limit the ligation

8    of probes in "subsequent cycles," or subsequent repeating steps, to sequential ligations to the

9    "extended duplex," or the previously-extended initializing oligonucleotide.

10       Illumina contends that during reexamination, it disavowed the form of repeating under step

11   (a) in which probes are ligated to an ever-extending duplex.  As discussed above, Illumina's

12   statements during reexamination did not constitute such a broad disavowal.  Rather, Illumina

13   "agreed that an unequivocal statement by the Applicant that step (c) of claim 1 of the ' 597 patent

14   requires repeating steps (a) and (b) on the same polynucleotide acted upon in the first cycle of the

15   recited method would overcome the rejections based on Martinelli."  Labbe Decl., Ex. 9 at 11

16   (8/6/2009 Suppl. Amendment).  Nevertheless, CGI's proposed construction of the term improperly

17   limits ligation of the oligonucleotide probe in subsequent cycles to the previously-extended

18   initializing oligonucleotide and excludes ligation to a new initializing oligonucleotide in subsequent

19   cycles when the method is repeated.

20   **Court's Construction**

21       The Court construes the term **"oligonucleotide probe"** to mean "a nucleic acid that can bind

22   to the polynucleotide, and, when bound to the polynucleotide, can be ligated to the initializing

23   oligonucleotide or to a previously extended duplex.  An oligonucleotide probe that has been

24   successfully ligated either contains, or is associated with, a label.

25       **B.    Claim 2**

26           2. A kit for DNA sequence analysis, the kit comprising one or
             more **sets** of oligonucleotide probes, wherein
27                  (i) each **probe set** contains at least 50 different-sequence,
             single-stranded oligonucleotide probes,
28                  (ii) the oligonucleotide **probes of a set** have a selected
             length of up to 12 nucleotides, and

(iii) for at least one said **probe set**, the different-sequence, single stranded oligonucleotide probes in that set have **annealing temperatures** whose maximum and minimum values differ from each other by no more than 1° C.

CGI explains that Claim 2 is directed at creating DNA sequencing kits that include sets of probes wherein at least one of the sets is organized by the stability (i.e., binding energy) of the probes: "the oligonucleotide probes may be grouped into mixtures, or subsets, of probes whose perfectly matched duplexes with complementary sequences have similar stability or free energy of binding." '597 patent, 11:40-43. This concept is implemented in both of the Examples given in the specification. Id., columns 14-18. The patent teaches to split up the probes into ninety-six subsets of probes, each subset having a particular annealing temperature between 22-70°C (two subsets for each degree). Id. at 15:66 - 16:9 [Example 1]. CGI contends that the annealing reaction is run at the fixed point annealing temperature for each of the ninety-six groups. Resp. at 31-32.

(5)     "set" and "probe set"

| Illumina's proposed construction | CGI's proposed construction |
|---|---|
| Illumina contends that no construction is necessary for the terms "set" and "probe set." Should the Court determine that construction is required, Illumina proposes: "a number of probes grouped together" | **"set" and "probe set"** mean "a subset of a mixture of all oligonucleotides of a selected length that are grouped according to their free energy of duplex formation with their perfectly complementary sequences" |

The terms "set of probes" and "probe set" appear in independent claim 2 and dependent claims 4 and 5. The parties dispute whether to include the phrase "grouped according to their free energy of duplex formation with their perfectly complementary sequences," which refers to grouping the probes according to their relative ability to bind to their complementary sequence at or near the same temperature.

**Illumina's proposed construction**

Illumina contends that these terms do not need to be construed because they are not defined in the intrinsic record to have meaning other than their ordinary meaning, or if they are construed, to give them their ordinary meaning of "a number of probes grouped together."

36

United States District Court
For the Northern District of California

1   CGI concedes that these terms are not highly technical terms, but proposes that the Court

2   construe them to restrict the claim from encompassing prior art and unintended subject matter, in

3   particular, to make clear that Claim 2 cannot encompass a set of all probes of a certain length.  Resp.

4   at 36.

5   **CGI's proposed construction**

6   CGI proposes that "set" or "probe set" be defined as probes that are grouped into subsets of

7   probes having similar duplex stability, so as to exclude the possibility that the use of all probes of a

8   given length is claimed by the patent.  CGI cites the specification describing the use of "stringency

9   classes" to support its proposed construction:

10          **In order to reduce the number of separate annealing reactions that
           must be carried out, the oligonucleotide probes may be grouped into
11          mixtures, or subsets, of probes** whose perfectly matched duplexes with
           complementary sequences have similar stability or free energy of binding.
12          Such subsets of oligonucleotide probes having similar duplex stability are
           referred to herein as "stringency classes" of oligonucleotide probes.  **The
13          mixtures, or stringency classes, of oligonucleotide probes are then
           separately combined with the target polynucleotide under conditions
14          such that substantially only oligonucleotide probes complementary to
           the target polynucleotide form duplexes.**

15

16   '597 patent, 11:39-50 (emphasis added); see CGI Markman slides 262-63.  As thus described in the

17   specification, stringency classes are "subsets of oligonucleotide probes having similar duplex

18   stability or free energy of binding."  Id.  CGI contends that this language from the specification

19   teaches a stringency class technique to assure that only perfectly matched probes will hybridize, but

20   does not teach using a set of all possible probes having the same length.

