Michael J. Malecek (State Bar No. 171034)
Email address:  michael.malecek@kayescholer.com
Sean Boyle (State Bar No. 238128)
Email address:  sean.boyle@kayescholer.com
Katherine LaBarre (State Bar No. 269726)
Email address:  katherine.labarre@kayescholer.com
Marisa Armanino Williams (State Bar No. 264907)
Email address:  marisa.armanino@kayescholer.com
KAYE SCHOLER LLP
Two Palo Alto Square, Suite 400
3000 El Camino Real
Palo Alto, California  94306
Telephone:  (650) 319-4500
Facsimile:  (650) 319-4700

Attorneys for Defendant
COMPLETE GENOMICS, INC.

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ILLUMINA, INC., and SOLEXA, INC., | Case No. 3:10-cv-05542 EDL |
| Plaintiffs, | **DEFENDANT COMPLETE GENOMICS, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY** |
| v. | |
| COMPLETE GENOMICS, INC., | Date:     July 10, 2012 |
| Defendant. | Time:     9:00 A.M. |
| | Place:    Courtroom E, 15th Floor |

KAYE SCHOLER LLP

## **TABLE OF CONTENTS**

I.    Introduction And Factual Background.................................................................. 1

    A.    Southern Reference ................................................................................ 1

    B.    Whiteley Reference ............................................................................... 2

    C.    Brenner Reference ................................................................................. 3

    D.    Martinelli Reference ............................................................................. 3

II.   Legal Standards ................................................................................................ 3

    A.    Summary Judgment Should Be Granted When There Is No Genuine Issue Of Material Fact ....................................................................... 3

    B.    Patents May Be Invalidated On Summary Judgment............................ 4

    C.    Summary Judgment Is Appropriate Where Assertions Of Diligence Are Uncorroborated ................................................................................ 4

III.  Argument........................................................................................................... 5

    A.    Southern Invalidates Claims 1, 9, 10, 14, 15, And 17-19 ..................... 5

        1.    Illumina Stipulated That Southern Invalidates Claim 1................. 5

        2.    The Federal Circuit Affirmed That Claim 1 Was Invalidated By Southern ........................................................................... 7

        3.    Illumina Misled The PTO In The Reexamination........................ 7

        4.    The § 1.131 Declaration Filed By Dr. Macevicz Is Insufficient To Swear Behind Southern, And Illumina Has No Evidence Of Diligence ............................................................... 8

        5.    Claim 1 ........................................................................... 12

        6.    Claim 9 ........................................................................... 14

        7.    Claim 10 ......................................................................... 14

        8.    Claim 14 ......................................................................... 14

        9.    Claim 15 ......................................................................... 15

        10.   Claim 17 ......................................................................... 15

        11.   Claim 18 ......................................................................... 15

        12.   Claim 19 ......................................................................... 15

    B.    Whiteley Invalidates Claims 1, 9, 10, 14, 15, And 17-19 ................... 16

        1.    The Inventor And Prosecutor Of The '597 Patent Provided An Opinion To CGI That If Claim 1 Is Not Limited To Successive Ligation, The '597 Patent Is Invalid Over Whiteley ................................ 16

        2.    Claim 1 ........................................................................... 17

        3.    Claim 9 ........................................................................... 18

        4.    Claim 10 ......................................................................... 18

        5.    Claim 14 ......................................................................... 18

        6.    Claim 15 ......................................................................... 19

        7.    Claim 17 ......................................................................... 19

        8.    Claim 18 ......................................................................... 19

        9.    Claim 19 ......................................................................... 19

        10.   Obviousness ................................................................... 19

    C.    Martinelli Invalidates Claims 1, 9, 10, 14, 15, And 17-19 ................. 19

        1.    Claim 1 ........................................................................... 20

        2.    Claim 9 ........................................................................... 21

i

KAYE SCHOLER LLP

3.      Claim 10...................................................................... 21
4.      Claim 14...................................................................... 22
5.      Claim 15...................................................................... 22
6.      Claim 17...................................................................... 22
7.      Claim 18...................................................................... 22
8.      Claim 19...................................................................... 22
9.      Obviousness ............................................................... 22

D.      Brenner Invalidates Claims 1, 9, 10, And 14-19............................................... 23

1.      The Inventor Copied Large Portions Of His Patent From His Client,
         Dr. Sydney Brenner ......................................................... 23
2.      Claim 1........................................................................ 24
3.      Claim 16...................................................................... 25
4.      Claims 9, 10, 14, 15, 17, And 19 ...................................... 25

IV.   Conclusion.......................................................................................... 25

MSJ OF INVALIDITY                                                                Case No. 3:10-cv-05542 EDL

KAYE SCHOLER LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

**Cases**

*Brown v. Barbacid,*
    436 F.3d 1376 (Fed. Cir. 2006) ............................................................... 5

*Brunswick Corp. v. U.S.,*
    34 Fed. Cl. 532 (1995) ......................................................................... 4

*Creative Compounds, LLC v. Starmark Labs.,*
    651 F.3d 1303 (Fed. Cir. 2011) ..................................................... 5, 8, 10, 11

*In re Meyer Mfg. Corp.,*
    411 F. App'x 316 (Fed. Cir. 2010) ................................................. 5, 8, 9, 10

*KSR Int'l Co. v. Teleflex Inc.,*
    550 U.S. 398 (2007) ................................................................. 4, 16, 19, 22

*Leggett & Platt, Inc. v. Vutek, Inc.,*
    537 F.3d 1349 (Fed. Cir. 2008) .............................................................. 4

*Loral Fairchild Corp. v. Victor Co. of Japan, Ltd.,*
    931 F. Supp. 1014 (E.D.N.Y. 1996) ........................................................ 8

*Mahurkar v. C.R. Bard, Inc.,*
    79 F.3d 1572 (Fed. Cir. 1996) ............................................................... 4

*Monsanto Co. v. Mycogen Plant Sci., Inc.,*
    261 F.3d 1356 (Fed. Cir. 2001) ............................................................. 4

*MySpace, Inc. v. GraphOn Corp.,*
    756 F. Supp. 2d 1218 (N.D. Cal. 2010) .................................................... 3

*Reed v. Tornqvist,*
    436 F.2d 501 (C.C.P.A. 1971) ............................................................. 10

*Rey-Bellet v. Engelhardt,*
    493 F.2d 1380 (C.C.P.A. 1974) ........................................................... 10

*Schering Corp. v. Geneva Pharms., Inc.,*
    339 F.3d 1373 (Fed. Cir. 2003) ............................................................. 4

*Texas Co. v. Globe Oil & Refining Co.,*
    112 F. Supp. 455 (N.D. Ill. 1953) ......................................................... 10

**Statutes**

35 U.S.C. § 102(e) ................................................................................. 19, 23

35 U.S.C. § 103 ......................................................................................... 4

37 C.F.R. § 1.131 ..................................................................................... 8, 9

**Other Authorities**

Manual of Patent Examining Procedure § 2286 ................................................ 7

Manual of Patent Examining Procedure § 715.07 ............................................ 10

**Rules**

Federal Rule of Civil Procedure 56 ............................................................... 1

KAYE SCHOLER LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

    

## NOTE ON CITATIONS

- LaBarre Decl. = Declaration of Katherine R. LaBarre in Support of Defendant Complete Genomics, Inc's Motion for Summary Judgment

- Meztker Decl. = Declaration of Michael L. Metzker, Ph.D. in Support of Defendant Complete Genomics, Inc's Motion for Summary Judgment

- Unless otherwise stated, all citations to exhibits refer to the exhibits attached to the LaBarre Declaration.

- Ex. = Exhibit

- XX:YY = Column number: Line number(s) of referenced patent

- Dep. Tr. = Transcript from the deposition of Dr. Stephen Macevicz dated August 11, 2011

- Jt. Cl. Constr. St. = Joint Claim Construction and Prehearing Statement in this case filed September 20, 2011

- Southern = Exhibit 3 to the LaBarre Decl.

