1  KEVIN M. FLOWERS (admitted *pro hac vice*)
   JOHN R. LABBE (admitted *pro hac vice*)
2  CULLEN N. PENDLETON (admitted *pro hac vice*)
   AMANDA K. ANTONS (admitted *pro hac vice*)
3  MARSHALL, GERSTEIN & BORUN LLP
   233 South Wacker Drive
4  6300 Willis Tower
   Chicago, Illinois 60606-6357
5  (312) 474-6300 (telephone)
   (312) 474-0448 (facsimile)
6  E-Mail: kflowers@marshallip.com
   E-Mail: jlabbe@marshallip.com
7  E-Mail: cpendleton@marshallip.com
   E-Mail: aantons@marshallip.com
8
   GINA A. BIBBY
9  FOLEY & LARDNER LLP
   975 Page Mill Road
10 Palo Alto, CA 94304
   (650) 856-3700 (telephone)
11 (650) 856-3710 (facsimile)
   E-Mail: gbibby@foley.com
12
   Attorneys for Plaintiffs
13 ILLUMINA, INC. and SOLEXA, INC.

14            **UNITED STATES DISTRICT COURT**

15           **NORTHERN DISTRICT OF CALIFORNIA**

16              **SAN FRANCISCO DIVISION**

17  ————————————————————————
                                              )
18  ILLUMINA, INC. and SOLEXA, INC.,          )   Case No. 3:10-cv-05542 EDL
                                              )
19              Plaintiffs,                   )   **ILLUMINA'S OPPOSITION TO**
                                              )   **COMPLETE GENOMICS'S MOTION**
20          v.                                )   **FOR SUMMARY JUDGMENT OF**
                                              )   **INVALIDITY**
21  COMPLETE GENOMICS, INC.                   )
                                              )   Date:   September 4, 2012
22              Defendant.                    )   Time:   2:00 p.m.
                                              )   Judge:  Honorable Elizabeth D. Laporte
23                                            )   Place:  Courtroom E, 15th Floor
                                              )
24  ————————————————————————

25

26

27

28

# TABLE OF CONTENTS

I.   SUMMARY OF ARGUMENT ........................................................................................1

II.  ARGUMENT ...........................................................................................................3

    A.   Dr. Macevicz conceived his inventions prior to Southern's prior-art date, and numerous documents corroborate his testimony that he was diligent in preparing his patent application ...........................................................................3

        1.   During the critical period, Dr. Macevicz could only work on his personal patent application on nights and weekends while he was employed full time as Senior Patent Counsel to Applied Biosystems .................................................................................................5

        2.   During the critical period, Dr. Macevicz was also spending his evenings and weekends working on patent applications for Dr. Sydney Brenner ....................................................................................6

        3.   During the critical period, Dr. Macevicz diligently worked on his patent application during his remaining available nights and weekends ..................................................................................................6

        4.   The case law supports a finding that Dr. Macevicz was diligent .............8

        5.   Illumina's lack of awareness and inability to rely on the newly discovered evidence during the AB litigation is irrelevant here ...........10

    B.   The references on which CGI now relies were already considered by the PTO Examiner team, and overcome, during the reexamination ........................11

    C.   CGI's assertion that the reexamination would have been stayed is incorrect and irrelevant ................................................................................................12

    D.   CGI has failed to establish that the prior-art references anticipate or render the asserted '597 claims obvious .........................................................................13

        1.   CGI fails to establish that Southern anticipates claims 14 or 15............13

            a.   Southern did not disclose using fluorescent labels, and thus cannot anticipate claim 14 of the '597 patent ...................................14

            b.   Questions of fact preclude summary judgment regarding whether Southern rendered claim 15 obvious ...................................15

            c.   Combining Southern with Brenner does not salvage Dr. Metzker's flawed opinion................................................................16

        2.   CGI fails to establish that Whiteley anticipates the '597 claims............17

            a.   CGI's reliance on Dr. Macevicz's "opinion" is misplaced ..............19

            b.   A genuine issue of disputed material fact precludes summary judgment concerning Whiteley .......................................................20

1

c.   Whiteley did not disclose "identifying a sequence of nucleotides in a polynucleotide" or "repeating until a sequence of nucleotides is determined" (claim 1) ...............................................21

2

3

d.   Whiteley did not disclose a "target polynucleotide that comprises an unknown sequence" (claim 10) ....................................22

4

5

3.   CGI fails to establish that Martinelli anticipates the '597 claims ..........23

6

a.   A genuine issue of disputed material fact exists concerning Martinelli ...............................................................................................24

7

b.   Martinelli did not disclose "identifying a sequence of nucleotides in a polynucleotide" or "repeating until a sequence of nucleotides is determined" (claim 1) ...............................................24

8

9

c.   Martinelli did not disclose a "target polynucleotide that comprises an unknown sequence" (claim 10) ....................................27

10

4.   CGI fails to establish that Brenner renders the '597 claims obvious ......28

11

a.   Neither CGI nor Dr. Metzker explain why one of ordinary skill in the art would have modified Brenner.............................................28

12

13

b.   Brenner cannot render claims 9 and 10 obvious ..............................30

14   III.    CONCLUSION ...............................................................................................................30

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*Applera Corp.--Applied Biosystems Group v. Illumina, Inc*.,
    2010 WL 1169936 (Fed. Cir. Mar. 25, 2010) ........................................................................5

*Boston Scientific Corp. v. Cordis Corp.*,
    422 F. Supp. 2d 1102 (N.D. Cal. 2006) ..............................................................................11

*Brown v. Barbacid*,
    436 F.3d 1376 (Fed. Cir. 2006) ............................................................................................8

*Courson v. O'Connor*,
    227 F. 890 (7th Cir. 1915).................................................................................................8, 9

*Creative Compounds, LLC v. Starmark Labs.*,
    651 F.3d 1303 (Fed. Cir. 2011) ............................................................................................9

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
    567 F.3d 1314 (Fed. Cir. 2009) ..........................................................................................17

*Griffith v. Kanamaru*,
    816 F.2d 624 (Fed. Cir 1987) ...............................................................................................8

*In re Gordon*,
    733 F.2d 900 (Fed. Cir. 1984) ......................................................................................16, 30

*In re Gurley*,
    27 F.3d 551 (Fed. Cir. 1994) ..............................................................................................17

*In re Jolley*,
    308 F.3d 1317 (Fed. Cir. 2002) ............................................................................................8

*In re Meyer Manufacturing Corp*,
    411 Fed. Appx. 316 (Dec. 10, 2010) .....................................................................................9

*In re Sponnoble*,
    405 F.2d 578 (C.C.P.A. 1969) ............................................................................................16

*Innogenetics, N.V. v. Abbott Labs.*,
    512 F.3d 1363 (Fed. Cir. 2008) ..............................................................................17, 20, 24

*Jackson Jordan, Inc. v. Plasser Am. Corp.*,
    747 F.2d 1567 (Fed. Cir. 1984) ..........................................................................................10

*Mahurkar v. C.R. Bard, Inc.*,
    79 F.3d 1572 (Fed. Cir. 1996) ............................................................................................10

*McGinley v. Franklin Sports, Inc.*,
    262 F.3d 1339 (Fed. Cir. 2001) ....................................................................................16, 30

*Medichem, S.A. v. Rolabo, S.L.*,
    437 F.3d 1157 (Fed. Cir. 2006) ............................................................................................4

*MEHL/Biophile Int'l Corp. v. Milgraum,*
    192 F.3d 1362 (Fed. Cir. 1999) ........................................................................13

*Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings,*
    370 F.3d 1354 (Fed. Cir. 2004) ........................................................................13

*Microsoft Corp. v. i4i Ltd. P'ship,*
    131 S. Ct. 2238 (2011) ........................................................................13

*Pandrol USA, LP v. Airboss Ry. Products, Inc.,*
    424 F.3d 1161 (Fed. Cir. 2005) ........................................................................19, 20

*Price v. Symsek,*
    988 F.2d 1187 (Fed. Cir. 1993) ........................................................................11

*Sandt Technology, Ltd. v. Resco Metal and Plastics Corp.,*
    264 F.3d 1344 (Fed. Cir. 2001) ........................................................................4

*Scripps Clinic & Research Found. v. Genentech, Inc.,*
    927 F.2d 1565 (Fed. Cir. 1991) ........................................................................13

*Spectralytics, Inc. v. Cordis Corp.,*
    649 F.3d 1336 (Fed. Cir. 2011) ........................................................................17

*SRAM Corp. v. AD-II Eng'g, Inc.,*
    465 F.3d 1351 (Fed. Cir. 2006) ........................................................................13

**Statutes**

35 U.S.C. § 102(a) ........................................................................3, 4

35 U.S.C. § 282 ........................................................................1, 4, 13

I.        **SUMMARY OF ARGUMENT**

Under 35 U.S.C. § 282, the '597 patent is presumed valid. CGI has failed to satisfy its heavy clear-and-convincing-evidence burden to prove that *any* of the prior-art references on which it relies renders those claims invalid. Its summary-judgment motion should be denied on that basis. And at the very least, CGI's motion is based on a number of false premises, each of which creates genuine issues of disputed material fact that preclude summary judgment.

**First**, CGI asserts that Illumina "has absolutely no evidence other than the inventor's bare assertion"[1] to establish that Dr. Macevicz was diligent in preparing his patent application during the critical period between February 9 and April 17, 1995 (so as to antedate or "swear behind" Southern). CGI is wrong, because it ignores at least three critical categories of evidence:

(i) Dr. Macevicz's draft patent application and its associated electronic "metadata," which show that Dr. Macevicz spent more than thirty-five hours editing seventy-one sequential versions of his patent application;

(ii) documents from the files of Dr. Macevicz's then-employer, Applied Biosystems ("AB"), as well as publicly available documents (*e.g.*, patents that Dr. Macevicz worked on during the critical period), all of which corroborate Dr. Macevicz's testimony that he was very busy during the critical period working as AB's Senior Patent Counsel;

(iii) Dr. Macevicz's employment agreement with AB, which limited him to working on his patent application only during his available time on nights and weekends; and

(iv) other documents showing that Dr. Macevicz was also working on patent applications for others during those nights and weekends, leaving even less time for him to work on his own patent application.

