United States District Court
For the Northern District of California

1
2
3
4
5               IN THE UNITED STATES DISTRICT COURT

6             FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    ILLUMINA INC. and SOLEXA, INC.,              No. C -10-05542(EDL)

9             Plaintiff,                          **AMENDED ORDER GRANTING
                                                  DEFENDANT'S MOTION FOR PARTIAL**
10      v.                                        **SUMMARY JUDGMENT OF
                                                  INVALIDITY OF CLAIMS 1, 9, 10, AND**
11   COMPLETE GENOMICS INC.,                      **14-19 OF THE '597 PATENT**

12            Defendant.
     _____/
13

14          This patent infringement case involves DNA sequencing technology.  Plaintiffs Illumina, Inc.

15   and Solexa, Inc., (collectively, "Illumina") accuse Defendant Complete Genomics, Inc. ("CGI") of

16   infringing U.S. Patent No 6,306,597 ("the '597 patent").  On May 31, 2012, CGI moved for

17   summary judgment, arguing that several claims of the '597 patent are invalid as anticipated and

18   obvious.  The Court held a hearing on this motion on September 4, 2012.  For the reasons stated at

19   the hearing and in this Order, Defendant's motion for partial summary judgment of invalidity is

20   granted.  The Court heard Illumina's reconsideration motion on January 29, 2013.  The Court has

21   issued a separate order denying that motion, but sta ted at the hearing that it would amend this

22   summary judgment order to correct two minor errors that do not affect the merits.

23

24

25   **I.      BACKGROUND**

26          **A.      The Instant Action**

27

28          Illumina filed this patent infringement action against CGI in the District Court for the

     District of Delaware on August 3, 2010.  The parties are competitors in the field of DNA

1   sequencing.  Illumina designs, manufactures, and sells several platforms for high-throughput DNA

2   sequencing, including its Genome Analyzer and HiSeq sequencing instruments.  CGI offers DNA

3   sequencing services to its customers through its Complete Genomics Analysis Service ("CGA™

4   Service").  In performing its CGA™ Service, CGI employs its Complete Genomics Analysis

5   Platform ("CGA™ Platform"), which includes its Combinatorial Probe-Anchor Ligation

6   ("cPAL™") read technology, among other technologies.

7        Illumina alleges that through CGI's use of its CGA™ Platform to perform DNA sequencing

8   services, CGI infringes three Illumina patents, specifically U.S. Patent No. 6,306,597 ("the '597

9   patent"), U.S. Patent No. 7,232,656 ("the '656 patent"), and U.S. Patent No. 7,598,035 ("the '035

10  patent") (collectively "the Illumina Patents").

11       CGI denies that it infringes any of the Illumina Patents.  CGI further alleges that all of the

12  Illumina Patents are invalid; this motion is specific to the '597 patent.

13       By order dated November 9, 2010, the court granted CGI's motion to transfer venue to the

14  Northern District of California.  Judge Alsup denied CGI's motion to consider whether this action is

15  related to an earlier filed action, <u>Applera Corp. - Applied Biosystems Group v. Illumina, et al.</u>, No.

16  C 07-02845 WHA ("<u>Applera</u>").  Docket No. 42.  Upon consent of the parties, this action was

17  reassigned to this Court by Judge Breyer.  The parties stipulated to dismissal without prejudice of all

18  claims and counterclaims related to the '656 and '035 patents.  Docket No. 75.

19

20       **B.      Prior Litigation of the '597 Patent and Stipulation to the Invalidity of**

21              **Claim 1**

22       In <u>Applera</u>, Applied Biosystems ("AB") filed suit against Illumina for ownership of the '597

23  patent and 2 related patents (U.S. Patent Nos. 5,750,341 and 5,969,119).  AB alleged that the

24  inventor, Dr. Stephen Macevicz, invented the subject matter of the patents while he was in-house

25  patent counsel for AB and breached the terms of an Invention Agreement by, among other things,

26  failing to disclose inventions to AB, applying for patents on the inventions in his own name, and

27  purporting to assign the inventions and patents to Lynx, a spinoff corporation of AB, which

28  subsequently merged with Solexa.  AB alleged that Macevicz's conduct, as well as Illumina and

2

**United States District Court**
For the Northern District of California

Solexa's conduct, gave rise to claims for interference with contract, breach of fiduciary duty, constructive fraud, conversion, imposition of constructive trust, and unfair competition.  Illumina countersued AB for infringement.

Judge Alsup issued a claim construction order on February 21, 2008, which construed terms from one of the '597 patent's sibling patents, some of which also appear in the '597 patent.  See Applera, Case No. 07-2845 WHA, Docket No. 133.  Judge Alsup issued a supplemental claim construction on terms from Claim 1 of the '597 patent and the parties stipulated that AB infringed Claim 1 and that the Southern prior art reference rendered Claim 1 invalid.  Applera, Docket Nos. 383-1, 384-1, 402 (order on stipulation re infringement and invalidity).  The parties agreed before the claim construction hearing that Judge Alsup's construction of the terms applied to the '597 patent.

Following a jury trial, on February 3, 2008, Judge Alsup entered judgment for Illumina on AB's claim of ownership of the Macevicz patents and entered judgment for AB on Illumina's claim that AB infringed the '119 patent.

On March 25, 2010, the Federal Circuit affirmed Judge Alsup's claim construction of the terms that were appealed and stated:  "Because the district court properly construed the terms of claim 1 of the '597 patent, we affirm the court's judgment of noninfringement with respect to Applera's accused products, and the court's order, entered pursuant to stipulation, concerning invalidity."  Mot. Ex. 13, at 8.

### C.      Reexamination

On June 30, 2008, AB filed a request for reexamination of the '597 patent.  Three months after the jury trial before Judge Alsup, on May 28, 2009, the PTO issued a non-final Office Action rejecting claim 1 of the '597 patent as being anticipated by several prior art references, including Martinelli (U.S. Patent No. 5,800,994) and either Landegren (U.S. Patent No. 4,988,617) or Whiteley (U.S. Patent No. 4,883,750) taken in view of Martinelli.  Mot. Ex. 14.

On June 22, 2009, Illumina filed an information disclosure statement ("IDS") with the PTO regarding the ongoing litigation.  Mot. Ex. 15.  Illumina attached many litigation-related documents

to the IDS, including the stipulation.  In the text of the IDS, Illumina noted that a jury had returned a verdict finding that claim 1 of the '119 patent (the '597 patent's sibling patent) was not invalid for obviousness, but the only mention of the stipulation was that "As a result of the district court's claim construction ruling, the parties entered into a stipulation regarding infringement and invalidity of claim 1 of the '597 patent."  Mot. Ex. 15 at 2, 3.

Illumina held an interview with the examiner on July 13, 2009, and filed a response to the office action on August 6, 2009, which included amendments to the claims.  Declaration of John Labbe in Support of Illumina's Claim Construction Brief ("Labbe Claim Const. Decl.") Exs. 9, 10. The examiner's interview summary indicates that he and Illumina discussed whether the "Martinelli patent is 'repeating' steps a and b within the meaning of claim 1."  Labbe Decl., Ex. 10.  In its response to the PTO's Office Action, Illumina summarized the interview as follows:

> It was discussed that Martinelli did not disclose repeating steps (a) and (b) on the same polynucleotide that was operated on in the first cycle of the claimed method.  It was discussed that claim 1 recites a method that is limited to repeating steps (a) and (b) on the same polynucleotide that was operated on in the first cycle of the method.  It was agreed that an unequivocal statement by the Applicant that step (c) of claim 1 of the '597 patent requires repeating steps (a) and (b) on the same polynucleotide acted upon in the first cycle of the recited method would overcome the rejections based on Martinelli.

Labbe Claim Const. Decl., Ex. 9 at 11 (8/6/2009 Suppl. Amendment).  According to Illumina, "Martinelli described its version of [oligonucleotide ligation assay] as a 'hybridization-ligation methodology (HLM),'" which involves binding two probes to a DNA sample to detect whether a mutation is present.  Id. at 15; Opening Claim Constr. Br. at 8.  Under the Martinelli patent, according to Illumina, "[i]f the two probes can be ligated, the identity of the nucleotide at the site in the sample where the two probes attach to each other can be determined, because ligation could only occur if the mutation is present."  Opening Claim Constr. Br. at 8.

In response to the rejection of claim 1 as anticipated by Martinelli and obvious over Landegren and Whiteley in view of Martinelli, Illumina distinguished Martinelli on the ground that Martinelli "did not disclose repeating the steps of its 'HLM' method . . . [and] expressly taught that the HLM reaction was intended to be performed for only one cycle."  Labbe Claim Const. Decl., Ex. 9 at 15.  In its amendment to Claim 1, Illumina made the following narrowing statement:

> As discussed at the interview, the "repeating" step in the claimed method, step (c), requires the repetition of steps (a) and (b) on the same polynucleotide sequence that was acted upon in the first cycle of the recited method.  Step (a) of claim 1 recites "extending an initializing oligonucleotide along the polynucleotide."  When step (a) is repeated as required by step (c), a (new) initializing oligonucleotide is extended along the same polynucleotide as was acted upon in the first cycle of the recited method ("the polynucleotide").

Labbe Claim Const. Decl., Ex. 9 at 15.

As part of the reexamination, Illumina also submitted an ex parte declaration of Dr. Stephen Macevicz pursuant to 37 C.F.R. § 1.131.  Mot. Ex. 16.  The declaration said that "[f]rom at least just before February 9, 1995, until April 17, 1995, I spent a number of evenings and weekend days working on the preparation and filing of the '663 application."  Id. at 4.  This declaration seems to be the first attempt by Illumina to antedate the Southern reference; during the course of the Applera litigation, there had been no attempt to show that Macevicz's earlier conception date (memorialized in his lab notebook) combined with an actual reduction to practice or due diligence, as is required to antedate or swear behind a reference.  Mot. Ex. 9, at 2.  The Examiner found that Macevicz had exercised reasonable diligence, and withdrew the anticipation rejection of claim 1 by Southern.  Mot. Ex. 17.

By Office Action dated September 30, 2009, the examiner withdrew the claim rejections based on Martinelli (and based on Landegren or Whiteley in view of Martinelli):

> Patent Owner has provided an unequivocal statement that "repeating" steps (a) and (b) of the claimed method means that the steps are performed on the same nucleic acid sequence in each cycle (response of August 3, 2009, p. 15).  In Martinelli, repetition is performed on different portions of the target nucleic acid (col. 4, lines 56-61).  Therefore Martinelli does not anticipate the claim and the rejection is **withdrawn**.

Labbe Claim Const. Decl., Ex. 12 at 5.  The PTO confirmed that for the reasons detailed in that Office Action,  claim 1 is patentable.  Labbe Claim Const. Decl., Ex. 13 at 3 (12/22/09 Office Action).  An Ex Parte Reexamination Certificate with regard to the '597 patent was issued on March 2, 2010.  Labbe Claim Const. Decl., Ex. 3.

### D.    Claim Construction

1    **1.      Claim 1**

2

3    This Court issued a claim construction order on February 8, 2012.  Illumina had previously

4    stipulated that Claim 1 was invalid and did not assert it; however, because subsequent claims were

5    dependent from Claim 1, the Court construed it.  See Docket No. 122, at 7.