21          CGI points to Illumina's statements during patent prosecution distinguishing the Pease prior

22   art, which claims probe matrices that contain "a complete set of all possible sequences of a given

23   length."  LaBarre Decl., Ex. FF at 5 (11/16/00 Amendment).  CGI contends that Pease teaches use of

24   a set of all X-mer probes on an array, that is, using probes of all possible sequences of a given

25   length.  CGI further contends that Illumina distinguished Pease by disclaiming the use of all probes

26   of a given length, telling the Examiner:

27          Pease et al. was discussed in the response filed May 12, 2000.
           Briefly, this reference describes preparation of probe matrices which contain
28          either (i) a single sequence, (ii) two different sequences, or **(iii) a complete
           set of all possible sequences of a given length**.  The first two instances

United States District Court

For the Northern District of California

clearly do not show or suggest the probe sets of the invention, each of which contains at least 50 different-sequence oligonucleotides.

> **The third instance, in which all possible sequences are present, does not suggest a subset of probe oligonucleotides, belonging to a single stringency class, as defined above**. Nor is there any suggestion or motivation in the reference to provide subsets of oligonucleotides from a single stringency class. The advantages of using such subsets in the applicants' disclosed sequencing methods, also discussed above, would not be provided by a set of all possible sequences.

LaBarre Decl., Ex. FF at 5 (11/16/00 Amendment) at 5 (emphasis added). There, however, Illumina was addressing the use of a single stringency class claimed in the invention, as distinguished from a complete set of all probes of a given length claimed in the Pease prior art. In the amendment, Illumina referred to the benefit of using stringency classes in the invention as follows:

> The benefits of using sets of probes from the same stringency class are described at page 16, lines 11-22 of the specification. As noted at page 9, first paragraph, **the probes are preferably applied to the polynucleotide template as mixtures comprising oligonucleotides of all possible sequences of a given length.** Such a mixture can be quite complex; for example, the full set of 8-mers includes over 65,000 oligonucleotides. In such a mixture, individual probes may not be present at concentrations sufficient to drive hybridization at a reasonable rate, particularly for sequences having lower free energy of binding.

> This problem can be addressed by employing groups of stringency classes. As described at page 16, lines 11-21, **each set of oligonucleotide probes from a single stringency class may be separately combined with the target polynucleotide under conditions such that substantially only oligonucleotide probes complementary to the target polynucleotide form duplexes.** That is, the stringency of the hybridization reaction can be tailored to the free energy of duplex formation of the stringency class being used, so that substantially only perfectly complementary oligonucleotide probes form duplexes. This reduces the possibility of mismatches and errors in sorting or sequencing.

LaBarre Decl., Ex. FF at 4-5 (11/16/00 Amendment). Illumina then went on to distinguish Pease, which did not teach use of a single stringency class, as claimed in the invention. Id. at 5 ("The third instance, in which all possible sequences are present, does not suggest a subset of probe oligonucleotides, belonging to a single stringency class, as defined above."). While the parties agree that Illumina further amended its claims, see CGI Markman slide 253, the statements by Illumina to overcome the Pease prior art in the 11/16/00 Amendment contemplate use of probes "of all possible sequences of a given length" and use of subsets of such probes from the same stringency class, which was not taught in Pease. LaBarre Decl., Ex. FF at 4-5 (11/16/00 Amendment).

1    CGI also relies on extrinsic evidence by citing Dr. Macevicz's testimony about how the

2    claim is practiced to support its proposed construction, but there Dr. Macevicz testified specifically

3    about "stringency classes" and was not asked about the more general term "set of probes."  Resp. at

4    37; LaBarre Decl., Ex. I at 52, 139 (Macevicz Depo. Tr.).  CGI proposes a construction of "probe

5    sets" to be synonymous with "subset" or "stringency classes," but does not cite any intrinsic

6    evidence that the term "set" or "probe set" (as distinct from the subset of all probes identified in

7    subsection (iii) of Claim 2) was intended to be so limited.  As Illumina points out, Claim 2 (iii) itself

8    already requires that the probes have a certain similarity to each other, based on the temperature at

9    which they can hybridize (anneal) to form a stable duplex: "for at least one said probe set, the

10   different-sequence, single stranded oligonucleotide probes in that set have annealing temperatures

11   whose maximum and minimum values differ from each other by no more than 1° C."  '597 patent,

12   21:41-44.  See Opening Br. at 28.

13   The Court declines CGI's proposal to import limitations from the specification dealing with

14   stringency classes into all uses of the term "set" or "probe set" in Claim 2, and adopts Illumina's

15   "plain meaning" construction of the term.