- Whiteley = Exhibit 4 to the LaBarre Decl.

- Brenner = Exhibit 5 to the LaBarre Decl.

- Martinelli = Exhibit 6 to the LaBarre Decl.

**Notice of Motion and Motion**

On July 10, 2012 at 9:00 a.m., or as soon thereafter as the matter may be heard, before the Honorable Elizabeth D. Laporte in Courtroom E, 15th Floor of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California 94102, Defendant and Counterclaimant Complete Genomics, Inc. ("CGI"), will and does move the Court pursuant to Federal Rule of Civil Procedure 56 for summary judgment of invalidity of claims 1, 9, 10, and 14-19 of U.S. Patent No. 6,306,597 ("the '597 patent").  (Exs. 1 and 2.)

## I.    Introduction And Factual Background

Illumina sought and received a very broad construction of the '597 patent claims – a construction broader than Judge Alsup's construction which was affirmed by the Federal Circuit. Under this construction, the method claims of the '597 patent are anticipated by numerous prior art references, each of which would independently invalidate the patent.  Illumina, itself, has conceded that one such reference – Southern – discloses all elements of the '597 patent.  The inventor, Dr. Stephen Macevicz, who is also a patent attorney, provided a written legal opinion to CGI in 2006 that another reference – Whiteley – would invalidate the '597 patent if the patent were interpreted as broadly as the present claim construction.  The evidence is clear and undisputed that Southern, Whiteley, and other references disclose all elements of the '597 patent. Accordingly, this Court should enter summary judgment of invalidity of the '597 patent over each of the following references.

## A.    Southern Reference

In 1993, Dr. Southern, a professor at Oxford who has been knighted for his scientific contributions in the field of molecular biology, filed an application in Great Britain on a sequencing by ligation method.  Approximately one year later, Southern filed a PCT application on the same subject matter, which published in February 1995.  (Ex. 3.)  In a prior litigation, Illumina conceded by stipulation that Southern's invention discloses all elements of claim 1 of the '597 patent.  Illumina now argues that because Southern is only entitled in the United States to the February 1995 publication date, they can swear behind it.  Illumina, however, has absolutely no evidence other than the inventor's bare assertion to carry its heavy burden to establish the

requisite diligence.  The case law is clear that without such corroborating evidence, Illumina may not put forward such a self-serving defense.  Southern, therefore, remains prior art and anticipates the method claims of the '597 patent.

During the prosecution of the applications in the '597 family, the inventor and prosecutor, Dr. Macevicz, personally filed Information Disclosure Statements ("IDSs") on July 11, 1995 and October 6, 1995 (and was under a continuing obligation as the inventor to submit prior art during the pendency of the prosecutions).  Remarkably, in neither of those IDSs did Dr. Macevicz disclose Southern, a reference with which he was familiar.  It was only after Illumina sued Applied Biosystems ("ABI") that ABI – not Dr. Macevicz or Illumina – put this reference before the PTO.

**B.**    **Whiteley Reference**

In 1989, Dr. Whiteley and his colleagues, Michael Hunkapiller (former president of ABI) and Alexander Glazer (professor at U.C. Berkeley and former postdoctoral fellow to Dr. Frederick Sanger), filed a patent application for a method of sequencing by ligation.  (Ex. 4.)  Dr. Macevicz was intimately familiar with this application, because from 1992 to 1995, as part of his job duties at ABI, he prosecuted patents derived from this same specification.  Again, neither Dr. Macevicz nor Illumina disclosed this reference to the PTO during the prosecution of the '597 patent.  Furthermore, in 2006, Dr. Macevicz gave a <u>written legal opinion</u> to CGI that the Whiteley reference would anticipate and invalidate his own '597 patent if it was interpreted to cover types of repeating beyond successive ligation:

> Claim 1 describes a process in which an initializing oligonucleotide is successively extended along a template in cycles of ligation and identification.  Step (c) indicates that such cycles must be carried out more than one time.  I[f] this were not the case, then the claim would appear to "read" on Whiteley's (4,883,750) disclosure and therefore be invalid.

(Ex. 7 at 34-35.)  This Court should accept Dr. Macevicz's own written views – as both the inventor and patent prosecutor of the '597 patent – that the patent claims are invalid as interpreted.

KAYE SCHOLER LLP

## C.    Brenner Reference

In 1993 and 1994, Dr. Macevicz worked with Nobel Laureate Dr. Sydney Brenner to file an application on sequencing by ligation.  (Ex. 5.)  After filing the Brenner application, Dr. Macevicz proceeded to copy verbatim and paraphrase six columns of Dr. Brenner's patent, including the Background, Summary of the Invention, Definitions, and portions of the Detailed Description of the Invention.  These sections were copied from the application he filed on behalf of Dr. Brenner and were not yet public.  The sections copied account for roughly a third of the disclosure of the '597 patent.  As Dr. Macevicz was not a practicing scientist, but was instead a patent attorney, he would not have been able to "invent" the '597 patent if not for his exposure to Dr. Brenner's invention.  Dr. Macevicz concedes that the '597 patent was an "outgrowth[] of ideas [he] had after working" on Dr. Brenner's invention.  (Ex. 8 [Dep. Tr.] at 185:4-8.)  The scope of the '597 patent and the Brenner patent overlap immensely.  Remarkably, despite the overlap in subject matter and actual text of the patent applications and his role in prosecuting <u>both</u> applications, Dr. Macevicz did not disclose this reference to the PTO.

## D.    Martinelli Reference

In 1994, Richard Martinelli and John Arruda filed a patent application on a method for sequencing by ligation.  (Ex. 6.)  During the reexamination, after receiving rejections based on Martinelli, Illumina mischaracterized the Martinelli patent to the PTO.  Illumina led the Examiner to find an alleged distinction in Martinelli that does not actually distinguish Martinelli as an anticipating prior art reference.  Martinelli, therefore, continues to anticipate the method claims of the '597 patent, despite Illumina's mischaracterizations.

## II.   Legal Standards

## A.    Summary Judgment Should Be Granted When There Is No Genuine Issue Of Material Fact

The Federal Rules of Civil Procedure provide for summary judgment when "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *MySpace, Inc. v. GraphOn Corp.*, 756 F. Supp. 2d 1218, 1235 (N.D. Cal. 2010).  A party seeking summary judgment bears the initial burden of informing the court of the basis for its

motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Id.* at 1236. (granting summary judgment of invalidity). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* at 1235. The court must view the facts in the light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts. *Id.* at 1235-36.

## B. Patents May Be Invalidated On Summary Judgment

A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention. *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003). Anticipation "may be decided on summary judgment if the record reveals no genuine dispute of material fact." *Leggett & Platt, Inc. v. Vutek, Inc.*, 537 F.3d 1349, 1352 (Fed. Cir. 2008) (affirming summary judgment of anticipation).

A claim is invalid for obviousness if the differences between the claimed subject matter and the prior art would have been obvious to a person having ordinary skill in the art at the time of the claimed invention. 35 U.S.C. § 103 (2006); *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 426 (2007). Where "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate." *KSR*, 550 U.S. at 427.

## C. Summary Judgment Is Appropriate Where Assertions Of Diligence Are Uncorroborated

A party seeking to swear behind a prior art reference must be able to show diligence "from a date just prior to the other party's conception to . . . [the date of] reduction to practice." *Monsanto Co. v. Mycogen Plant Sci., Inc.,* 261 F.3d 1356, 1363 (Fed. Cir. 2001). "Reasonable diligence" is defined as continuous activity toward reduction to practice so that the invention's conception and reduction to practice are substantially one continuous act. *Mahurkar v. C.R. Bard, Inc.,* 79 F.3d 1572, 1577 (Fed. Cir. 1996). Any lapse in diligence may prove fatal to establishing an earlier priority date. *Brunswick Corp. v. U.S.*, 34 Fed. Cl. 532, 591 n.21 (1995) ("There are only a few recognized excuses for lapses in continuous diligence . . . .").