This documentary evidence corroborates Dr. Macevicz's testimony that he was diligent in preparing his patent application, and at the very least creates a genuine issue of disputed material fact regarding his diligence that precludes summary judgment regarding Southern.

**Second**, beyond the fact that Dr. Macevicz and Illumina can "swear behind" and eliminate Southern as prior art, CGI admits that Southern does not anticipate claims 14 and 15 of the '597

---

[1] CGI's Brief (D.I. 142) at 1:27-28; *see also* 8:4–11:27.

1   patent. The evidence further shows that Southern does not render those claims obvious because (as

2   Dr. Keith Backman explains in his expert declaration submitted herewith) Southern actually

3   teaches *away from* using a fluorescent label to identify an individual base, as required by claims

4   14 and 15.[2] Thus, at the very least, a genuine issue of disputed material fact exists regarding

5   whether Southern renders claims 14 or 15 obvious, precluding summary judgment as to at least

6   claims 14 and 15.

7        **Third**, each of the references on which CGI relies (Southern, Whiteley, Martinelli, and

8   Brenner) was submitted to and considered by several PTO Examiners during the original

9   prosecution and/or the re-examination of the asserted '597 claims. Those Examiners agreed that

10  those references did not render the '597 claims invalid, and CGI's arguments here do not change

11  that conclusion. For example, as Dr. Backman explains in his declaration, Dr. Metzker and CGI

12  misrepresent what Whiteley and Martinelli disclosed; in reality, neither reference disclosed

13  repeatedly hybridizing and ligating new probes at the same polynucleotide sequence to identify "a

14  sequence of nucleotides in a polynucleotide," as required by the asserted '597 claims. Thus, at the

15  very least, Dr. Backman's testimony creates genuine issues of disputed material fact that preclude

16  summary judgment as to Whiteley and Martinelli.

17       **Fourth**, CGI asserts – apparently because Dr. Macevicz wrote both the Brenner patent and

18  his own '597 patent – that Brenner rendered the '597 patent claims obvious. That Dr. Macevicz

19  included some of the same text in the different patents he wrote, or used similarly structured

20  claims for those different inventions, does not mean he copied his invention from Brenner, nor is it

21  otherwise relevant to the validity issue. And in any event, Brenner could not have rendered the

22  '597 claims obvious, because as Dr. Backman explains in his declaration,[3] Brenner taught one of

23  ordinary skill in the art *away from* modifying his method (which requires the use of restriction

24  enzymes to cleave double-stranded target polynucleotides) in any way that would result in the

25  methods claimed in the '597 patent (which require single-stranded target polynucleotides that

26

27  _____

    [2] Declaration of John R. Labbé ("Labbé Decl.") Exh. 6 (Southern) p. 23, lines 4-11; Declaration of
    Keith Backman, Ph.D. ("Backman Decl.") ¶¶ 25-36, 38-48, 50-72.

28  [3] Backman Decl. ¶¶ 69-70.

1    cannot be cleaved by restriction enzymes). Thus, at the very least, Dr. Backman's testimony

2    creates a genuine issue of material fact that precludes summary judgment as to Brenner.

3         **Fifth**, the "opinion" that Dr. Macevicz gave CGI regarding the '597 patent is inadmissible

4    under the well-settled doctrine of "Assignor Estoppel," which precludes an assignor of a patent

5    (such as Dr. Macevicz), and those in privity with an assignor (such as CGI), from attacking the

6    validity of the assigned patent. Because Dr. Macevicz assigned his patent to Illumina, his

7    "opinion" is inadmissible and irrelevant to the validity of his patent, and it should be excluded.

8         **Sixth**, CGI's thinly veiled suggestions that Dr. Macevicz somehow acted improperly by

9    not submitting prior-art references during the original prosecution of the '597 patent are baseless

10   and irrelevant: the reality is that although he filed the original application, Dr. Macevicz was not

11   substantively involved in the prosecution of the '597 patent, and CGI's suggestion that Illumina

12   willfully withheld prior-art references is simply untrue. In any event, these accusations are

13   irrelevant to the validity analysis (indeed, a panel of three PTO Examiners confirmed the validity

14   of the asserted '597 claims in light of these very references during the re-examination).

15        The validity issues raised in CGI's motion depend, at least in part, on whether the jury (i)

16   will believe Dr. Macevicz's testimony regarding diligence to antedate Southern, and (ii) will

17   believe Dr. Metzker or Dr. Backman regarding anticipation and/or obviousness over the other

18   references. This Court cannot grant summary judgment in the face of such genuine issues of

19   disputed material facts.

20   **II.     ARGUMENT**

21        **A.     Dr. Macevicz conceived his inventions prior to Southern's prior-art date, and
22               numerous documents corroborate his testimony that he was diligent in
                 preparing his patent application[4]**

23        Under 35 U.S.C. § 102(a), the effective prior-art date for the Southern reference is its

24   publication date of February 9, 1995, a little more than two months before Dr. Macevicz filed his

25   first patent application. But under § 102(a), only references published "before the invention" are

26

27   _____

     [4] Dr. Macevicz has submitted two declarations that support his diligence in preparing his patent
     application: he submitted a 37 C.F.R. § 1.131 declaration to the Patent Office during the
28   reexamination of the '597 patent ("Macevicz PTO Decl.") (Labbé Decl. Exh. 5) and he is
     submitting a "Supplemental" Declaration in support of this Opposition ("Suppl. Macevicz Decl.").

1    prior art: a reference is not prior art if the inventor conceived the invention prior to the reference's

2    publication date, and was diligent in preparing his application for filing, starting from a time just

3    before the publication date through to the filing of the application.[5]

4       CGI, not Illumina, bears the burden of proving that Southern qualifies as prior art, by

5    clear-and-convincing evidence.[6] To antedate ("swear behind") art under § 102(a), an inventor must

6    provide evidence that corroborates his testimony that he was diligent during the critical period.[7]

7    Sufficiency of corroboration is determined by "a 'rule of reason' analysis, under which all

8    pertinent evidence is examined when determining the credibility of an inventor's testimony."[8]

9       Here, Dr. Macevicz conceived the sequencing-by-ligation inventions claimed in the '597

10    patent on July 9, 1994: he recorded his inventions in his personal notebook, and one of his

11    colleagues signed and witnessed the relevant notebook pages.[9] In view of this evidence, CGI does

12    not challenge that Dr. Macevicz conceived his inventions before February 9, 1995. CGI only

13    argues that Dr. Macevicz was not sufficiently diligent in preparing his '663 patent application.[10]

14       CGI asserts that no documents corroborate Dr. Macevicz's testimony that he was diligent

15    during the critical two-month period. But Dr. Macevicz's testimony, combined with the

16    corroborating evidence discussed below, establishes that he was diligent: during the critical period,

17    he was only able to work on his '663 patent application on available nights and weekends, and he

18    in fact spent his available time on evenings and weekends working on his application.

19

20

---

21    [5] *Sandt Technology, Ltd. v. Resco Metal and Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001).
22    CGI does not dispute that the effective prior-art date for Southern is February 9, 1995. CGI's Brief
     (D.I. 142) at 5:14-15, 23-24. Although CGI suggests that Southern's effective prior-art date may
23    be earlier because it was disclosed in earlier-filed foreign applications, *id.* at 5:20-25, that is not
     the law under § 102(a): Southern's effective prior-art date is its February 1995 publication date,
24    not the date it was filed as an application in Great Britain.

     [6] *Sandt*, 264 F.3d at 1350 (Fed. Cir. 2001) ("The presumption of validity, 35 U.S.C. § 282 (1994),
25    requires those challenging validity to introduce clear and convincing evidence on all issues
     relating to the status of a particular reference as prior art.").

26    [7] *Sandt*, 264 F.3d at 1350.

27    [8] *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1170 (Fed. Cir. 2006).

     [9] Suppl. Macevicz Decl. ¶ 9 & Exh. A.
28    [10] *See, e.g.*, CGI's Brief (D.I. 142) at 9:3-4.

---

1

**1.      During the critical period, Dr. Macevicz could only work on his personal patent application on nights and weekends while he was employed full time as Senior Patent Counsel to Applied Biosystems**

2

3      During the critical two-month period between Southern's publication (February 9, 1995)

4   and Dr. Macevicz's filing of his '663 patent application (April 17, 1995), Dr. Macevicz was

5   employed full-time as Senior Patent Counsel at Applied Biosystems ("AB"). As a result of his

6   time commitment to this full-time job, and as a consequence of his Employee Invention

7   Agreement with AB, he could only work on his '663 patent application for his sequencing-by-

8   ligation inventions at home during his available time on nights and weekends.[11]

9      During the critical two-month period, Dr. Macevicz's workload as AB's Senior Patent

10   Counsel was "particularly demanding."[12] His work included: "[p]reparing, filing, and prosecuting

11   AB's patent applications in the United States and foreign countries; [m]aking decisions as to

12   whether existing patent applications should be maintained or abandoned, depending on the needs

13   of AB's business; [c]oordinating the invention disclosure process with AB's various business

14   units; [a]ssisting in all phases of AB's licensing matters, including negotiating and drafting new

15   licensing matters, and maintaining and monitoring existing licensing relationships; and [a]ssisting

16   in regulatory matters."[13] This is confirmed by his Performance Review.[14] For example, during the

17   critical period, Dr. Macevicz was directly responsible for the preparation and filing of an AB

18   patent application (filed on March 8, 1995).[15] During the critical period, he was also supervising

19   the work of Paul Grossman and Meredith McIntosh, who were involved in the preparation and

20   prosecution of AB's patent applications,[16] and he was also supervising the work of attorneys at

21   outside law firms on licensing matters and preparing and prosecuting patent applications for AB.[17]

22   [11] Twelve years after the original application was filed, AB sued Dr. Macevicz and Solexa seeking
23   to transfer ownership of the '597 patent to AB. A jury found that Dr. Macevicz did not breach his
     Employee Invention Agreement with AB and that Solexa was the rightful owner of the '597
     patent; that verdict was affirmed by the Federal Circuit. *See Applera Corp.--Applied Biosystems*
24   *Group v. Illumina, Inc.*, 2010 WL 1169936, at *3-6 (Fed. Cir. Mar. 25, 2010).