6    Claim 1 teaches the following method:

7         1.  A method for identifying a sequence of nucleotides in a polynucleotide, the

8    method comprising the steps of:

9              a) extending an initializing oligonucleotide along the polynucleotide by

10   ligating an oligonucleotide probe thereto to form an extended duplex;

11             b) identifying one or more nucleotides of the polynucleotide; and

12             c) repeating steps a) and b) until the sequence of nucleotides is determined.

13   The parties asked the Court to construe the following terms of Claim 1: step a) ("extending

14   an initializing oligonucleotide along the polynucleotide by ligating an oligonucleotide probe thereto

15   to form an extended duplex"); step c) ("repeating steps a) and b) until the sequence of nucleotides is

16   determined"); "initializing oligonucleotide"; and "oligonucleotide probe."

17   The Court construed step a), "extending an initializing oligonucleotide along the

18   polynucleotide by ligating an oligonucleotide probe thereto to form an extended duplex," to mean

19   "ligating an oligonucleotide probe to an initializing oligonucleotide to form an extended duplex."

20   Docket No. 122 at 26.

21   The Court construed step c), "repeating steps a) and b) until the sequence of nucleotides is

22   determined," to mean

23         either (1) ligating an additional probe to the extended duplex by subsequent cycles of ligation
           until the sequence of nucleotides is determined or (2) ligating a new probe to a new
24         initializing oligonucleotide, either by extending different sequence initializing
           oligonucleotides, each out of register by one or more nucleotides, or by extending new
25         initializing oligonucleotides with the same sequence as the initializing oligonucleotide used
           in the first cycle along the identical polynucleotide sequence as was acted upon in the first
26         cycle of the recited method, until the sequence of nucleotides is determined.  There is no
           need for repetition if the sequence of the polynucleotide has been fully determined in the first
27         cycle.

28   Docket No. 122 at 26-27.

1     The Court construed "initializing oligonucleotide" to mean "an oligonucleotide that forms a

2   highly stable duplex with the binding region of the polynucleotide that remains intact during any

3   washing steps of the extension cycles."  Docket No. 122 at 31.

4     The Court construed "oligonucleotide probe" to mean "a nucleic acid that can bind to the

5   polynucleotide, and, when bound to the polynucleotide, can be ligated to the initializing

6   oligonucleotide or to a previously extended duplex.  An oligonucleotide probe that has been

7   successfully ligated either contains, or is associated with, a label."  Id. at 35.

8

9                    **2.        Dependent Claims 9 and 10**

10

11     Claim 9 reads as follows:

12         "9.  The method of claim 1, wherein the polynucleotide comprises a binding region

13   and a target polynucleotide."

14     Claim 10 reads as follows:

15         "10.  The method of claim 9, wherein the binding region comprises a known

16   sequence and the target polynucleotide comprises an unknown sequence; and wherein in step (a) the

17   initializing oligonucleotide is hybridized to the binding region on the polynucleotide."

18     The Court construed "binding region" to mean "a known sequence of the polynucleotide to

19   which the initializing oligonucleotide binds."  Docket No. 122 at 49.

20     The Court construed "target polynucleotide" to mean "a polynucleotide having a portion to

21   be sequenced."  Docket No. 122 at 51.

22

23                    **3.        Claim 14**

24

25     Claim 14 reads as follows:

26         "14.  The method of claim 1, wherein the oligonucleotide probe comprises a label

27   which results in a spectrally resolvable fluorescent signal."

28     The Court construed "spectrally resolvable fluorescent signal" to mean "a light signal

generated by fluorescence which can be distinguished based on its spectral characteristics (e.g., its color)." Docket No. 122 at 53.

## II.   MOTION FOR SUMMARY JUDGMENT

### A.   LEGAL STANDARD

#### 1.   Summary Judgment

A court may grant summary judgment when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine where there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id. The court must view the facts in the light most favorable to the nonmoving party and give it the benefit of all reasonable inferences to be drawn from those facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. However, on an issue where the nonmoving party bears the burden of proof at trial, the moving party can prevail simply by pointing out to the court that there is an absence of evidence to support the nonmoving party's case. Id. If the moving party meets its initial burden, the nonmoving party "may not rely merely on allegations or denial in its own pleading;" rather, it must set forth "specific facts showing a genuine issue for trial." See Fed. R. Civ. P. 56(e)(2); Anderson, 477 U.S. at 250. If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to

1    judgment as a matter of law." <u>Celotex</u>, 477 U.S. at 323.

2

3            **2. Invalidity**

4

5        Under 35 U.S.C. § 282, a patent is presumed valid, and a party asserting invalidity as a

6    defense to infringement must present "clear and convincing evidence that the patent is invalid."

7    <u>Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings</u>, 370 F.3d 1354, 1365 (Fed. Cir. 2004).   A

8    patent may be invalidated on summary judgment for anticipation or obviousness.

9

10            **a. Anticipation**

11

12        A patent claim is invalid for anticipation if "the invention was patent or described in a

13    printed publication in this or a foreign country or in public use or on sale in this country, more than

14    one year prior to the date of the application for patent in the United States, . . .." 35 U.S.C. § 102(b).

15    To anticipate under section 102(b), a prior art reference must disclose and enable each and every

16    element of the claimed invention, either explicitly or inherently.  <u>In re Gleave</u>, 560 F.3d 1331, 1334

17    (Fed. Cir. 2009); <u>Schering Corp. v. Geneva Pharms., Inc.</u>, 339 F.3d 1373, 1377 (Fed. Cir. 2003)

18    ("Moreover, a prior art reference may anticipate without disclosing a feature of the claimed

19    invention if that missing characteristic is necessarily present, or inherent, in the single anticipating

20    reference.").

21

22            **b. Obviousness**

23

24        A patent claim is invalid for obviousness if the differences between the subject matter of the

25    claims and the prior art would have been obvious to a person having ordinary skill in the art at the

26    time of the claimed invention.  35 U.S.C. § 103; <u>KSR Int'l Co. v. Teleflex, Inc.</u>, 550 U.S. 398, 406

27    (2007).  In evaluating obviousness, "a court must ask whether the improvement is more than the

28    predictable use of prior art elements according to their established functions." <u>Id.</u>  "The question is

not whether the combination was obvious to the patentee but whether the combination was obvious to a person with ordinary skill in the art.  Under the correct analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." Id. at 420.  In addition, "[c]ommon sense teaches, however, that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." Id.

Obviousness under 35 U.S.C. § 103 is a question of law based on underlying facts, including the scope and content of the prior art, differences between the prior art and the claimed invention, the level of ordinary skill in the art, and any relevant secondary considerations.  See Graham v. John Deere, 383 U.S. 1, 17-18 (1966); Power-One v. Artesyn Techs., 599 F.3d 1343, 1351-52 (Fed. Cir. 2010); Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318, 1324 (Fed. Cir. 2008).  When the underlying facts are not in dispute, summary judgment is appropriate.  See KSR, 550 U.S. at 427 ("Where, as here, the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate.").

### c.  Diligence

A court may also grant summary judgment where a patentee seeking to antedate a prior art reference fails to present adequate evidence of reasonable diligence during the period from a date prior to the other party's conception until the date of reduction to practice.  See Creative Compounds, LLC v. Starmark Labs., 651 F.3d 1303, 1312-13 (Fed. Cir. 2011); Monsanto Co. v. Mycogen Plant Sci., Inc., 261 F.3d 1356, 1363 (Fed. Cir. 2001).  The burden is on the moving party to prove by clear and convincing evidence that there is prior art and that the patentee did not invent prior to the publication of the prior art because "1) he did not conceive and reduce his invention to practice before the publication date and 2) he did not conceive and thereafter proceed with reasonable diligence as required to his filing date." Mahurkar v. C.R. Bard, Inc., 79 F.3d 1572, 1578

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   (Fed. Cir. 1996).

2       The Federal Circuit defines "reasonable diligence" as continuous activity toward reduction to

3   practice so that the invention's conception and reduction to practice are substantially one continuous

4   act.  Id. at 1577.  Assertions of diligence must be specific and corroborated.  See Loral Fairchild

5   Corp. v. Victor Co. of Japan, Ltd., 931 F. Supp. 1014, 1030-31 (E.D.N.Y. 1996) ("An inventor must

6   provide specific details on activity during the critical period.  General testimony that the inventor

7   worked continuously and diligently will not suffice.  Moreover, the inventor must corroborate

8   evidence of reasonable diligence.").  In addition, an inventor must account for the entire critical

9   period.  3 D. Chisum, Patents § 10.07 at 10-120 (1986).

10

11      **B.      DISCUSSION**

12

13      CGI has moved for summary judgment on claims 1, 9, 10, and 14-19 of the '597 patent.  It

14  argues that PCT Application No. WP 95/04160 (PCT/GB94/01675) (hereafter "Southern") discloses

15  all elements of the '597 patent, and invalidates the patent because Dr. Macevicz did not act with

16  reasonable diligence after conceiving his invention and before filing the patent application, and

17  therefore he cannot swear behind Southern.  CGI also claims that under the Court's claim

18  construction, several other prior art references anticipate or make the '597 patent obvious, and

19  therefore invalidate, all the claims at issue.  These references are:  U.S. Patent No. 4,88,750

20  (hereafter "Whiteley"); U.S. Patent No. 5,800,994 (hereafter "Martinelli"); and U.S. Patent No.

21  5,522,278 (hereafter "Brenner").

22      Illumina contends that Dr. Macevicz was diligent and that the '597 patent therefore antedates

23  Southern.  It also points to the reexamination of the patent by the PTO, during which the Examiners

24  considered all of the references raised by CGI and withdrew their objections to some of the claims,

25  including claim 1.  See Declaration of John Labbe in Support of Illumina's Opposition to CGI's

26  Motion for Summary Judgment ("Labbe Decl.") Ex. 20 at 4.  Illumina rejects the references that

27  CGI argues invalidate various claims of the '597 patent, and maintains that there are genuine issues

28  of material fact regarding the invalidity of the claims that must be heard by a jury.

The Court will address each prior art reference as it relates to the '597 patent.

### 1. Southern

CGI argues that the Southern prior art reference anticipates or makes obvious claims 1, 9, 10, 14, 15, and 17-19 of the '597 patent. Illumina contests only claims 14 and 15 as not anticipated or made obvious by Southern. Opp. at 13-16. During the Applera litigation, Illumina stipulated to "a finding that the Southern reference . . . renders Claim 1 of the '597 patent invalid." Mot. Ex. 12, at 2. Neither party claims that this stipulation has a preclusive effect.

Illumina argues that Dr. Macevicz was diligent in reducing his invention to practice, and therefore the '597 patent antedates Southern, which would eliminate Southern as prior art. Opp. at 1-2. Therefore, the Court must first address the issue of Dr. Maceviciz's diligence following his conception of the invention claimed in the '597 patent.

### a. Diligence

Dr. Southern's patent for a method of sequencing by ligation was published on February 9, 1995, just over two months before Dr. Macevicz filed his application for the '663[1] patent. Mot. at 5. However, it is undisputed that Dr. Macevicz conceived the sequencing-by-ligation method claimed in the '597 patent months earlier, in July of 1994, as evidenced by several notebook pages, signed and witnessed by a colleague. Opp. at 4; Supplemental Declaration of Stephen Macevicz in Support of Illumina's Opposition ("Suppl. Macevicz. Decl.") ¶ 9 & Ex. A.