16   **Court's Construction**

17   The Court construes **"set" and "probe set"** to mean "a number of probes grouped together."

18

19          **(6)      "annealing temperatures"**

20

| Illumina's proposed construction | CGI's proposed construction |
|---|---|
| **"annealing temperatures"** means "the temperatures at which the annealing step can be carried out" | **"annealing temperatures"** means "the temperatures at which particular probes have about fifty percent maximum annealing in a standard PCR buffer solution" |

24   The parties agree that "annealing temperatures" is a significant term for construction.  CGI

25   proposes a construction of "annealing temperature" to define it as a specific temperature, rather than

26   range of temperatures at which the annealing process can take place, as proposed by Illumina.

27

28

United States District Court
For the Northern District of California

**Illumina's proposed construction**

Illumina proposes a construction that reflects that the annealing temperature for an oligonucleotide, at which the annealing step of a process can be carried out, is a range of temperatures, not a specific temperature.  As CGI explains,

> Annealing occurs when two single strands of DNA containing complementary base sequences come together such that the specific pairing of bases takes place between the complementary strands. Similar to the melting process, the annealing of two strands is a [sic] equilibrium over a temperature range.  At high temperatures, fewer strands will anneal together, and at low temperatures many more strands will anneal.

Resp. at 32 (citations omitted).

Illumina relies on the portion of the specification which refers to the range of annealing temperatures:

> The **range of annealing temperatures** (22-70° C) is roughly bounded by the temperatures 5-10 degrees below the temperatures at which the least stable and most stable 8-mers, respectively, are expected to have about fifty percent maximum annealing in a standard PCR buffer solution.

'597 patent, 16:4-9 (emphasis added).  This passage does not, however, refer to the entire range of temperatures at which the probes can anneal, but rather refers to the full range of annealing temperatures by which the stringency classes or subsets are each defined and thereby grouped by specific temperatures within that range: "The 48 stringency conditions are defined by annealing temperatures which range from 22° C. to 70° C., such that each grouping of subsets at the same temperature differ in annealing temperature by 1° C. from that of the subset groupings containing the next highest and next lowest stringency classes." '597 patent, 15:66 - 16:4.  The range of annealing temperatures described in this embodiment (22-70° C) covers a range of 48 degrees Celsius, such that each of the 48 stringency groups of probes is defined by particular annealing temperatures that are within 1 degree of each other, covering the range between 22 and 70 degrees Celsius.

CGI does not dispute that the possible annealing temperatures for a given set of probes of the same length cover a wide range of temperatures.  CGI contends, however, that the term "annealing temperature" is "best understood as the point at which fifty percent annealing would have taken

40

United States District Court

For the Northern District of California

1  place," which it adds is also the point where fifty percent melting would have taken place.  Resp. at

2  33 and n.24.  CGI contends that Illumina's construction would render the entire claim inoperable

3  because one must be able to compare one probe's annealing temperature to another probe's

4  annealing temperature to determine if they are more than 1 degree apart, as required by the

5  specification.  Resp. at 36.  CGI further argues that its proposed construction is consistent with the

6  fact that the specification refers to separating the probes into "2 subsets for each of 48 different

7  annealing temperatures" because if "annealing temperature" meant the entire range of temperatures

8  at which a probe can anneal, then grouping the probes into subsets for "each" of 48 different

9  annealing temperatures would be nonsensical.  Resp. at 34 (citing '597 patent, 15:55 - 16:9)**.**

10  Illumina responds that one skilled in the art would be familiar with meaningful limits on the range of

11  workable annealing temperatures for a given oligonucleotide, and that there is no support for

12  limiting the range of annealing temperatures to a fixed temperature.  Reply at 10.

13          The Court is persuaded that Illumina's proposed construction of "annealing temperature" as

14  the entire range of temperatures at which the probes can anneal would render the claim inoperable

15  because subsection (iii) of Claim 2 requires the probes in at least one probe set to have "annealing

16  temperatures whose maximum and minimum values differ from each other by no more than 1° C."

17  Thus, the annealing temperature limitation must be sufficiently specific to identify at least one

18  subset of probes whose annealing temperatures are within one degree Celsius of each other.

19  Illumina contends that expert testimony will demonstrate how to compare annealing temperatures to

20  within one degree apart.  On its face, however, Illumina's proposed construction would be

21  unworkable generally such that the limitation that the maximum and minimum values cannot differ

22  from each other by more than  1° C would be written out of the claim.  The Court must avoid a

23  construction with a nonsensical result.  AIA Engineering Ltd. v. Magotteaux Intern. S/A, 657 F.3d

24  1264, 1276 (Fed. Cir. 2011).  "While inoperability in itself does not doom [Illumina's] construction,

25  'a construction that renders the claimed invention inoperable should be viewed with extreme

26  skepticism.'"  Id. at 1278 (quoting Talbert Fuel Sys. Patents Co. v. Unocal Corp., 275 F.3d 1371,

27  1376 (Fed. Cir.), vacated and remanded on other grounds, 537 U.S. 802 (2002)).