A court may grant summary judgment where the patentee fails to present adequate evidence of diligence. *Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303, 1312-13 (Fed. Cir. 2011) (affirming summary judgment of invalidity because bare assertion of diligence was not sufficient to raise genuine issue of material fact). "Merely asserting diligence is not enough; a party must 'account for the entire period during which diligence is required.'" *Id.*; *see also In re Meyer Mfg. Corp.*, 411 F. App'x 316, 319 (Fed. Cir. 2010). An inventor's testimony concerning diligence also must be corroborated. *Brown v. Barbacid*, 436 F.3d 1376, 1380 (Fed. Cir. 2006).

## III.   Argument

The '597 patent has one independent method claim. Claim 1 claims a method for "identifying a sequence of nucleotides in a polynucleotide." Illumina asserts claims 9, 10, 14, 15, 16, 17, 18, and 19, all dependent from claim 1. These method claims are at issue in this motion.

### A.   Southern Invalidates Claims 1, 9, 10, 14, 15, And 17-19

PCT Application No. WO 95/04160 (PCT/GB94/01675) ("Southern") was filed on August 1, 1994 and published on February 9, 1995. Southern is available as prior art because it published before the earliest filing date of the '597 patent. The listed inventors are Sir Edwin Southern and William Cummins. The application is directed to a method of successive sequencing by ligation and anticipates or makes obvious claims 1, 9, 10, 14, 15, and 17-19 of the '597 patent.

Southern claims priority to GB Application No. 9315847.5, filed July 30, 1993, that describes the same invention. The content of Southern was, therefore, filed in a patent application a year before Dr. Macevicz began logging his ideas for the '597 patent in his notebook (July of 1994). Illumina now argues that because Southern is only entitled to the February 1995 publication date, that they can swear behind it.

#### 1.   Illumina Stipulated That Southern Invalidates Claim 1

The '597 patent and its two sibling patents were involved in a prior litigation in the Northern District of California. On May 31, 2007, Applera Corp.-Applied Biosystems Group ("ABI") filed a complaint against Illumina, Solexa, and Stephen Macevicz. *Applera Corp.-*

KAYE SCHOLER LLP

*Applied Biosystems Group v. Illumina, Inc., Solexa, Inc. and Macevicz*, No. 07-cv-02845 (N.D. Cal. filed May 31, 2007) (hereinafter the "*ABI v. Illumina* litigation").  On August 13, 2007, Illumina and Solexa filed a counterclaim alleging infringement by ABI of the '597 patent and its two sibling patents.

On June 30, 2008, while litigation was pending, ABI filed a request for *ex parte* reexamination based on Southern and other references.  In this request, ABI explained that there was potential evidence that Macevicz could show an earlier conception date than Southern's publication date and other references in the reexamination request, but that ABI was not aware of evidence showing an actual reduction to practice or due diligence required to antedate such references:

> From the litigation described at page six *infra*, Requester is aware of a few Macevicz notebook pages dated July 9, 16, and 19, 1994, purporting to describe the claimed methods.  <u>Requester is aware of no evidence of actual reduction to practice or due diligence from July 21, 1994 to the April 17, 1995 filing of the 08/424,663 application.</u>

(Ex. 9 at 2) (emphasis added).  Attorneys of the law firm Marshall, Gerstein, and Borun represented Illumina and Solexa in the *ABI v. Illumina* litigation as well as in the *ex parte* reexamination of the '597 patent.

ABI and Illumina litigated the validity of the '597 patent all the way through a week-long jury trial.  At trial, Southern was the only reference asserted by ABI to invalidate the '597 patent.  During this trial, Illumina made no effort to present evidence antedating Southern, and in fact, <u>explicitly admitted</u> such during the charging conference in front of Judge Alsup:  "There is no challenge to swearing behind or diligence or any of that sort of stuff."  (Ex. 10 (Transcript of Jan. 22, 2009) at 2352.)

On January 21, 2009, on the eve of closing arguments, Judge Alsup provided the parties with a supplemental construction of claim 1 of the '597 patent.  (Ex. 11.)  As a result of this claim construction, on January 22, 2009, Illumina stipulated to invalidity of the '597 patent over Southern:  "Solexa stipulates to a finding that the Southern reference (WO 95/04160) renders Claim 1 of the '597 patent invalid."  (Ex. 12 at p. 2.)

6

## 2.      The Federal Circuit Affirmed That Claim 1 Was Invalidated By Southern

On January 26, 2009, Judge Alsup entered the January 22, 2009 stipulation submitted by ABI, Illumina, and Solexa.  (Ex. 12 at 4.)  This stipulation became part of the final judgment in the matter, and based on the final judgment, Illumina filed an appeal to the Federal Circuit.

On March 25, 2010, in *ABI v. Illumina*, 2010 U.S. App. LEXIS 6250, at *23-24 (Fed. Cir. Mar. 25, 2010), the Federal Circuit affirmed the claim construction and the stipulated order that claim 1 of the '597 patent is invalid.  The Federal Circuit stated,

> Because the district court properly construed the terms of claim 1 of the '597 patent, we affirm the court's judgment of noninfringement with respect to Applera's accused products, and the court's order, entered pursuant to stipulation, concerning invalidity.

(Ex. 13 at 8.)

## 3.      Illumina Misled The PTO In The Reexamination

On May 28, 2009, a first Office Action issued in the pending *ex parte* reexamination involving the '597 patent.  The Examiner rejected claim 1, the only independent claim in reexamination, as anticipated by Southern, the same reference that Illumina and Solexa stipulated invalidated claim 1.  (Ex. 14 at 4.)  On June 22, 2009, Illumina filed an IDS regarding the pending *ABI v. Illumina* litigation.  In the IDS, they listed and attached over two hundred documents relating to the litigation, including the stipulation.  They took the stipulation out of chronological order and attached it as the last document to the IDS.  In the summary of the IDS, the only reference to the stipulation reads:

> During the course of the litigation, the district court ruled on the construction of certain terms in the '597 patent and related patents (see Citation Nos. D20, D45, D47 (at pages 7 to 8), and D48).  As a result of the district court's claim construction ruling (D47, pages 7-8), the parties entered into a stipulation regarding infringement and invalidity of claim 1 of the '597 patent (see Citation Nos. D59, and D59A in the attached Form PTO-1449).

(Ex. 15 at 2.) Illumina did not disclose in the June 22, 2009 IDS that it had stipulated that claim 1 of the '597 patent was invalid over Southern.  Illumina likewise did not disclose to the PTO that a final judgment rendering claim 1 invalid was entered by the district court, directly violating MPEP § 2286, which requires a patent owner to promptly notify the Patent Office that a decision has been issued in federal court.  In contrast, Illumina did explicitly reference the jury's finding

KAYE SCHOLER LLP

"that AB did not infringe claim 1 of U.S. Patent No. 5,696,119 ("the '119 patent"), and that claim 1 of the '119 patent was not invalid for obviousness." Had Illumina appropriately notified the PTO, the reexamination would have been stayed pending the Federal Circuit decision.