25   [12] Suppl. Macevicz Decl. ¶ 14; Macevicz PTO Decl. ¶ 11 (Labbé Decl. Exh. 5).

     [13] Suppl. Macevicz Decl. ¶ 11 & Exh. B; Macevicz PTO Decl. ¶¶ 10-11 (Labbé Decl. Exh. 5).
26
     [14] Suppl. Macevicz Decl. ¶ 12 & Exh. C.
27
     [15] *Id.* ¶ 14 & Exh. E.
28   [16] *Id.* ¶ 13 & Exh. E.
     [17] *Id.* ¶ 15 & Exhs. B, C & F.

1    In addition to his work for AB, pursuant to a Corporate Services Agreement between AB

2    and Lynx Therapeutics, Inc. ("Lynx"), Dr. Macevicz was also acting as patent counsel to Lynx in

3    patent prosecution and licensing matters.[18]

4    **2.    During the critical period, Dr. Macevicz was also spending his evenings and weekends working on patent applications for Dr. Sydney Brenner**

5    During the critical period, Dr. Macevicz also spent a good deal of his available time on

6    evenings and weekends drafting and prosecuting patent applications for Dr. Sydney Brenner, a

7    Nobel Prize-winning scientist he met through his work for Lynx:

8    

9    > During the February 8, 1995 to April 17, 1995 time period, I was also working on patent applications for Dr. Sydney Brenner, a Nobel Prize-winning scientist whom I met as a result of my work for Lynx. During this time, I was responsible for managing the preparation, filing, and prosecution of Dr. Brenner's sequencing-related patent portfolio. My work on Dr. Brenner's patent portfolio was separate from my work for AB and Lynx, and, just as for my work on my own patent application during this period, I could only work on Dr. Brenner's patent portfolio in the evening and on weekends. Moreover, during this period, I was obligated to give priority to my work on Dr. Brenner's patent portfolio over working on my own patent application.[19]

10   

11   

12   

13   

14   Dr. Macevicz performed numerous such tasks for Dr. Brenner between July 1994 and April 1995,

15   including preparing and filing five patent applications, the latest filed on March 24, 1995.[20] As

16   reflected on a list of pending and anticipated applications, Dr. Macevicz was preparing these

17   applications on behalf of a new company created to develop Dr. Brenner's inventions.[21] This work

18   is further corroborated by documents such as a personal check Dr. Macevicz used to pay filing

19   fees for one of Dr. Brenner's patent applications.[22] Dr. Macevicz "was the sole patent attorney

20   responsible for preparing and prosecuting these patent applications for Dr. Brenner, and [he] did

21   all of the work on these applications in [his] spare time (in the evenings and on weekends)."[23]

22   **3.    During the critical period, Dr. Macevicz diligently worked on his patent application during his remaining available nights and weekends**

23   

24   As he explains in his declaration, Dr. Macevicz was limited to working on his '663 patent

25   [18] *Id.* ¶¶ 16-18 & Exh. G.

     [19] *Id.* ¶ 19.

26   [20] *Id.* ¶¶ 20-24 & Exhs. H-M.

27   [21] *Id.* ¶ 25 & Exh. N.

     [22] *Id.* ¶ 23 & Exh. L.

28   [23] *Id.* ¶ 26.

application on nights and weekends:

> Due to the terms of my Employee Invention Agreement with AB, I was not able to prepare the '663 application (the first application leading to the '597 patent) during my normal work hours at AB. I was worried that if I had used AB's resources, or worked on the '663 application during work hours, AB would claim to have rights to my invention (which I later assigned to Lynx Therapeutics, Inc., which later became known as Solexa, Inc. and was later acquired by Illumina, Inc.). Therefore, my work on the '663 application was limited to working on the application at my home during the limited time available to me in the evenings and on weekends (during this period, I was married and had two school-age children). From at least just before February 9, 1995, until April 17, 1995, I spent a number of evenings and weekend days working on the preparation and filing of the '663 application.[24]

Dr. Macevicz's testimony regarding his diligence is corroborated by his draft '663 patent

application, which is contained in an electronic file (titled "POE1PA.DOC") on a "Zip" disk that

Dr. Macevicz retained in his personal files and provided to Illumina. Illumina engaged a forensics

expert to extract and authenticate the "metadata" from this

file.[25] The screen shot at right from this electronic

"metadata" shows that Dr. Macevicz revised his application

at least 71 times, which took at least 2,145 minutes (more

than 35 hours), and worked on the application all the way

through Sunday, April 16, 1995 (the day before filing).[26]



After reviewing this metadata, Dr. Macevicz

explained that it confirms his recollection that he did "the

bulk of" his work on the application (totaling more than 35

hours of work) during the critical February-to-April-1995 period:

> This screen shot of the "Statistics" window of the properties of my draft '663 patent application shows that I worked on this application for at least 2,145 minutes (i.e., more than 35 hours), and that I revised the application more than 71 times.  I would have done the bulk of this work in drafting and revising my application during the two-month period preceding the filing of the application (that is, from February to April 1995).  This evidence showing that I worked on my application for more than 35 hours is consistent with my recollection of the time that I had available to work on my application.  Because I was only permitted to work on my application during available nights and weekends, I can

---

[24] *Id.* ¶ 27 & Exh. O; Macevicz PTO Decl. ¶ 12 (Labbé Decl. Exh. 5).

[25] Declaration of John H. Evans ("Evans Decl.") ¶¶ 5-10; Suppl. Macevicz Decl. ¶ 28.

[26] Evans Decl. ¶ 11 & Exh. D.

1

say that I spent most of my available time at night and on the weekends for the two months preceding the filing date, April 17, 1995 (i.e., the available time on nights and weekends that I was not working on Dr. Brenner's patent portfolio) preparing my '663 patent application for filing.[27]

Viewed collectively, in the light most favorable to Illumina, and resolving all credibility determinations and inferences in favor of Illumina, this evidence establishes that Dr. Macevicz was indeed diligent in preparing his '663 patent application during the critical period. At the least, this evidence creates a genuine issue of disputed material fact that precludes summary judgment.

### 4. The case law supports a finding that Dr. Macevicz was diligent

The case law does not require more than what Dr. Macevicz has provided. "Unlike the legal rigor of conception and reduction to practice, diligence and its corroboration may be shown by a variety of activities."[28] "[C]orroboration may be provided by sufficient independent circumstantial evidence, and corroboration of every factual issue contested by the parties is not a requirement of the law."[29] In similar circumstances, where an inventor's job slowed his work on his application, the court held that the inventor's workload must be considered:

In considering the question of diligence, the circumstances surrounding the inventor must be taken into account. Courson was at the head of a large and important shop, in charge of nearly 3,000 men. His time was not his own. Unless he gave up his position, he could ordinarily devote only his own, not his employer's, time to his inventions. He could go to Pittsburg, not when he desired, but when the work at the shop made it convenient.[30]

"The question of reasonable diligence is one of fact."[31] Here, Dr. Macevicz was only required to exercise "reasonable diligence," which "does not require an inventor to devote his entire time thereto, or to abandon his ordinary means of livelihood."[32] In these circumstances, reasonable diligence did not require Dr. Macevicz to give up his job at AB to devote every day to drafting his patent application.

---

[27] Suppl. Macevicz Decl. ¶ 30 (emphasis added).

[28] *Brown v. Barbacid*, 436 F.3d 1376, 1380 (Fed. Cir. 2006).

[29] *In re Jolley*, 308 F.3d 1317, 1328 (Fed. Cir. 2002).

[30] *Courson v. O'Connor*, 227 F. 890, 894 (7th Cir. 1915). As here, *Courson* involved a two-month critical period. *Id.* at 892.

[31] *Brown*, 436 F.3d at 1379.

[32] *Id.*; *see also Griffith v. Kanamaru*, 816 F.2d 624, 626 (Fed. Cir 1987) ("A review of caselaw on excuses for inactivity in reduction to practice reveals a common thread that courts may consider the reasonable everyday problems and limitations encountered by an inventor.").

1    The cases CGI cites are inapposite. CGI relies on an unpublished Federal Circuit opinion,

2    *In re Meyer Manufacturing Corp*, 411 Fed. Appx. 316 (Dec. 10, 2010), to argue that the mere

3    submission of a declaration to the Patent Office is insufficient to overcome an Examiner's

4    objection to the declaration, but that argument does not apply here. Nor does CGI's argument that

5    Dr. Macevicz's testimony *alone* is insufficient to establish his diligence during the critical period.

6    And here, unlike in *In re Meyer*, the "reasonable diligence" requirement does not extend to the

7    entire two-month period, but rather to Dr. Macevicz's available time on nights and weekends

8    during those two months. Dr. Macevicz testified that he was very busy working on patent

9    prosecution and licensing matters for AB and Lynx during that period, and that testimony is

10   corroborated by the numerous documents attached to his declaration from his AB employee files.

11   Moreover, unlike in *In re Meyer*, Dr. Macevicz has provided a draft patent application

12   showing that he revised his application 71 different times, which took more than 35 hours of

13   working time. This evidence supports Dr. Macevicz's testimony that he spent those nights and

14   weekends leading up to the filing of his application working on the application. CGI cannot fit this

15   case into the facts of *In re Meyer*.

16   In *Creative Compounds*, another case CGI cites, the court held that Creative, the party

17   challenging the patent based on a prior invention theory (under 35 U.S.C. § 102(g)), was required

18   but failed to meet the clear-and-convincing-evidence standard regarding prior conception and

19   reduction to practice.[33] In addition, the court stated "[e]ven if Creative raised a genuine issue of

20   material fact as to conception, which it did not, Creative's bald assertion that Cornelius was

21   'diligent' during the intervening eighteen months between conception and Creative's first

22   reduction to practice fails to raise a genuine issue of material fact as to diligence—a required

23   element of Creative's § 102(g) defense."[34] CGI cites a copy of the declaration submitted in the

24   district court in *Creative*,[35] but the Federal Circuit did not address the sufficiency of the

25   declaration. Rather, it merely held that Creative failed to prove prior conception by clear-and-

26

---

27   [33] *Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303, 1311-12 (Fed. Cir. 2011).