Under 35 U.S.C. § 102(a), only references published "before the invention" are considered prior art; a reference is not prior art if the inventor conceived the invention before the reference's publication date, and was diligent in preparing her application for filing, starting from just before the publication date through the date of the filing of the application. Sandt Tech., Ltd. v. Resco Metal &

---

[1] Although the '597 patent is at issue here, the '663 patent is a sibling patent to the '597 patent and was the first application leading to the '597 patent. There is no dispute among the parties that the '597 patent receives the priority date of the '663 patent.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Plastics Corp., 264 F.3d 1344, 1350 (Fed. Cir. 2001).   At issue, therefore, is only Dr. Macevicz's

2    diligence during the period between February 9, 1995 and the filing date of the '663 patent

3    application on April 17, 1995.

4         Illumina made no argument in the Applera litigation that Dr. Macevicz could antedate the

5    Southern reference through prior conception and diligence.  During the charging conference before

6    Judge Alsup, counsel for Illumina stated that "there is no challenge to swearing behind or diligence

7    or any of that sort of stuff."  Mot. Ex. 10, at 2352.  However, during the reexamination of the '597

8    patent, Dr. Macevicz submitted a Rule 131 declaration to the PTO describing his work on the

9    application during the spring of 1995 and arguing that his work should antedate Southern:  "From at

10   least just before February 9, 1995, until April 17, 1995, I spent a number of evenings and weekend

11   days working on the preparation and filing of the '663 application."  Mot. Ex. 16, at 4.  The

12   Examiner withdrew the anticipation rejection of claim 1 by Southern.  Mot. Ex. 17.

13        In this case, Dr. Macevicz has submitted a declaration describing both his work on the patent

14   application during the relevant two-month period and how busy he was with other obligations.

15   During the relevant period, Dr. Macevicz worked full-time as Senior Patent Counsel at Applied

16   Biosystems, and could only work on the patent application at home during available time on nights

17   and weekends.  He describes this period as a "particularly demanding" one at his job, involving

18   preparing, filing, and prosecuting Applied Biosystems's patent applications, negotiating licensing

19   deals, and supervising in-house and outside attorneys.  Opp. at 5, Suppl. Macevicz Decl. ¶¶ 12-15.

20   In addition, Dr. Macevicz was also working as patent counsel to Lynx Therapeutics under a

21   Corporate Services Agreement between Applied Bioystems and Lynx.  Id.

22        Dr. Macevicz's evenings and weekends were not entirely free to work on the '663 patent

23   application.  He spent much of the critical period drafting and prosecuting patent applications for Dr.

24   Sydney Brenner.  Id. ¶ 19.  He was the sole patent attorney responsible for preparing and filing five

25   patent applications for Dr. Brenner between July 1994 and April 1995, and he could work on these

26   applications only in the evenings and on weekends, as part of his employment agreement with

27   Applied Biosystems.  Id. ¶¶ 20-26.  In his declaration, Dr. Macevicz states:

28              My work on Dr. Brenner's patent portfolio was separate from my work for AB and
              Lynx, and just as for my work on my own patent application during this period, I

13

**United States District Court**
For the Northern District of California

1  |  could only work on Dr. Brenner's patent portfolio in the evening and on weekends.
2  |  Morever, during this period, I was obligated to give priority to my work on Dr. Brenner's patent portfolio over working on my own patent application.[2]

3  Id. ¶ 19.  Dr. Macevicz also notes that one of the Brenner applications attached as an exhibit to his

4  declaration includes a copy of a personal check for the filing fee, "which indicates that I performed

5  all of my work for Dr. Brenner on my own time and advanced the filing fees from my own funds."

6  Id. ¶ 23.

7  During the remaining time, Dr. Macevicz claims to have worked diligently on his own patent

8  application. (He also had a wife and two school-age children during this period.)  Id. ¶ 27.  Dr.

9  Macevicz's supplemental declaration contains one piece of new information beyond the simple

10  description of evening and weekend work that he submitted to the PTO:  metadata from the

11  electronic file containing the draft '663 patent application, derived from a Zip disk that Dr.

12  Macevicz had in his personal files.  A screenshot of the metadata statistics appears at page 7 of the

13  Opposition.  It shows that the file was created on November 6, 1994, and last modified on April 16,

14  1995.  Opp. at 7.  In addition, the screenshot shows a "revision number" of 71 and a "total editing

15  time" of 2145 minutes, or approximately 35 hours.  Id.

16  After a review of this metadata, Dr. Macevicz said that it confirmed his recollection that he

17  "*would* have done the bulk of the work" on the application during the spring of 1995 (emphasis

18  added):

19  |  This evidence showing that I worked on my application for more than 35 hours is consistent with my recollection of the time that I had available to work on my application.  Because I was only permitted to work on my application during available nights and weekends, I can say that I spent most of my available time at night and on the weekends for the two months preceding the filing date, April 17, 1995 (i.e., the available time on nights and weekends that I was not working on Dr. Brenner's patent portfolio) preparing my '663 patent application for filing.
20  |
21  |
22  |

23  Suppl. Macevicz Decl. ¶ 30.

24

_____

25  |  [2]  At oral argument, counsel for Illumina argued for the first time that Dr. Macevicz's work for Dr. Brenner should be considered an "obligation" like his work for Applied Biosystems and Lynx.
26  |  Counsel stated that Dr. Macevicz was working on the Brenner applications for "Newco," a company formed to commercialize Dr. Brenner's inventions, which would become Spectragen, a spinoff of Lynx.
27  |  As the Court noted at the hearing, the summary judgment record does not reflect that level of obligation.  Indeed, as cited above, Dr. Macevicz himself described his work as "separate from my work for AB and Lynx" and stated "I did all of the work on these applications in my spare time (in the evenings and on weekends) outside of my work for Applied Biosystems."  Suppl. Macevicz Decl. ¶¶ 19, 26.
28  |

There are several areas requiring analysis here.  First: what does the metadata mean about when and how the patent application was worked on, and is it proper corroboration for Dr. Maceviciz's testimony?  Does it show continuous and diligent work during the critical period?  Second, what are the implications of Dr. Macevicz's workload, both with his two employers and with his contract work with Dr. Brenner, during the critical period?

### i.   Metadata

The metadata extracted from the draft patent application file shows that the file was created on November 6, 1994, last modified on April 16, 1995, accessed on September 15, 2000, and printed on April 16, 1995.  Opp. at 7.  In addition, the screenshot shows a "revision number" of 71 and a "total editing time" of 2145 minutes, or approximately 35 hours.  Id.  The critical period during which Dr. Macevicz must have been continuously diligent is from before February 9, 1995 to April 17, 1995.

Although Illumina maintains that the metadata means that Dr. Macevicz worked on the application for 35 hours, that is not necessarily accurate; rather, it means that the file was open for approximately 35 hours.  Similarly, the number of times it was revised, 71, may include non-substantive revisions such as a date change or adding an extra space.  Most importantly, the file was created on November 6, 1994 and last modified on April 16, 1995.  In his declaration Dr. Macevicz says that *"would have* done the bulk of this work in drafting and revising my application during the two-month period preceding the filing of the application," Suppl. Macevicz Decl. ¶ 30 (emphasis added).  However, the metadata does not necessarily corroborate this statement; it could be that most of the work was done between November 1994 and February 1995, rather than February 1995 and April 1995.

The metadata is very specific in some ways but very general in others.  There is a record of the date of the creation of the file and the dates it was last modified, accessed, and printed, but nothing in between.  And Dr. Macevicz's testimony – that he *would have* done the bulk of the work during the critical period – is quite speculative.  While it is understandable that Dr. Macevicz did not

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   testify about exactly when he performed the majority of his work on the application, given the

2   amount of time that has elapsed, the ambiguity of his "would have done" statement means that the

3   metadata is not closely tied to the specific dates at issue. The diligence inquiry depends on

4   particularity of evidence and continuity of effort.  For example, in Gould v. Schawlow, the court

5   noted that the inventor had not identified particular activity with particular times during the critical

6   period.  Simply stating that there was no time during that period when he did not work on his

7   invention was not enough, without supporting facts, to establish diligence.  363 F.2d 908, 918

8   (C.C.P.A. 1966).  The testimony did "not set forth adequate facts to support a finding of that

9   continuity of activity which constitutes reasonable diligence." Id.   The inventor in Gould testified

10  that he took certain days off from his job in order to work on his invention (6.5 days in July, 2 days

11  in August, 3 days in September) but the court called on him establish more precisely "what was

12  done and when it was done;" that he took time off from his regular job did not lead to an inference

13  that he was working on his invention during that time off.  Id. at 919.  Nor did the testimony of his

14  wife and son supply the necessary details to adequately corroborate diligence:  "Their evidence,

15  which was not specific as to dates and facts, does not constitute the kind of corroboratory evidence

16  required to establish [the inventor's] diligence during the critical period." Id. at 920.  "We may

17  surmise that appellant was probably diligent but mere surmise cannot take the place of proof." Id. at

18  919 (citing Ireland v. Smith, 97 F.2d 95 (C.C.P.A. 1938)).

19       In D'Amico v. Koike, the Court of Customs and Patent Appeals again declined to draw

20  inferences as to how diligently an inventor worked on a patent application during a period with

21  relatively little record evidence.  347 F.2d 867 (C.C.P.A. 1965).  D'Amico has a similar fact pattern

22  to this case, with a 2-month period between an undisputed date of conception and constructive

23  reduction to practice via the filing of the patent application, as well as a sparse record on diligence.

24  Similar too is the speculation of what *would* have happened in the normal course of things (the

25  attorney in charge of the application *would* normally have prepared the finished application and

26  done a final check):

27       The gist of appellant's arguments seems to be that, notwithstanding failure of the record to
         show specific acts to have been done by named persons on known days, the record does
28       establish reasonable diligence for a period of two months by reason of its showing that work
         remained to be done on the application on September 23, and that somebody obviously did it

sometime during that period, otherwise the application would not have been filed. 347 F.2d at 870.  The court acknowledged that eight years had passed and it was understandable that the inventor did not remember specific acts on specific days, but noted that the appellant was attempting to use "rule of reason" principles "as substitutes for record evidence, of which there is very little." Id. at 871.

In D'Amico, the court considered the possibility that the bulk of the work could have been done early in the critical period, an inquiry relevant to this case as well:

> [I]n the present appeal we know essentially nothing about the handling of the application during the two-month period except that a) [the attorney] did in fact 'consider and approve' the application, and b) the other work, i.e., checking, placing in final form, and preparing the formal papers, was done some time.  There is no end to the inferences which might be drawn from the scanty record before us and we prefer not to indulge in them, but we cannot overlook the fact that Koike's priority date falls nearly midway in this two-month period and it is certainly possible that all of D'Amico's activity took place during the period prior to October 29, whereupon the application lay idle for nearly one month awaiting execution by the inventor.

Id.

At the summary judgment stage, the Court draws all inferences in favor of the non-moving party, but even so, the metadata and the declaration provide too scant a record to raise a triable issue of fact regarding diligence.  There is little evidence regarding specific acts at specific times; the testimony is vague and the corroboration incomplete; and the evidence that does exist could apply just as readily to time outside of the critical period and does not establish continuity.  Now to the second issue: the effect of Dr. Macevicz's busy schedule.

### ii.     Dr. Macevicz's Available Time

 Illumina argues that since Dr. Macevicz was so busy with other work (for Applied Biosystems and Lynx during the week and his contract patent prosecutions for Dr. Brenner during most of his evening and weekend time), the 35 hours the file was open and the 71 revisions show great diligence – basically, that he must have been using virtually every spare moment to work on the '663 patent application, because there were so few moments to spare.  Opp. at 8-9.