28

United States District Court

For the Northern District of California

**CGI's proposed construction**

CGI proposes that the term "annealing temperatures" be defined as "the temperatures at which particular probes have about fifty percent maximum annealing."  CGI relies on the specification language which refers to temperatures at which probes "have about fifty percent maximum annealing in a standard PCR buffer solution."  Resp. at 33 (quoting '597 patent, 16:4-9).  CGI contends that the specification uses the term to mean the fixed midpoint, not the entire range of potential annealing conditions.  Referring to Examples 1 and 2 which employ stringency classes (defined as "mixtures, or subsets, of probes whose perfectly matched duplexes with complementary sequences have similar stability or free energy of binding"), CGI contends that the patent teaches a method that separates probes into 96 stringency classes with "2 subsets for each of 48 different annealing temperatures."  Resp. at 33-34 (quoting '597 patent, 11:40-43, 15:55-58).

CGI also relies on narrowing statements made by Illumina during prosecution of the '597 patent to overcome the Pease prior art which it distinguished as allowing all probes of a given length without limiting any of the sets to a similar binding energy.  At that time, Illumina amended its claims to teach "a subset of probe oligonucleotides, belonging to a single stringency class."  Resp. at 35; LaBarre Decl., Ex. FF at 5 (11/16/00 Amendment) ("The third instance, in which all possible sequences are present, does not suggest a subset of probe oligonucleotides, **belonging to a single stringency class, as defined above**.") (emphasis in bold added).  See LaBarre Decl., Ex. FF at 4 ("Claim 20 has been amended to replace the language 'have substantially the same free energy of duplex formation' with 'are from the same stringency class.'").

CGI points out that after the claim was again rejected over prior art, Illumina further amended the claim to the current language of Claim 2 by limiting the claimed probe sets to contain at least one subset whose maximum and minimum annealing temperatures differ from each other by no more than 1° C: "for at least one said probe set, the different-sequence, single stranded oligonucleotide probes in that set have annealing temperatures whose maximum and minimum values differ from each other by no more than 1° C."  LaBarre Decl., Ex. GG at 1 (4/5/2001 Amendment).  These narrowing statements by Illumina demonstrate that the claimed subset of probes was narrowed in Claim 2 to a subset whose annealing temperatures did not differ by more

1   than 1° C, indicating that the annealing temperature of the probes was determined at least at an

2   approximately fixed temperature point that could be compared to the annealing temperature of the

3   other probes in that subset, not to a wide range of temperatures.

4          Looking to the specification language, the specification states that annealing temperature is

5   preferably used to define the stringency classes, although other factors also affect stringency classes:

6          Selection of oligonucleotide probe length and stringency class size depends
       on several factors, such as length of target sequence and how it is prepared,
7       the extent to which the hybridization reactions can be automated, the degree
       to which the stringency of the hybridization reaction can be controlled, the
8       presence or absence of oligonucleotide probes with complementary
       sequences, and the like. . . . Stringency can be controlled, [sic] several
9       varying several parameters, including temperature, salt concentration,
       concentration of certain organic solvents, such as formamide, and the like.
10      Preferably, temperature is used to define the stringency classes because the
       activity of the various polymerases or ligases employed limits the degree to
11      which salt concentration or organic solvent concentration can be varied for
       ensuring specific annealing of the oligonucleotide probes.

12

13  '597 patent, 11:56 - 12:15.  The embodiments in Examples 1 and 2, cited by CGI, define the

14  stringency conditions by annealing temperature:

15      The 48 stringency conditions are defined by annealing temperatures which
       range from 22° C to 70° C, such that each grouping of subsets at the same
16      temperature differ in annealing temperature by 1° C, from that of the subset
       groupings containing the next highest and next lowest stringency classes.
17      The range of annealing temperatures (22-70° C) is roughly bounded by the
       temperatures 5-10 degrees below the temperatures at which the least stable
18      and most stable 8-mers, respectively, are expected to have about fifty
       percent maximum annealing in a standard PCR buffer solution.

19

20  '597 patent, 15:66 - 16:9 (Example 1).  See id. 16:65-67 (Example 2) ("As above, the 6-mer probes

21  are prepared in 96 stringency classes of 42 or 43 probes each (2 subsets for each of 48 different

22  annealing temperatures).").  In these embodiments, the stringency classes group the probes by

23  annealing temperatures which range from 22 to 70 degrees Celsius.  This particular temperature

24  range stated in the specification is not included as a limitation in Claim 2, but does limit Claim 4

25  ("The kit of claim 2 wherein said annealing temperatures have a value from 22° C to 70° C.").

26          Based on the specification, prosecution history and the claim language itself, the Court is

27  persuaded that annealing temperatures refer to a particular temperature, or at least a very narrow

28

1   range of temperatures, rather than the full range of all temperatures at which the probes can anneal.