**4.      The § 1.131 Declaration Filed By Dr. Macevicz Is Insufficient To Swear Behind Southern, And Illumina Has No Evidence Of Diligence**

On July 13, 2009, Illumina discussed Southern in an *ex parte* interview with the Examiner.  On August 10, 2009, Illumina filed an *ex parte* declaration of Dr. Stephen Macevicz pursuant to 37 C.F.R. § 1.131 (Ex. 16, hereinafter, "Macevicz Declaration") to antedate Southern (despite having stipulated to invalidity only months before).  Because of the Macevicz Declaration, on September 30, 2009, in a Final Office Action, the Examiner withdrew the anticipation rejection of claim 1 by Southern.  (Ex. 17.)  The reexamination certificate of the '597 patent later issued on March 2, 2010, leaving claim 1 unchanged and adding claims 9-20, all of which depend from claim 1.  (Ex. 2.)

The Macevicz Declaration is insufficient to antedate Southern.  When an inventor asserts reasonable diligence, that testimony must be corroborated.  *See Creative Compounds*, 651 F.3d at 1312-13 ("Merely asserting diligence is not enough; a party must 'account for the entire period during which diligence is required.'"); *In re Meyer*, 411 F. App'x at 319-320 ("We may surmise that appellant was probably diligent, but mere surmise cannot take the place of proof."); *Loral Fairchild Corp. v. Victor Co. of Japan, Ltd.*, 931 F. Supp. 1014, 1030-31 (E.D.N.Y. 1996) ("An inventor must provide specific details on activity during the critical period.  General testimony that the inventor worked continuously and diligently will not suffice.  Moreover, the inventor must corroborate evidence of reasonable diligence.").

Simply put, the Macevicz Declaration amounts to nothing more than a bald assertion of diligence with no support.  Only a single sentence in the Declaration even attempts to establish diligence:  "From at least just before February 9, 1995, until April 17, 1995, I spent a number of evenings and weekend days working on the preparation and filing of the '663 application."  (Ex. 16 at 4.)  On its face, the Macevicz Declaration omits the following information critical to diligence:  specific dates of activity; frequency of activity during the critical period; specific work

8

KAYE SCHOLER LLP

completed to perfect the invention; specific tasks necessary to prepare the application, including various drafts of the application; and specific tasks necessary to file the application with the PTO. Furthermore, Dr. Macevicz never submitted a single piece of documentary evidence to support his claims of diligence.  Tellingly, the only document from the critical period, Dr. Macevicz's idea notebook, does not contain a single entry between February 8, 1995 and April 17, 1995.[1] (Ex. 17.)  Dr. Macevicz likewise failed to present testimony from, or even identify, other witnesses who could attest to his activities during the critical period.  In his deposition, Dr. Macevicz was unable to provide any further information on his activities during the critical period, and could not even recall submitting his Declaration in the first place.  (Ex. 8 at 11:1-3; 84:21-23; 13:11-18; 17:25-19:21; Ex. 19 [Ex. 2 to Macevicz Depo. (6/13/11 Macevicz Letter)].[2])

       This utter lack of evidence is insufficient to antedate the prior art as a matter of law.  A recent Federal Circuit case is particularly instructive, as it presents facts similar to the instant case.  In *In re Meyer Manufacturing Corp.*, the claims of the patent-in-suit were rejected in reexamination as obvious over a prior art reference.  411 F. App'x at 318.  In an attempt to antedate the reference, the inventor testified in a § 1.131 affidavit that  "[f]rom a time prior to April 18, 1994, the inventors and the attorney of record were diligent in drafting, revising, and filing the subject patent with the United States Patent and Trademark Office on July 8, 1994." (Ex. 20 at 1.)  The Examiner found that the affidavit was insufficient to establish diligence, and the Board affirmed, finding that "the 'facts' submitted by the Patent Owner in the present appeal merely 'asserts that facts exist but does not tell what they are or when they occurred.'"  (Ex. 21 at 16.)  On appeal, the Federal Circuit agreed that the affidavit was insufficient because it was "vague and general in nature, lacking in any details, and thus, is not of character and weight

---

[1] In fact, after an August 25, 1994 entry, there is only one entry, on January 4, 1995, for nearly a year (until August 10, 1995).  (Ex. 17.)

[2] It is not entirely surprising that the Macevicz Declaration is so blatantly deficient.  In the *ABI* trial, Illumina had an opportunity to attempt to antedate Southern, but ultimately elected not to do so, even though Southern was the only reference ultimately presented to invalidate the '597 patent.  Thus, by the time the *ABI* case concluded, and Illumina and Dr. Macevicz submitted the Declaration in the reexamination, both parties had studied the relevant evidence and were already well aware that nothing could support the Declaration.

MSJ OF INVALIDITY                                                    Case No. 3:10-cv-05542 EDL

sufficient to establish diligence." 411 F. App'x at 318.  Notably, although the court suspected that the inventor may have been diligent, it could not find diligence based solely on such a "conclusory assertion."  *Id.* at 319 ("'[W]e may surmise that an appellant was probably diligent, but mere surmise cannot take the place of proof.'") (internal citation omitted).

Like the inventor in *In re Meyer*, Dr. Macevicz has offered nothing more than a conclusory assertion of diligence.  Each inventor had to show diligence for a period of about three months, and submitted a declaration devoid of crucial information such as specific dates of activity, frequency of activity, specific work completed to perfect the invention, and specific tasks necessary to file the application with the PTO.  Instead, each inventor rested on the vague claim that he was busy "drafting, revising, and filing" (*In re Meyer* Declaration) or working on the "preparation and filing" of his application (Macevicz Declaration).  Dr. Macevicz's lack of evidence is especially remarkable given that '597 patent had been through prosecution, a trial, and a reexamination, thus providing ample opportunity to develop and corroborate allegations of diligence.  For these reasons, the Macevicz Declaration is deficient under the law.[3]

In another case, *Creative Compounds*, the court granted the patentee's motion for summary judgment that the patent-in-suit was not invalid because the accused infringer (who had its own patent on similar subject matter) could not show prior invention through earlier conception plus diligence.  651 F.3d at 1312-13.  The inventor's declaration contained the following allegations of diligence:

- "Between November 2001 and the time of filing of my application on April 30, 2003, Gary Haynes and I proceeded diligently in reducing dicreatine to practice by engaging

---

[3] An inventor is either diligent or not; there are no degrees of diligence.  Manual of Patent Examining Procedure § 715.07.  To the extent Illumina claims that the Macevicz Declaration sets forth an excuse for lack of diligence during the critical period, it is likewise insufficient to antedate Southern.  There are only a few recognized excuses for lapses in continuous diligence, including:  acts of God; extreme poverty; and poor health.  *See, e.g.*, *Texas Co. v. Globe Oil & Refining Co.*, 112 F. Supp. 455, 482 (N.D. Ill. 1953) (excusing delay caused by World War I); *Reed v. Tornqvist*, 436 F.2d 501, 504-05 (C.C.P.A. 1971) (excusing delay caused by illness and death of father); *Rey-Bellet v. Engelhardt*, 493 F.2d 1380, 1389 (C.C.P.A. 1974) (excusing delay caused by shortage of research animals and limited ability to house them).  Accordingly, Dr. Macevicz's unremarkable contention that he "was married and had two school-age children" and had a "particularly demanding" workload falls drastically short of a valid excuse.

MSJ OF INVALIDITY                                                      Case No. 3:10-cv-05542 EDL

Tiancheng to make dicreatine malate. During that time Gary Haynes and I also prepared the patent application for dicreatine malate." (Ex. 22, *Creative Compounds, LLC v. Starmark Labs.*, No. 1:07-cv-22814 (S.D. Fla.), Dkt. 80, ¶ 7.)

- "It took us approximately eight months to draft the patent application as we prepared it without the assistance of a patent attorney. In preparing the patent application, we conducted prior art searches, review[ed] prior art references and discussed the references as they relate to the invention in the '272 patent application. We also drafted the specification, the background, and the claims of the '272 application." *Id.*, ¶ 8.

- Gary Haynes and I began drafting the '272 patent application beginning approximately in August or September of 2002. *Id.*, ¶ 9.