     [34] *Id.* at 1312-13.

28   [35] CGI's Brief (D.I. 142) at 10:20-11:10.

1   convincing evidence. The *Creative* court's statements about diligence were mere dicta, and even

2   as dicta are not applicable to this case.

3       Here, unlike in *Creative*, the critical period consists of only two months of nights and

4   weekends, not eighteen months, and Dr. Macevicz has offered much more than "bald assertions"

5   that he was diligent. Dr. Macevicz was limited to working on his application on available nights

6   and weekends, and unlike the inventor in *Creative*, offered evidence showing that indeed he *was*

7   *working* on the application during that time. Moreover, in *Creative*, the party seeking to establish

8   prior invention had to satisfy a clear-and-convincing-evidence standard of proof, whereas here

9   CGI bears that burden; Illumina need only show by a preponderance of the evidence that Dr.

10  Macevicz acted with reasonable diligence over those nights and weekends to prepare his patent

11  application, and it has done so.[36]

### 5.  Illumina's lack of awareness and inability to rely on the newly discovered evidence during the AB litigation is irrelevant here

13      Although Dr. Macevicz testified at his deposition that he was unaware of additional

14  evidence to corroborate his diligence, he "did *nothing* to prepare" for his deposition, and he was

15  not able to consult with counsel for Illumina to prepare.[37] Dr. Macevicz was unaware of the

16  contents of the Zip Disks on which Illumina found his draft application because he had no means

17  of reading the disks before he sent them to counsel for Illumina.[38]

18      CGI suggests that Illumina's failure to rely on this evidence in the AB litigation is

19  somehow relevant here. It is not. During the AB litigation, Illumina was not aware of Dr.

20  Macevicz's draft patent application and its associated metadata.[39] In 2009, during the

---

[36] *See Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572 (Fed. Cir. 1996). In *Mahurkar*, the court held that the patentee has the burden of producing evidence showing an earlier invention date. *Id.* at 1576-77. Once the patentee satisfies this burden of production, the alleged infringer bears the usual clear-and-convincing-evidence burden of persuasion for invalidity. *Id.* 1577-78.

[37] Macevicz Depo. (8/11/2011) at 8:22-23 (Labbé Decl. Exh. 10); *see also* Labbé Decl. ¶ 10.

[38] Macevicz Depo. (8/11/2011) at 216:20-217:17 (Labbé Decl. Exh. 10).

[39] Labbé Decl. ¶¶ 3-6. CGI does not, and cannot, contend that Illumina is barred from litigating whether Southern qualifies as prior art. CGI failed to raise the issue because the stipulation entered in the AB litigation cannot be given issue-preclusive effect. *See Jackson Jordan, Inc. v. Plasser Am. Corp.*, 747 F.2d 1567, 1576 (Fed. Cir. 1984) (holding that issues raised in a nearly identical stipulation, incorporated into the judgment in a prior litigation, is not "fully litigated," and therefore barred the application of collateral estoppel in a subsequent case).

1  reexamination of the '597 patent, Dr. Macevicz provided several Zip Disks to counsel for

2  Illumina, although he did not know what was on them.[40] Counsel for Illumina did not have those

3  disks during the earlier litigation, and did not review the documents on those disks until retaining a

4  forensic expert to do so in anticipation of this litigation against CGI.[41] Moreover, Illumina only

5  stipulated to the invalidity of claim 1 of the '597 patent over Southern following Judge Alsup's

6  last-minute supplemental claim construction, after the close of evidence during the AB trial.[42]

7  Accordingly, Illumina was not aware of any need to antedate Southern until after it was too late to

8  introduce detailed evidence to support that argument.

9       The issue is not whether Illumina should have relied on evidence of diligence in the AB

10  case; it is whether that evidence establishes genuine issues of disputed material fact regarding

11  whether Dr. Macevicz was diligent in preparing his patent application between February 8 and

12  April 17, 1995. Applying the rule of reason to all the evidence outlined in this brief,[43] and

13  resolving all credibility determinations and inferences in favor of Illumina (as the Court must), the

14  Court should find at the very least that there are genuine issues of disputed material fact as to Dr.

15  Macevicz's diligence that preclude summary judgment as to Southern. In *Boston Scientific Corp.*

16  *v. Cordis Corp.*, 422 F. Supp. 2d 1102, 1113-14 (N.D. Cal. 2006), this Court denied summary

17  judgment in similar circumstances because the diligence issue is "concerned with whether a party

18  exercised reasonable diligence, and such reasonableness determinations are [a] standard task for

19  the trier of fact."

20       **B.    The references on which CGI now relies were already considered by the PTO**
            **Examiner team, and overcome, during the reexamination**

21
22       CGI wrongly alleges that Illumina misled the PTO (i) about the stipulation on invalidity,

23  and (ii) by failing to submit Southern, Whiteley, and Brenner. CGI misstates these facts to divert

    the Court's attention from the reality that a team of highly trained PTO Reexamination Unit

24

25  _____

    [40] Suppl. Macevicz Decl. ¶ 28; Labbé Decl. ¶ 3.

26  [41] Labbé Decl. ¶¶ 3-4.

27  [42] Judge Alsup issued his supplemental claim construction at 1:00 p.m. on January 22, 2009,
    before closing arguments the next morning. (Labbé Decl. Exh. 11 (Tr. Trans. at 2327:7-14).)

28  [43] *See Price v. Symsek*, 988 F.2d 1187, 1196 (Fed. Cir. 1993) ("all of the evidence put forth" must
    be considered "as a whole, not individually" in evaluating the inventor's testimony).

1    Examiners issued the asserted claims after considering all the references on which CGI now relies.

2          A reexamination in the Patent Office involves a "thorough review by a panel of

3    supervisors and senior patent examiners," who are "highly skilled" Examiners.[44] Illumina

4    submitted and pointed out the stipulation regarding Southern to the Examiners, and Southern,[45]

5    Whiteley, Brenner, and Martinelli were submitted, considered, and formed the basis of rejections

6    that were overcome by Illumina during the reexamination.[46] Given that a panel of Examiners

7    considered these very references and reached the opposite conclusion that CGI asks this Court to

8    reach, there are at least genuine issues of disputed material fact raised by CGI's motion. CGI

9    certainly cannot meet its clear-and-convincing-evidence burden by casting aspersions on Illumina

10   regarding the submission of references that were in fact thoroughly considered by a team of

11   experienced Examiners during the reexamination.

12          **C.     CGI's assertion that the reexamination would have been stayed is incorrect
              and irrelevant**

13

14          CGI wrongly alleges, without any citation or explanation, that "the reexamination would

15   have been stayed pending the Federal Circuit decision" had Illumina properly notified the PTO of

16   the Federal Circuit proceedings. There simply can be no dispute that during the reexamination,

17   Illumina notified the Patent Office of the Federal Circuit appeal proceedings, on at least three

18   different occasions. For example, in an Information Disclosure Statement ("IDS"), Illumina wrote:

19   "The case is currently on appeal to the United States Circuit Court of Appeals for the Federal

20   Circuit, Case Nos. 2009-1253, -1260 (see Citation Nos. D56 and D58 in the attached Form PTO-

21   1449)."[47] Then Illumina submitted copies of the Federal Circuit appeal briefs.[48]

22          Moreover, the Patent Office could not have stayed the reexamination pending the outcome

23   of the Federal Circuit appeal, because Illumina's pending new claims (which are asserted in this

24   _____

25   [44] Labbé Decl. Exh. 12 (July 29, 2005 USPTO Press Release).

26   [45] Illumina removed Southern as a prior-art reference by "swearing behind" it.

27   [46] Martinelli was considered during the original prosecution of the '597 patent claims.

     [47] Labbé Decl. Exh. 13 (June 17, 2009 IDS) at 2.

28   [48] Labbé Decl. Exh. 14 (August 7, 2009 IDS) at "Sheet 5 of 5" listing D60 and D61. The Federal
     Circuit opinion issued on March 25, 2010, three weeks after the Patent Office issued the '597
     patent reexamination certificate (on March 2, 2010).

case) were not the subject of the Federal Circuit appeal.[49] CGI's suggestion that Illumina took advantage of an uninformed Examiner is plainly false.

### D. CGI has failed to establish that the prior-art references anticipate or render the asserted '597 claims obvious

"A United States patent is presumed valid under 35 U.S.C. § 282, and a party asserting invalidity as a defense to infringement must present clear and convincing evidence that the patent is invalid."[50] "To anticipate, a single reference must teach every limitation of the claimed invention."[51] "If it is necessary to reach beyond the boundaries of a single reference to provide missing disclosure of the claimed invention, the proper ground is not § 102 anticipation, but § 103 obviousness."[52]

In considering summary judgment, the evidence is viewed "through the prism of the evidentiary standard of proof that would pertain at a trial on the merits."[53] Because patents are presumed valid, "a moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of facts underlying invalidity that no reasonable jury could find otherwise."[54] CGI's motion is premised entirely on the opinions of its expert, Dr. Metzker, whose reasoning and conclusions are challenged here by Dr. Backman. Dr. Metzker's opinions alone cannot establish, by clear-and-convincing evidence, that the '597 claims are invalid.

### 1. CGI fails to establish that Southern anticipates claims 14 or 15

Southern, which was published on February 8, 1995, disclosed a sequencing method that used repetitive cycles of ligation of probes hybridized to an unknown DNA sequence. Southern disclosed a method of detecting up to six bases at once using "a tag moiety comprising one or

---

[49] Labbé Decl. Exh. 15 (M.P.E.P. § 2286) at § IV ("On the other hand, a *final* Federal Court holding of invalidity or unenforceability (after all appeals), is binding on the Office. . . . The reexamination *will continue* as to any remaining claims being examined. Thus, the reexamination will continue if any original, new, or amended claim is being examined that was not found invalid or unenforceable by the Court.") (second emphasis added).

[50] *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1365 (Fed. Cir. 2004); *see also Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2252 (2011) ("For nearly 30 years, the Federal Circuit has interpreted § 282 as we do today.").

[51] *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999).

[52] *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1577 (Fed. Cir. 1991).

[53] *SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1357 (Fed. Cir. 2006).