Illumina does not argue that Dr. Macevicz's schedule is an excuse for inactivity.  However, the cases that it cites to support its contention that inventors are allowed to have demanding day jobs

United States District Court
For the Northern District of California

1    and extra side jobs and busy lives and still be considered diligent on their own inventions are mostly

2    "excuse" and "hardship" cases that do not support Illumina's claim of diligence here.

3              In Courson v. O'Connor, another case with a two-month critical period, the court noted that

4    the inventor's regular job had slowed his work on the application and that the "circumstances

5    surrounding the inventor must be taken into account."  227 F. 890, 894 (7th Cir. 1915).  Those

6    circumstances included supervising nearly 3000 men at a railroad shop and being able to devote only

7    his spare time, rather than his employer's time, to his inventions.  Id.  Dr. Macevicz also had

8    pressing job duties.  However, the Courson court seems to have been convinced more by the

9    hardship required by travel to consult patent attorneys than by the inventor's schedule.  The Courson

10   inventor had hired patent attorneys fifteen miles away and had a hard time finding the time to meet

11   with them; travel of fifteen miles in 1908 - 09 was a significant hardship.  Id.   Further, his patent

12   attorneys were delayed and the draftsman he used to do the drawings was competent but

13   inexperienced, and the drawings took longer than expected.  These factors go beyond an inventor

14   having a lot on his plate.

15             There are a number of cases where courts have accepted excuses to the diligence

16   requirement, and a number that show "that courts may consider the reasonable everyday problems

17   and limitations encountered by an inventor."  Griffith v. Kanamaru, 816 F.2d 624, 626 (Fed. Cir.

18   1987).  Such everyday problems include:  a delay of three weeks following the illness of the

19   inventor's father (Reed v. Tornqvist, 436 F.2d 501 (C.C.P.A. 1971)); a delay in filing to produce an

20   appropriate receiver to test a component for a color television (Keizer v. Bradley, 270 F.2d 396

21   (C.C.P.A. 1959)); and confusion related to World War II (Texas Co. v. Globe Oil & Refining Co.,

22   112 F. Supp. 455 (N.D. Ill. 1953)).  Indeed, job demands can be an element of excusable delay.  See

23   Courson, 227 F. 890, 894 ("The exercise of reasonable diligence in preparing and filing his

24   application does not require an inventor to devote his entire time thereto, or to abandon his ordinary

25   means of livelihood.").   However, CGI argues persuasively that the implications of Dr. Macevicz's

26   busy professional life are quite different:  by prioritizing other work over the '663 patent application,

27   particularly his contract work for Dr. Brenner, Dr. Macevicz did not act diligently, but instead

28   voluntarily set aside his own work in favor of someone else's, outside of the bounds of his normal

18

1   professional obligations.  Reply at 7-8.  CGI cites <u>Griffith v. Kanamaru</u>, in which an inventor

2   acknowledged that he frequently put his work on the invention aside in order to work on other

3   experiments, at the request of his employer.  816 F.2d 624, 626-29 (Fed. Cir. 1987).  The court held

4   that the invention was "second and often third priority" for the inventor, and therefore he could

5   establish neither diligence nor a sufficient excuse for his lack of activity.  <u>Id.</u> at 629.

6        Other cases also hold that an inventor's other obligations do not provide sufficient excuse for

7   a lack of diligence.  In <u>Morway, Beerbower, & Zimmer v. Bondi</u>, the court notes that the inventors

8   and members of their research team "had many other projects and duties. . . . When the party first to

9   conceive voluntarily lays aside his inventive concept because he is engrossed in pursuit of other

10  projects, this is generally not an acceptable excuse for failure to act diligently in reducing to

11  practice."  97 U.S.P.Q. 318, 323 (C.C.P.A. 1953).  Dr. Macevicz was certainly engrossed in pursuit

12  of other projects, notably for his employer and for Lynx, but also for Dr. Brenner.  In <u>Feinberg v.</u>

13  <u>Cowen</u>, the inventor of a clamp for holding glass plates said that he was so busy earning a living as a

14  plate glass salesman and opening several music schools that he didn't have time to work on the

15  invention.  1907 WL 19764, at *1 (App. D.C. Feb. 5, 1907).  The court noted that the inventor had

16  borrowed the substantial sum of $3,000 to start a new business, the music schools, but that he

17  refused to pay a nominal amount to have samples of his invention fabricated.  The court concluded

18  that the inventor's lack of diligence "throws some light on his subsequent conduct, and leads to the

19  conclusion that until late in 1904 he did not regard his invention as of sufficient importance to

20  warrant the expenditure of either time or money."  <u>Id.</u>  Dr. Macevicz's professional activities were

21  not so varied as those of the plate glass salesman/music school manager in <u>Feinberg</u>, but his

22  prioritization of several other professional projects over his own invention is similar.  Dr.

23  Macevicz's own invention was at the bottom of his priority list, and as <u>Feinberg</u> makes clear, that

24  cannot support a finding of diligence.

25       Illumina argues that the "reasonable diligence" requirement does not extend to the entire

26  two-month period in the spring of 1995, but rather to Dr. Macevicz's "available time on nights and

27  weekends during those two months."  Opp. at 9.  Illumina cites no authority for this proposition, and

28  it seems inconceivable that such a statement of the rule could be accurate.  If an inventor could chip

1    away at the time during the critical period in which he had to establish diligence, eliminating those

2    times when he was at work or in class or at a baseball game, the exceptions would swallow the rule.

3    The inquiry already takes into account that inventors have jobs and families, and must eat and sleep,

4    but to take on "moonlighting" and prioritize that above one's own invention seems a bridge too far.

5    See Creative Compounds, LLC v. Starmark Labs, 651 F.3d 1303, 1312-13 (Fed. Cir. 2011) ("Merely

6    asserting diligence is not enough; a party must account for the entire period during which diligence

7    is required.") (internal quotations omitted).  It would be a strange diligence analysis that allowed as

8    an excuse for delay or lack of diligence the fact that the invention was the last professional priority

9    of the inventor.  To the extent that Dr. Macevicz simply had a demanding regular full-time job, that

10   would be a sufficient excuse to get past the summary judgment stage.  But his decision to take on the

11   work from Dr. Brenner and specifically prioritize it over his own patent work during the rare times

12   when he had time to devote to non-Applied Biosystems, non-Lynx projects belies his diligence

13   arguments.

14          Illumina cites Boston Scientific Corp. v. Cordis Corp. to support its argument that the Court

15   should not deal with the diligence issue at the summary judgment stage:  "In Boston Scientific . . .

16   this Court denied summary judgment in similar circumstances because the diligence issue is

17   'concerned with whether a party exercised reasonable diligence, and such reasonableness

18   determinations are [a] standard task for the trier of fact.'"  Opp. at 11 (quoting 422 F. Supp. 2d 1102,

19   1113-14 (N.D. Cal. 2006)).  In that case, plaintiffs sued defendants for infringement of patents on

20   methods and devices used for treating aneurysms.  The court had granted plaintiffs' motion for

21   summary judgment of literal infringement of the '415 patent, and later denied defendants' motion for

22   summary judgment of invalidity of that same patent.  Plaintiffs moved for summary judgment of

23   validity.  422 F. Supp. 2d at 1104.  The court addressed whether defendant was entitled to an

24   affirmative defense of invalidity based on priority of inventorship, requiring defendant to provide

25   clear and convincing evidence that:  a) defendant conceived the idea at issue, the date of that

26   conception, and that the date preceded plaintiffs' conception; b) that defendant reduced its invention

27   to practice and the date it did so; and c) that the period of time between conception and reduction to

28   practice was reasonable.  Defendant presented a series of memos, meeting agendas, letters, and a

privilege log showing work on the patent applications as early as April of 1995, before plaintiffs conceived of their device.  Id. at 1113.  The court found that defendant could, if believed by a trier of fact, prove by clear and convincing evidence the earlier conception date.  Id.

The court then addressed diligent reduction to practice.  Plaintiffs argued that the testimony of the researchers and the memoranda cited above were insufficiently specific to establish diligence, particularly because of an absence of lab notebooks (the lab notebooks were the property of University of California and could not be obtained).  Id.  Having found a material dispute as to the date of conception, the court declined to reach the issue of diligence, noting that "the diligence inquiry is concerned with whether a party exercised reasonable diligence, and such reasonableness determinations are standard task for the trier of fact."  Id. at 1113-14.

By contrast to Boston Scientific, where the threshold issue, the date of conception, was in dispute, here there is no such dispute.  And while diligence may at times turn on matters of disputed fact that should be decided by a jury, here the undisputed facts do not support the requisite diligence on the part of Dr. Macevicz under the correct legal standard.  The evidence does not show the continuity of activity needed for diligence, because the testimony is so vague and the metadata from the application file does not provide sufficient support.  The specificity of some of the information (number of hours the file was open; number of times the file was revised) does not correspond to the kind of specificity called for in a diligence inquiry (specific acts at specific times).  The caselaw does not support Dr. Macevicz's decision to prioritize work for another inventor (not his regular full-time employer) above his own during nights and weekends.

Because the court has found that Dr. Macevicz was not diligent in pursing his patent application, the '597 patent does not antedate Southern, and Southern is prior art.  Therefore, the Court must determine whether Southern anticipates or makes obvious the claims of the '597 patent.

**b.        Anticipation and Obviousness of the '597 Patent by Southern**

Because the Court has concluded that Dr. Macevicz did not act with reasonable diligence in pursuing his patent application, the Southern reference, published on February 8, 1995, is prior art.

United States District Court
For the Northern District of California

The parties do not dispute that Southern anticipates or makes obvious many of the claims of the '597 patent, including claim 1, the method claim, as well as claims 9, 10, and 17-19.  Opp. at 13-14; Reply at 10.   The Court will briefly discuss Southern's anticipation of claim 1 before proceeding to the analysis of claims 14 and 15, which depend from claim 1 and which are in dispute.  As discussed above, Claim 1 of the '597 patent is separated into a preamble and three separate steps:

    1.  A method for identifying a sequence of nucleotides in a polynucleotide, the method comprising the steps of:

        a) extending an initializing oligonucleotide along the polynucleotide by ligating an oligonucleotide probe thereto to form an extended duplex;

        b) identifying one or more nucleotides of the polynucleotide; and

        c) repeating steps a) and b) until the sequence of nucleotides is determined.

    Southern discloses a method for identifying a sequence of nucleotides in a polynucleotide, as required by the preamble to Claim 1 of the '597 patent.  Metzker Decl. ¶ 31.  It discloses ligating an oligonucleotide probe to an initializing oligonucleotide to form an extended duplex, as described in step (a).  Southern, 14:31-15:10.  It discloses removing the label of the ligated nucleotide probe and analyzing it to determine the sequence of bases in that probe, which anticipates step (b).  Southern, 15:11-13; Metzker Decl. ¶¶ 38-40.  Finally, Southern discloses a repeating step that encompasses successive ligation, one of the forms of repeating included by the Court in its claim construction order.  Southern, 19:20-24; Metzker Decl. ¶¶ 41-43.

    Illumina disputes CGI's claim that Southern anticipates or makes obvious claims 14 and 15, which relate to fluorescent labels.  Claim 14 states "The method of claim 1, wherein the oligonucleotide probe comprises a label which results in a spectrally resolvable fluorescent signal."  The Court construed "spectrally resolvable fluorescent signal" to mean "a light signal generated by fluorescence which can be detected based on its spectral characteristics (e.g., its color)."  Docket No. 122 at 53.  Claim 15 states:  "The method of claim 14, wherein the identity of one or more nucleotides of the polynucleotide is correlated to a distinct color of the spectrally resolvable

United States District Court
For the Northern District of California

1   fluorescent signal." Id.