2   See '597 patent, 15:55-58 (Example 1) and 16:65-67 (Example 2).

3          CGI contends that the term "annealing temperature" is best understood as the point at which

4   about fifty percent annealing would take place, based on the specification language referring to the

5   temperatures at which probes are expected to have "about fifty percent maximum annealing in a

6   standard PCR buffer solution."  Resp. at 33 n.24.  But as Illumina points out, the specification states

7   that the "range of annealing temperatures" is bounded by the temperatures 5-10 degrees below the

8   melting temperatures at which CGI would define the annealing temperature, that is, the temperatures

9   at which the probes are expected to have "about fifty percent maximum annealing."  Reply at 10

10  (citing '597 patent, 16:4-9).  Illumina persuasively argues that the specification teaches that to

11  calculate the highest end of the range of annealing temperatures, one practicing the invention would

12  subtract 5-10 degrees from the melting temperature.  Opening Br. at 30.  Thus, CGI's proposed

13  construction of "annealing temperatures" to be identical to the melting temperature is inconsistent

14  with the specification which defines the range of annealing temperatures to be bounded by

15  temperatures that are five to ten degrees lower than the melting temperatures.  Illumina also cites a

16  molecular biology treatise indicating that the melting temperature is not synonymous with the

17  annealing temperature, Labbe Decl, Ex. 20 at 6412 (stating that the annealing temperature "was

18  determined by subtracting 8° from the [melting temperature] of the less stable oligonucleotide").

19  That treatise further bolsters Illumina's distinction between melting and annealing temperatures,

20  although it is not necessary to rely on this extrinsic evidence.

21          CGI also relies on the inventor's testimony to support its proposed construction, Resp. at 34-

22  35.  The intrinsic evidence provides more support to CGI than Illumina, but does not fully resolve

23  the ambiguity.  The Court therefore considers this extrinsic evidence offered by CGI to construe this

24  term. See Vitronics, 90 F.3d at 1583.  Dr. Macevicz testified that "all the different oligonucleotides

25  will have different temperatures, so that if you used the full mixture – that is, if you didn't use

26  stringency classes or some other means – you might have incomplete hybridizations or you might

27  have something that hybridizes that you don't want to hybridize because of this difference in binding

28  energies.  But if you did it by stringency class, that problem would go away."  CGI Markman slide

**United States District Court**
For the Northern District of California

252.  This testimony supports CGI's argument that Claim 2 (iii) requires a specific temperature rather than a broad range, solving the inoperability problem raised by Illumina's proposed construction.

As CGI points out, the specification teaches in both examples that "[a]fter 5-10 minutes incubation at 80° C, the reaction mixtures are brought down to their respective annealing temperatures over a period of 20-30 minutes."  Resp. at 34 (citing '597 patent, 16:10-12).  The claim language of Claim 2 is also consistent with a construction of "annealing temperature" as a fixed temperature that can be compared to the annealing temperature of the other probes in that probe set.  CGI points to the only part of the specification that provides a method for determining the fixed temperature point for annealing, which is somewhat persuasive, but it is not clear that this passage was meant to establish the sole method for doing so.  At this point, the Court will not rule out that one skilled in the art would be familiar with other methods to determine the fixed annealing temperature when practicing Claim 2.

The Court determines that as used in the patent, the term "annealing temperatures" refers to particular fixed temperatures at which probes that are grouped in a probe set form a duplex, or anneal, such that, as used in subsection (iii) of Claim 2, the maximum and minimum annealing temperatures of the probes within that set do not differ from each other by more than about 1 degree Celsius.

**Court's Construction**

The Court construes **"annealing temperatures"** to mean "particular temperatures at which probes that are grouped in a probe set form a duplex."

### C.     Dependent Claims 9 and 10

Claim 9 reads as follows:

> 9.  The method of claim 1, wherein the polynucleotide comprises a **binding region** and a **target polynucleotide**.

Claim 10 reads as follows:

> 10.  The method of claim 9, wherein the **binding region** comprises a known sequence and the **target polynucleotide** comprises an unknown sequence; and wherein in step (a) the initializing oligonucleotide is hybridized to the **binding region** on the polynucleotide.

Labbe Decl., Ex. 3 ('597 patent Ex Parte Reexamination Certificate dated 3/2/2000).

(7)    "binding region"

| Illumina's proposed construction | CGI's proposed construction |
|---|---|
| "**binding region**" means "a region of the polynucleotide to which the initializing oligonucleotide binds" | "**binding region**" means "a known sequence of the polynucleotide to which the initializing oligonucleotide binds" |

The parties agree that the "binding region" is a region of the polynucleotide to which the initializing oligonucleotide binds, but dispute whether the "binding region" must be a known sequence.