- Gary Haynes and I proceeded diligently at all times from the conception of dicreatine malate to the filing of the '273 patent application on April 30, 2003. *Id.*, ¶ 10.

The Federal Circuit affirmed the district court's grant of summary judgment of no invalidity in part because the accused infringer's "bald assertion" of diligence did not create a genuine issue of material fact. *Creative Compounds*, 651 F.3d at 1312-13. Notably, the inventor in *Creative Compounds* submitted more detailed information than Dr. Macevicz—such as specific steps taken to file the patent application and specific dates—but the court still found these assertions insufficient and granted summary judgment of no invalidity. For this reason, Dr. Macevicz cannot demonstrate diligence as a matter of law.

Finally, Dr. Macevicz has confirmed that there exists no additional evidence that could further prove diligence. Thus, the record is complete and this Court may rule on summary judgment on the issue of diligence. Dr. Macevicz conceded that there is no further documentation of his inventive activities during the critical period. In his deposition, Dr. Macevicz confirmed that he has no records other than his notebook from 1994-1995 that relate to the '597 patent. (Ex. 8 [Depo. Tr.] 13:11-18; 17:25-19:21; Ex. 19 [6/13/11 Macevicz Letter].) Additionally, because Dr. Macevicz does not even recall submitting the Macevicz Declaration, he is incapable of offering any further detail regarding the Declaration and other sources of support. (Ex. 8 [Depo. Tr.] 11:1-3; 84:21-23.)

Therefore, there is no genuine issue of material fact regarding Dr. Macevicz's alleged diligence during the critical period from February 8, 1995 to April 17, 1995. Without proof of diligence, Illumina cannot antedate Southern, and Southern remains prior art to the '597 patent.

11

KAYE SCHOLER LLP

#### 5.     Claim 1

Claim 1 is the only independent method claim of the '597 patent and is separated into a preamble and three distinct steps, each of which are discussed below.

> A method for identifying a sequence of nucleotides in a polynucleotide, the method comprising the steps of:

Southern discloses a method for identifying a sequence of nucleotides in a polynucleotide, as required by the preamble at 14:31-32.  (Metzker Decl. ¶ 31.)

> (a) extending an initializing oligonucleotide along the polynucleotide by ligating an oligonucleotide probe thereto to form an extended duplex;

The Court has construed this entire step to mean "ligating an oligonucleotide probe to an initializing oligonucleotide to form an extended duplex."  (Ex. 23 at 26.)  Additionally, "initializing oligonucleotide" has been construed to mean "an oligonucleotide that forms a highly stable duplex with the binding region of the polynucleotide that remains intact during any washing steps of the extension cycles" and "oligonucleotide probe" has been construed to mean "a nucleic acid that can bind to the polynucleotide, and, when bound to the polynucleotide, can be ligated to the initializing oligonucleotide or to a previously extended duplex.  An oligonucleotide probe that has been successfully ligated either contains, or is associated with, a label."  (Ex. 23 at 33, 35.)

Southern discloses ligating an oligonucleotide probe to an initializing oligonucleotide to form an extended duplex:

> In another aspect the invention provides a method of sequencing a target nucleic acid, which method comprises the steps of:
> a) providing an oligonucleotide immobilised on a support,
> b) hybridising the target nucleic acid with the immobilised oligonucleotide,
> c) incubating the hybrid from b) with the library as defined in which the reagents are mixed together in solution, so that an oligonucleotide chain of a first reagent of the library becomes hybridised to the target nucleic acid adjacent to the immobilised oligonucleotide,
> d) ligating the adjacent oligonucleotide, thus forming a ligated first reagent.

(Southern, 14:31-15:10.)  This is depicted in Figure 5 of Southern, wherein the tethered or immobilised oligonucleotide serves as the "initializing oligonucleotide," the target nucleic acid

serves as the "polynucleotide," and the library or oligonucleotide pool serves as the "oligonucleotide probes." (Metzker Decl. ¶¶ 33-37.)

(b) identifying one or more nucleotides of the polynucleotide; and

The parties have agreed that the proper construction of this step means "within each cycle determining the identity of one or more bases in the polynucleotide." (Ex. 24 [Jt. Cl. Constr. St.] at 5.) Southern discloses removing the label of the ligated oligonucleotide probe and analyzing it to determine the sequence of the bases in the probe. Step (f) in the process quoted above states, "f) recovering and analyzing the tag moiety of the ligated first reagent as an indication of the sequence of a first part of the target nucleic acid." (Southern, 15:11-13.) Figure 4 of Southern shows that the label or tag in the first step is removed and then one "read[s] code and generate[s] OH group" to continue with the process. (Metzker Decl. ¶¶ 38-40.)

(c) repeating steps (a) and (b) until the sequence of nucleotides is determined.

The Court has construed this step to include three separate types of repeating: "either (1) ligating an additional probe to the extended duplex by subsequent cycles of ligation until the sequence of nucleotides is determined" (hereinafter "successive ligation"), "or (2) ligating a new probe to a new initializing oligonucleotide, either by extending different sequence initializing oligonucleotides, each out of register by one or more nucleotides," (hereinafter "re-registration") "or by extending new initializing oligonucleotides with the same sequence as the initializing oligonucleotide used in the first cycle along the identical polynucleotide sequence as was acted upon in the first cycle of the recited method, until the sequence of nucleotides is determined" (hereinafter "same sequence initializing oligonucleotide repetition"). The Court also held that "[t]here is no need for repetition if the sequence of the polynucleotide has been fully determined in the first cycle" (hereinafter "conditional repeating").
(Ex. 23 at 26-27.)

Southern discloses a repeating step that encompasses successive ligation. This is depicted in Figure 4 of Southern wherein the figure starts by removing the labeled tag from the first ligated oligonucleotide probe and generating a hydroxyl (or OH) group for subsequent ligations. The extended duplex is exposed to a pool of oligonucleotide probes and the next corresponding probe

13

KAYE SCHOLER LLP

is ligated to the end of the extended duplex as described in option (1) repeating.  The repeating in Figure 4 is described at Southern 16:26-35.  Southern also states, "Preferably thereafter use is made of the library of reagents, with the hybridization, ligation, cleavage and analysis steps being repeating cyclically to provide additional information about the sequence of the target nucleic acid." (19:20-24.)  (Metzker Decl. ¶¶ 41-43.)

Southern, therefore, discloses all elements of claim 1 of the '597 patent, as Illumina previously stipulated.

### 6.    Claim 9

Claim 9 recites:  "The method of claim 1, wherein the polynucleotide comprises a binding region and a target polynucleotide."  The Court has construed "binding region" to mean "a known sequence of the polynucleotide to which the initializing oligonucleotide binds" and "target polynucleotide" to mean "a polynucleotide having a portion to be sequenced."  (Ex. 23 at 49, 51.) Southern discloses a polynucleotide made up of a binding region and target polynucleotide, or more specifically the "target nucleic acid" of Southern contains a known portion and a portion to be sequenced.  (Southern, Figs. 4 and 5, 14:31-15:8.)  (Metzker Decl. ¶ 44.)

### 7.    Claim 10

Claim 10 reads, "The method of claim 9, wherein the binding region comprises a known sequence and the target polynucleotide comprises an unknown sequence; and wherein in step (a) the initializing oligonucleotide is hybridized to the binding region on the polynucleotide."  As described above, the "target nucleic acid" of Southern contains both a known region and a portion to be sequenced that is unknown.  Southern describes "hybridizing the target nucleic acid with the immobilized oligonucleotide."  (Southern, 14:31-15:8, 15:21-29.)  The "immobilized oligonucleotide" functions as the initializing oligonucleotide.  (Metzker Decl. ¶ 45.)