[54] *Id.*

1   more reporter groups adapted for detection by mass spectrometry."[55] As the title implies ("Tag

2   Reagent and Assay Method"), Southern disclosed *one* means for detecting unknown DNA: "mass

3   tags." Southern refers to his "mass tags" no fewer than 82 times.[56] Southern's method, which he

4   illustrated in Figure 4, must be used with his "mass tags":[57]



(GCGCAA probe ligated at bottom of Fig. 4)

9   After cleaving and reading the mass tag attached to the probe, the cycle begins again,

10   which in Figure 4 is represented by a line pointing back to the top of the figure. Figures 1-3A

11   concern the synthesis of mass tags, and Figure 3B shows how the complex mass tag is broken

12   down to allow one to read the six bases associated with the probe (which would correspond to

13   complementary bases in the unknown DNA).[58]

### a.   Southern did not disclose using fluorescent labels, and thus cannot anticipate claim 14 of the '597 patent

15   CGI and Dr. Metzker argue that Southern anticipated claim 14 of the '597 patent because

16   Southern disclosed using a "spectrally resolvable fluorescent signal" (which this Court construed

17   as "a light signal generated by fluorescence which can be detected based on its spectral

18   characteristics (e.g., its color)"). CGI and Dr. Metzker cite two passages in Southern as having

19   disclosed "fluorescence," but as Dr. Backman explains in his Declaration, each passage actually

20   *teaches away* from using fluorescence in Southern's method; the second from a section expressly

21   identified as a discussion of the *drawbacks* of existing methods:[59]

---

[55] Labbé Decl. Exh. 6 (Southern) p. 1, lines 27-28; Backman Decl. ¶ 17.

[56] Labbé Decl. Exh. 6 (Southern) p. 15, line 20 – p. 16, line 10; Backman Decl. ¶18.

[57] Backman Decl. ¶ 18.

[58] Labbé Decl. Exh. 6 (Southern) at Figure 1-3B, and the corresponding description of those figures at p. 4, lines 16-25; Backman Decl. ¶ 19.

[59] Backman Decl. ¶ 29-30.

**Present array-based methods.**

The major drawbacks of existing array-based methods are:

…

c) **Of present detection methods**, radioactivity has high sensitivity but poor resolution, **fluorescence has low sensitivity and high resolution**; both are relatively slow. The proposal to use **mass spectrometry could improve resolution, speed and sensitivity, as well as adding the potential to read the sequences of tags**.[60]

**The advantages of mass spectrometry as a detection system are: its great sensitivity** - only a few hundred molecules are needed to give a good signal; **its wide dynamic range and high resolving power** - molecules in the mass range 100 to 200,000 Daltons can be resolved with a resolution better than 0.01; its versatility - molecules of many different chemical structures are readily analysed; **the potential to image analytes by combining mass spectrometry with, for example, scanning laser desorption: and the ability to make quantitative as opposed to merely qualitative measurements**.

Thus **mass-labeling** combines advantages of radioactivity and fluorescence and **has additional attributes which suggest novel applications**.[61]

Because Southern only disclosed the disadvantages of fluorescence, not the use of fluorescence in his method, this disclosure cannot anticipate Claim 14.[62] At a minimum, questions of material fact – presented in the conflicting opinions of the parties' respective experts, Drs. Metzker and Backman – preclude summary judgment as to Claim 14.

### b. Questions of fact preclude summary judgment regarding whether Southern rendered claim 15 obvious[63]

CGI fails to establish by clear-and-convincing evidence that claim 15 of the '597 patent would have been obvious to one of ordinary skill in the art. CGI cites the conclusory testimony of Dr. Metzker, who stated that fluorescent labels "were extremely common in the art and were often

---

[60] Labbé Decl. Exh. 6 (Southern) p. 22, lines 21-24; p. 23, lines 4-11 (emphasis added); *see* CGI's Brief (D.I. 142) at p. 15, lines 1-4; Metzker Decl. (D.I. 143) at ¶ 46.

[61] Labbé Decl. Exh. 6 (Southern) p. 3, lines 10-24; *see* CGI's Brief (D.I. 142) at p. 15, lines 1-4; Metzker Decl. (D.I. 143) at ¶ 46.

[62] Backman Decl. ¶ 34.

[63] The issue of obviousness of claim 15 is identical to the obviousness issue regarding claim 14; however, CGI failed to address the issue of obviousness of claim 14 other than by a conclusory statement: "To the extent the Court finds that any of the limitations of the above claims are not explicitly disclosed in Southern, those limitations would have been obvious to one skilled in the art in light of Southern." CGI's Brief (D.I. 142) at p. 16, line 4-6. The Court should not entertain new arguments on obviousness in CGI's reply brief, or (as CGI attempted at the *Markman* hearing) during the hearing on the instant summary judgment motion.

1    directly correlated to a particular nucleotide."[64] But Dr. Metzker misses the point: the question is

2    not whether labels were common, but whether it would have been obvious (or even possible) to

3    combine Southern's method for identifying six bases by reading a single tag by mass spectroscopy

4    with other art that disclosed using a fluorescent label to identify a single base. It would not have

5    been obvious (or, indeed, possible) to use fluorescent labels in Southern's method.[65] Indeed, if it

6    were possible to identify more than one base using fluorescent labels, CGI would be doing it.[66]

7        It is black-letter law that if the combination of a fluorescent label with Southern would

8    render Southern inoperable, it would not have been obvious to combine the two: "If references

9    taken in combination would produce a 'seemingly inoperative device,' [the Federal Circuit has]

10   held that such references teach away from the combination and thus cannot serve as predicates for

11   a prima facie case of obviousness."[67] Here, CGI attempts to combine the use of a fluorescent label

12   that is only capable of identifying one base at a time with a method that requires the identification

13   of multiple bases in each round of ligation and identification.[68] Again, whether one of ordinary

14   skill in the art would have understood Southern to be inoperable when used with fluorescence, and

15   thereby teach away from using fluorescence, is a question of material fact that cannot be resolved

16   on summary judgment.

17              c.      **Combining Southern with Brenner does not salvage Dr.**
                        **Metzker's flawed opinion**

18

19       CGI and Dr. Metzker argue that claim 15 would have been obvious to one of ordinary skill

20   in the art from the combination of Southern's mass-tag sequencing method with Brenner's single-

21   base fluorescence method.[69] As Dr. Backman explains in his Declaration, Dr. Metzker is simply

22   wrong: it could not have been obvious to one of ordinary skill to combine two very different

---

[64] Metzker Decl. (D.I. 153) at p. 18, line 26 – p. 19, line 4.

[65] *See* Backman Decl. ¶ 29-36.

[66] Labbé Decl. Exh. 16 (CGI's White Paper) at 7 ("cPAL uses pools of probes labeled with four distinct dyes (one per base) to read the positions adjacent to each adaptor (Figure 6).").

[67] *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1354 (Fed. Cir. 2001); *see also In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984) (inoperable modification teaches away); *In re Sponnoble*, 405 F.2d 578, 587 (C.C.P.A. 1969) (references teach away from combination if combination produces seemingly inoperative device).

[68] *See* Backman Decl. ¶ 32.

[69] Metzker Decl. (D.I. 143) ¶ 47.

sequencing methods that each utilized a very different detection method, especially when, as noted above, the combination would have rendered Southern inoperable.[70] There is no evidence that Brenner's enzyme-cleavage method could be used in Southern's mass-tag method, nor that Southern's mass-tags could be used in Brenner's method.[71]

When a prior-art reference "suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant," the prior art is said to "teach away" from the claimed invention.[72] "An inference of nonobviousness is especially strong where the prior art's teachings undermine the very reason being proffered as to why a person of ordinary skill would have combined the known elements."[73] "What a prior art reference discloses is, of course, a question of fact, and if there are disputes over material facts ... [they] should be resolved at trial by the fact finder."[74]

A conclusory statement by CGI's expert falls far short of satisfying CGI's clear-and-convincing-evidence burden on obviousness, and Illumina's expert Dr. Backman disagrees with each of Dr. Metzker's opinions with regard to claims 14 and 15. This alone justifies denying CGI's motion for summary judgment: the jury must choose between competing expert opinions and, after hearing all of the evidence, must determine whether Southern explicitly teaches away from the use of fluorescence, and/or teaches away by rendering Southern's methods inoperable.[75]

### 2.   CGI fails to establish that Whiteley anticipates the '597 claims

Whiteley, which was thoroughly considered by the Examiners during the reexamination, disclosed a method that is now known as oligonucleotide ligation assay ("OLA").[76] As noted in the first two paragraphs of Whiteley, Whiteley allows for the detection of a single-base difference (a mutation) in the known sequence of a particular gene:

---

[70] *See* Backman Decl. ¶ 36.

[71] *Id.*

[72] *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994).

[73] *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326 (Fed. Cir. 2009).

[74] *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1378 n.6 (Fed. Cir. 2008).

[75] *See Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1343 (Fed. Cir. 2011) (whether the prior art teaches away from the claimed invention is a question of fact).

[76] *See* Backman Decl. ¶ 37.

> This invention relates to the detection of specific sequences of nucleotides in a variety of nucleic acid samples, and more particularly to those which contain a sequence characterized by a difference in a single base pair from a standard sequence.
>
> In recent years it has been found that many human diseases can be traced directly to genetic mutations. Some commonly known examples include cystic fibrosis, muscular dystrophy, Tay-Sachs disease, hemophilias, phenylketonuria and sickle-cell anemia. Of the over 500 recognized genetic diseases, many can be traced to single base pair mutations.[77]

Whiteley listed the classic examples of genes that could be assayed by using the probes (a "diagnostic probe" and a "continuous probe") which are each designed to hybridize to the target sequence so that their ends meet at the nucleotide in the target that is being tested.[78] Both of the probes are designed to hybridize to a known DNA sequence, except at the nucleotide where the probes meet. After the probes are ligated together, the presence or absence of a label in the test sample can indicate which probes bound and thus whether the gene has a single-base mutation.[79] Whiteley's Figure 2A shows the design of its method:



In this Figure, the single-stranded DNA target (11) is tested using diagnostic probes (13) (which correspond to the known sequence "D" shown on 11), and a contiguous probe (15) (which corresponds to the known sequence "C" shown on 11).[80] After the unligated probes are washed off of the single-stranded DNA (11), the presence or absence of label (which is attached to one of the

---

[77] Labbé Decl. Exh. 7 (Whiteley) col. 1, lines 6-10; *see also* Backman Decl. ¶ 37.