2        Southern discusses fluorescence twice.  First, in discussing the advantages of mass

3   spectrometry as a detection system, Southern notes that "mass-labeling combines advantages of

4   radioactivity and fluorescence and has additional attributes which suggest novel applications."

5   Southern at 3:22-24.  Later, Southern discusses the drawbacks of existing array-based detection

6   methods, stating that "Of present detection methods, radioactivity has high sensitivity but poor

7   resolution, fluorescence has low sensitivity and high resolution; both are relatively slow.  The

8   proposal to use mass spectrometry could improve resolution, speed and sensitivity, as well as adding

9   the potential to read the sequences of tags."  Southern at 23:4-11.

10       CGI argues that while Southern teaches that mass labels are the preferred method of labeling,

11  it also discloses the use of a single tag and fluorescently labeled oligonucleotide probes.  Southern,

12  3:22-24, 23:5-11; Metzker Decl. ¶ 46.  The Southern abstract states: "The tag moiety consists of *one*

13  *or more reporter groups* distinguishable by mass and thus capable of being analysed by mass

14  spectrometry."  Southern, 2:33-35 (emphasis added).  Southern also states that "a tag moiety

15  comprising one or more reporter groups" can determine the "analyte residue" as part of a reagent.

16  Southern, 1:23-33.  CGI further argues in the alternative that Southern's disclosure of a single tag, in

17  combination with the Brenner reference's use of fluorescent labels with colors tied to particular

18  nucleotides, makes the use of fluorescence in claims 14 and 15 obvious.  Reply at 11.  It is

19  undisputed that Brenner discloses fluorescent labels; claim 14 of the '597 patent is identical to the

20  relevant portion of the Brenner patent.  See Metzker Decl. ¶ 82; Brenner 15:63-16:9.

21       Illumina counters that Southern's method requires "mass tags" and teaches away from using

22  fluorescence because Southern only disclosed its disadvantages.  It cites In re Gurley for the

23  proposition that when a prior-art reference "suggests that the line of development flowing from the

24  reference's disclosure is unlikely to be productive of the result sought by the applicant," that

25  reference teaches away from the invention.  27 F.3d 551, 553 (Fed. Cir. 1994).  In addition, "[a]n

26  inference of nonobviousness is especially strong where the prior art's teachings undermine the very

27  reason being proffered as to why a person of ordinary skill would have combined the known

28  elements."  DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 567 F.3d 1314, 1326 (Fed. Cir.

United States District Court
For the Northern District of California

2009).  Illumina also objects to CGI's contention that because fluorescent labels were extremely common and usually directly correlated to a particular nucleotide, they were obvious for purposes of an invalidity analysis.  Opp. at 15-16.  Further, Illumina points out that there is no evidence that Brenner's detection method, which focuses on enzyme cleavage, could be used in Southern's very different mass-tag method, or vice versa.  Opp. at 16-17, Backman Decl. ¶ 36.

As discussed above, a reference anticipates a patent claim under section 102(b) if it discloses and enables each and every element of the claimed invention, either explicitly or inherently.  In re Gleave, 560 F.3d 1331, 1334 (Fed. Cir. 2009), Schering Corp. v. Geneva Pharms., Inc., 339 F.3d 1373, 1377 (Fed. Cir. 2003) ("Moreover, a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference.").  Because the Court can resolve the issue of invalidity based on obviousness, the Court need not reach the issue of anticipation.

### i.      Obviousness of Claims 14 and 15 of the '597 Patent from Prior Art References Southern and Brenner

As discussed above, the standard for obviousness is whether the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art.  KSR Int'l Co. v. Teleflex, Inc., 550 U.S. 398, 405 (2007).  Obviousness under 35 U.S.C. § 103 is a question of law based on underlying facts, including the scope and content of the prior art, differences between the prior art and the claimed invention, the level of ordinary skill in the art, and any relevant secondary considerations.  See Kinetic Concepts, Inc. v. Smith & Nephew, 688 F.3d 1342, 1360 (Fed. Cir. 2012); Power-One v. Artesyn Techs., 599 F.3d 1343, 1351-52 (Fed. Cir. 2010).  When the underlying facts are not in dispute, summary judgment is appropriate.  See KSR, 550 U.S. at 427 ("Where, as here, the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate.").

1    The two prior art references at issue here are Southern and Brenner. The Court will address

2    the factors underlying the obviousness analysis below, in particular the scope and content of the

3    Southern reference and whether Southern "teaches away" from the fluorescence of the '597 patent,

4    as well as whether Brenner and Southern can be combined to make claims 14 and 15 of the '597

5    patent obvious. There is no dispute as to the scope and content of the Brenner reference as it

6    pertains to Claims 14 and 15: the relevant claim in Brenner is virtually identical to claim 15 of the

7    '597 patent. Opp. at 15-16. In addition, the parties acknowledged at oral argument that there was

8    no dispute as to the level of ordinary skill in the art.

9

10                          **A.        Teaching Away and the Scope and Content of Southern**

11

12    If a prior art reference "teaches away" from an invention, that invention is not made obvious

13    by the prior art. 2-5 Chisum on Patents § 5.03. "A reference may be said to teach away when a

14    person of ordinary skill, upon reading the reference, would be discouraged from following the path

15    set out in the reference, or would be led in a direction divergent from the path that was taken by the

16    applicant. . . . [I]n general, a reference will teach away if it suggests that the line of development

17    flowing from the reference's disclosure is unlikely to be productive of the result sought by the

18    applicant." In re Gurley, 27 F.3d 551, 553 (Fed. Cir. 1994). Prior art references often include

19    observations about particular techniques or inventions, whether positive, neutral, or negative. As

20    those observations get more negative, courts are more likely to find that the reference teaches away.

21    The standard for how discouraging and negative a reference must be about an invention for

22    the reference to teach away is quite high, as illustrated by DePuy Spine, Inc. v. Medtronic Sofamor

23    Danek, Inc., 567 F.3d 1314 (Fed. Cir. 2009). That case dealt with with polyaxial pedicle screws

24    used for spinal surgeries. Id. The defendant produced two references that it argued rendered the

25    claim obvious. The plaintiff countered that one of those references taught away from the rigid screw

26    embodied in the claim, because that reference, Puno, warned that rigidity increases the likelihood

27    that the screw would fail inside the body, making the device inoperative for its intended purpose.

28    567 F.3d at 1326-27. The appeals court concluded that:

> Puno *does not merely express a general preference* for pedicle screws having a 'shock absorber' effect.  Rather, Puno *expresses concern for failure* and states that the shock absorber feature 'decreas[es] the chance of failure of the screw or the bone-screw interface.'

Id. at 1327 (emphasis added) (internal citations omitted).  This warning of complete device failure prompted the court to affirm the district court's holding that Puno taught away from the rigid pedicle screw in the claim, such that a person of ordinary skill would have been deterred from combining Puno and the other reference.  Id. at 1328.  In another case, the Federal Circuit affirmed that claims were not obvious where a jury heard expert testimony that prior art taught away from the claimed structure by describing features of the structure as "potentially harmful."  Cordis Corp. v. Boston Scientific Corp., 561 F.3d 1319, 1332 (Fed. Cir. 2009).  Southern's teaching that mass tags are superior to fluorescent tags is a far cry from the warning of complete device failure in DePuy or potential harm in Cordis Corp.

By contrast, when a reference explores several alternatives, courts generally do not find that the reference teaches away from an invention that uses one of the alternatives.  For example, in Bayer Schering Pharma AG v. Barr Labs., Inc., the plaintiff argued that the prior art taught away from using a micronized form of contraceptive medication in a tablet, while the defendant argued that the prior art taught away from using an enteric coating for the tablet.  575 F.3d 1341, 1349 (Fed. Cir. 2009).  The Federal Circuit concluded that in presenting these offsetting "teach away" arguments, the parties presented the options available to a pharmaceutical formulator having ordinary skill to solve the problem:  "[A] person having ordinary skill in the art has reached a crossroads where he must choose between two known options."  Id. at 1350.  The court held that the invention would have been obvious.

The analysis becomes more nuanced when a reference makes a somewhat negative statement about an invention or technique, but falls short of warning against its use as completely ineffective or dangerous.   A reference that recognizes deficiencies in a technique, or even states that a technique is inferior but usable, does not necessarily teach away from that technique.  In re Gurley, 27 F.3d 551 (Fed. Cir. 1994).  In that case, the applicant claimed a bendable epoxy-based printed circuit material that maintained its shape, and the PTO rejected the claim as obvious in view of Yamaguchi.  The material claimed in Yamaguchi was similar, but Yamaguchi used a different resin

26

than the claimed epoxy resin.  Yamaguchi indicated that epoxy "had relatively acceptable

dimensional stability" and "some degree of flexibility," but that epoxy was inferior to his resin

boards.  Id. at 553.  After the PTO rejected the claim, the applicant argued that Yamaguchi taught

away from using the epoxy resin, and therefore could not be used to show this his claim was

obvious. The court rejected his argument:

> We share [applicant's] view that a person seeking to prove the art of flexible circuit boards,
> on learning from Yamaguchi that epoxy was inferior to polyester-imide resins, might well be
> led to search beyond epoxy for improved products.  However, Yamaguchi also teaches that
> epoxy is usable and has been used for [applicant's] purpose.  The Board recognized
> Yamaguchi's teaching of the deficiencies of epoxy-impregnated material, but observed that
> [applicant] did not distinguish his epoxy product from the product described by Yamaguchi. .
> . . *Even reading Yamaguchi's description as discouraging use of epoxy for this purpose,*
> *[applicant] asserted no discovery beyond what was known to the art.*"

Id. at 553 (emphasis added).

The situation here with fluorescent labels is somewhat similar.  Southern teaches that

fluorescent tags are inferior to mass tags, because fluorescence has low sensitivity and is relatively

slow, but also that fluorescent tags are usable and have been used for the applicant's purpose.

Southern specifically refers to fluorescence as a "present detection method."  Southern at 23:4.

Even if Southern discouraged the use of fluorescent tags for this purpose, claims 14 and 15 of the

'597 patent, which disclose fluorescent tags, do not appear to go "beyond what was known to the

art," in the words of the Gurley court.  It is undisputed that Brenner, which was filed in July of 1994,

before the '597 patent, disclosed fluorescent tags (using the same language that Dr. Macevicz used

in claims 14 and 15).  Mot. at 23.  It is clear that fluorescent tags were "known to the art" at the time

of the '597 patent.

Also informative is In re Inland Steel Co., where the Federal Circuit held that a reference that

taught a variation to achieve an optimal result did not teach away from the claimed invention.  265

F.3d 1354 (Fed. Cir. 2001).  The applicant's claims related to the production of cold-rolled electrical

steel.  The claim required the addition of antimony and the avoidance of annealing during a "hot

band" period of processing, in order to avoid a problem in prior art methods.  Two prior art

references showed aspects of the claims:  one primary reference showed all the claimed steps except

for the antimony, while a secondary reference, Irie, showed the addition of antimony to improve

electrical properties.  Id. at 1358.  The patent owner argued that the secondary reference taught the

1  use of antimony only in combination with hot-band annealing, which his patent specifically rejected.