**Illumina's proposed construction**

Illumina cites the specification to show that the singular role of the binding region in the invention is "to bind ("hybridize") to the initializing oligo."  Opening Br. at 24.  Referring to Figure 1, the specification states as follows:

> Binding region (40) has a known sequence, but can vary greatly in length and composition. It must be sufficiently long to accommodate the hybridization of an initializing oligonucleotide. Different binding regions can be employed with either identical or different initializing oligonucleotides, but for convenience of preparation, it is preferable to provide identical binding regions and different initializing oligonucleotides. Thus, all the templates are prepared identically and then separated into aliquots for use with different initializing oligonucleotides. Preferably, the binding region should be long enough to accommodate a set of different initializing oligonucleotides, each hydridizing to the template to produce a different starting point for subsequent ligations. Most preferably, the binding region is between about 20 to 50 nucleotides in length.

'597 patent, 5:15-29 [Detailed Description of the Invention].  Illumina acknowledges that in the embodiment depicted in Figure 1, the "binding region" has a known sequence which makes it easier to design an initializing oligonucleotide which will bind to it, but argues that this particular embodiment does not require limiting the binding region to a known sequence.  Opening Br. at 24-25.

**CGI's proposed construction**

CGI relies on the embodiment described in the specification which teaches that the "binding region" has a known sequence.  Because the patent only refers to an embodiment, shown in Figure 1,

46

United States District Court

For the Northern District of California

1   where the binding region has a known sequence, the limitations of this embodiment generally cannot

2   be read into the claims.  "Although the specification may aid the court in interpreting the meaning of

3   disputed claim language, particular embodiments and examples appearing in the specification will

4   not generally be read into the claims."  Comark Communications, Inc. v. Harris Corp., 156 F.3d

5   1182, 1187 (Fed. Cir. 1998) (quotation omitted).  However, "when the preferred embodiment is

6   described in the specification as the invention itself, the claims are not necessarily entitled to a scope

7   broader than that embodiment."  Edwards Lifesciences, 582 F.3d at 1330 (quoting Chimie v. PPG

8   Indus. Inc., 402 F.3d 1371, 1379 (Fed.Cir. 2005)) (quotation marks omitted).

9       CGI also argues that if the initializing oligonucleotide is "known," as Illumina agrees, then

10  the binding region must also be known if its sole purpose is to bind to the "known" initializing

11  oligonucleotide.  Resp. at 38-39.  See Opening Br. at 2 ("The sequencing method described and

12  claimed in the '597 patent begins by bringing a short single strand of DNA having a known

13  sequence (an 'initializing oligonucleotide') into contact with a very long single strand of DNA

14  having an unknown sequence (a polynucleotide')").  CGI also argues that there are "no

15  embodiments described in the specification which would allow the binding region to be unknown,

16  and it would be difficult to conceive of a way the method could even work with an unknown binding

17  region.  If the binding region is unknown, then the initializing oligonucleotide could not be a known

18  starting point for the reaction."  Resp. at 38.  In response, Illumina contends that an initializing

19  oligonucleotide can bind to a binding region that does not have a known sequence and points out

20  that CGI's accused process uses a binding region that is arguably unknown.  Reply at 9 n.34.

21  However, Illumina does not identify any embodiment of the invention where the binding region is

22  unknown.

23      In support of its construction, CGI also cites Judge Alsup's claim construction order

24  construing the terms of the parent patent to the '597 patent: "The initializing oligonucleotide then

25  hybridizes with the binding region, a known sequence, and subsequent ligations are done."  See

26  Labbe Decl., Ex. 4 at 9.  There, however, Judge Alsup was not specifically construing the term

27  "binding region" but instead referring to it in his construction of "initializing oligonucleotide probe,"

28  citing an embodiment described in the patent at issue with language similar to the embodiment

United States District Court

For the Northern District of California

1   described in the '597 patent: "Binding region (4) has a known sequence, but can vary greatly in

2   length and composition." Id. at 8 (quoting '341 patent, 5:13-27).

3       Illumina argues that CGI's proposed construction would violate the doctrine of claim

4   differentiation because claim 10, which itself depends from dependent claim 9, requires that the

5   binding region contain a "known sequence." Under this doctrine, "the presence of a dependent

6   claim that adds a particular limitation gives rise to a presumption that the limitation in question is

7   not present in the independent claim." Enzo, 599 F.3d at 1342 (quoting Phillips, 415 F.3d at 1315)

8   (quotation marks omitted). In Enzo, the patent owner argued that the dependent claim added "a

9   preformed detectable molecular complex" limitation to claim 1, so that the court's construction of

10  the independent claim term "non-radioactive moiety" referring to detection with "a preformed

11  detectable molecular complex" rendered the dependent claim coextensive with the independent

12  claim. Id. The Federal Circuit rejected the claim differentiation argument because the independent

13  claim was broader than the dependent claim:

14          But the district court's construction imposes no requirement that a
            preformed detectable molecular complex is actually present in claim 1;
15          rather, it simply requires the "non-radioactive moiety" to be capable of
            performing a function: " can be detected with a preformed detectable
16          molecular complex." [Citation omitted.] Claim 1, unlike claim 14, is
            infringed even in the absence of a preformed detectable molecular complex.
17          [Citation omitted.] Because claim 1 is broader than claim 14 under the
            district court's construction, this case simply does not implicate the doctrine
18          of claim differentiation.