### 8.    Claim 14

Claim 14 states, "The method of claim 1, wherein the oligonucleotide probe comprises a label which results in a spectrally resolvable fluorescent signal."  The Court has construed "spectrally resolvable fluorescent signal" to mean "a light signal generated by fluorescence which

14

KAYE SCHOLER LLP

can be detected based on its spectral characteristics (e.g., its color)." (Ex. 23 at 53.) While Southern teaches that mass-labels are the preferred method of labeling, the reference also discloses fluorescently labeled oligonucleotide probes. (Southern, 3:22-24, 23:5-11.) (Metzker Decl. ¶ 46.)

### 9. Claim 15

Claim 15 states, "The method of claim 14, wherein the identity of the one or more nucleotides of the polynucleotide is correlated to a distinct color of the spectrally resolvable fluorescent signal." Southern discloses the use of fluorescent labels at 3:22-24 and 23:5-11. Fluorescent labels were extremely common in the art and were often directly correlated to a particular nucleotide. One of ordinary skill in the art would have considered it obvious to tie the identity of one or more nucleotides to a distinct color of the fluorescent signal. (Metzker Decl. ¶ 47.)

### 10. Claim 17

Claim 17 states: "The method of claim 1, wherein before step (a), the method further comprises (d) providing a plurality of different oligonucleotide probes to the polynucleotide." Southern teaches the use of multiple different probes: "incubating the immobilized target nucleic acid . . . with a plurality of coded oligonucleotide reagents." (Southern, 19:4-24.) (Metzker Decl. ¶ 48.)

### 11. Claim 18

Claim 18 of the '597 patent recites, "The method of claim 17, wherein each probe in the plurality of different oligonucleotide probes comprises a label, and wherein the label represents a base." The oligonucleotide probes used in Southern contain labels that correspond to particular bases, as shown by the chart on 7:15-25. (Metzker Decl. ¶ 49.)

### 12. Claim 19

Claim 19 requires, "The method of claim 17, wherein each probe in the plurality of different oligonucleotide probes has a predetermined length selected from the group consisting of

8 nucleotides, 9 nucleotides, and 12 nucleotides." Southern discloses using all 8-mers, or probes that are 8 nucleotides in length at 19:29-34. (Metzker Decl. ¶ 50.)

### 12.  Obviousness

To the extent the Court finds that any of the limitations of the above claims are not explicitly disclosed in Southern, those limitations would have been obvious to one skilled in the art in light of Southern. *See KSR*, 550 U.S. at 417 ("If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability."). (Metzker Decl. ¶ 51.)

### B.  Whiteley Invalidates Claims 1, 9, 10, 14, 15, And 17-19

U.S. Patent No. 4,883,750 ("Whiteley") was filed on December 13, 1984 and issued on November 28, 1989 to Norman Whiteley, Michael Hunkapiller, and Alexander Glazer. Whiteley is available as prior art because it published before the earliest filing date of the '597 patent. Whiteley is directed to methods of detection of specific sequences of DNA and anticipates or makes obvious claims 1, 9, 10, 14, 15, and 17-19 of the '597 patent.

### 1.  The Inventor And Prosecutor Of The '597 Patent Provided An Opinion To CGI That If Claim 1 Is Not Limited To Successive Ligation, The '597 Patent Is Invalid Over Whiteley

The inventor and prosecutor of the '597 patent, Dr. Macevicz, was engaged by CGI to provide legal advice in 2006. He surveyed the IP landscape and provided an opinion to CGI regarding numerous patents, including his own '597 patent. This opinion stated that claim 1 of the '597 patent describes successive ligation: "Claim 1 describes a process in which an initializing oligonucleotide is successively extended along a template in cycles of ligation and identification. Step (c) indicates that such cycles must be carried out more than one time." (Ex. 7 at 34-35.) Dr. Macevicz then noted that if the patent was not limited to successive ligation, claim 1 would be invalid over Whiteley, "I[f] this were not the case, then the claim would appear to 'read' on Whiteley's (4,883,750) disclosure and therefore be invalid."[4] (*Id.* at 35.) Additionally,

---

[4] One could conclude that Dr. Macevicz providing this advice to CGI even though he was the inventor and served as a patent prosecutor for another company on this patent raises serious ethical concerns. In the context of this motion, however, Dr. Macevicz's prior roles only reinforce that his opinion, which noted that his own patent could be invalid, is especially well-informed and trustworthy, as it is an admission against his interests.

Dr. Macevicz provided a slide presentation to the Board of Directors of CGI to report on his

patent analysis.  He informed the Board that he had searched "ligation-based sequencing"

methods and concluded that "NO VALID BLOCKING PATENTS FOUND."  (Ex. 25 at 1.)

Dr. Macevicz, both the inventor and drafter of claim 1 of the '597 patent has stated in

writing that if claim 1 was not limited to successive ligation, claim 1 would be invalid over

Whiteley and that the '597 patent is not a valid blocking patent of CGI's technology.  The Court

has issued a claim construction in this case that does not limit claim 1 of the '597 patent to

successive ligation, and this claim, as well as those that depend from it, are therefore invalid over

Whiteley.

### 2.     Claim 1

Whiteley discloses a method for identifying a sequence of nucleotides in a polynucleotide,

as required by the preamble of claim 1, at the abstract, 3:28-30, and 3:41-43.  (Metzker Decl. ¶

53.)  Whiteley discloses steps (a) and (b) of claim 1, extending an initializing oligonucleotide by

ligation and identifying one or more bases:

> In one aspect, the invention relates to a method for determining the
> presence or absence of a target sequence in a sample of denatured
> nucleic acid which entails hybridizing the sample with a probe
> complementary to a diagnostic portion of the target sequence (the
> diagnostic probe), and with a probe complementary to a nucleotide
> sequence contiguous with the diagnostic portion (the contiguous
> probe), under conditions wherein the diagnostic probe remains
> bound substantially only to the sample nucleic acid containing the
> target sequence. The diagnostic probe and contiguous probe are
> then covalently attached to yield a target probe which is
> complementary to the target sequence, and the probes which are
> not attached are removed.

(Whiteley, 3:41-54.)  (Metzker Decl. ¶¶ 54-58.)

Whiteley discloses multiple forms of repeating embodied in the Court's construction.  For

example, Whiteley describes using two different probes, one that corresponds to the normal gene

and one that corresponds to the mutated gene at 4:11-13.  These probes are used with the same

initializing oligonucleotide and are carried out independently of one another (*i.e.*, not at the same

time).  (*Id.*)  This is same sequence initializing oligonucleotide repetition according to the Court's

KAYE SCHOLER LLP

construction. Whiteley extends "along the identical polynucleotide sequence as was acted upon in the first cycle" since a polynucleotide with the identical sequence is used in the second cycle (with a different "diagnostic probe" and the same "contiguous probe"). (Metzker Decl. ¶¶ 59-60.)

Whitely also teaches conditional repeating from the Court's construction. Because Whiteley is specifically aimed at the detection and diagnosis of genetic abnormalities, it is possible to determine the polynucleotide sequence in the first cycle of the method. Whiteley specifically states, "Use of only one diagnostic probe, preferably specific to the mutated sequence of interest is also possible." (4:25-26.) If a signal is generated to indicate that the "mutated" sequence probe has been successfully ligated in the first cycle, then the sequence of the polynucleotide has been fully determined in the first cycle. Therefore, because it is not necessary to repeat if fully determined in the first cycle, Whiteley invalidates claim 1. (Metzker Decl. ¶ 61.)

### 3. Claim 9

Claim 9 requires the polynucleotide to contain a binding region and a target polynucleotide. Whiteley discloses a "denatured nucleic acid" with a portion that is known and a portion that is to be sequenced, *i.e.* the "diagnostic portion of the target sequence." (Whiteley, 3:41-51.) (Metzker Decl. ¶ 62.)