[78] Labbé Decl. Exh. 7 (Whiteley) col. 5, lines 5-10 ("'Diagnostic portion' refers to that portion of the target sequence which contains the nucleotide modification, the presence or absence of which is to be detected. 'Contiguous portion' refers to a sequence of DNA which is a continuation of the nucleotide sequence of that portion of the sequence chosen as diagnostic."); *see also* Backman Decl. ¶ 37.

[79] Labbé Decl. Exh. 7 (Whiteley) col. 5, lines 5-10; *see also* Backman Decl. ¶ 37.

[80] Labbé Decl. Exh. 7 (Whiteley) col. 8, lines 10-12 ("In the Figure, the sample nucleic acid, represented by several denatured strands 11, has diagnostic portions D and a contiguous portion C. Where contiguous portion C and diagnostic portion D are adjacent designates the target sequence."); *see also* Backman Decl. ¶ 37.

1    probes) is detected.[81]

2          As Dr. Backman explains, Whiteley did not disclose identifying more than a single base on

3    the target polynucleotide, and did not disclose repeating the cycle of hybridizing probes, ligating,

4    and identifying to determine a previously unknown sequence.[82] In the AB litigation, Dr. Metzker

5    agreed with Illumina's reading of Whiteley, but is now contradicting himself.[83]

6                    **a.    CGI's reliance on Dr. Macevicz's "opinion" is misplaced**

7          CGI argues that Dr. Macevicz's one-line "opinion" regarding the '597 patent, apparently

8    offered to CGI in the course of giving CGI a clearance opinion on numerous patents, is evidence

9    that claim 1 of the '597 patent might be invalid over Whiteley if construed in a certain manner.[84]

10   Dr. Macevicz's "opinion" is inadmissible, and barred from the Court's consideration, by the

11   doctrine of assignor estoppel. Under assignor estoppel, "an assignor and parties in privity with the

12   assignor are estopped or barred from asserting invalidity defenses."[85] Assignor estoppel blocks an

13   assignor of patent rights (Dr. Macevicz)[86] from "asserting that its own patent, for which it may

14   have received value upon assignment, is invalid and worthless."[87] Here, CGI cannot rely on Dr.

15   Macevicz's "opinion" to have the assignor (Dr. Macevicz, who received compensation from Lynx

16   for assigning his patent) disparage his own patent.

17

18   _____

     [81] Labbé Decl. Exh. 7 (Whiteley) col. 8, lines 30-45; *see also* Backman Decl. ¶ 37.

19   [82] Backman Decl. ¶ 38.

20   [83] In the AB litigation, Dr. Metzker (AB's expert) testified at his deposition that you need to know
     the sequence of the target to perform the Whiteley method: "You need to know the sequence to --
     to do this Whiteley assay." Dr Metzker also testified that Whiteley could not be used to sequence
21   an unknown DNA: "That is correct. It could not be used to sequence an unknown -- the sequence
     of an unknown target." Labbé Decl. Exh. 17 (AB Metzker Dep.) at 121:2-7, 14-19. When Dr.
22   Metzker was asked the exact same questions that elicited those answers, he gave contradictory
     answers, calling his credibility into question. Labbé Decl. Exh. 18 (CGI Metzker Dep.) at 79:25-
23   81:4.

     [84] CGI's Brief (D.I. 142) at 16:17-17:9.

24   [85] *Pandrol USA, LP v. Airboss Ry. Products, Inc.*, 424 F.3d 1161, 1167 (Fed. Cir. 2005).

25   [86] Illumina reserves the right to assert that CGI is barred from asserting that the '597 patent claims
     are invalid under the assignor estoppel doctrine. CGI highlights Dr. Macevicz's "opinion" work
26   for CGI; however, to the extent that Illumina discovers that Dr. Macevicz played a role in the
     development of CGI's technology, was an employee of CGI, or had a close relationship with CGI,
27   CGI's privity with Dr. Macevicz may justify applying assignor estoppel to bar CGI's invalidity
     defense and counterclaim.

28   [87] *Pandrol*, 424 F.3d at 1167.

_____

The Federal Circuit squarely addressed this situation in *Pandrol USA, LP v. Airboss Ry. Products, Inc.*, 424 F.3d 1161 (Fed. Cir. 2005), where the accused infringer tried to use the inventor's testimony to bolster its invalidity defense.[88] Applying the doctrine of assignor estoppel, the court excluded the inventor's statements that could be interpreted as undercutting the validity of the patent, because the inventor (just like Dr. Macevicz here) received valuable consideration from the sale of his patented invention.[89] And in any event, the conclusion that CGI attempts to draw from Dr. Macevicz's "opinion" is wrong. The Patent Office specifically considered the Whiteley reference and found from the very beginning that Whiteley did not anticipate the claims.

### b.    A genuine issue of disputed material fact precludes summary judgment concerning Whiteley

CGI relies on the opinion of its expert, Dr. Metzker to support its argument that Whiteley "discloses a method for indentifying a sequence of nucleotides in a polynucleotide."[90] But as Dr. Backman explains in his declaration, Dr. Metzker overlooks the fact that Whiteley's method only identifies *a single base* by ligating two probes that abut at a particular location (a potential mutation site), and *did not repeat*.[91] Dr. Backman's view is supported by express statements from the panel of Examiners.[92] Whiteley, like Martinelli (discussed below), separated the ligated probes from the target DNA, and thus did not disclose "repeating," as this Court has construed repeating in step (c) of claim 1.

"What a prior art reference discloses is, of course, a question of fact, and if there are disputes over material facts...[they] should be resolved at trial by the fact finder."[93] The parties' experts' disagreement about whether Whiteley disclosed the following claim limitations precludes summary judgment regarding Whiteley.

---

[88] *Id.* at 1167-68.

[89] *Id.* at 1168.

[90] CGI's Motion (D.I.) at 17:11-12.

[91] Backman Decl. ¶ 38, 41-46.

[92] Labbé Decl. Exh. 19 (5/28/09 Office Action) at 6 ("Neither Landgren nor Whiteley suggest repeating their method to obtain additional information."); and Exh. 20 (9/30/09 Office Action) at 5 ("Landegren and Whiteley disclose hybridization-ligation methods which meet the limitations of steps (a) and (b), but the steps are not repeated.")

[93] *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1378 n. 6 (Fed.Cir.2008).

1

2

c.      **Whiteley did not disclose "identifying a sequence of nucleotides in a polynucleotide" or "repeating until a sequence of nucleotides is determined" (claim 1)**

3       Whiteley disclosed a method of determining the identity of a single base by designing two

4  probes to hybridize at adjacent positions on a target so that their ends abut at the particular base to

5  be interrogated.[94] If the two probes hybridize at adjacent positions on the target and are ligated,

6  one can determine the identity of the base at the ligation point by detecting a label attached to one

7  of the probes.[95] But as Dr. Backman explains, determining the identity of a single base, as

8  Whiteley disclosed, does not constitute "identifying a sequence of nucleotides" by "repeating"

9  steps (a) and (b) of claim 1.[96]

10      Whiteley does not disclose repeating, as the panel of Examiners indicated in the very first

11  Office Action during the reexamination, before Illumina had submitted anything:

12          Landegren and Whiteley each disclose hybridization-ligation methods for
            obtaining information regarding the sequence of a target nucleic acid. Each
13          method is very similar to the method of Martinelli which is described above, and
            each method meets the limitations of steps (a) and (b) of the claim (see claim 1 of
14          both Landegren and Whiteley). Neither Landegren nor Whiteley suggest repeating
            their method to obtain additional information.[97]

15  The panel of Examiners confirmed their understanding of Whiteley in the next Office Action,

16  stating "Landegren and Whiteley disclose hybridization-ligation methods which meet the

17  limitations of steps (a) and (b), but the steps are not repeated."[98]

18      CGI argues that even without repeating, Whiteley disclosed "identifying a sequence of

19  nucleotides in a polynucleotide" simply by determining if the two probes hybridize at adjacent

20  positions on the target (CGI argues that this identifies the entire target sequence to which those

21  probes hybridize). CGI stretches the scope of "identifying" too far. For example, in the '597

22  method, one hybridizes an initializing oligonucleotide probe to the target, but one of ordinary skill

23  would not understand that to mean that all of the bases in the sequence to which that probe

24

25  _____
    [94] Backman Decl. ¶ 37.

26  [95] *Id.*

27  [96] *Id.* at ¶ 38-39.

    [97] Labbé Decl. Exh. 19 (Non-Final Action) at 6 (emphasis added).

28  [98] Labbé Decl. Exh. 20 (9/30/09 Final Action) at 5.

1   hybridized had therefore been "identified." CGI asks this Court to reach the conclusion that even

2   though Whiteley itself and the Examiner understood it to have disclosed a method for identifying

3   only a single base, it nevertheless identified *all* of the bases in the sequence of the target to which

4   the probes are designed to, and do, hybridize. The Court should reject that view, because it would

5   render element step (c) of claim 1 meaningless.

6        CGI and Dr. Metzker suggest that the following passage in Whiteley disclosed "repeating"

7   to identify "a sequence of nucleotides in a polynucleotide:"

> The above method is directly applicable to detecting genetic diseases, particularly
> those resulting from single base pair mutations, and may be made more precise by
> comparative results from tests wherein each of the normal and abnormal sequence
> is made the target sequence. For example, in this embodiment, two diagnostic
> probes are synthesized, one for the normal gene and one for the mutated gene, and
> the above method is carried out for each probe independently.[99]

As Dr. Backman explains in his Declaration, even assuming that this passage in Whiteley

disclosed repeating, it disclosed repeating on the *same base that was identified in the first cycle*.[100]

This form of "repeating" does not identify "a sequence of nucleotides in a polynucleotide," it re-

identifies the same base.[101] This genuine issue of disputed material fact precludes summary

judgment regarding Whiteley.

### d.    Whiteley did not disclose a "target polynucleotide that comprises an unknown sequence" (claim 10)

     Whiteley disclosed using two probes, a "contiguous probe" and a "diagnostic probe."