2  The court affirmed the PTO's rejection of the claims as obvious.

> The fact that Irie teaches that annealing in addition to adding antimony produces optimal results does not negate Irie's additional teaching that adding antimony is effective even in non-annealed steel. <u>See</u> In re Boe, 355 F.2d 961, 965 (C.C.P.A. 1966) (all of the disclosures in a reference, including non-preferred embodiments, "must be evaluated for what they fairly teach one of ordinary skill in the art"); <u>Merck & Co. v. Biocraft Labs.</u>, 874 F.2d 804, 807 (Fed. Cir. 1989) ("The fact that a specific [embodiment] is taught to be preferred is not controlling, since all disclosures of the prior art, including unpreferred embodiments, must be considered") (quoting <u>In re Lamberti</u>, 545 F.2d 747, 750 (C.C.P.A. 1976)). *The absence of a further advantage that Irie associates with annealing is not a 'disadvantage,' as* [the applicant] suggests, and therefore Irie cannot be regarded as teaching away from the use of antimony in non-annealed steel. 265 F.3d 1354, 1361 (Fed. Cir. 2001).

9  <u>Id.</u> at 1361 (emphasis added).

10  In this case, Southern does not cite fluorescence and radiation as preferred embodiments.

11  Fluorescence and radiation are, however, disclosed in the patent.  As the <u>Inland Steel</u> court noted,

12  quoting <u>In re Lamberti</u>, *all* disclosures of the prior art must be considered in an obviousness

13  analysis.  265 F.3d at 1361.  Disclosed examples and preferred embodiments do not constitute a

14  teaching away from a broader disclosure or nonpreferred embodiments.  <u>In re Susi</u>, 440 F.2d 442

15  (C.C.P.A. 1971).  "A known or obvious composition does not become patentable simply because it

16  has been described as somewhat inferior to some other product for the same use."  <u>In re Gurley</u>, 27

17  F.3d 551, 554 (Fed. Cir. 1994).  Similarly, here, fluorescent tags have only been described as

18  "somewhat inferior" to another product, mass tags, for the same use, DNA sequencing.

19  As discussed above, Dr. Backman also emphasizes that mass tags add the ability to obtain

20  "sequence reads" from the tags – the ability to read multiple bases at once, not just a single base, as

21  is possible with fluorescent tags.  Backman Decl. ¶ 29.  It is undisputed that Southern says that mass

22  tags are better.  Southern discusses sequence reads in the context of the improvements that mass tags

23  make on currently used detection technologies, including fluorescence and radiation.  One of those

24  improvements is being able to read multiple bases at once.  But a statement that a new technique

25  would be an improvement on a currently existing technique does not teach away from the use of that

26  existing technique without a more profound criticism.  <u>See, e.g.</u>, <u>In re Fulton</u>, 391 F.3d 1195, 1201

27  (Fed. Cir. 2004) (A reference does not teach away if it merely expresses a general preference for an

28  alternative invention but does not "criticize, discredit, or otherwise discourage" investigation into

1   the invention claimed.)

2          Here, it is undisputed that the scope and content of Southern includes fluorescence.  Southern

3   refers to fluorescence as a "present detection method.  Southern at 23:4.  Dr. Backman's assertion

4   that Southern teaches away from fluorescence fails as a matter of law, because as discussed above, a

5   statement that one disclosed method is preferred to another is not sufficient to teach away.  In

6   addition, Southern's preference for mass tags over fluorescent tags does not rise even close to the

7   level of criticism held to constitute "teaching away" in DePuy and Cordis.  In the next section, the

8   Court will discuss whether Southern can be combined with the specific fluorescent tags disclosed in

9   Brenner to make claims 14 and 15 of the '597 patent obvious, or whether the combination would be

10  inoperable.

11

12                          **B.          Motivation to Combine the Southern and**

13                                         **Brenner References**

14

15          Although Southern addresses fluorescent tags as part of the current state of the art, that

16  general discussion is arguably not enough, at the summary judgment stage, to completely anticipate

17  claims 14 and 15 of the '597 patent.  The Court need not decide this issue, however, because it can

18  resolve invalidity based on obviousness.  CGI contends that Southern's disclosure of a single tag, in

19  combination with the Brenner reference's use of fluorescent labels with colors tied to particular

20  nucleotides, makes the use of fluorescence in claims 14 and 15 obvious.  Reply at 11.  It is

21  undisputed that Brenner discloses fluorescent labels; claim 14 of the '597 patent is identical to the

22  relevant portion of the Brenner patent, see Metzker Decl. ¶ 82; Brenner 15:63-16:9.  To combine

23  references for a finding of obviousness, a court considers whether the prior art references are in the

24  same field of endeavor, whether there is a motivation to combine the references, and whether any

25  secondary considerations of nonobviousness exist and are significant.  Wyers v. Master Lock Co.,

26  616 F.3d 1231 (Fed. Cir. 2010).  The Wyers court held that even in the absence of expert testimony

27  about motivation to combine references, courts can make a common-sense determination to combine

28  the prior art to find patent claims obvious.  Id. at 1239-40 ("[T]he legal determination of

**United States District Court**
For the Northern District of California

1   obviousness may include recourse to logic, judgment, and common sense, in lieu of expert

2   testimony."). This is in line with the Supreme Court's directive in <u>KSR Int'l Co. v. Teleflex, Inc.</u> to

3   take a more "expansive and flexible approach" in determining obviousness. 550 U.S. 398, 415

4   (2007). While motivation to combine is still a question of fact, it "may nonetheless be addressed on

5   summary judgment or JMOL in appropriate circumstances." <u>Wyers</u>, 616 F.3d at 1239.

6        Here, it cannot be disputed that Brenner and Southern are in the same field of endeavor,

7   DNA sequencing, and there are no significant secondary considerations of nonobviousness. The

8   main issue, therefore, is whether there is a motivation to combine the references. The parties focus

9   their arguments on whether a combination of Brenner and Southern would yield an inoperable

10  device, and therefore teach away from the invention of the '597 patent. <u>See</u> <u>In re Lucas S. Gordon</u>,

11  733 F.2d 900, 902 (Fed. Cir. 1984) (reversing the PTO's rejection of claims where the PTO found

12  that turning the prior art reference upside down would render the claim obvious; the prior art

13  reference disclosed a strainer that required gravity to separate dirt and water from gasoline and

14  therefore could not be operated upside down). Illumina argues that combining Southern with

15  Brenner's fluorescent tags would create an inoperable device, and therefore teaches away from the

16  invention. However, the ability to physically combine references is not the heart of the inquiry.

17  Indeed, courts have consistently held that the test for combining references is not whether the

18  features of one may be "bodily incorporated" into the other, but rather, whether the combined

19  teaching renders the claim at issue obvious. <u>Application of Wood</u>, 599 F.2d 1032, 1036-37

20  (C.C.P.A. 1979); <u>In re Billingsley</u>, 279 F.2d 689 (C.C.P.A. 1960) ("[I]t is not necessary in

21  combining references that it should be possible to substitute features of one physically in the

22  structure of the other. It is sufficient if, taken together, the references would suggest doing what the

23  applicant has done.")

24       Illumina cites <u>In re Sponnoble</u>, 405 F.2d 578, 587 (C.C.P.A. 1969), dealing with center seal

25  plugs. In that case, the prior art reference disclosed a frictionally induced rolling action that would

26  have been incapable of serving the applicant's purpose, which was to have the center seal slide

27  against the glass. As the court observed, unlike the frictional properties in the prior art, "a sliding

28  engagement is absolutely essential to operability of appellant's center seal plug." <u>Id.</u>  In addition,

**United States District Court**
For the Northern District of California

1  the material would have been nearly impossible to seat in the appellant's design.  Id.  The court

2  concluded that the invention was not obvious in light of the prior art, noting that the inoperability of

3  the suggested combination was bolstered by evidence of commercial success and the failure of other

4  inventions in the field to solve the longstanding problem addressed by the inventor.  Id.  However,

5  as the dissent correctly noted, it is "not necessary in a combination rejection that the structure of one

6  reference be substituted bodily in that of the reference with which it is combined," citing In re

7  Billingsley, 279 F.2d 689 (C.C.P.A. 1960).  Id. at 588.

8         Sponnoble stands for the proposition that if the prior art combines with the current invention

9  to make an inoperable device, the prior art teaches away, and can support non-obviousness,

10  especially if combined with other evidence such as successful commercialization of the invention

11  (absent here).  However, the obviousness inquiry does not depend on whether the inventions are

12  identical or every piece would work perfectly with every other piece.  The inquiry is whether, to a

13  person of ordinary skill in the art, it would be obvious to take a certain step.  For example, in In re

14  Keller, the court upheld a Board decision that it would have been obvious to include a digital timing

15  circuit in a cardiac pacemaker, despite the patentholder's argument that one of the prior art

16  references taught the use of digital timing circuits and other references used R-C-type timing

17  circuits.  642 F.2d 413, 425 (C.C.P.A. 1981).  The court stated:

18         To justify combining reference teachings in support of a rejection it is not necessary that a
        device shown in one reference can be physically inserted into the device shown in the other.
19         The test for obviousness is not whether the features of a secondary reference may be bodily
        incorporated into the structure of the primary reference; nor is it that the claimed invention
20         must be expressly suggested in any one or all of the references.  Rather, the test is what the
        combined teachings of the references would have suggested to those of ordinary skill in the
21         art.

    Id.

22         For example, in Application of Wood, the court upheld the rejection of an application for a

23  variable venturi apparatus for mixing and modulating fuel and air for an internal combustion engine.

24  599 F.2d 1032 (C.C.P.A. 1979).  The Board had affirmed the examiner's determination that the

25  invention was obvious, because teachings of subsonic variable venturi carburetors concerning

26  alternative mechanisms for varying flow area in the throat of the venturi could be combined with a

27  prior art reference that concerned pollution reduction.  Id. at 1036.  The applicant argued that the

28  two references could not be combined because it was impossible to physically combine them:  one

United States District Court
For the Northern District of California

1    involved subsonic speeds and the other involved sonic speeds.  Id.  The court held that this argument

2    was irrelevant, because the "test for obviousness is not whether the features of one reference may be

3    bodily incorporated into another reference.  Rather, we look to see whether combined Teachings

4    render the claimed subject matter obvious."  Id. at 1036-37.

5           Dr. Backman, Plaintiff's expert, argues that the combination of Southern with a fluorescent

6    label would render Southern inoperable because a fluorescent label is only capable of identifying

7    one base at a time, and Southern's method using mass tags can identify up to six bases at a time by

8    reading a single tag by mass spectroscopy.  Opp. at 16; Backman Decl. ¶¶ 29-36.   It is undisputed

9    that Southern discloses mass spectrometry, and taking all inferences in favor of Illumina as the non-

10   moving party, the Court will assume that the mass spectrometer used in Southern cannot be used to

11   read fluorescent tags.  However, that fact does not by itself render claims 14 and 15 of the '597

12   patent non-obvious.  Obviousness is a question of law with factual underpinnings, and Dr.