19  Id.

20      Here, Illumina argues that CGI's proposed construction of "binding region" to be a known

21  sequence would render the limitation in claim 10 superfluous. "There is presumed to be a difference

22  in meaning and scope when different words or phrases are used in separate claims. To the extent

23  that the absence of such difference in meaning and scope would make a claim superfluous, the

24  doctrine of claim differentiation states the presumption that the difference between claims is

25  significant." Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1187 (Fed. Cir. 1998).

26  However, CGI correctly points out that claim 10 additionally requires the target polynucleotide to

27  include an unknown sequence and that the initializing oligonucleotide is hybridized to the binding

28

48

1 | region, so that claim 10 would not be rendered redundant.  Resp. at 29.  CGI's proposed construction

2 | would not, therefore, render claim 10 entirely superfluous by requiring a "known sequence."

3 |      CGI contends that a binding region is known in every embodiment of the invention, so that

4 | any presumption against the limitation under the doctrine of claim differentiation is rebutted by the

5 | specification itself.  CGI Markman slide 279 (citing Edwards Lifesciences, 582 F.3d at 1332).  In

6 | Edwards, the court determined that the claimed "graft" devices required wires, rejecting Edwards'

7 | claim differentiation argument that the claimed graft body did not itself include wires, where the

8 | claims that recited the graft bodies also recited that the graft bodies were dockable or attachable, and

9 | the parties agreed that such an attachment required wires.  Edwards Lifesciences, 582 F.3d at 1332.

10 | Here, the intrinsic evidence demonstrates that there is no embodiment of the invention where the

11 | binding region has an unknown sequence.  The Court therefore adopts CGI's proposed construction

12 | of "binding region."

13 | **Court's Construction**

14 |      The Court construes **"binding region"** to mean "a known sequence of the polynucleotide to

15 | which the initializing oligonucleotide binds."

16 |

17 |        **(8)**    **"target polynucleotide"**

18 |

| Illumina's proposed construction | CGI's proposed construction |
|---|---|
| **"target polynucleotide"** means "a polynucleotide having a portion to be sequenced" | **"target polynucleotide"** means "the region of the polynucleotide to be identified that is conjugated to the binding region" |

22 |      The parties disagree (1) whether the "target polynucleotide" is a polynucleotide that has a

23 | portion to be **sequenced** or is a region to be **identified**, and (2) whether "target polynucleotide"

24 | should be construed to require conjugation to the binding region.  Following oral argument, the

25 | Court instructed the parties to meet and confer, but the parties were unable to reach agreement on

26 | the construction of this term.  Doc. no. 117.

27 | **Illumina's proposed construction**

28 |      To support its proposed construction of "target polynucleotide" to be "sequenced," Illumina

| argues that one of ordinary skill in the art would have understood the specification to describe

49

"target polynucleotide" as a polynucleotide having a portion to be sequenced.  For example, the

patent describes the limitations of conventional sequencing techniques in terms of their ability to

sequence "long target polynucleotides."  '597 patent, 2:13-17.  Further, Illumina contends that the

purpose and function of the "target polynucleotide" is to be subjected to the claimed sequencing

method, as demonstrated by the two examples described in the specification which are each titled

"Sequencing a Target Polynucleotide."  Id., 14:40-43 ("EXAMPLE 1: Sequencing a Target

Polynucleotide Amplified from pUC19 with Four Initializing Oglionucleotides"); 16:30-33

("EXAMPLE 2: Sequencing a Target Polynucleotide Amplified from pUC 19 with One Initializing

Oligonucleotide").  Opening Br. at 26.

CGI does not address Illumina's argument that the patent describes the  "target

polynucleotide" as a polynucleotide to be sequenced, but refers to the language of claim 1 which

contains identifying language in step (b).  Claim 1 does not itself contain the term "target

polynucleotide," but teaches a method "for identifying a sequence of nucleotides in a

polynucleotide," comprising the steps of extending step (a), identifying step (b) and repeating step

(c).  Because claim 1 refers to identifying a sequence, not identifying a polynucleotide, the claim

language and the specification support Illumina's proposed construction over CGI's proposed

construction.

Looking to the claims themselves, Illumina points out that the claims do not state that the

target polynucleotide must be conjugated to the binding region.  Illumina points out that the

specification language describing a preferred embodiment in which a target polynucleotide is

conjugated to a binding region to form a template does not limit the scope of the term "target

polynucleotide" to be "conjugated to the binding region."

**CGI's proposed construction**

CGI contends that claim 1 contains identifying language, rather than sequencing language.