### 4. Claim 10

Claim 10 requires the binding region to be of known sequence and the target polynucleotide to have unknown sequence. Whiteley discloses "a sample of denatured nucleic acid" with a portion complementary to the known contiguous probe and portion complementary to the diagnostic probe, which contains unknown sequence. Claim 10 also requires that the initializing oligonucleotide is hybridized to the binding region, and Whiteley teaches the hybridization of the contiguous probe (initializing oligonucleotide) to the binding region. (Whiteley, 3:41-54.) (Metzker Decl. ¶ 63.)

### 5. Claim 14

Claim 14 requires the probe to contain a fluorescent label. Whiteley describes "fluorescent moieties" as potential labels. (Whiteley, 5:68-6:3.) (Metzker Decl. ¶ 64.)

KAYE SCHOLER LLP

**6.    Claim 15**

Claim 15 requires one or more nucleotides to be tied to a specific fluorescent color, which Whiteley discloses in the definition of a label:  "'Label' refers to a modification to the probe nucleic acid that enables the experimenter to identify the labeled nucleic acid in the presence of unlabeled nucleic acid." (Whiteley, 5:64-67.)  Detection of a fluorescent color signifies that a particular-sequence probe was ligated.  (Metzker Decl. ¶ 65.)

**7.    Claim 17**

Claim 17 requires the use of a plurality of probes.  Whiteley teaches using two different diagnostic probes, and the parties have agreed on a construction of plurality that means "two or more." (Whiteley, 4:11-25 and Ex. 24 [Jt. Cl. Constr. St.] at 5.)  It would have been obvious to one of skill in the art to add these two probes simultaneously.  (Metzker Decl. ¶ 66.)

**8.    Claim 18**

Claim 18 adds the limitation that a label specifically represents a base, which Whiteley teaches by aiming to specifically detect a single base difference.  (Whiteley, 1:7-11, 4:6-10.)  The difference between the two probes is one base, and the detection of a label shows the existence of that base.  (*Id.*, 4:11-25.) (Metzker Decl. ¶ 67.)

**9.    Claim 19**

Claim 19 requires the oligonucleotide probe to contain 8, 9, or 12 nucleotides.  Whiteley teaches that the "diagnostic probe" be between four and nineteen base pairs.  (Whiteley, 11:21-24.) (Metzker Decl. ¶ 68.)

**10.    Obviousness**

To the extent the Court finds that any of the limitations of the above claims are not explicitly disclosed in Whiteley, those limitations would have been obvious to one skilled in the art in light of Whiteley.  *See KSR*, 550 U.S. at 417 ("If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability.").  (Metzker Decl. ¶ 69.)

**C.    Martinelli Invalidates Claims 1, 9, 10, 14, 15, And 17-19**

U.S. Patent No. 5,800,994 ("Martinelli") was filed July 24, 1996 as a continuation of an application filed April 4, 1994.  Martinelli is available as prior art under 35 U.S.C. § 102(e)

19

because it is an issued patent filed before the earliest filing date of the '597 patent. Martinelli issued on September 1, 1998 and is directed to hybridization-ligation assays for the detection of nucleic acid sequences. Martinelli anticipates or makes obvious claims 1, 9, 10, 14, 15, and 17-19 of the '597 patent.

### 1.    Claim 1

Martinelli discloses a method for identifying a sequence of nucleotides in a polynucleotide, as required by the preamble of claim 1 of the '597 patent at 9:28-29 and claim 1 of Martinelli. (Metzker Decl. ¶ 88.) Martinelli discloses step (a), the extension step, of the '597 patent,

> Once an amplified sample is available, this material is analyzed by HLM [hybridization-ligation methodology]. In HLM, the sequence which is complementary to some or all of the target sequence is incorporated into 2 or more probes which are reacted with the target oligonucleotide…A ligase is then used to attempt to join the 2 complementary sequences of the probes. If the 2 complementary sequences precisely match the target in the immediate region of the junction of the two probes, the terminal nucleic acids are close enough to each other to be connected by the ligase.

(Martinelli 3:57-60, 4:13-18.) (Metzker Decl. ¶¶ 89-94.) Martinelli discloses the identification step at 4:1-5 and 5:20-25. (Metzker Decl. ¶¶ 95-96.)

Martinelli also teaches several of the repeating options contained in the Court's construction of step (c). The Court's construction of repeating includes conditional repeating, and because Martinelli discloses the detection of specific sequences, it is possible to determine the polynucleotide sequence in the first cycle of the method. If a signal is generated to indicate that the "normal" (non-mutated) sequence probe has been successfully ligated in the first cycle, then it would not be necessary to repeat because the sequence of the polynucleotide is fully determined in the first cycle. (Metzker Decl. ¶ 101.)

Martinelli also discloses the re-registration option of repeating embodied in the Court's construction. Martinelli describes "moving sequentially along the target" to "determine the site or sites on the target where mutations are found." (Martinelli, 4:56-61.) A set of probes designed to hybridize to the normal sequence that does not ligate indicates that a mutation occurs in that segment of the target and one can "proceed to design experiments to identify the exact mutation

KAYE SCHOLER LLP

which occurs at each of the mutation sites." (Martinelli, 4:51-61.) Martinelli correctly understands "If the 2 complementary sequences precisely match the target in the immediate region of the junction of the two probes, the terminal nucleic acids are close enough to each other to be connected by ligase . . . if there is a mismatch at the location where the 2 probes meet, the 2 probes will not be ligated efficiently under conditions defined herein." (Martinelli, 4:13-30.) One must, therefore, shift the location where the two probes meet in order to identify the exact mutations that occur, and the initializing oligonucleotides would be out of register by one or more nucleotides. (Metzker Decl. ¶¶ 97-98.)

Martinelli discloses another form of repeating from the Court's construction: same sequence initializing oligonucleotide repetition. This is embodied in Figure 14 of Martinelli, where the initializing oligonucleotide contains an X and the oligonucleotide probe contains a Y. The X on the initializing oligonucleotide and Y on the oligonucleotide probe signify that these positions are varied between bases A, C, G, and T. The experiment performed is described in Example 6 (Martinelli, 15:20-67) and the results are displayed in Tables II-V. Martinelli discloses this form of repeating by using the same-sequenced initializing oligonucleotide with different probes (on the same-sequenced polynucleotide in each cycle). (Metzker Decl. ¶¶ 99-100.)

### 2.    Claim 9

Martinelli discloses a polynucleotide with a known binding region and a target polynucleotide containing a portion to be sequenced, as required by Claim 9. (Martinelli, 3:57-61, 4:13-18.) (Metzker Decl. ¶ 102.)

### 3.    Claim 10

Claim 10 further specifies that the binding region contains known sequence, the target polynucleotide contains unknown sequence, and in step (a), the initializing oligonucleotide is hybridized to the binding region of the polynucleotide. Martinelli discloses the hybridization of a first probe (acting as the initializing oligonucleotide) to the known binding region and a second

probe (acting as the oligonucleotide probe) to the target polynucleotide, which contains an unknown portion to be sequenced.  (Martinelli, 3:57-4:7.)  (Metzker Decl. ¶ 103.)

### 4.  Claim 14

Claim 14 requires that the probe contains a fluorescent label.  Claim 4 of Martinelli teaches the use of fluorescent moieties as labels for the "second probe."  (Metzker Decl. ¶ 104.)

### 5.  Claim 15

Claim 15 requires that one or more nucleotides be correlated to a distinct fluorescent signal.  Martinelli teaches that to distinguish between different probes corresponding to different mutations, different labels can be used.  These different labels may be fluorescent.  (Martinelli, 6:18-42.)  (Metzker Decl. ¶ 105.)

### 6.  Claim 17

Claim 17 requires using a plurality of probes.  Martinelli teaches "if several potential mutations can occur at one site, it is also possible to design several probes, each with a different label."  (Martinelli, 6:18-42.)  (Metzker Decl. ¶ 106.)