Whiteley explained that the difference between the two is that the "diagnostic probe" is designed

so that it hybridizes to a target where a base is to be identified.[102] Claim 10, which depends from

claim 1, requires that the "target polynucleotide" be "unknown." In Whiteley, the target

polynucleotide is the part of the "polynucleotide" (the "denatured strands 11" in Figures 2A and

---

[99] CGI's Brief (D.I. 142) at 17:23-18:3 (citing Whiteley at 4:11-13).

[100] Backman Decl. ¶ 45.

[101] Dr. Metzker's visual aid shows the form of repeating CGI asserts was disclosed in Whiteley.
*See* Metzker Decl. (D.I. 143) ¶ 60. In both the first, and "repeating" steps, the base identified was
a Thymidine, shown as a "T" in both instances.

[102] Labbé Decl. Exh. 7 (Whiteley) col. 5, lines 12-18 ("It will be recognized, based on the
disclosure below, that the precise position of the selected diagnostic portion is arbitrary, except
that it must contain the nucleotide(s) which differentiate the presence or absence of the target
sequence. Thus, the contiguous portion continues the sequence of this arbitrarily chosen diagnostic
portion."); *see also* Backman Decl. ¶ 47.

2B) to which the diagnostic probe hybridizes. In Whiteley, all of the nucleotides in the target polynucleotide are known (except for one, which is being tested for a possible mutation).

In the '597 method, unlike in Whiteley, the purpose is to identify "a sequence of nucleotides in a polynucleotide" that is unknown. As Dr. Backman explains in his Declaration, claim 10 highlights the difference between Whiteley and Macevicz's method – one determines the identity of a single base, and the other identifies a sequence of nucleotides in an unknown DNA.[103] Whiteley is incapable of identifying an unknown target polynucleotide, and thus cannot anticipate or render claim 10 obvious. This testimony precludes summary judgment as to Whiteley.

### 3. CGI fails to establish that Martinelli anticipates the '597 claims

Martinelli was the primary subject of the Examiner's attention during the reexamination of the '597 patent. Martinelli, like Whiteley, disclosed the use of two (or more) probes that are designed to abut at the particular base that is being examined as a potential mutation.[104] Once the probes hybridize to the target (whose sequence is known, except at the nucleotide where the probes abut), the probes are ligated together.[105] After the ligase enzyme is applied to link the two probes together, the ligated probes are separated from the target DNA and a label on one of the probes is read:

> After the ligation step is undertaken, a denaturation step separates the target sequence from that of the probes and ligated from unligated probe. The material connected to the insoluble material can then be separated from the reaction mixture by centrifugation, application of a magnetic field or other appropriate procedure, and the presence of any label connected to the insoluble material due to the action of the ligase can be determined.[106]

As Dr. Backman explains, Martinelli did not disclose sequencing more than a single base on the target polynucleotide, and did not disclose repeating the cycle of hybridizing probes, ligating, and identifying to determine a previously unknown sequence.[107]As in Whiteley, the presence of a label will determine whether the base at the junction of the two probes was the predicted base (usually a

---

[103] *See* Backman Decl. ¶ 48.

[104] *See* Labbé Decl. Exh. 8 (Martinelli) col. 3, line 57 – col. 4, line 7; Backman Decl. ¶ 49.

[105] *See* Labbé Decl. Exh. 8 (Martinelli) col. 4, lines 10-29; *see also* Backman Decl. ¶ 49.

[106] *See* Labbé Decl. Exh. 8 (Martinelli) col. 5, lines 20-27.

[107] Backman Decl. ¶ 55.

1  choice between two, the normal and mutation base).[108]

2  ###   a.   A genuine issue of disputed material fact exists concerning Martinelli

3

4  Martinelli failed to anticipate claim 1 of the '597 patent (and the claims that depend from

5  claim 1) for the same reasons Whiteley failed to anticipate claim 1. Whether the claimed methods

   were disclosed in Martinelli is "a question of fact, and if there are disputes over material

6  facts...[they] should be resolved at trial by the fact finder."[109]

7
   ###   b.   Martinelli did not disclose "identifying a sequence of nucleotides in a polynucleotide" or "repeating until a sequence of nucleotides is determined" (claim 1)
8

9  As was made clear to the Examiner, Martinelli did not disclose repeating the cycle of

10
   hybridization and ligation steps, which Martinelli explicitly noted:
11

12         HLM, on the other hand, is an analytical technique, wherein probes to one or
          more suspected sequences which are likely to be found in the target are added to
13         the target. The probes are joined either to a material which can aid separation
          from the reaction mixture or to a label. Furthermore, the reaction is intended to be
          run for only one cycle.[110]
14
   During the reexamination, the panel of examiners requested that Illumina distinguish Dr.
15
   Macevicz's claimed method from Martinelli's form of "repeating," which the Examiner concluded
16
   occurred on another part of the target DNA.[111] After Illumina expressly disavowed the form of
17
   repeating disclosed in Martinelli (according to the Examiner), the Examiner withdrew his rejection:
18

19         Patent Owner has provided an unequivocal statement that "repeating" steps (a)
          and (b) of the claimed method means that the steps are performed on the same
20         nucleic acid sequence in each cycle (response of August 3, 2009 [sic, August 10,
          2009], p. 15). In Martinelli, repetition is performed on different portions of the
21         target nucleic acid (col. 4, lines 56-61). Therefore Martinelli does not anticipate
          the claim and the rejection is withdrawn.[112]

22  CGI now argues that despite Illumina's express disavowal during the reexamination, and this

23

24  ---
    [108] *See* Labbé Decl. Exh. 8 (Martinelli) col. 6, lines 18-29; *see also* Backman Decl. ¶ 49.

25  [109] *Innogenetics, N.V. v. Abbott Labs.,* 512 F.3d 1363, 1378 n.6 (Fed.Cir.2008).

    [110] *See* Labbé Decl. Exh. 8 (Martinelli) col. 7, lines 13-19 (emphasis added).
26
    [111] Labbé Decl. Exh. 21 (8/10/09 Supp. Amendment) at 11 ("It was agreed that an unequivocal
    statement by the Applicant that step (c) of claim 1 of the '597 patent requires repeating steps
27  (a) and (b) on the same polynucleotide acted upon in the first cycle of the recited method would
    overcome the rejections based on Martinelli.").

28  [112] Labbé Decl. Exh. 20 (9/30/09 Final Action) at 5.

1  Court's consideration of the issue as part of its claim construction order, Martinelli nevertheless

2  disclosed a form of repeating that falls within the scope of claim 1 as construed by the Court.[113] A

3  close examination of each of the passages in Martinelli that CGI cites to support this argument

4  reveals that Martinelli did not disclose repeating (as construed by the Court), and did not disclose

5  "identifying a sequence of nucleotides in a polynucleotide."

6      First, just as it did regarding Whiteley, CGI argues that Martinelli's method identifies the

7  entire sequence of the target to which the two probes used in Martinelli hybridize, even though

8  those probes are designed based on the fact that that entire sequence (other than, at times, the

9  nucleotide being interrogated) is already known.[114] This argument would require interpreting

10  claim 1 of the '597 patent so as to render the claimed method of "identifying a sequence of

11  nucleotides in a polynucleotide" meaningless. In the prior art (Southern, Martinelli, and Whiteley)

12  an initializing oligonucleotide is used that hybridizes to a known sequence. CGI's interpretation of

13  "identifying a sequence of nucleotides" would mean that the hybridization of an initializing

14  oligonucleotide to a target polynucleotide, in and of itself, identifies "a sequence of nucleotides in

15  a polynucleotide," even though the initializing oligonucleotide was selected based on the known

16  sequence in that target polynucleotide. Only through this nonsensical reading of claim 1 can CGI

17  argue that Martinelli (and Whiteley) identify a sequence of nucleotides without repeating the

18  hybridization-ligation steps.[115]

19      Second, CGI argues that the "re-registration" form of repeating step (c) of claim 1 was

20  disclosed in the passage in Martinelli that described "moving sequentially along the target" to

21  "determine the site or sites on the target where mutations are found."[116] CGI cites the same

22  passages in Martinelli that the Examiner cited during the reexamination, which led to Illumina's

23  disavowal of claim scope, and was a hotly disputed issue during claim construction in this case.[117]

24  _____

[113] CGI's Brief (D.I. 142) at 20:17-21:17.

25  [114] Id. at 20:17-23.

26  [115] Backman Decl. ¶¶ 55-56.

[116] CGI's Brief (D.I. 142) at 20:24-21:8.

27  [117] Labbé Decl. Exh. 19 (5/28/09 Non-Final Action) at 6 ("Martinelli also discloses that the

28  process can be repeated with probes complementary to different portions of the target nucleic acid (col. 4, lines 56-61), which meets the limitations of step (c) of the claim.").

The Court, in its claim construction order, agreed that Illumina disavowed claim scope:

> During re-examination of the '597 patent, Illumina did narrow "repeating" to extending a "(new) initializing oligonucleotide" along the "same" polynucleotide as was acted upon in the first cycle, distinguishing the claimed invention from the repetition in Martinelli's method, which "does not refer to repeating steps (a) and (b) on the same template sequence."[118]

CGI argued that "Illumina disavowed hybridization on a **different** target polynucleotide, limiting step (a) to the **same** polynucleotide to overcome Martinelli."[119] The Court agreed.[120]

Remarkably, CGI now asserts that the "moving sequentially along the polynucleotide" language in Martinelli covers the re-registration form of repeating steps (a) and (b) of claim 1. CGI cannot have it both ways (*i.e.*, arguing that Illumina both disavowed repeating on **a different part of the target DNA**, and disavowed repeating by "re-registration," which happens on the **same sequence** (shifted over one base, but overlapping the same sequence).