13   Backman's conclusion that Southern would be inoperable if used with fluorescent labels is premised

14   on an error of law – the assumption that it must be possible to physically combine and incorporate

15   all elements from multiple references.  As Billingsley, Wood, and Keller instruct, the features of one

16   invention need not be "bodily incorporated" into the other for the references to make a claim

17   obvious.  In determining whether Southern, or Southern in combination with Brenner, makes

18   obvious claims 14 and 15 of the '597 patent, the inquiry is not whether fluorescent tags can be run

19   through a mass spectrometer.  Rather, the questions is whether a person of ordinary skill in the art,

20   reviewing a method that discusses fluorescent tags as one aspect of the current state of the art of

21   DNA sequencing, or looking at that reference in combination with a reference that disclosed

22   fluorescent tags, would find claims disclosing fluorescent tags in DNA sequencing obvious.

23          Further, the '597 patent does not have to be operationally identical to Southern or Brenner in

24   terms of the apparatus used for the DNA sequencing for the prior art references to make a particular

25   claim of the '597 patent obvious.  In In re ICON Health & Fitness, the patent at issue concerned a

26   treadmill with a folding base.  The PTO found, and the court affirmed, that the claim would have

27   been obvious in light of a combination of two prior art references, one of which showed a folding

28   treadmill with all the claim limitations apart from a gas spring, and the other which showed a spring

mechanism for a folding bed.  496 F.3d 1374, 1382 (Fed. Cir. 2007).  The patent owner argued that the folding bed reference taught away from his claim because the spring would overpower the treadmill mechanism, rendering it inoperable, but the court held that a person skilled in the art would make appropriate modifications to the device.  Id.  That a folding bed can be prior art for a folding treadmill shows that a prior art reference can look very different or have a different focus from an invention and still make that invention obvious.

Dr. Backman also discusses Southern's ability to read multiple bases at a time, what he calls "sequence reads."  Backman Decl. ¶ 28.  In one of the passages in which it discusses fluorescence, Southern notes that its proposal to use mass spectrometry could improve on present detection methods, "as well as adding the potential to read the sequences of tags."  Id.  Dr. Backman states that because of these sequence reads, which are impossible to obtain using fluorescence, Southern teaches away from fluorescence.  Id. ¶¶ 29-31.  At the summary judgment stage, the Court assumes that Dr. Backman is correct that fluorescent tags cannot be used to read sequences of bases.  However, as discussed above, that does not mean that Southern teaches away from fluorescent tags or that it cannot make the '597 patent obvious.  While it is true that fluorescent labels cannot be used to determine more than one base at a time, Southern itself says that its method can be used on a single base at a time.  It is undisputed that Southern anticipates claim 1 of the '597 patent, including step (b) "identifying one or more nucleotides of the polynucleotide."  See Metzker Decl. ¶¶ 37-38.  The "one or more nucleotides" means single or multiple bases.

Dr. Backman focuses on the improvements that Southern made in the state of the art -- using mass spectrometry, being able to read multiple bases at once -- but those improvements do not mean that Southern cannot make obvious, either by itself or in combination with another reference, claims 14 and 15 of the '597 patent.  Although Dr. Backman may be correct in his observation that the fluorescent labels of the '597 patent would not physically work in the mass spectrometer contemplated by Southern, the obviousness inquiry does not, as a matter of law, founder there.

The Court holds that Southern, in combination with Brenner, makes claims 14 and 15 of the '597 patent obvious:  the differences between the subject sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time that the invention was

United States District Court
For the Northern District of California

1   made to a person having ordinary skill in the art.  35 U.S.C. § 103(a).   The motivation to combine

2   the two references is readily apparent, given Southern's discussion of fluorescence as the current

3   state of the art and Brenner's disclosure of fluorescent tags.  Hindsight bias, which can be a problem

4   in a motivation-to-combine analysis, is not an issue here.  See Kinetic Concepts, Inc. v. Smith &

5   Nephew, 688 F.3d 1342, 1370 (Fed. Cir. 2012) ( noting that once a problem and a solution appear

6   together in a patent disclosure, the combination can seem self-evident).  In resolving questions of

7   obviousness, courts presume full knowledge by the inventor of all prior art in the field of his

8   endeavor.  See Application of Wood, 599 F.2d 1032, 1036 (C.C.P.A. 1979).  Fluorescent tags were

9   part of the current state of the art in Dr. Macevicz's field of endeavor.  Brenner's single-base

10  fluorescent tag, together with Southern's general discussion of fluorescence, make the '597 patent's

11  use of fluorescent tags obvious.  The disputes raised by Illumina's expert about teaching away and

12  inoperability are issues of law, rather than disputes of fact; Southern itself discloses the use of

13  fluorescence, and its preference for another method does not rise to the level of "teaching away"

14  required by the Federal Circuit.  In addition, Dr. Backman's conclusory statements about

15  inoperability misapprehend the standard set forth in Billingsley and Wood.

16      Illumina does not contest that Southern anticipates the other claims CGI raised in its Motion

17  for Summary Judgment (claims 1, 9, 10, and 17-19).   Therefore Southern and Brenner together

18  invalidate claims 1, 9, 10, 14, 15, and 17-19.  Next, the Court will discuss the Whiteley reference

19  and whether it anticipates those same claims of the '597 patent.

20

21          **2.      Whiteley**

22

23      U.S. Patent No. 4,88,750 ("Whiteley") was filed on December 13, 1984 and issued on

24  November 28, 1989, before the earliest filing date of the '597 patent.  See Labarre Decl. Ex. 4.  It

25  allows for the detection of a single-base difference – a mutation – from the standard sequence of

26  nucleotides in a single gene.  In Whiteley, there are two probes (a diagnostic probe and a continuous

27  probe) that are each designed to hybridize to the target sequence so that their ends meet at the

28  particular nucleotide that is being tested.  The probes hybridize to a DNA sequence that is known,

34

United States District Court
For the Northern District of California

1   except at the nucleotide to be tested, where the probes meet.  After ligation, the presence or absence

2   of a label in the sample indicates which probes bound and whether the gene has a single-base

3   mutation.  See Opp. at 18-19.

4        CGI argues that Whiteley anticipates or makes obvious claims 1, 9, 10, 14, 15, and 17-19 of

5   the '597 patent.  Illumina counters that Whiteley did not disclose identifying more than a single base

6   on the target polynucleotide, and did not disclose repeating the cucle of hybridizing probes, ligating,

7   and identifying to determine a previously unknown sequence.  Opp. at 19.  In addition, Illumina

8   points to the Examiners' consideration of Whiteley during the reexamination process.  Id. at 17.

9   Before discussing the substantive dispute, the Court will address Illumina's argument that assignor

10  estoppel precludes CGI relying on a 2006 statement by Dr. Macevicz regarding the possible

11  anticipation of the '597 patent by Whiteley.

### a.    Assignor Estoppel and Dr. Macevicz's Opinion Regarding Whiteley

16       Dr. Macevicz invented the '597 patent on his own, during the period when he worked at

17  Applied Biosystems in the mid-1990s.  Dr. Macevicz assigned the '597 patent to Lynx, a spin-off

18  corporation of Applied Biosystems.  Lynx then merged with Solexa, which along with Illumina is a

19  plaintiff in the current action.  Docket No. 122 at 2.

20       Later, in 2006, CGI engaged Dr. Macevicz to provide it with legal advice.  Mot. at 16.

21  During the course of that engagement, he provided CGI with a "clearance opinion" on numerous

22  patents, including the '597 patent.  Mot. at 16 & Ex. 7.  A patent attorney's clearance opinion

23  evaluates whether a particular process or product might infringe any claims of issued patents or

24  pending patent applications.  Dr. Macevicz's clearance opinion regarding the '597 patent consists of

25  a quotation of the claims of the patent and then a comment regarding the patent's potential invalidity

26  if claim 1 were construed not to require repetition of cycles:

27       Claim 1 describes a process in which an initializing oligonucleotide is successively extended
         along a template in cycles of ligation and identification.  Step (c) indicates that such cycles
28       must be carried out more than one time.  In [sic] this were not the case, then the claim would
         appear to 'read' on Whiteley's (4,883,750) disclosure and therefore be invalid.

35

1

2   Ex. 7 at 34-35.   The Court's claim construction does not limit step (c) of claim 1 to successive

3   ligation (carrying out the cycles more than one time).  Docket No. 122, at 26-27.  CGI argues,

4   therefore, that Dr. Macevicz has admitted that Claim 1 of the '597 patent is invalid over Whiteley.

5   Mot. at 17.

6          Illumina argues that under the doctrine of assignor estoppel, the Court may not consider Dr.

7   Macevicz's opinion.  Under assignor estoppel, "an assignor and parties in privity with the assignor

8   are estopped or barred from asserting invalidity defenses."  Pandrol USA, LP v. Airboss Ry. Prods.,

9   Inc., 424 F.3d 1161, 1167 (Fed. Cir. 2005).  In Pandrol, the accused infringer submitted the

10   inventor's testimony to support its invalidity claims.  The Federal Circuit affirmed the district

11   court's exclusion of the inventor's statements on the grounds that an assignor should not be

12   permitted to receive value for a patent and then later assert that the patent is worthless, to the

13   detriment of the assignee.  424 F.3d at 1167.  See also Diamond Scientific Co. v. Ambico, Inc., 848

14   F.2d 1220, 1224.  CGI argues that assignor estoppel only prevents the inventor, and those in privity

15   with the inventor, from challenging the validity of a patent.  QG Prods. v. Shorty, Inc., 992 F.2d

16   1211, 1212-14 (Fed. Cir. 1993).  While Illumina relies on Pandrol, there, the inventor was an

17   employee of the accused infringer at the time of the lawsuit, whereas Dr. Macevicz is not an

18   employee of CGI.              CGI is correct that assignor estoppel does not bar it from

19   challenging the validity of the '597 patent.[3]  However, CGI's argument about the privity requirement

20   does not touch on Dr. Macevicz himself; assignor estoppel bars the inventor from asserting

21   invalidity once he has assigned the patent, whatever his relationship with any other organization.

22   An employer or other corporation would be barred only if it were in privity with the inventor.  See

23   QG Prods., 992 F.2d at 1212.  Dr. Macevicz received valuable consideration for his patent when he

24   assigned it to Lynx, so he is barred from asserting its invalidity.

25          More fundamentally, however, Dr. Macevicz did not actually assert the '597 patent's

26

27        [3]     Although Illumina includes a footnote purporting to reserve the right to assert that CGI
28   should be banned from asserting invalidity claims because of Dr. Macevicz's past relationship with CGI,
this argument is not affirmatively made in the motion, and the Court need not address it.  Opp. at 19
n.86.

United States District Court
For the Northern District of California

1    invalidity when he provided the clearance opinion to CGI.  Rather, Dr. Macevicz was giving his

2    interpretation of step (c) of claim 1 as having to be carried out more than one time; only if step (c)

3    were construed not to require repetition would "the claim. . . appear to 'read' on Whiteley's . . .

4    disclosure and therefore be invalid."  Mot. Ex. 7 at 35.  His statement is conditional:  *if* the step (c)

5    cycles of ligation and identification are not repeated, contrary to his own interpretation, *then* the

6    claim would likely read on Whiteley.  Such a conditional statement cannot be an assertion of

7    invalidity under the doctrine of assignor estoppel; for an individual's observation to have such

8    profound legal effect based on equity, the statement cannot be equivocal.  Indeed, the assignor

9    estoppel cases highlight the affirmative nature of an assertion of invalidity on the part of the patent's

10   assignor.  In Diamond Scientific, the inventor who had assigned the patent to the plaintiff had gone

11   to work for the defendant and started selling a very similar product.  848 F.2d at 1222.  When

12   infringement was claimed, the defendant raised invalidity as a defense.  The court noted:  "Assignor

13   estoppel is an equitable doctrine that prevents one who has assigned the rights to a patent (or patent

14   application) from later contending that what was assigned is a nullity."  Id. at 1224.  Here, Dr.