Step (b), for example, requires "identifying one or more nucleotides of the polynucleotide."  CGI

represents that the parties have agreed to a construction of this identifying step (b) and have not

construed it to mean sequencing.  Resp. at 39.  Illumina makes the more persuasive argument,

however, that the patent specification refers to the "target polynucleotide" as a polynucleotide

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  having a portion to be sequenced.  For example, the specification describes the Field of the

2  Invention as follows: "The invention relates generally to methods for determining the nucleotide

3  sequence of a polynucleotide . . . ." '597 patent, 1:10-11.  Further, the identifying step (b) of claim 1

4  on which CGI relies refers to "identifying a sequence of nucleotides."  CGI's proposed construction

5  of "target polynucleotide" as a region of the polynucleotide "to be identified" leaves out the aspect

6  of identifying a sequence that is taught by the patent.

7  CGI also proposes that the "target polynucleotide" be construed to be conjugated to the

8  binding region.  CGI relies on the specification, which states "**Preferably**, a target polynucleotide is

9  conjugated to a binding region to form a template." '597 patent, 8:9-10 (emphasis added).  CGI also

10  refers to Figure 1 which depicts the binding region attached to the target polynucleotide.  The

11  specification describes this embodiment as follows:

12  > The general scheme of one aspect of the invention is shown
13  > diagrammatically in FIG. 1. As described more fully below, the invention is
   > not meant to be limited by the particular features of this embodiment.
14  > **Template (20) comprising a polynucleotide (50) of unknown sequence
   > and binding region (40) is attached to solid phase support (10)**.

15  Id., 4:46-51 (emphasis added).  As the specification clearly states, the limitations of this preferred

16  embodiment are not intended to limit the claims of the invention: "the invention is not meant to be

17  limited by the particular features of this embodiment."  CGI's proposed construction would

18  improperly do so.  The Court therefore adopts Illumina's proposed construction of "target

19  polynucleotide."

20  **Court's Construction:**

21  The Court construes **"target polynucleotide"** to mean "a polynucleotide having a portion to

22  be sequenced."

23

24  **D.      Claim 14**

25  Claim 14 states as follows:

26  > The method of claim 1, wherein the oligonucleotide probe comprises a label
   > which results in a **spectrally resolvable fluorescent signal**.

27

28  Labbe Decl., Ex. 3 ('597 patent Ex Parte Reexamination Certificate dated 3/2/2000 ).

United States District Court

For the Northern District of California

(9)    "spectrally resolvable fluorescent signal"

| Illumina's proposed construction | CGI's proposed construction |
|---|---|
| **"spectrally resolvable fluorescent signal"** means "a light signal generated by fluorescence which can be distinguished based on its spectral characteristics (e.g., its color)" | **"spectrally resolvable fluorescent signal"** means "a signal that may be distinguished on the basis of its spectral characteristics" |

The parties agree that a **"spectrally resolvable fluorescent signal"** is a signal that can be distinguished on the basis of its spectral characteristics, but disagree as to whether the signal must be a "fluorescent" light signal, or one involving the emission of fluorescent light.

**Illumina's proposed construction**

Illumina relies on the claim term itself to propose that the term be construed as a signal "generated by fluorescence." CGI does not address whether it disputes Illumina's proposed definition of "fluorescent" as "generated by fluorescence." Rather, CGI contends that the term should not be limited to the detection of a particular color of light because the specification gives alternatives to detection of fluorescence:

> In one preferred kit, fluorescently labeled oligonucleotide probes are provided such that probes corresponding to different terminal nucleotides of the target polynucleotide carry distinct spectrally resolvable fluorescent dyes. As used herein, "spectrally resolvable" means that the dyes may be distinguished on basis of their spectral characteristics, **particularly fluorescence emission wavelength**, under conditions of operation. Thus, the identity of the one or more terminal nucleotides would be correlated to a distinct color, **or perhaps ratio of intensities at different wavelengths.**

''597 patent, 14:21-31. CGI suggests that Illumina's proposed construction would exclude embodiments proposed by the patent specification by limiting detection of spectral characteristics to only fluorescent wavelengths. CGI does not, however, explain how this specification language would overcome a plain reading of the claim term itself to include "fluorescent."

**CGI's proposed construction**

CGI contends that its proposed construction would not exclude embodiments proposed by the patent specification. However, CGI's proposed construction would improperly read "fluorescent" out of the claim term itself. At the same time, Illumina correctly recognizes that color is not necessarily the sole way to distinguish the signal by using "e.g." in its construction. The

Court therefore adopts Illumina's proposed construction of "spectrally resolvable fluorescent

signal."

**Court's construction:**

The Court construes **"spectrally resolvable fluorescent signal"** to mean "a light signal

generated by fluorescence which can be distinguished based on its spectral characteristics (e.g., its

color)."

**IT IS SO ORDERED.**

Dated: February 8, 2012

_Elizabth D. Laporte_
ELIZABETH D. LAPORTE
United States Magistrate Judge

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28