### 7.  Claim 18

Claim 18 requires probes to contain a label and that the label represents a base.  As described in claim 17 above, Martinelli teaches labeling different probes differently to correspond to a particular base difference.  (Martinelli, 13:58-62, 6:18-42.)  (Metzker Decl. ¶ 107.)

### 8.  Claim 19

Claim 19 requires the oligonucleotide probe to contain 8, 9, or 12 nucleotides.  Figure 4 of Martinelli discloses probes that are 8 bases in length.  (Metzker Decl. ¶ 108.)

### 9.  Obviousness

To the extent the Court finds that any of the limitations of the above claims are not explicitly disclosed in Martinelli, those limitations would have been obvious to one skilled in the art in light of Martinelli.  *See KSR*, 550 U.S. at 417 ("If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability.").  (Metzker Decl. ¶ 109.)

22

KAYE SCHOLER LLP

**D.   Brenner Invalidates Claims 1, 9, 10, And 14-19**

U.S. Patent No. 5,552,278 ("Brenner") was filed on July 25, 1994 and issued on September 3, 1996 to Dr. Sydney Brenner.  Brenner is available as prior art under § 102(e) because it is an issued patent filed before the earliest filing date of the '597 patent.  The patent was filed and prosecuted by Dr. Stephen Macevicz, the inventor of the '597 patent.  Brenner is directed toward a sequencing by ligation method and makes obvious claims 1, 9, 10, and 14-19 of the '597 patent.

**1.   The Inventor Copied Large Portions Of His Patent From His Client, Dr. Sydney Brenner**

The '597 patent is a "paper patent."  No lab work was done by the inventor, Dr. Macevicz, who is a patent attorney.  Dr. Macevicz has a Ph.D. in Biophysics, but his graduate work involved mathematical modeling, and he has no lab experience related to nucleic acid analysis or genome sequencing.  (Ex. 8 [Dep. Tr.] at 21:7-15.)  In his work as a patent attorney, working for Lawrence Livermore National Laboratory and DNAX Research Institute, among other companies, Dr. Macevicz was exposed to nucleic acid analysis assays, but he has never practiced as a scientist in this field.  (*Id.* at 25:1-11, 193:12-14.)

To draft the '597 patent, Dr. Macevicz copied large portions of a sequencing by ligation patent he had filed on behalf of Dr. Brenner.  (*Id.* at 199:2-200:19.)  Dr. Brenner's patent described the use of repeated cycles of ligation to sequence a polynucleotide.  Dr. Macevicz lifted from Dr. Brenner's application, nearly verbatim, the Background, Summary of the Invention, and Definitions, and lifted significant sections of the Detailed Description of the Invention.  He also used the same claim structure as Dr. Brenner's application.  *See* claim 1, below.  Of the approximately 16 columns of disclosure in the '597 patent (excluding the sequence data and claims at columns 17-22), approximately 6 columns (roughly a third of the whole patent) are copied nearly verbatim from the Brenner patent.  Dr. Macevicz concedes that the '597 patent was an "outgrowth[] of ideas [he] had after working" on Dr. Brenner's invention.  (Ex. 8 [Dep. Tr.] at 185:4-8.)  These "outgrowths" in fact are copied inventions, and there can be no dispute that Brenner makes obvious the method claims of the '597 patent.

KAYE SCHOLER LLP

2.      **Claim 1**

Claim 1 of the '597 patent is made obvious by Brenner.  For example, claim 1 of Brenner

which claim 1 of the '597 was modeled after, is shown in the chart below:

| 5,552,278 Patent, Claim One (Brenner) | 6,306,597 Patent, Claim One (Macevicz) |
|---|---|
| A method for determining the nucleotide sequence of a polynucleotide, the method comprising the steps of: | A method for identifying a sequence of nucleotides in a polynucleotide, the method comprising the steps of: |
| (a) providing the polynucleotide in double stranded form such that the polynucleotide has a protruding strand at at least one end; | (a) extending an initializing oligonucleotide along the polynucleotide by ligating an oligonucleotide probe thereto to form an extended duplex; |
| (b) ligating a probe from a mixture of probes to an end of the polynucleotide having a protruding strand to form a ligated complex, each probe having an end with a complementary protruding strand to that of the polynucleotide and each probe having a nuclease recognition site of a nuclease whose cleavage site is separate from its recognition site; | |
| (c) identifying one or more nucleotides in the protruding strand of the polynucleotide; | (b) identifying one or more nucleotides of the polynucleotide; and |
| (d) cleaving the ligated complex with said nuclease that recognizes said nuclease recognition site and cuts the ligated complex to give an augmented probe and a new protruding strand on the polynucleotide; and | |
| (e) repeating steps (a) through (d) until the nucleotide sequence of the polynucleotide is determined. | (c) repeating steps (a) and (b) until the sequence of nucleotides is determined. |

As shown in the above claim 1, Brenner discloses a method of sequencing a polynucleotide by

hybridizing a probe to a polynucleotide that already has the "initializing oligonucleotide" bound

to it (*i.e.* the "polynucleotide" in Brenner actually starts off as partially double-stranded).  The

probe is ligated to the partially double-stranded polynucleotide.  One or more nucleotides are then

identified.  The ligated complex is then cleaved or cut to provide another protruding strand so the

process can be repeated (step (e) of Brenner).  It is clear that Dr. Macevicz copied the hybridize,

ligate, detect, and repeat format from Brenner, and Brenner makes obvious the method claims of

the '597 patent.  (Metzker Decl. ¶¶ 70-79.)

Brenner's form of repeating from Brenner claim 1 is encompassed by the re-registration

option articulated by the Court.  The initializing oligonucleotide is shortened by the cleavage in

Brenner, allowing a "shifting" to take place.  (Metzker Decl. ¶¶ 77-78.)

Brenner 14:1-14 also discloses a "multiple stepping" process where "a plurality of

nucleases which cleave at different distances from the ligation site" are used "to sequence a target

polynucleotide."

24

KAYE SCHOLER LLP

> The use of multiple nucleases having different reaches permits one to periodically 'restart' the sequencing process by capping sequences involved in prior or current cycles of ligation and cleavage and by beginning a new cycle of ligation and cleavage on a 'fresh' set of target polynucleotides whose protruding strands are exposed by cleavage with a long reach nuclease.  By employing multiple nucleases in this manner the number of nucleotides that can be determined on a set of target polynucleotides can be increased over that which can be done with a single nuclease.

(Brenner 14:1-14.)  This "multiple stepping" process described in Brenner makes obvious both the re-registration and same-sequence initializing oligonucleotide repetition options described by the Court.  (Metzker Decl. ¶ 79.)

### 3.     Claim 16

Claim 16 recites:  "The method of claim 1, wherein the oligonucleotide probe comprises one or more deoxyinosine bases."  Brenner discloses the additional limitation of claim 16, the use of deoxyinosine in oligonucleotide probes at 4:58-67.  This section of Brenner was copied word-for-word into the '597 patent.  (Metzker Decl. ¶ 84.)

### 4.     Claims 9, 10, 14, 15, 17, And 19

Claims 9, 10, 14, 15, 17, and 19 are obvious in view of Brenner, as shown in the Metzker Declaration at ¶¶ 80-83, 85-86.

## IV.     Conclusion

For the aforementioned reasons, CGI respectfully requests the Court to grant summary judgment of invalidity as to claims 1 , 9, 10, and 14-19 of the '597 patent.

Dated: May 31, 2012                    Respectfully submitted,

KAYE SCHOLER LLP


By:___*/s/ Michael J. Malecek*_____
    Michael J. Malecek
Attorneys for Defendant and Counterclaimant
COMPLETE GENOMICS, INC.

MSJ OF INVALIDITY                               Case No. 3:10-cv-05542 EDL