The passage in Martinelli on which CGI relies addressed the situation where, if the probes did not hybridize to the target DNA, one could design experiments to narrow down the locations where other mutations might occur; but later experiments would have to be performed to narrow down (or identify) the specific mutations in the DNA.[121] That passage did not disclose identifying the mutations, it disclosed only that if one knows that the probes do not match the interrogated nucleotide, a mutation must exist in the DNA:

> Similarly, by using sets of probes that are expected to hybridize and ligate to a portion of the normal sequence, it is possible to determine whether the target contains a mutation. If it is found that hybridization or ligation do not occur, it can be concluded that the mutation probably occurs in that portion of the target being examined. By moving to the next portion of the target, a similar experiment can be run. Thus, by moving sequentially along the target, one can determine the site or sites on the target where mutations are found and then proceed to design experiments to identify the exact mutation which occurs at each of the mutation sites.[122]

This is certainly not a disclosure, as CGI argues, of identifying a sequence of nucleotides in a polynucleotide by re-registering an initializing oligonucleotide by one nucleotide up- or down-

---

[118] D.I. 122 at 13:25-28.

[119] *Id.* at 15:5-6 (emphasis in original).

[120] *Id.* at 16:4-7.

[121] Backman Decl. ¶ 60.

[122] Labbé Decl. Exh. 8 (Martinelli) col. 4, lines 51-60 (emphasis added).

1    stream on the polynucleotide.

2           Finally, CGI and Dr. Metzker argue that Figure 14 of Martinelli, and the accompanying

3    description of Figure 14 in Example 6, disclosed "same sequence initializing oligonucleotide

4    repetition."[123] CGI and Dr. Metzker appear to misread Figure 14 and Example 6. Example 6

5    describes a study of the specificity of the ligation, the extent to which the ligase enzyme only

6    ligates adjacent probes where the probes are perfectly complementary to the target at the designed

7    interrogation position.[124] In Example 6, Martinelli selected *one position* on the p53 gene, the

8    portion "surrounding codon 175 (SEQ ID NO 23)."[125] Example 6 used position 175 on the p53

9    gene to study the ligase enzyme by conducting the same experiment over and over again by

10   varying the four bases (denoted as "X" and "Y" in Figure 14) and measuring whether the ligase

11   showed specificity each time.[126] The description of Figure 14 in Martinelli makes this point clear:

12           FIG. 14: The p53 model for systematic evaluation of ligation specificity. The top
             sequence is that of the target (region flanking codon 175 of the p53 gene). The
13           probe sequences are on the bottom. *The positions marked "X" and "Y" were*
             *systematically varied with the four nucleotides.*[127]
14
     The tables shown in column 16 of Martinelli list the results of the "systematic" experiments –
15
     repeated HLA reactions varying the same terminal bases on the probes.[128] None of the references
16
     to "repeating" elevate Martinelli to a reference that disclosed "identifying a sequence of
17
     nucleotides in a polynucleotide" or "repeating until a sequence of nucleotides is determined."
18
                      c.      **Martinelli did not disclose a "target polynucleotide that**
19                            **comprises an unknown sequence" (claim 10)**

20           Martinelli disclosed using two preselected probes to interrogate the position where the two

21   probes abut upon hybridizing to the target polynucleotide. One must know the sequence on the

22   DNA (the normal and mutated nucleotide identities) when designing the probes used in Martinelli.

23   In contrast, Claim 10 requires that the "target polynucleotide" is "unknown."[129] It could hardly be

24   [123] CGI's Brief (D.I. 142) at 21:9-17.

25   [124] Backman Decl. ¶ 61.

     [125] Labbé Decl. Exh. 8 (Martinelli) col. 15, lines 36-39; Backman Decl. ¶ 61.
26
     [126] Backman Decl. ¶ 61.
27
     [127] Labbé Decl. Exh. 8 (Martinelli) col. 2, lines 61-65 (emphasis added); Backman Decl. ¶ 61.
28   [128] Labbé Decl. Exh. 8 (Martinelli) col. 16, lines 1-67; Backman Decl. ¶ 61.

     [129] Backman Decl. ¶ 64.

1   said that the target polynucleotide is unknown when it is either the known normal or mutated

2   sequence. Martinelli is incapable of identifying an unknown target polynucleotide, and thus cannot

3   anticipate or render claim 10 obvious.[130]

4       **4.    CGI fails to establish that Brenner renders the '597 claims obvious**

5       CGI asserts that the '597 patent is a "paper patent," whose specification was "lifted from

6   Dr. Brenner's application."[131] CGI's characterization is wrong and irrelevant. Dr. Macevicz, who

7   wrote both patents, simply used the same text in the Background and Definitions sections. CGI's

8   thinly-veiled suggestion that Dr. Macevicz therefore copied his invention from Dr. Brenner's is

9   not supported by any evidence, and should be rejected.

10      CGI's reliance on Dr. Macevicz's testimony that his invention was "an outgrowth[] of

11  ideas he had" after working on Dr. Brenner's application is also irrelevant. Even if Dr. Macevicz

12  was inspired to conceive his invention because of Dr. Brenner, that does not make the invention

13  obvious: many inventions are "inspired" by something or someone, but that doesn't mean they are

14  obvious in light of the idea that inspired the invention.

15      CGI argues that Dr. Macevicz "modeled" '597 Claim 1 after Brenner Claim 1, but even a

16  cursory review of the claims (as compared in CGI's chart) reveals the two inventions are very

17  different. For example, step (a) of each claim, describing the polynucleotide, are nothing alike (for

18  example, Brenner's step (a) requires a double-stranded polynucleotide with a protruding end,

19  which is nowhere in '597 Claim 1, and the latter requires an initializing oligo, which is nowhere in

20  Brenner Claim 1); Brenner's step (b), which requires a "nuclease recognition site," is entirely

21  missing from '597 Claim 1; and Brenner's step (d), which requires a nuclease (a restriction

22  enzyme) to cleave the polynucleotide at the nuclease recognition site, is also entirely missing from

23  597 Claim 1 (which uses single-stranded DNA that can never be cleaved by such an enzyme).

24          **a.    Neither CGI nor Dr. Metzker explain why one of ordinary skill
                    in the art would have modified Brenner**

25

26      In its motion, CGI failed to explain why one of ordinary skill would have been motivated

27  ─────────────────

28  [130] Backman Decl. ¶ 64-65.
    [131] CGI's Brief (D.I. 142) at 23:8-27.

1    to modify Brenner's method to achieve the invention of the '597 patent. Instead, CGI simply cites

2    Dr. Metzker's declaration, who argues that although the methods are different, one method is

3    obvious in view of the other as a matter of law. But as Dr. Backman explains in his Declaration,

4    one of ordinary skill in the art would <u>not</u> have been motivated to modify Brenner's method to

5    create Dr. Macevicz's invention.[132] At the very least, this creates genuine issues of disputed

6    material fact that preclude summary judgment regarding Brenner.

7         As Dr. Backman explains, Brenner's method (requiring a double-stranded polynucleotide

8    with a  protruding end, ligating double-stranded probes (containing protruding ends) to the double-

9    stranded polynucleotide, and restriction enzyme cleavage of the ligated complex) would not have

10   worked with Macevicz's single-stranded initializing oligonucleotides and probes. The differences

11   between the two inventions are profound: Brenner did not use an initializing oligonucleotide (as

12   construed by the Court), and did not ligate a probe to the initializing oligonucleotide to form an

13   extended duplex, as recited in step (a) of claim 1.[133] Instead, Brenner took a double-stranded

14   target, created a protruding single-stranded end a few bases long at one end, and then ligated to

15   that a double-stranded probe with a single-stranded end that could hybridize to the single-stranded

16   protruding end on the target.[134] The purported "obvious" changes to Brenner would include (1)

17   denaturing the double-stranded target DNA, thereby separating the strands of the target DNA so

18   that an initializing oligonucleotide could hybridize to one strand; (2) using single-stranded probes

19   that could be ligated to the initializing oligonucleotide to form an extended duplex; and, after

20   ligation and identification, (3) repeating, without the use of restriction enzymes.[135]

21        CGI relies on Dr. Metzker's conclusory opinion that these modifications <u>could</u> be made,

22   but as Dr. Backman explains, one cannot cleave single-stranded DNA with restriction enzymes, as

23   Brenner requires.[136] If one tried to modify Brenner to yield Macevicz's invention, it would be

24   inoperable, so Brenner taught one of ordinary skill in the art *away from* Macevicz's invention, and

25   _____

     [132] Backman Decl. ¶ 68.

26   [133] Backman Decl. ¶ 70.

27   [134] Labbé Decl. Exh. 9 (Brenner) col. 3, lines 11-16; Backman Decl. ¶ 70.

     [135] Backman Decl. ¶ 70.

28   [136] Backman Decl. ¶ 69.

1    thus could not have rendered Macevicz's Claim 1 obvious.[137]

2                    **b.        Brenner cannot render claims 9 and 10 obvious**

3          Claim 9 requires that the polynucleotide include a known binding region and an unknown

4    target polynucleotide. Claim 10 further requires that an initializing oligonucleotide hybridizes to

5    the known region, and a probe hybridizes to the unknown region. Brenner's method, however,

6    uses a polynucleotide that is ***all*** unknown.[138] Brenner's polynucleotide lacks a binding region,

7    because Brenner modifies the end of the polynucleotide by nuclease enzyme digestion.[139]

8          CGI says it would have been obvious to take Brenner's completely unknown double-

9    stranded polynucleotide, denature it, and add a known sequence to the polynucleotide so that an

10   initializing oligonucleotide can bind to it. As Dr. Backman explains, that would not have been

11   obvious to one of ordinary skill in the art.[140] Given these genuine issues of disputed material fact,

12   summary judgment cannot be granted regarding Brenner.

13   **III.     CONCLUSION**

14         The genuine issues of disputed material fact here concerning (i) whether Illumina can

15   antedate Southern; and (ii) what Southern, Whiteley, Martinelli, and Brenner disclose and whether

16   they anticipate or render the asserted '597 claims obvious preclude summary judgment.

17   Dated: July 31, 2012                    Respectfully submitted,
18                                           MARSHALL, GERSTEIN & BORUN LLP

19                                  By:   __/s/ John R. Labbé_____
                                         John R. Labbé (admitted *pro hac vice*)
20                                       Attorneys for Plaintiffs

21

22

23

24

25

---

26   [137] *Id. See McGinley*, 62 F.3d at 1354; *see also In re Gordon*, 733 F.2d at 902.

27   [138] Backman Decl. ¶ 72.

     [139] *Id.*

28   [140] *Id.*