15   Macevicz was not asserting that what he assigned to Lynx was a nullity; rather, he was pointing out

16   a condition precedent to its validity.  Indeed, Dr. Macevicz specifically did not say that the '597

17   patent was invalid; rather, he pointed out a potential interpretation, contrary to his own, that could

18   call the patent's validity into question.  Only later did the courts disagree with his interpretation of

19   step (c), opening the door to invalidity based on a broader construction.  Significantly, Dr. Macevicz

20   was not engaging in the inequitable conduct that the equitable doctrine of assignor estoppel seeks to

21   prevent, which is to get value unfairly from the assignment of a patent and then turn around and

22   diminish that value to the assignee.  His confidential, proprietary opinion provided to another

23   company regarding its own projects was never meant to be public or to be shared with the assignee.

24   There is no evidence to suggest that his work for CGI involved any strategy to invalidate the

25   assignment he had earlier made to Lynx/Solexa.

26          Accordingly, assignor estoppel does not apply.

27

28                  **b.      Claim 1**

It is undisputed that Whiteley discloses a sequencing method that includes steps (a) and (b) of claim 1 of the '597 patent, extending an initializing oligonucleotide by ligation and identifying bases. Illumina contests whether Whiteley discloses "repeating" in the manner that the Court construed the term, but not that Whiteley discloses steps (a) and (b). According to CGI, Whiteley performs in one step what the '597 patent does in multiple steps:

> In one aspect, the invention relates to a method for determining the presence or absence of a target sequence in a sample of denatured nucleic acid which entails hybridizing the sample with a probe complementary to a diagnostic portion of the target sequence (the diagnostic probe), and with a probe complementary to a nucleotide sequence contiguous with the diagnostic portion (the contiguous probe), under conditions wherein the diagnostic probe remains bound substantially only to the sample nucleic acid containing the target sequence. The diagnostic probe and contiguous probe are then covalently attached to yield a target probe which is complementary to the target sequence, and the probes which are not attached are removed.

Whiteley, 3:41-54.

The purpose of Whiteley differs from that of the '597 patent. Whiteley specifically looks for the presence or absence of one particular base, a mutation. The '597 patent seeks to determine the sequence of a longer series of bases (a larger segment of the DNA sequence). There are two disputes as to Whiteley. The first, regarding claim 1 of the '597 patent, is whether Whiteley discloses "repeating," as the Court construed it in the claim construction order. The second, regarding claim 10 of the '597 patent, is whether Whiteley discloses a target polynucleotide that comprises an unknown sequence.

### i. Repeating and Identifying a Sequence of Nucleotides (Claim 1)

CGI argues that Whiteley discloses multiple forms of repeating embodied in the Court's construction. First, CGI contends, Whiteley teaches "conditional repeating"/"no repeating," where no repeating is necessary if the sequence of the polynucleotide has been fully determined in the first cycle. See Docket No. 122, at 27. Aimed at detecting genetic mutations, Whiteley contemplates determining the polynucleotide sequence in the first cycle. It states "use of only one diagnostic probe, preferably specific to the mutated sequence of interest is also possible." Whiteley 4:25-26. If the probe that targets a mutation has been successfully ligated during the first cycle, then the

United States District Court

For the Northern District of California

1    sequence has been fully determined and it is not necessary to repeat the cycle.  Metzker Decl. ¶ 61.

2

3                          **A.      Conditional Repeating**

4

5           Whiteley teaches that there can be no repetition if the probe has been successfully ligated

6    during the first cycle.  As Illumina points out, the PTO's Examiners did not consider Whiteley to

7    suggest repetition: "Landegren and Whiteley each disclose hybridization-ligation methods for

8    obtaining information regarding the sequence of a target nucleic acid. . . . [E]ach method meets the

9    limitations of steps (a) and (b) of the claim . . . . Neither Landegren nor Whiteley suggest repeating

10   their method to obtain additional information."  Opp. at 21; Labbe Decl. Ex. 19 at 6.  The question

11   of repetition, therefore, comes down to the Court's claim construction.  Step (c) of claim 1 is

12   "repeating steps (a) and (b) until the sequence of nucleotides is determined."  Docket No. 122 at 11.

13   In the Applera litigation, Judge Alsup determined that the repeating step "is conditional, meaning

14   that there is no need for repetition *if* the sequence of the polynucleotide has been fully determined in

15   the first cycle."  Id. at 12 (emphasis in original).  The Federal Circuit affirmed Judge Alsup's

16   construction.  Id. at 13, 25 ("To meet the limitations of claim 1, one must repeat steps (a) and (b)

17   until the sequence of nucleotides is determined.  There is no need for repetition once the sequence of

18   the polynucleotide has been fully determined.").

19          During claim construction in this case, Illumina argued that because it had relied on an

20   unequivocal statement that repeating was required during reexamination before the PTO in order to

21   overcome rejections based on Martinelli, it would be improper to construe the repeating step as

22   conditional.  Id. at 13, 25.  Illumina made the same argument at the hearing on this motion, saying

23   that it was illogical to use the very thing that it disavowed during reexamination to invalidate the

24   claims at issue.  This Court held in its claim construction order that Illumina did not effectively

25   disavow successive ligation during the reexamination process:  the disclaimer was not related to the

26   conditional aspect of step (c), and did not unconditionally require repetition of steps (a) and (b) even

27   if the sequence of the polynucleotide has been fully determined in the first cycle.  Id. at 25.  Rather,

28   the disclaimer distinguished Martinelli as carrying out its method on different (non-overlapping and

1  noncontiguous) portions of the polynucleotide.  Therefore, this Court held, there was no reason to

2  revisit the previous constructions of the term as conditional.  Id. at 26.  This construction is broad,

3  but it is the construction initially decided upon by Judge Alsup, specifically affirmed by the Federal

4  Circuit, and recognized by this Court in its claim construction order.  Illumina's objections here are

5  based not on factual disputes as to what Whiteley discloses, but rather on questions of law related to

6  claim construction, questions that have already been resolved to the contrary.  In light of the

7  construction of "repeating," Whiteley anticipates claim 1 of the '597 patent.

8

9                    **B.        Same-Sequence Initializing Oligonucleotide Repeating**

10

11         In addition to its "conditional repeating" argument, CGI contends that Whiteley also teaches

12  "same-sequence initializing oligonucleotide repetition," as it appears in the Court's construction.

13  Dr. Metzker, CGI's expert, states that Whiteley's two different probes would be used with the same

14  initializing oligonucleotide and could be performed in sequential reactions, satisfying one of the

15  forms of repeating from the Court's construction, "by extending new initializing oligonucleotides

16  with the same sequence as the initializing oligonucleotide used in the first cycle along the identical

17  polynucleotide sequence as was acted upon in the first cycle of the recited method."  See Metzker

18  Decl. ¶ 59; Docket No. 122 at 26-27.  In its opening brief, CGI claims that because the probes are

19  used with the same initializing nucleotide and are carried out independently of one another, that

20  means they can repeat.  Illumina contends that because this discloses repeating on the same base that

21  was identified in the first cycle, the method does not "identify a sequence of nucleotides in a

22  polynucleotide;" rather, it re-identifies the same base.  Opp. at 22.

23         In Whiteley's method, a set of diagnostic probes interrogates a target.  Only one of those

24  probes has a nucelotide that is complementary to the unknown nucleotide being targeted, and only

25  that probe can successfully ligate.  The probe in the other reaction does not have a nucleotide that is

26  complementary to the unknown nucleotide in the target, so it does not ligate.  Therefore, there is

27  only a single ligation. For example:  there are two probes; Probe 1 has a T, and Probe 2 has a G.  T

28  is complementary to A, and G is complementary to C.  The unknown base turns out to be a C.  Probe

1 does not ligate, because T is not complementary to C.  Probe 2 does ligate, because G is

complementary to C.   Thus, there are two probes, but only one ligation step.  The key component of

the repetition in the claim construction is not the number of probes for the same sequence but the

number of ligations.  There is only one ligation in Whiteley.  However, under the claim construction,

only one is needed, because the ligation step need not be repeated if the sequence of nucleotides is

determined on the first cycle.  As discussed above, Whiteley anticipates claim 1 of the '597 patent.

### C.    Identifying a Sequence of Nucleotides and Known/Unknown Sequence

Illumina argues that Whiteley does not disclose "identifying a sequence of nucleotides in a

polynucleotide" because only one of the bases is unknown.  Opp. at 21.  It is true that most of the

sequence is known, so the only "unknown" is the presence or absence of the particular base.  CGI

responds that just because a sequence is expected to be found, it may still be identified through the

process described in the patent.  For example, if the probes bind at adjacent positions on the target,

that identifies the target sequence, even if that sequence is "identified" as contemplated.  Reply at

12.  If the probes do not bind as expected, that too may identify the sequence.  Reading it literally,

Whiteley discloses "identifying a sequence of nucleotides," even when there is only one unknown

base.

### ii.    Unknown Sequence (Claim 10)

Claim 10 of the '597 patent requires that the target polynucleotide be unknown.  Illumina

argues that in Whiteley, all of the nucleotides in the target are known, except for one, which is being

tested for a potential mutation.  Opp. at 23.  Illumina maintains that because Whiteley seeks to

identify a single base, and the '597 patent seeks to identify a series of nucleotides in unknown DNA,

that Whiteley cannot anticipate claim 10 or render it obvious.  Id.  CGI argues that Whiteley

comprises a diagnostic probe, complementary to an unknown sequence, and a contiguous probe,

United States District Court
For the Northern District of California

complementary to a known sequence. Before the experiment, the identify of the target is unknown; after the experiment is run, if ligation occurs, then the full sequence is known. Reply at 12. There would be no reason to run the experiment without an unknown sequence.

Illumina is correct that only one nucleotide is unknown, and that most of the target sequence is known. However, under a literal reading of the claim, one unknown base does make the target sequence unknown. Even if the experiment is run to confirm an anticipated result, before the experiment, the sequence is unknown. Whiteley therefore anticipates Claim 10 of the '597 patent.

### 3. Brenner

U.S. Patent No. 5,522,278 ("Brenner") was filed on July 25, 1994 and issued on September 3, 1996. It is directed toward DNA sequencing by ligation, and is available as prior art under 35 U.S.C. § 102(e) because it was filed before the earliest filing date of the '597 patent. Dr. Macevicz filed and prosecuted the patent. CGI argues that Brenner makes obvious claims 1, 9, 10, and 14-19 of the '597 patent. Illumina contests claims 1, 9, and 10, but not claims 14-19. The Court need not address Brenner in detail beyond the discussion above regarding Brenner's combination with Southern to make obvious claims 14 and 15. The Court notes that it is undisputed that claim 16 of the '597 patent is anticipated by Brenner, and not by any of the other prior art references cited by CGI. Opp. at 28-30; Mot. at 25.

### 4. Martinelli

Because the Court has already addressed all of the contested claims at issue it need not address the Martinelli reference.

### III. Conclusion

United States District Court
For the Northern District of California

1    The Court hereby grants summary judgment of invalidity as to claims 1,9, 10, 14, 15, and 16-

2    19 of the '597 patent.

3

4    IT IS SO ORDERED.

5

6    Dated: March 26, 2013

ELIZABETH D. LAPORTE
United States Chief Magistrate Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28